## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VICTIM RIGHTS LAW CENTER; T.R., by and through his parent, TARA BLUNT; TARA BLUNT; A.J., by and through his parent, KAREN JOSEFOSKY; and KAREN JOSEFOSKY, | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. _____ |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; and CRAIG TRAINOR, in his official capacity as Acting Assistant Secretary for Civil Rights, | ) ) ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Defendants*. | ) ) ) | |

## INTRODUCTION

1.     This case concerns an issue that should be uncontroversial: whether the administrative system that Congress established to protect children who are victims of discrimination should provide a meaningful path to relief. Defendants recently gutted that system almost overnight, leaving a hollowed-out organization incapable of performing its statutorily mandated functions. Without judicial intervention, the system will exist in name only for children who have suffered most types of discrimination.

2.     Congress created the United States Department of Education's Office for Civil Rights ("OCR") to enforce landmark federal civil rights laws that ban discrimination based on race, sex, and disability in schools that receive federal funds: Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of

1973, and Title II of the Americans with Disabilities Act. Federal regulations require OCR to promptly investigate complaints that indicate a "possible failure to comply" with those laws.

3.    For over forty years, American students who face discrimination or harassment at school have looked to OCR to protect their civil rights. Some face exclusion from school activities because of their race or sex. Some endure sexual harassment, including assault, or race-based violence while their schools fail to act. Still others struggle to learn on an equal basis with their peers because their schools will not provide basic accommodations for their disabilities. These students seek OCR's help because their local school systems have engaged in discrimination or allowed it to continue. As a result, many of them have nowhere else to turn.

4.    Defendants' actions have closed that path to relief to thousands of students. Shortly after the new administration took office on January 20, 2025, the Department of Education (the "Department") froze all investigations into complaints of race and sex discrimination filed by members of the public. Although Education Secretary Linda McMahon purported to lift that pause on March 6, 2025, Defendants have largely continued it in practice. Secretary McMahon has announced that the Department's "Final Mission" is to dismantle itself entirely. On March 11, 2025, as part of that ongoing effort, the Department's Reduction in Force ("RIF") cut OCR's staff in half and shuttered seven of its twelve regional offices. These actions have made it impossible for OCR to comply with its statutory and regulatory obligations.

5.    In doing so, Defendants have abdicated their responsibilities to entire classes of students. The RIF means that OCR has the capacity to address only a small fraction of the complaints it receives. While Defendants have selectively launched a series of high-profile investigations into select issues, including investigations into diversity, equity, and inclusion programs that Defendants allege discriminate against white and Asian students, Defendants'

actions have effectively frozen almost all other investigations. Due to the RIF, complaints that allege race discrimination against students of color, most sex discrimination against women and girls, and disability discrimination will continue to stagnate absent judicial action.

6.      Defendants' actions violate the Administrative Procedure Act ("APA") and statutory mandates under the civil rights laws, leaving students across the country to face discrimination and hostile learning environments without viable recourse. Plaintiffs seek declaratory and injunctive relief to set aside Defendants' illegal actions.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law. Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district, Plaintiff Victim Rights Law Center resides in this District, and Defendants are United States agencies or officers acting in their official capacities.

## PARTIES

9.      Plaintiff Victim Rights Law Center ("VRLC") is a nonprofit organization dedicated to serving the legal needs of victims of sex-based harassment, including survivors of sexual assault, dating violence, and stalking in school. VRLC's mission is to ensure that victims have adequate legal representation needed to help rebuild their lives and to promote a national movement committed to seeking justice for every victim. As part of that mission, VRLC's attorneys represent

student survivors of sexual harassment, including sexual assault, in OCR investigations. It also counsels advocates nationwide about the legal options available for such students. Defendants' actions have frustrated VRLC's core activities and forced it to divert resources to counseling clients and attorneys about the implications of the RIF and office closures for the OCR process and about alternative, often inadequate remedies under state and federal law.

10.    Plaintiff T.R. is a twelve-year-old Black child. Plaintiff Tara Blunt is T.R.'s mother. From 2022 to 2023, as an elementary school student in a Falls City, Nebraska public school, T.R. experienced persistent harassment based on his race from a group of other students. He and his mother reported the racial harassment to school officials, who failed to adequately respond and instead retaliated against T.R. for reporting. From there, the harassment only worsened, forcing Ms. Blunt to withdraw T.R. from public school. In December 2023, OCR opened an investigation into the school's response to the harassment and the alleged retaliation under Title VI. But, on information and belief, OCR stopped processing Ms. Blunt's complaint during the pause, and the RIF will make it impossible for OCR to timely resolve the investigation so that T.R. can return to public school.

11.    Plaintiff A.J. is a ten-year-old child with life-threatening allergies. Plaintiff Karen Josefosky is A.J.'s mother. A.J.'s allergies are so severe that they interfere with major life activities and thereby constitute a legal disability. From 2023 through 2024, A.J. attended third grade at a public school in Birmingham, Michigan. He was repeatedly and severely harassed for his allergies throughout the school year, and his school did nothing to address the discrimination. After a particularly traumatic event in which other students surrounded A.J. with allergens, taunted him, and pushed him to the ground, Ms. Josefosky withdrew A.J. from public school. Following the filing of a complaint, OCR opened an investigation into the school's failure to respond to the

disability-based harassment A.J. suffered. Facing an investigation, the school agreed to an OCR-facilitated mediation. But OCR stopped processing Ms. Josefosky's complaint during the pause, the OCR mediation did not go forward, and OCR has been unresponsive since the RIF. Upon information and belief, OCR has stopped investigating Ms. Josefosky's complaint, and the RIF has made it impossible for OCR to fulfill its responsibility to promptly resolve the investigation in a manner that addresses the discrimination.

12.    Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government. Congress created the Department and defined its responsibilities by statute. *See* 20 U.S.C. § 3411.

13.    Defendant Linda McMahon is the former CEO of World Wrestling Entertainment and is now the United States Secretary of Education and the Department's highest ranking official. She is charged with the supervision and management of all decisions and actions of the agency. 20 U.S.C. § 3412. She is sued in her official capacity.

14.    Defendant Craig Trainor is the Acting Assistant Secretary for Civil Rights. He is the head of the OCR, an office Congress created within the Department. *See* 20 U.S.C. § 3413. He is sued in his official capacity.

## LEGAL BACKGROUND

### I.    Federal law requires OCR to promptly investigate and resolve civil rights violations by educational institutions that receive federal funds.

15.    Congress established the U.S. Department of Education in 1979. *See* Department of Education Organization Act, Pub. L. No. 96–88, 93 Stat. 669 (1979) (codified as amended at 20 U.S.C. §§ 3401–510). It did so in part to meet the "continuing need to ensure equal access for all Americans to educational opportunities of a high quality" and to ensure that "such educational opportunities should not be denied because of race, creed, color, national origin, or sex." *Id.* § 101.

16.     To ensure "access by every individual to equal educational opportunities," Congress created the Department's Office for Civil Rights, administered by the Assistant Secretary for Civil Rights, to "assume responsibility for effectively carrying out the nation's civil rights laws in education." S. Rep. No. 96-49, at 35 (Mar. 27, 1979); *see* 20 U.S.C. § 3413(a) ("There shall be in the Department an Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights appointed under section 3412(b) of this title.").

17.     Congress charged OCR with enforcing federal statutes that prohibit race, sex, and disability-based discrimination under education programs and activities that receive federal financial assistance. These include: Title VI of the Civil Rights Act of 1964, which bans race discrimination, including race-based harassment, 42 U.S.C. §§ 2000d *et seq.*; Title IX of the Education Amendments of 1972, which bans sex discrimination, including sexual harassment, 20 U.S.C. §§ 1681 *et seq.*; and Section 504 of the Rehabilitation Act of 1973, which bans disability discrimination, 29 U.S.C. § 794. OCR also has the responsibility to enforce Title II of the Americans with Disabilities Act ("Title II"), which bans disability discrimination by public entities, 42 U.S.C. §§ 12131, *et seq.*, with respect to public schools. 28 C.F.R. § 35.190(b)(2).

18.     Title VI and Title IX each expressly direct the Department to enforce their anti-discrimination mandates. *See* 42 U.S.C. § 2000d-1 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity by way of grant, loan, or contract . . . is . . . directed to effectuate the provisions of [Title VI] with respect to such program or activity . . . ."); 20 U.S.C. § 1682 ("Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract . . . is . . . directed to effectuate the provisions of [Title IX] with respect to such program or activity . . . .").

6

19.     Federal regulations require OCR to investigate and resolve potential violations of Title VI, Section 504, Title IX, and Title II. *See* 34 C.F.R. Parts 100, 104, & 106; 28 C.F.R. Part 35. "[T]he regulations implementing Title VI . . . . require OCR to investigate complaints that are filed with the agency . . . ." Off. for Civ. Rts., U.S. Dep't of Educ., *OCR Case Processing Manual* 21 (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf ("Case Processing Manual"). Specifically, they require "[t]he responsible Department official or his designee" to "make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply" with the regulations implementing Title VI, which prohibit discrimination based on race, color, or national origin in programs or activities that receive federal funds. 34 C.F.R. § 100.7(c). In addition, "the regulations require OCR to initiate 'periodic compliance reviews' to assess the practices of recipients to determine whether they comply with the Title VI regulations." Case Processing Manual 21; *see* 34 C.F.R. § 100.7(a). These requirements are incorporated by reference in the regulations implementing Title IX and Section 504. *See* 34 C.F.R. § 104.61; 34 C.F.R. § 106.81; *see also* Case Processing Manual at 21. The regulations implementing Title II also require OCR to investigate Title II complaints for which it is responsible. *See* 28 C.F.R. § 35.171; *see also* Case Processing Manual 7 n.3.

20.     OCR's Case Processing Manual provides procedures OCR must follow "to promptly and effectively investigate and resolve complaints, compliance reviews and directed investigations to ensure compliance with the civil rights laws and regulations enforced by OCR." Case Processing Manual 2. It requires OCR to ensure that "the actions it[] takes in investigations are legally sufficient, supported by evidence, and dispositive of the allegations." *Id.* at 15.

21.     When OCR resolves a case through a voluntary resolution agreement, it must ensure the agreement is tied to both the allegations and the evidence obtained during the

investigation and that the resolution comports with applicable regulations. After OCR enters a resolution agreement, it must monitor the recipient to ensure it complies with the agreement. *See id.* at 22.

22.     Once OCR concludes its investigation, it must issue a letter of finding as to whether the evidence establishes a violation. In case of a violation, OCR must attempt to negotiate a resolution agreement that "must include actions [or] steps that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur." *Id.* at 17. The manual sets strict deadlines for the completion of negotiations after OCR shares a proposed resolution agreement or issues a finding of noncompliance. *See id.* at 16, 18-19.

23.     When OCR finds a violation but is unable to negotiate a resolution agreement within the specified timeframe, OCR must initiate enforcement action. Specifically, it must either: (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from the Department to the recipient; or (2) refer the case to the Department of Justice for judicial proceedings. Case Processing Manual at 23.

24.     Beyond investigations and enforcement actions, OCR must provide technical assistance to help institutions comply with the civil rights laws to help avoid violations in the first place. Federal regulations require OCR to "provide assistance and guidance to recipients to help them comply voluntarily" with their regulatory obligations. 34 C.F.R. §§ 100.6(a); *see also id.* § 100.12(b) (requiring OCR to "issue and promptly make available to interested persons forms and detailed instructions and procedures for effectuating this part"). For example, OCR provides guidance documents, FAQs, pre-recorded webinars and webcasts, resources for drafting policies

that comply with civil rights statutes, and many other resources.[1] In the past, students, families, schools, and advocates like VRLC could contact OCR's attorneys for support, such as interpretative guidance regarding the application of civil rights laws and regulations to particular situations. This helped students advocate for themselves, helped VRLC advocate for its clients, and helped schools achieve compliance without the need for formal legal action.

## II.    OCR plays a vital role in the enforcement of civil rights laws in school.

25.    As these statutory and regulatory mandates reflect, vigorous enforcement by OCR is vital to implementing the landmark legislation Congress charged OCR to enforce. A functional OCR is an essential bulwark against unlawful discrimination in the American education system.

26.    In some circumstances, students may file lawsuits against educational institutions that violate their rights under Title VI and Title IX. But a lawsuit is not a viable option for many students who face discrimination and must contend with its effects.

27.    First, to file a lawsuit, most students must hire a lawyer. The demands of modern litigation, including pleading requirements, discovery, and trial, require an attorney to navigate effectively. But many students cannot afford to pay an attorney to conduct litigation on an hourly basis. And because, in light of a 2022 Supreme Court decision, students can no longer obtain damages for emotional distress under Title VI, Title IX, or Section 504, it is often difficult—and sometimes impossible—for students to find an attorney willing to take their case on a contingency basis. Even when students are lucky enough to find an attorney who will litigate their case, litigation is still costly: they must typically pay one third of any money recovered in attorneys' fees, in addition to the expenses of litigation—which can amount to tens or even hundreds of

---

[1] Off. for Civ. Rts., U.S. Dep't of Educ., *Civil Rights Tutorials and Technical Assistance*, https://www.ed.gov/about/ed-offices/ocr/civil-rights-tutorials-and-technical-assistance (last visited Apr. 17, 2025).

thousands of dollars—at the end of the case. In contrast, the OCR process is designed so that students can file complaints and obtain relief without an attorney, as OCR itself conducts the investigation and, when appropriate, negotiates a resolution with the school without the need for students to conduct discovery, brief motions, or handle a trial.

28.     Second, because private lawsuits require intentional discrimination, but administrative enforcement by OCR does not, many students have claims that would support an OCR investigation (and potential enforcement action) that they could not assert in a private lawsuit. Thus, by making it impossible for OCR to perform its functions, Defendants have precluded entire categories of legal claims—not just a choice of forum. For example, although OCR may investigate claims of disparate impact under Title VI—that is, a claim based on a school policy that does not intentionally discriminate but has an unjustified disparate impact based on race—students may not assert such claims in a private lawsuit, which requires intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 285 (2001).

29.     Similarly, a student can file a lawsuit based on race-based harassment only if: (1) the harassment was both "severe" *and* "pervasive," (2) a school official with authority to take corrective action had "actual" knowledge of the harassment, and (3) the school showed "deliberate indifference" to it. *See Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643, 650 (1999); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 308 & n.8 (D. Mass. 2024) (explaining that "*Davis*'s deliberate indifference test applies in the Title VI context," per every circuit to address the issue). Even where these elements are present, gathering evidence through discovery to make the requisite showing in a civil litigation is often an unsurmountable burden. In contrast, OCR may find that a school has violated Title VI because (1) a student experienced "severe, pervasive *or* persistent" race-based harassment, (2) a

10

school employee had "constructive" notice (that is, *should* have known) of the harassment, and (3) the school failed to take "reasonable steps to eliminate" the hostile environment. *See* Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11448, 11449-50 (Mar. 10, 1994); *accord* Off. for Civ. Rts., U.S. Dep't of Educ., *Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics* 4-5 (May 7, 2024).

30.     The same is true for Section 504 and Title II harassment claims. In a private lawsuit, a student alleging disability-based harassment must meet an adaptation of the *Davis* standard— they must show they faced severe and pervasive harassment based on their disability to which the school showed "deliberate indifference." *See Thomas v. Springfield Sch. Comm.*, 59 F. Supp. 3d 294, 305 (D. Mass. 2014). In contrast, "OCR would find a disability-based harassment violation under Section 504 and Title II when: (1) a student is bullied based on a disability; (2) the bullying is sufficiently serious to create a hostile environment; (3) school officials know *or should know* about the bullying; and (4) the school does not respond appropriately," i.e., if it failed to "take prompt and effective steps reasonably calculated to end the bullying, eliminate the hostile environment, prevent it from recurring, and, as appropriate, remedy its effects." Off. of Civ. Rts., U.S. Dep't of Educ., *Dear Colleague Letter: Responding to Bullying of Students with Disabilities* 4 (Oct. 21, 2014) (emphasis added).

31.     Although Department of Education's Title IX regulations require more for complaints of sexual harassment, the administrative standards for such claims are still less stringent than the high bar for private lawsuits under *Davis*. For example, OCR may find that an elementary or secondary school had "actual" notice of sexual harassment if "any employee" knew about it, even if that employee did not have "authority to redress the harassment" themselves.

11

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30038-39 (May 19, 2020). In addition, single instances of "sexual assault, dating violence, domestic violence, and stalking" all meet the definition of "sexual harassment" for OCR's purposes even when they do not "meet the *Davis* elements of severity, pervasiveness, and objective offensiveness." *Id.* at 30036.

32.    Third, OCR has often obtained systemic relief—including changes to school policies, procedures, and practices—that benefit not only the individual complainant, but also other current and future students at the school. Such remedies help prevent future violations. In contrast, plaintiffs in private lawsuits often cannot obtain systemic relief. Moreover, when OCR reaches a resolution agreement, it will monitor compliance with that agreement on its own, which individual students often lack the power, time, or resources to do.

33.    OCR also offers other assistance to help resolve potential violations. For instance, OCR offers two mediation options to which the parties may voluntarily agree. Case Processing Manual at 13. If both parties agree to enter mediation, a trained OCR staff member helps the parties try to reach a mutually acceptable resolution to the complaint. *Id.* at 13-14. In contrast to private mediation, OCR provides mediation without cost to the complainant.

## FACTUAL ALLEGATIONS

## I.    Defendants have decimated OCR as part of their goal to eliminate the Department.

34.    Despite the Department's and OCR's vital role in fulfilling the "federal commitment . . . to equal educational opportunities," S. Rep. No. 96-49, at 35, Defendants have taken a series of steps to demolish the Department as a whole and OCR in particular.

35.    During his campaign for office, President Donald Trump repeatedly vowed to close the Department of Education. He called the Department "a big con job" and declared that he would

"like to close it immediately."[2] In an October 2023 video posted to social media, he announced, "One thing I'll be doing very early in the administration is closing up the Department of Education in Washington D.C., and sending all education and education work and needs back to the states."[3] In December 2024, he reiterated to TIME Magazine that he wanted to implement "[a] virtual closure of [the] Department of Education."[4] In another interview, he said that he told the Secretary of Education, Linda McMahon, to put herself "out of a job."[5]

36.    Shortly after President Trump's inauguration, OCR froze all investigations into complaints filed by members of the public. It instructed staff not to communicate with students, families, and schools involved in their cases and instructed them to cancel scheduled meetings and mediations.[6] While OCR instructed staff that they could review case files, they could not request documents, conduct interviews, participate in meetings or mediations, negotiate resolution agreements, issue letters of finding, or take other steps to investigate or resolve complaints. On February 20, 2025, Acting Assistant Secretary for Civil Rights Craig Trainor lifted that pause only

---

[2] *See*, *e.g.*, Michael C. Bender, *Trump Is Said to Be Preparing Order That Aims to Eliminate Education Department*, N.Y. Times (Mar. 6, 2025), https://www.nytimes.com/2025/03/06/us/politics/trump-education-department-executiveorder.html.

[3] Steve Inskeep, *What Trump's pledge to close Dept. of Education means for students, GOP-led states*, NPR (Nov. 15, 2024), https://www.npr.org/2024/11/14/nx-s1-5181966/a-look-at-the-potential-impact-of-shutting-down-the-department-of-education

[4] *Transcript: Donald Trump's 2024 Person of the Year Interview*, TIME (Dec. 12, 2024), https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/.

[5] *See* Zachary B. Wolf, *Trump and Musk are moving to smother these three pieces of the government*, CNN (Feb. 5, 2025), https://www.cnn.com/2025/02/05/politics/donald-trump-elon-musk-agencies/index.html.

[6] *See* Jennifer Smith Richard & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://www.propublica.org/article/department-of-education-civil-rights-office-investigations.

as to complaints that alleged solely disability-based discrimination, meaning that the freeze remained in effect as to complaints that contained claims of race or sex discrimination.[7]

37.    On March 3, 2025, the Senate confirmed Linda McMahon as Secretary of Education. Secretary McMahon affirmed that "President Trump believes that the bureaucracy in Washington should be abolished so that we can return education to the states, where it belongs," and that she "wholeheartedly support[s] and agree[s] with this mission."[8] Hours after being confirmed, she sent an email to all Department staff entitled "Our Department's Final Mission." There, she wrote that the president had tasked the Department "with accomplishing the elimination of bureaucratic bloat here at the Department of Education—a momentous final mission—quickly and responsibly."[9] On March 11, 2025, she would add that "the President's mandate," his "directive to me, clearly, is to shut down the Department of Education."[10]

38.    On March 6, 2025, Secretary McMahon circulated a memo indicating that she was "lifting the pause on the processing of complaints." But only two days later, the Department gutted OCR's ability to promptly or equitably investigate most complaints of discrimination.

---

[7] *See* Jennifer Smith Richards & Jodi S. Cohen, *Education Department "Lifting the Pause" on Some Civil Rights Probes, but Not for Race or Gender Cases*, ProPublica (Feb. 20, 2025), https://www.propublica.org/article/department-education-civil-rights-investigations-disability-gender-race-discrimination.

[8] *See* Lexi Lonas Cochran, *McMahon says she 'wholeheartedly' agrees with Trump plan to abolish Education Department*, The Hill (Feb. 25, 2025), https://thehill.com/homenews/education/5162816-mcmahon-abolish-education-department-trump/.

[9] U.S. Dep't of Educ., Secretary McMahon: Our Department's Final Mission (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission.

[10] Filip Timotija, *Education Secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161- linda-mcmahon-education-department-mass-layoffs.

39.    On March 11, 2025, Secretary McMahon announced that "[a]s part of [its] final mission," the Department had initiated a massive reduction in force.[11] After approximately 572 employees accepted voluntary separation packages, the Department terminated another 1,315 of its approximately 4,113 workers.[12] According to the Department, the combined impact of its staff reductions since January 20, 2025 reduced its workforce by roughly 1,950 workers, cutting its staff almost in half.[13] The RIF eliminated more than half of OCR's previously 550-person staff. [14]

40.    On the same day as the RIF, the Department closed seven of OCR's twelve regional offices—those in Boston, New York, Philadelphia, Chicago, Cleveland, San Francisco, and Dallas—and terminated all staff members who had worked in those offices.[15] Together, the shuttered field offices served twenty-six states, Puerto Rico, and the U.S. Virgin Islands.

41.    On March 20, 2025, President Trump confirmed via executive order that the RIF and office closures are part of an effort to close the entire Department. The Executive Order states that "[t]he Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority

[11] Press Release: U.S. Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://bit.ly/42fXyf8.

[12] *See id.*; Michael C. Bender & Dana Goldstein, *Education Department Fires 1,300 Workers, Gutting Its Staff*, N.Y. Times (Mar. 11, 2025), https://www.nytimes.com/2025/03/11/us/politics/trump-education-department-firings.html.

[13] *See* Press Release: U.S. Dep't of Educ., U.S. Department of Education Initiates Reduction in Force (Mar. 11, 2025), https://bit.ly/42fXyf8.

[14] *See* Laura Meckler, et al., *How education department layoffs hit student loans, testing, civil rights*, The Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/education/2025/03/13/education-department-layoffs-student-loans-fafsa-impacts.

[15] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs

over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely."[16]

## II.    Defendants have made it impossible for OCR to fulfill its legal obligations.

42.    Consistent with the stated goal of shutting down the DOE, the RIF created widespread chaos and made it impossible for OCR to fulfill its statutory and regulatory obligations.

43.    OCR employees were notified of their termination less than two hours after they received notice of the RIF on March 11, 2025. The notice received by OCR employees stated that "your organizational unit is being abolished along with all positions within the unit—including yours," and did not comply with standard protocols for RIFs.[17]

44.    Both before and immediately after the RIF email notification, Department employees' access to the Department's information systems was suddenly restricted. For example, OCR attorneys in the San Francisco office reported that their laptops suddenly and unexpectedly restarted shortly before they received the RIF notice.[18] After that restart, they could no longer communicate with complainants, schools, or anyone else involved in their investigations.[19] Incoming requests are therefore going unaddressed and unacknowledged.

45.    Even before the Department decimated its workforce, OCR was already struggling to address a "persistent backlog" of cases. Off. of Civ. Rts., U.S. Dep't of Educ., Protecting Civil Rights: Highlights of Activities 2021-2025, at 6, https://www.ed.gov/media/document/protecting-

---

[16] Exec. Order 14,242, Improving Education Outcomes by Empowering Parents, States, and Communities, 90 Fed. Reg. 13679 (Mar. 20, 2025).

[17] *See, e.g.*, Smith Decl. ¶¶ 5–8, Doe Declarant 1 Decl. ¶ 15, *New York v. McMahon*, No. 1:25-cv-10601 (D. Mass. Mar. 24, 2025). From this point forward, citations to declarations refer to those filed in *New York v. McMahon*, No. 1:25-cv-10601 (D. Mass. Mar. 24, 2025).

[18] *See, e.g.*, Doe Declarant 1 Decl. ¶¶ 12–22.

[19] *Id.*; *see also*, Hamlin Decl. ¶ 7; Miller Decl. ¶ 13.

civil-rights-109409.pdf. For three consecutive years, from 2022 through 2024, OCR had received the highest number of complaints in its history, with a record high of 20,687 complaints in 2024. *Id.* at 4. Although OCR resolved more complaints from 2021 through 2024 than it had during the previous four years, it still lacked the resources to keep up with the demand: from 2021 through 2024, OCR received approximately 14,547 more complaints than it resolved. *Id.* at 6.[20]

46.     To meet these high demands, Congress allocated OCR a budget of $140 million to support the full-time equivalent of 557 employees.[21] For the past fifteen years, the Department has requested funds for between 500 and 800 full time equivalent staff at OCR, stating that such staffing was "necessary" or essential "for OCR to deliver on its statutory and regulatory mandates."[22] In its 2025 budget request, OCR asked for $162.4 million for OCR to "support a full time equivalent (FTE) level of 643." In support, it noted that "OCR's [staffing] levels have not kept pace with case demand." It warned if the upward trend in caseloads persisted, "unless staffing

---

[20] *See* Lhamon Decl. ¶¶ 39–42 (noting that even though OCR resolved more complaints during the past four years than it did during the previous administration, it still "strained to meet the volume of need").

[21] U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2025 Budget Request 9 (2025).

[22] *See*, *e.g.*, U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2025 Budget Request 9 (2025); U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2024 Budget Request 9 (2024); U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2023 Budget Request 10 (2023); U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2022 Budget Request BB-9 (2022); U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2021 Budget Request AA-10 (2021); U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2020 Budget Request Z-9 (2020); U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2019 Budget Request Z-9 (2019).

is increased, the total increase in complaints [would] reach a level that significantly challenges OCR's capacity to effectively and efficiently investigate and resolve cases."[23]

47.    OCR cannot fulfill its statutory and regulatory mandates with only half of its staff. Current and former OCR employees attest that it will not be possible for OCR to do so. As the former Assistant Secretary for Civil Rights and former head of OCR agreed, the RIF has made OCR "a shell that can't function."[24] As another, current employee put it, "There was already a case backlog, and now these cases will simply fall to the wayside." As a result, "students will suffer harm . . . that, for many, will have repercussions for the rest of their lives."[25]

48.    Indeed, the closed offices—in Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco—covered some of the largest population centers in the country. Those closed offices had an aggregate of 208 investigators and part-time investigators— approximately 55% of OCR's total number of investigators (379)—and handled most of OCR's open investigations. As a result, the remaining investigators have staggering caseloads. Before the RIF, OCR's investigators handled an average of over sixty cases at a time.[26] Even if matters can

---

[23] U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2025 Budget Request (2025), https://www.ed.gov/sites/ed/files/about/overview/budget/budget25/justifications/dd-ocr.pdf.

[24] Jodi S. Cohen & Jennifer Smith Richards, *Massive Layoffs at the Department of Education Erode Its Civil Rights Division*, ProPublica (Mar. 12, 2025), https://www.propublica.org/article/education-department-civil-rights-division-eroded-by-massive-layoffs.

[25] Sunlen Serfati, *Students will suffer harm': Education Department's civil rights office gutted by layoffs, closures*, CNN (Mar. 12, 2025), https://www.cnn.com/2025/03/12/politics/education-departments-civil-rights-office-layoffs/index.html.

[26] U.S. Dep't of Educ., Office for Civil Rights Fiscal Year 2025 Budget Request 16 (2025); https://www.ed.gov/media/document/ocr-fiscal-year-2025-budget-request-39373.pdf; Lhamon Decl. ¶ 26; *see also* Gonzales Decl. ¶¶ 10–11 (noting that the Dallas office employed about 55 employees, and each team of six to seven OCR staff members effectively handled 250 to 300 cases).

be redistributed to open offices, the RIF will result in an untenable caseload of over 120 cases per investigator.[27]

49.     The elimination of seven regional offices has also made it impossible for OCR to complete investigations and resolve cases promptly and fairly. OCR investigations often require staff to visit schools in person to conduct witness interviews and on-site inspections for critical fact gathering.[28] For example, the requirements for accessibility for people with disabilities are governed by technical standards that require in-person inspection.[29] But the closure of regional offices will make such travel costly and often infeasible. OCR will also lose the regional expertise and community relationships that those offices had built and used to resolve cases.[30]

50.     Moreover, while the Department has recently fast-tracked certain high-profile OCR investigations by collaborating with the Department of Justice, that in no way addresses the fact that OCR in its current hobbled form is incapable of addressing the vast majority of OCR complaints. That is particularly true because the Department of Justice's Civil Rights Division is undergoing its own downsizing. On April 14, 2025, the newly-appointed head of the Division, as one of her first official actions, circulated a memo announcing that Civil Rights attorneys could apply for a new round of deferred resignation programs.

**III.    The Department's actions abdicate its responsibilities to entire classes of students.**

51.     As a result of the RIF, OCR has allowed nearly all discrimination complaints to stall and abdicated its responsibilities to whole classes of students.

---

[27] Lhamon Decl. ¶ 26.

[28] Gonzales Decl. ¶ 29.

[29] *See* Doe Declarant 1 Decl. ¶¶ 21–22.

[30] *See* Lhamon Decl. ¶¶ 33–38.

52.     To be sure, since President Trump's inauguration, OCR has selectively initiated high-profile investigations into certain limited issues. For example, OCR has opened self-directed investigations into programs designed to foster diversity, equity, and inclusion. On January 27, 2025, OCR opened an investigation into a public school district for sponsoring an event designed to "provide a safe space for" and to "celebrate and uplift students of color" as part of its inclusion and support efforts.[31] And on March 14, 2025, the Department announced investigations into forty-five universities for partnering with an organization that supports Black, Latino, and Native American students but not white students.[32]

53.     But such cherry-picked investigations appear to be the only matters the Department is currently pursuing, to the exclusion of other types of discrimination and thousands of complaints that were already pending. Since President Trump's inauguration, OCR has not announced any investigations or resolutions of complaints of race discrimination against Black, Latino, or Indigenous students. Nor has it announced any investigations or resolutions of complaints that allege sexual harassment or other sex discrimination besides those based on policies or practices that permit transgender students to access school facilities and activities. And, since the RIF, OCR has not announced any investigations into discrimination based on disability. Due to the RIF and the office closures, such complaints cannot be resolved in a prompt and equitable manner.

---

[31] Maddy Vogel, *Trump-Era Education Department Launches Investigation into Ithaca Schools Over Alleged Racial Exclusion*, Ithaca.com (Feb. 4, 2025), https://www.ithaca.com/news/ithaca/trump-era-education-department-launches-investigation-into-ithaca-schools-over-alleged-racial-exclusion/article_b1635a08-e2af-11ef-85e6-7760bf2508d6.html.

[32] Press Release: Office of Civil Rights Initiates Title VI Investigations into Institutions of Higher Education (Mar. 14, 2025), https://www.ed.gov/about/news/press-release/office-civil-rights-initiates-title-vi-investigations-institutions-of-education-0.

**IV.    Defendants' actions will irreparably harm Plaintiffs and students nationwide.**

54.    As a result, students across the country will suffer. As of January 2025, OCR had 12,000 or more active investigations, including nearly 6,000 complaints of disability discrimination; 3,200 of racial harassment or other race discrimination; and 1,000 of sexual harassment, including sexual violence.[33] Behind those complaints, many students are counting on OCR's intervention to secure needed learning accommodations or to allow them to return to school safely. But due to Defendants' actions, most will never receive meaningful relief.

55.    Many OCR cases are time sensitive. They involve the ongoing educational needs of children, often implicating their access to education altogether.

56.    For example, a school had refused to allow a kindergarten student to bring a wheelchair on campus until an Individualized Education Program meeting could be held—literally blocking the student from accessing school. OCR's rapid resolution procedure allowed the situation to be resolved such that the student was able to start school on time.[34] Without OCR's intervention, that student could have been forced to miss the entire school year, costing the student instructional time and school experience they could never get back.

57.    Likewise, a special education advocate, Craig Haller, filed an OCR complaint in January 2025 against Brookline, Massachusetts Public Schools alleging systemic discrimination against students with disabilities. Mr. Haller's complaint alleges that the school district redirected federal funds that were earmarked for special education services to cover an approximately $8

---

[33] Jennifer Smith Richard & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump* (Feb. 13, 2025), https://www.propublica.org/article/department-of-education-civil-rights-office-investigations; Doe Declarant 7 Decl. ¶ 16 (stating that OCR had over 16,000 active investigations in January 2025).

[34] Lhamon Decl. ¶¶ 19–20.

million shortfall in the district's budget—and that funds for other programs were not similarly diverted. As a result, the district delayed payments to special education service providers for months, and multiple families have reported that they have experienced long delays in obtaining the services their children need for their disabilities and that their children had to miss sessions with providers.[35]

58.     Prior to the RIF, Mr. Haller's complaint would have been handled by OCR's Boston office. Now, it is unclear which office, if any, is addressing the complaint, as Mr. Haller has received no updates on his matter since it was filed. As a result, on information and belief, special education services continue to be disrupted in the Brookline school district.

   A.     **Plaintiffs Tara Blunt and T.R.**

59.     Plaintiff Tara Blunt and her son represent another troubling example. Ms. Blunt filed an OCR complaint after her child, Plaintiff T.R., experienced regular harassment based on his race over the course of two school years, from spring 2022 through spring 2023. A group of other students regularly referred to him with racial epithets. They called him a "n*gger" and a "monkey," said he had "bird's nest hair," and told him his skin looked like a "turd." They pushed and hit him at recess. In October 2022, one of the students pushed T.R. to the ground and stomped on his head, and teachers found T.R. crying in the fetal position. T.R. and Ms. Blunt reported the harassment to teachers and administrators, but they did not take meaningful action to end the harassment. Nonetheless, the school district did not offer any plan to protect T.R. from the ongoing racial harassment. With T.R. afraid to return to his public school, Ms. Blunt saw no viable choice

---

[35] *See also* Mandy McLaren, *Brookline schools have a budget mess. The town's taxpayers will pay for an audit to sort it out.*, Bos. Globe (Feb. 12, 2025, 1:00 PM), https://www.bostonglobe.com/2025/02/12/metro/brookline-special-education-disabilities-financial-mismanagement/?p1=StaffPage.

but to withdraw him from the school district and enroll him in a local private school, where T.R.'s family has had to pay tuition, fees, and other costs.

60.    On June 20, 2023, Ms. Blunt filed an OCR complaint under Title VI of the Civil Rights Act of 1964. The complaint described the school district's failure to respond to the repeated racial harassment and the retaliation that T.R. experienced for his complaints to the school. Ms. Blunt amended that complaint through counsel on August 21, 2023. Relying on OCR's longstanding guidance regarding Title VI racial harassment complaints, which does not apply to Title VI lawsuits, Ms. Blunt's complaint alleges that (1) T.R. experienced "severe, pervasive or persistent" race-based harassment, (2) the school district had at least "constructive" notice of the harassment, and (3) it failed to take "reasonable" steps to eliminate the hostile environment.

61.    On December 7, 2023, OCR opened an investigation into "[w]hether the Falls City Public Schools failed to respond in a reasonable, timely, and effective manner to notice of a hostile environment based on [T.R.'s] race, in violation of Title VI and its implementing regulation at 34 C.F.R. § 100.3" and whether it engaged in retaliation in response to Ms. Blunt's complaints.

62.    If OCR continued its investigation and remedied the hostile environment in Falls City Public Schools—for example, by compelling the school district to train teachers and improve its policies and procedures for handling racial harassment, or to devise a plan to protect T.R. from future harassment—Ms. Blunt would consider returning T.R. to public school, for which his family would not have to pay tuition. If OCR were to complete its investigation, the family could also obtain other relief, including reimbursement for the costs of T.R.'s private-school tuition and for medical and therapy expenses caused by the harassment.

63.    Due to the RIF, however, T.R.'s complaint is likely to remain uninvestigated and unresolved. The Kansas City office, to which T.R.'s complaint was assigned, has absorbed all of

the cases previously assigned to OCR's much larger Dallas office, which had approximately 2,000 pending complaints and covered Texas, Mississippi, and Louisiana. As the Dallas office's Chief Attorney testified, "[i]t is not possible for the Kansas City enforcement office to absorb this work" and still process its "own caseload," which it is "already struggling" to handle.[36]

**B.    Plaintiffs Karen Josefosky and A.J.**

64.    Plaintiff Karen Josefosky and her son, Plaintiff A.J., represent yet another example of the devastating effects of the RIF. A.J. began third grade in August. A.J. has life-threatening allergies, including an allergy to dairy, that interfere with major life activities, including his breathing, and constitute a disability under Section 504. Because of his severe allergies, his Section 504 plan indicated that his classroom must be kept dairy-free.

65.    Throughout the 2023–24 school year, A.J. was repeatedly harassed in class, with his teacher present, based on his disabilities. Classmates called A.J. names, pulled his glasses off his face, shoved him, and punched him. They waved food with his allergens and taunted him to touch it or eat it. They rubbed cheese on his desk. On November 13, 2023, a student poured milk on A.J.'s lunch and said, "[a]llergies are dumb." In another incident, another student poured milk on A.J.'s coat as other students laughed. On April 15, 2024, ten students surrounded A.J., pushed him, tripped him, slapped his laptop closed, tried to take his glasses, put cutouts of cheese on his desk and his cubby, and put a cheese crown on his head, among other forms of harassment.

66.    The school did not respond to this recurring harassment effectively, if at all, and did not enforce the Section 504 plan. For example, from the very start of the school year, students brought allergens into the classroom, disregarding the classroom's dairy-free status. Despite Ms. Josefosky's repeated complaints, calls, and meetings with A.J.'s school throughout the school year,

---

[36] Gonzales Decl. ¶ 19.

the school took no meaningful action to stop the harassment. The deputy superintendent admitted at one point that the school had no plan in place to protect A.J. from further harassment. Nevertheless, the district denied the family's request for A.J.'s transfer to a different public school.

67.    After the April 15, 2024 assault, A.J. no longer felt safe returning to school. Because Ms. Josefosky's continued efforts to push the school to act were unsuccessful, she withdrew A.J. from the public school, homeschooled him for the remainder of the school year, and continued to homeschool him for the following year (fourth grade).

68.    On September 2, 2024, Ms. Josefosky filed an OCR complaint regarding the school's failure to address A.J.'s experiences of disability-based harassment and to implement A.J.'s Section 504 plan. The complaint also sought reimbursement for A.J.'s therapy as a result of that unaddressed discrimination and funds for alternative schooling.

69.    On October 1, 2024, OCR opened an investigation into "whether a student was subjected to harassing conduct on the basis of disability . . . and, if so, whether the District failed to investigate promptly and to respond appropriately, in violation of 34 C.F.R. § 104.4, and the Title II implementing regulation at 28 C.F.R. § 35.130." The investigation would also assess "whether the District failed to provide a qualified student with a disability with a free appropriate public education (FAPE), in violation of the Section 504 implementing regulation at 34 C.F.R. § 104.33." This case was assigned to the Cleveland OCR office.

70.    Shortly after OCR opened the investigation, OCR recommended a mediation and the parties began to discuss potential dates. On February 5, 2025, however, OCR informed the Josefoskys that the investigation had been paused. Since then, OCR has not contacted the Josefoskys to reschedule the mediation or indicated that any progress has been made on the case.

71.     If OCR had continued its investigation and involvement, the parties would have shortly proceeded to mediation with OCR. Although Ms. Josefosky and the school have scheduled a private mediation, it is unclear if that will resolve the situation now that OCR is no longer involved.

72.     OCR would be invaluable in helping A.J.'s school develop protocols for how to implement Section 504 and deal with such harassment. OCR could compel the school district to train teachers and staff to respond to disability harassment, devise other ways to protect A.J. from future harassment, and provide other remedies requested, and then follow up to ensure they are properly implemented. As of now, however, because of the RIF and office closures, A.J.'s OCR complaint is in limbo with no resolution likely—while the harassment at his public school remains unremediated, effectively barring A.J. from attending school there.

### C.    Plaintiff Victim Rights Law Center

73.     By precluding OCR's ability to promptly and equitably investigate most discrimination complaints, Defendants have upended one of VRLC's core activities—representing students in OCR investigations—and forced VRLC to divert resources to exploring alternative remedies for its clients and for attorneys nationwide who seek VRLC's advice.

74.     VRLC's mission is to help survivors of sexual violence rebuild their lives. VRLC relies on grant funding to support that mission. As a condition of its funding, VRLC must dedicate eighty percent of representation activities to sexual assault victims. And because most sexual assault victims are youth or young adults, most of VRLC's clients require legal assistance in education matters. VRLC assists them in Title IX grievance procedures, obtaining Section 504 accommodations for a disability caused or aggravated by post-sexual-assault trauma, and in filing administrative complaints when their schools violate Title IX or Section 504.

75.    As a result, VRLC frequently represents students in OCR investigations. Its attorneys advise students about the OCR process, collect facts and conduct legal research into potential claims, prepare and file complaints with OCR on students' behalf, and assist students during the investigation. VRLC employs approximately six attorneys who represent students in OCR investigations. Because VRLC does not have the capacity to take most cases to litigation, the OCR process provides the only viable way to obtain relief for many of its clients.

76.    VRLC currently represents complainants in several OCR investigations. All of these complaints were pending in OCR's Boston office, which is now closed. The OCR investigators and points of contact for those cases were terminated during the RIF. Since then, VRLC has attempted to contact OCR to ascertain the status of its pending cases, but it has not received any response. Due to the RIF, OCR is now unlikely to provide VRLC's clients with timely or meaningful relief. As a result, VRLC has had to spend hours of attorney time and resources to investigate other avenues to relief for its clients and advise them accordingly.

77.    In another core program vital to VRLC's mission, VRLC provides advice to advocates, attorneys, and campus professionals across the country who work with victims of gender-based violence in education settings. VRLC employs three full time staff attorneys who dedicate their time to reviewing such education-related requests, conducting research necessary to address them, and counseling the person seeking advice. Three other staff attorneys advise on education-related matters in addition to other subjects. In the last twelve months, VRLC provided ninety consultations to legal advocates and attorneys on education-related matters.

78.    The RIF and office closures have also prompted a flood of requests for advice about other avenues to relief from attorneys and advocates across the country, including advocates who had pending complaints in offices closed during the RIF. These requests have already required

VRLC attorneys to conduct hours of research that they would not have had to conduct when OCR was a viable path to timely and meaningful relief. To counsel attorneys about OCR, VRLC did not need to conduct any research because OCR's procedures are uniform and available to students, families, and advocates nationwide, and its staff was already familiar with the OCR process. Now, however, VRLC's staff must conduct hours of jurisdiction-specific research to determine the alternative options available to victims in particular states and territories, if any.

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act -
### Arbitrary & Capricious and Abuse of Discretion
### (Against All Defendants)

79.    Plaintiffs reallege and incorporate by reference all paragraphs above.

80.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this provision, a court may hold unlawful and set aside an agency action when the agency fails to provide a reasonable explanation for its action, including a rational connection between the facts found and the choice made, when an agency relies on factors that Congress did not intend for it to consider, or when an agency fails to consider an important aspect of the problem before making its decision.

81.    The Department's mass RIF is arbitrary and capricious because, among other things, Defendants provided no reasoned basis or explanation for the decision; relied on an impermissible consideration—their goal to close the Department; failed to consider the consequences of their actions, including for OCR's ability to promptly and equitably investigate complaints of unlawful discrimination and perform its other functions; and have made it impossible for OCR to comply with applicable statutes and regulations.

82.     Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that these actions violate the APA because they are arbitrary and capricious.

83.     Plaintiffs are also entitled to a vacatur of the Department's decision to implement the RIF and office closures and an injunction requiring appropriate action to ensure that OCR its able to fulfill its statutory and regulatory mandates.

### Count II
### Violation of the Administrative Procedure Act – Contrary to Law
### (Against All Defendants)

84.     Plaintiffs reallege and incorporate by reference all paragraphs above.

85.     Defendants are "agenc[ies]" under the APA. 5 U.S.C. § 551(1).

86.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C). Under these provisions, a court may hold unlawful and set aside agency action that violates a statute, the Constitution, or federal regulations.

87.     Defendants' decision to eliminate approximately half of OCR's staff and close half of its regional offices violates the mandates of Title VI and Title IX to effectuate the provisions of those statutes. It also violates the mandates of federal regulations that require OCR to investigate potential violations of Title VI, Title IX, Section 504, and Title II.

88.     Under 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that these actions violate Title VI, Title IX, and federal regulations, and exceed Defendants' statutory authority.

89.     Plaintiffs are also entitled to a vacatur of the Department's decision to implement the RIF and office closures and an injunction requiring appropriate action to ensure that OCR is able to fulfill its statutory and regulatory mandates.

## Count III
### Ultra Vires Action in Excess of Statutory Authority
### (Against All Defendants)

90.     Plaintiffs reallege and incorporate by reference all paragraphs above.

91.     Federal courts may set aside agency action or inaction that exceeds an agency's constitutional or statutory authority, including action or inaction that violates a clear and mandatory statutory command or that lacks a contemporaneous, reasoned justification.

92.     By eliminating approximately half of OCR's staff and closing half its regional offices, Defendants have violated the mandates of Title VI and Title IX to effectuate the provisions of those statutes. Those actions also violate the federal regulations that require OCR to promptly investigate potential violations of Title VI, Title IX, Section 504, and Title II.

93.     Secretary McMahon and the Department have not supported the RIF or the office closures with a contemporaneous, reasoned justification.

94.     Pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the RIF and office closures exceed Defendants' statutory authority.

95.     Plaintiffs are also entitled to an injunction setting aside the decisions to implement the RIF and office closures and requiring appropriate action to ensure that OCR is able to fulfill its statutory and regulatory mandates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Issue a declaration that the elimination of approximately half of OCR's staff and half of OCR's offices violates the Administrative Procedure Act.

2. Pursuant to 5 U.S.C. § 706, vacate Defendants' decision to implement the RIF and the decision to close half of OCR's regional offices.

3. Preliminarily and permanently enjoin Defendants to take appropriate actions to remedy the effects of the RIF and the closure of OCR offices so that OCR can fulfill its legal mandates;

4. Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

5. Grant such other equitable relief as the Court deems just and proper.


Dated: April 21, 2025

Respectfully submitted,

*/s/ Sean Ouellette*
Sean Ouellette
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
souellette@publicjustice.net

L. Reid Skibell (*pro hac vice* forthcoming)
Jonathan Friedman (*pro hac vice* forthcoming)
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 970-1600
rskibell@glennagre.com
jfriedman@glennagre.com

*Counsel for Plaintiffs*