**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| VICTIM RIGHTS LAW CENTER; T.R., by and through his parent, TARA BLUNT; TARA BLUNT; A.J., by and through his parent, KAREN JOSEFOSKY; and KAREN JOSEFOSKY,<br><br>    *Plaintiffs*,<br>v.<br><br>UNITED STATES DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as Secretary of Education; and CRAIG TRAINOR, in his official capacity as Acting Assistant Secretary for Civil Rights,<br><br>    *Defendants*. | Case No. 1:25-cv-11042-MJJ |

**<u>MEMORANDUM IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................................................... ii

**TABLE OF AUTHORITIES** ............................................................................................. iii

**INTRODUCTION** ............................................................................................................... 1

**BACKGROUND** .................................................................................................................. 2

    I.    Federal statutes and regulations require the Office of Civil Rights to effectuate civil rights laws and to promptly investigate all potential violations. ............................... 2

    II.    The Secretary gutted OCR as part of her "Final Mission" for the Department. ................. 4

    III.    The reduction in force makes it impossible for OCR to promptly investigate and resolve complaints and perform its other statutory functions. ........................................... 8

    IV.    The RIF will irreparably harm plaintiffs and students across the country....................... 10

        A.  T.R. and A.J. ....................................................................................................... 10

        B.  Victim Rights Law Center.................................................................................... 12

**ARGUMENT** ....................................................................................................................... 13

    I.    Plaintiffs are likely to succeed on the merits. .................................................................. 13

        A.    The RIF is arbitrary and capricious in violation of the APA. .................................... 14

        B.    The RIF violates OCR's statutory and regulatory mandates. ................................... 18

        C.    The RIF is ultra vires. ............................................................................................ 20

    II.    Plaintiffs will suffer irreparable harm without a preliminary injunction. ......................... 20

        A.    T.R. and A.J. will suffer irreparable harm absent injunctive relief. ......................... 21

        B.    VRLC will suffer irreparable harm absent injunctive relief. .................................... 22

    III.    The balance of equities and the public interest favor an injunction. ................................ 24

    IV.    The Court should waive the bond requirement or impose a nominal bond...................... 25

**CONCLUSION** .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Richardson*,
480 F.2d 1159 (D.C. Cir. 1973)..................................................................................*Passim*

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014)................................................................................. 15

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ................................................................................................. 20

*Baillargeon v. CSX Transportation Corp.*,
463 F. Supp. 3d 76 (D. Mass. 2020)........................................................................ 13

*Blackman v. D.C.*,
374 F. Supp. 2d 168 (D.D.C. 2005)......................................................................... 21

*Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*,
622 F.3d 36 (1st Cir. 2010)...................................................................................... 13

*Brown v. Bd. of Ed. of Topeka*,
347 U.S. 483 (1954) ................................................................................................... 1

*Brown v. Bd. of Educ. of Rochester City Sch. Dist.*,
2005 WL 17838 (W.D.N.Y. 2005)........................................................................... 21

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ..................................................................................... 14

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
513 F. Supp. 3d 154 (D.D.C. 2021).......................................................................... 22

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
370 F.3d 151 (1st Cir. 2004)..................................................................................... 20

*Cox v. Brown*,
498 F. Supp. 823 (D.D.C. 1980)............................................................................... 21

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ..................................................................................................... 17

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................................................... 15, 17, 18

*F.C.C. v. NextWave Pers. Commc'ns Inc.*,
    537 U.S. 293 (2003) ..................................................................................... 18

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ..................................................................................... 14

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
    2025 WL 978101 (U.S. Apr. 2, 2025) ........................................................ 17

*Grimes & Co., Inc. v. Carlson*,
    2024 WL 5110193 (D. Mass. Dec. 12, 2024)............................................. 23

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ...................................................................... 23

*Johnson v. Collins*,
    233 F. Supp. 2d 241 (D.N.H. 2002) ........................................................... 21

*Judulang v. Holder*,
    56 U.S. 42 (2011) ........................................................................................ 15

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989)................................................................. 19, 20

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)................................................................... 22, 24

*Maine v. United States Dep't of Agric.*,
    2025 WL 1088946 (D. Me. Apr. 11, 2025) ............................................... 25

*Maryland v. U.S. Dep't of Agric.*,
    2025 WL 800216 (D. Md. Mar. 13, 2025) ........................................... 13, 25

*Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
    496 F. Supp. 3d 600 (D. Mass. 2020)................................................... 22, 23

*Mass. Pub. Int. Rsch. Grp., Inc. v. U.S. Nuclear Regul. Comm'n*,
    852 F.2d 9 (1st Cir. 1988)........................................................................... 18

*Massachusetts v. Nat'l Institutes of Health*,
    2025 WL 702163 (D. Mass. Mar. 5, 2025) .............................................. 22, 23, 24

*Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................................... 14, 15, 16, 17

*Murphy v. Fort Worth Indep. Sch. Dist.*,
  258 F. Supp. 2d 569 (N.D. Tex. 2003) ................................................................. 21

*N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*,
  817 F.2d 149 (1st Cir. 1987)................................................................................. 18

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
  26 F.4th 960 (D.C. Cir. 2022)............................................................................... 20

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
  407 F. Supp. 2d 323 (D. Mass. 2005)................................................................... 24

*New Jersey v. Trump*,
  131 F.4th 27 (1st Cir. 2025) ................................................................................. 13

*Nken v. Holder*,
  556 U.S. 418 (2009) .............................................................................................. 13

*P.G. ex rel. C.G. v. Saucon Valley Sch. Dist.*,
  571 F. Supp. 3d 430 (E.D. Pa. 2021).................................................................... 21

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) .............................................................................. 24

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996)................................................................................... 23

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  217 F.3d 8 (1st Cir. 2000)..................................................................................... 20

*Ryan v. U.S. Immigr. & Customs Enf't*,
  382 F. Supp. 3d 142 (D. Mass. 2019)................................................................... 23

*S.E.C. v. Chenery Corp.*,
  332 U.S. 194 (1947) ........................................................................................ 14, 15

*Sears, Roebuck & Co. v. United States Postal Serv.*,
  844 F.3d 260 (D.C. Cir. 2016)............................................................................... 20

*Tirrell v. Edelblut*,
  748 F. Supp. 3d 19 (D.N.H. 2024) ........................................................................ 21

*Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*,
  961 F.3d 34 (1st Cir. 2020).................................................................................... 18

*Trudeau v. Fed. Trade Comm'n,*
    456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 20

*Victim Rts. L. Ctr. v. Cardona,*
    552 F. Supp. 3d 104 (D. Mass. 2021) ............................................................... 16

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
    2025 WL 1116157 (D.R.I. Apr. 15, 2025) .............................................. 23, 24, 25

**Statutes**

5 U.S.C. § 706 ...................................................................................................... 13, 14

20 U.S.C. 3413 ...................................................................................................... 13, 15, 19

20 U.S.C. § 1682 .......................................................................................................*Passim*

20 U.S.C. § 3473 .................................................................................................... 15, 19

20 U.S.C. §§ 3402 ................................................................................................... 3, 15

20 U.S.C. §§ 1681 .......................................................................................................... 2

29 U.S.C. § 794 .................................................................................................... 2, 11, 18

42 U.S.C. § 2000d-1 ...............................................................................................*passim*

42 U.S.C. §§ 2000d .......................................................................................................... 2

Pub. L. No. 96–88, 93 Stat. 669, §§ 102 (1979) ............................................................ 3

**Regulations**

28 C.F.R. § 35.171 .............................................................................. 3, 16, 18, 19

34 C.F.R. §§ 100.6 .......................................................................................................... 4

34 C.F.R. § 100.7 ................................................................................ 3, 16, 18, 19

34 C.F.R. § 104.61 .............................................................................. 3, 16, 18, 19

34 C.F.R. § 106.81 .............................................................................. 3, 16, 18, 19

**Other Authorities**

S. Rep. 96-49, 1979 U.S.C.C.A.N. 1514 (Mar. 27, 1979) ................................. 2, 3, 5, 19

## INTRODUCTION

For over forty years, children have relied on the Department of Education's Office for Civil Rights ("OCR") to protect one of their most basic rights: the "opportunity of an education" "on equal terms" with their peers, *Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 493 (1954). Congress charged OCR with enforcing a landmark set of civil rights laws that protect students from discrimination based on race, sex, and disability. Students look to OCR for help when their schools ignore sexual assault and racial violence, deny them the accommodations they need to learn with their disabilities, or otherwise exclude them from school activities for discriminatory reasons.

Through OCR, the Department of Education (the "Department") plays a primary role in carrying out the nation's longstanding commitment to equal educational opportunity. Yet Defendants seek to eliminate the Department and OCR along with it. In pursuit of that goal, on March 11, 2025, the Secretary of Education imposed a massive reduction in force ("RIF") that has gutted OCR by cutting its workforce in half and closing more than half its regional offices. Before the RIF, OCR already struggled to keep up with a record caseload and a large backlog of complaints. Now, without injunctive relief, it will be impossible for OCR to meet its legal mandate to promptly investigate and resolve potential civil rights violations across the country.

Indeed, that seems to be the point. Defendants have not even attempted to explain how their hobbled version of OCR can fulfill its statutory mission. Rather, they have repurposed what remains of OCR to chase selected investigations—into diversity, equity, and inclusion programs designed to help minority students, for example—while ignoring the expanding backlog of complaints regarding most types of discrimination. As a result, students and families nationwide who are already struggling with the effects of discrimination will be irreparably harmed.

Plaintiffs are entitled to a preliminary injunction to stay the RIF as to OCR employees who

are set to be terminated on or about June 9, 2025, to reopen the closed OCR offices, and to allow the affected employees to return to work so that OCR can perform its statutory functions. Plaintiffs' claims are likely to succeed on the merits because the RIF is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). Contrary to the APA's requirements, Defendants provided no reasoned explanation for the RIF, failed to consider its predictable effects on OCR's ability to process cases and fulfill its mandates, and imposed it in furtherance of a goal—to close a Congressionally-created department—that overtly defies what Congress directed. By making it impossible for OCR to perform its mandated functions, the RIF violates the civil rights statutes and their implementing regulations. If not enjoined, it will cause irreparable harm to the plaintiffs and students across the United States who need OCR's assistance. For those reasons, the balance of equities and public interest also strongly favor the requested injunction.

In short, the Court should grant preliminary injunctive relief to maintain the status quo of an OCR capable of protecting children from discrimination, as expressly required by statute.

## BACKGROUND

**I.    Federal statutes and regulations require the Office of Civil Rights to effectuate civil rights laws and to promptly investigate all potential violations.**

In the 1960s and 70s, Congress passed a series of landmark civil rights laws: Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, and Section 504 of the Rehabilitation Act of 1973, which together ban race, sex, and disability discrimination in education programs and activities that receive federal financial assistance. *See* 42 U.S.C. §§ 2000d (Title VI); 20 U.S.C. §§ 1681 (Title IX); 29 U.S.C. § 794 (Section 504). In doing so, it sought to "ensure equality of educational opportunity for every American regardless of race, sex," or disability. S. Rep. 96-49, 11, 1979 U.S.C.C.A.N. 1514, 1525 (Mar. 27, 1979).

To effectuate that promise, Congress created the Department and its Office of Civil Rights

and charged OCR to "assume responsibility for effectively carrying out the nation's civil rights laws in education." S. Rep. No. 96-49, at 35, 68; *see* Dep't of Educ. Organization Act ("DOEA"), Pub. L. No. 96–88, 93 Stat. 669, §§ 102 (1979) (codified as amended at 20 U.S.C. §§ 3402, 3413). Federal law requires OCR to enforce those civil rights laws and their implementing regulations. Title VI and Title IX each expressly direct the Department to "effectuate" their anti-discrimination mandates. *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (quoting 42 U.S.C. § 2000d-1); 20 U.S.C. § 1682. Federal regulations require OCR to conduct "periodic compliance reviews" to assess recipients' policies and practices and to "make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply" with Title VI, Title IX, or Section 504. 34 C.F.R. § 100.7(c) (Title VI); 34 C.F.R. § 106.81 (Title IX); 34 C.F.R. § 104.61 (Section 504). OCR must enforce Title II of the Americans with Disabilities Act ("Title II") using the same procedures. 28 C.F.R. § 35.171(a)(3); Off. for Civ. Rts., U.S. Dep't of Educ., *OCR Case Processing Manual* 21 (Feb. 19, 2025), ("Case Processing Manual") (confirming these mandates), https://perma.cc/RS7S-4MET.

If OCR finds a violation, it must attempt to negotiate a resolution agreement that "must include actions [or] steps that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur." Case Processing Manual at 17. If OCR cannot negotiate such an agreement within a specified timeframe, it must (1) initiate administrative proceedings to suspend, terminate, or refuse to grant or continue and defer financial assistance from the Department to the recipient; or (2) refer the case to the Department of Justice for court action. *Id.* at 23. "The majority of investigations result in voluntary agreements." Ex. 1, Lhamon Decl. ¶ 12. When OCR enters a resolution agreement, it monitors the school to ensure that it complies with the terms. *Id.* ¶ 13; Case Processing Manual at 22.

For many years, OCR's performance standards have defined "timely" resolution of a complaint to mean resolution within 180 days, and it has sought to resolve at least 80% of its cases within that timeframe. *See*, *e.g.*, Ex. 13 (Excerpts from OCR Budget Requests for Fiscal Years 2010–2025) 26, 34-35, 40-41, 46-47, 54-55, 62, 68-69, 76, 86, 96, 107-08, 118-19, 126-27, 134, 141-42, 149-50; Ex. 2, Doe 1 Decl. ¶ 10, ECF No. 71-53 at 4.

Federal law tasks OCR with performing several other functions beyond investigations and enforcement actions. To prevent violations from occurring, OCR must provide "assistance and guidance" to help schools voluntarily comply with civil rights laws. 34 C.F.R. § 100.6(a). To fulfill that mandate, OCR has issued guidance documents, conducted trainings, and answered questions from schools, parents, and students who contact OCR about the laws it enforces and the complaint process. Ex. 1, Lhamon Decl. ¶ 14; Ex. 3, Gonzales Decl. ¶ 16. OCR also provides mediations, without cost to complainants, to help students and their schools resolve the issues raised by agreement. Case Processing Manual at 13-14.

Under these mandates, OCR is responsible for protecting the civil rights of more than 49 million students in public pre-K-12 schools in more than 18,000 public school districts as well as over 19 million students in over 6,000 colleges and universities. Ex. 1, Lhamon Decl. ¶ 7. As of January 2025, OCR had approximately 16,000 active investigations. Ex. 4, Doe 7 Decl. ¶ 16. These include nearly 6,000 complaints of disability discrimination, 3,200 of racial harassment or other race discrimination, and 1,000 of sexual harassment, including sexual violence.[1]

## II.     The Secretary gutted OCR as part of her "Final Mission" for the Department.

Despite the Department's and OCR's vital role in fulfilling the "federal commitment . . .

---

[1] Jennifer Smith Richard & Jodi S. Cohen, *"We've Been Essentially Muzzled": Department of Education Halts Thousands of Civil Rights Investigations Under Trump*, ProPublica (Feb. 13, 2025), https://perma.cc/28HM-TCPV.

to equal educational opportunities," S. Rep. No. 96-49, at 35, the Secretary has hollowed out both. Although she has conceded that an act of Congress would be required to formally shutter the Department, she nevertheless imposed the RIF as a "first step" to dismantle it.[2]

President Trump campaigned on a promise to shut down the Department and reaffirmed that plan shortly after he took office. In February 2025, he announced that he had told Education Secretary nominee Linda McMahon to "put herself out of a job" and that he would "like [the Department] to be closed immediately."[3] Two weeks later, on her first day in office, Secretary McMahon sent a message to all staff entitled "Our Department's Final Mission." Ex. 5 (March 3, 2025 Statement). The message acknowledged that the "final mission" would "profoundly impact staff, budgets, and agency operations . . . at the Department." *Id.*

As "part of" that "final mission," on March 11, 2025, the Secretary "initiated a reduction in force (RIF) impacting nearly 50% of the Department's workforce." Ex. 6 (Mar. 11, 2025 Press Release). In addition to "nearly 600" employees who accepted voluntary separation packages, the Department terminated another 1,315 of its approximately 4,113 workers. *Id.* Combined, the reductions shrank the Department's workforce by roughly half. *Id.* As part of the RIF, the Department closed seven of OCR's twelve regional offices—those in Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco. Ex. 7, Smith Decl. ¶ 14; Ex. 4, Doe 7 Decl. ¶

---

[2] Shahar Ziv, Education Department Layoffs Are 'First Step' To Shutdown Per McMahon, Forbes (Mar. 13, 2025), https://perma.cc/MM9B-MJQ6.

[3] Zachary B. Wolf, *Trump and Musk are moving to smother these three pieces of the government*, CNN (Feb. 5, 2025); https://perma.cc/VT7R-7HY6; Nandita Bose & Kanishka Singh, "Trump says he wants Education Department to be closed immediately," Reuters (Feb. 13, 2025), https://perma.cc/R82P-YR7R.

12. This eliminated at least 55% (208) of its 379 investigators. Ex. 4, Doe 7 Decl. ¶ 17.[4]

The press release asserted that the "reduction in force reflects the Department of Education's commitment to efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." Ex. 6 (Mar. 11, 2025 Press Release). The Secretary did not explain how she expected the RIF to serve those goals. *See id.* Although she wrote that the Department would "continue to deliver on all statutory programs that fall under the agency's purview, including formula funding, student loans, Pell Grants, funding for special needs students, and competitive grantmaking," the Secretary did not mention OCR or explain how it could deliver on its statutory civil rights mandates with only half its staff and offices. *See id.*

The same day, March 11, OCR staff members and other Department colleagues laid off in the RIF received an email stating: "your organizational unit is being abolished along with all positions within the unit—including yours." Ex. 7, Smith Decl. ¶ 6, 32. The email informed employees that they would be placed on administrative leave beginning March 21, 2025, and that they would receive an "official RIF notice" no earlier than 30 days after March 11, 2025. *Id.* at 32. Two hours before sending the notice to employees, the Department also notified its employees' union, AFGE Local 252, of the "intent to implement a department-wide reduction-in-force (RIF)." *Id.* at ¶¶ 5–6. Both emails referenced Executive Order 14158, Establishing and Implementing the President's "Department of Governmental Efficiency," 90 Fed. Reg. 8441 (Jan. 20, 2025), which directed agencies to "eliminat[e] waste, bloat, and insularity'" and "promptly undertake"

---

[4] The government had already taken steps to disable OCR before the Secretary took office. Shortly after President Trump's inauguration, OCR staff were directed to freeze all investigations into complaints filed by members of the public. Ex. 8 (Feb. 20, 2025 memo from Craig Trainor referencing the pause). On February 20, 2025, the acting head of OCR lifted that pause only as to complaints that alleged solely disability-based discrimination, which left the freeze in effect as to all other complaints, including any that alleged race or sex discrimination. *See id.* Although the Secretary later lifted the pause, she instituted the RIF just days later. *See* Ex. 6.

"preparations to initiate large-scale reductions in force." Ex. 7, Smith Decl. at 8; Ex. 2, Doe 1 Decl. at 15. Neither message provided any further explanation of the reasons for the RIF.

Within hours of receiving the notice, affected OCR staff lost physical access to Department buildings and lost electronic access to document management systems and external email, so they could not access or save case documents and could not communicate with complainants, witnesses, or schools about pending cases. *See* Ex. 2, Doe 1 Decl. ¶¶ 13-14; Ex. 9, Doe 3 Decl. ¶ 14. The notice stated that employees would lose all "access to ED accounts or systems" on March 21, and their terminations would take effect on June 9, 2025. Ex. 2, Doe 1 Decl. at 17.

In an interview the same day, March 11, 2025, Secretary McMahon confirmed that the RIF was part of an effort to shut down the Department of Education:

| Interviewer: | Now, is this the first step on the road to a total shutdown? |
|---|---|
| McMahon: | Yes, actually it is, because that was the President's mandate. His directive to me, clearly, was to shut down the Department of Education, which we know we'll have to work with Congress, you know, to get that accomplished. But what we did today was to take the first step of eliminating what I think is bureaucratic bloat. |

Fox News Channel, Mar. 11, 2025, https://www.foxnews.com/video/6369901522112 (recording of televised interview). On March 20, 2025, President Trump confirmed that directive through an executive order, which stated: "[t]he Secretary of Education shall, to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." Exec. Order 14,242, Improving Education Outcomes by Empowering Parents, States, and Communities, 90 Fed. Reg. 13679 (Mar. 20, 2025).

In further public comments on April 8, 2025, the Secretary acknowledged the RIF may

have gone too far. She compared it to a surgeon accidentally cutting into vital tissue: "Sometimes you cut a little deeper into the muscle than you intended, and you realize, 'That was too deep.' So you bring a couple of people back. I don't think that's necessarily chaotic."[5]

On April 10, 2025, the affected employees received an "official" notice that confirmed their "position[s] [were] being abolished" in a "reduction in force" and that their employment would be terminated effective June 10, 2025. Ex. 10, Hamlin Supp. Decl. at 6.

### III. The reduction in force makes it impossible for OCR to promptly investigate and resolve complaints and perform its other statutory functions.

Even before the Secretary cut the Department's workforce in half, OCR was already struggling to address a growing backlog of cases. *See* Ex. 11 (OCR Highlights of Activities for 2021-2025) at 7. Each year from 2022 through 2024, OCR received record numbers of complaints—including over 20,000 complaints in 2024. *Id.* at 5. Even though OCR resolved more complaints during the past four years than it did during the previous administration, it still "strained to meet the volume of need." Ex. 1, Lhamon Decl. ¶¶ 39-42. From 2021-2024, the four years preceding the RIF, OCR received around 14,547 more complaints than it resolved. Ex. 11 at 6-7. The average investigator managed 50 to 80 cases at once, "already an untenable caseload." Ex. 1, Lhamon Decl. ¶¶ 25-27, 39-42; Ex. 13 (OCR Budget Requests) at 17-18.

To meet these high demands, Congress allocated OCR a 2025 budget of $140 million to support the full-time equivalent of 557 employees. *See* Ex. 13 (OCR Budget Requests) at 10. For the past fifteen years, the Department has requested funds for between 500 and 800 full time equivalent staff at OCR, stating that such staffing was "necessary," essential, or required "for OCR to deliver on its statutory and regulatory mandates." *Id.* at 11, 32, 38, 44, 52, 60, 67, 75, 85, 95,

---

[5] Greg Toppo, The NEAP Test "Absolutely Needs to Stay, Linda McMahon says. The Education Department? Not So Much, The74 (Apr. 8, 2025), https://perma.cc/P86E-7TXC.

103, 114, 122, 130, 137, 145. In its 2025 budget request, OCR asked for $162.4 million for OCR to "support a full time equivalent (FTE) level of 643." *Id.* at 11. In support, it noted that "OCR's [staffing] levels have not kept pace with case demand." *Id.* at 16. It warned if the upward trend in caseloads persisted, "unless staffing is increased, the total increase in complaints [would] reach a level that significantly challenges OCR's capacity to effectively and efficiently investigate and resolve cases." *Id.*

By cutting OCR's already-lean staff in half, "the Department's RIF will render the Department unable to fulfill [OCR's] statutory functions" or "meet the existing need for its services." Ex. 1, Lhamon Decl. ¶¶ 30, 43; *see* Ex. 9, Doe 3 Decl. ¶¶ 15, 17; Ex. 4, Doe 7 Decl. ¶ 16; Ex. 7, Smith Decl. ¶ 14; Ex. 3, Gonzales Decl. ¶¶ 18-30. The closed offices covered some of the largest population centers in the country and handled most of OCR's cases. Ex. 4, Doe 7 Decl. ¶ 16. Even if OCR manages to redistribute those cases to open offices, the RIF will swell caseloads to an unmanageable 120 cases per investigator. *See* Ex. 1, Lhamon Decl. ¶ 26; Ex. 4, Doe 7 Decl. ¶¶ 18-20. OCR cannot do its job with that load. Many cases require significant work and "undivided attention" to resolve fairly and effectively, including "interviews, multiple document requests, on-site inspections," "ongoing work with the complainant," Ex. 9, Doe 3 Decl. ¶ 18, and negotiations with the school to secure relief, Case Processing Manual 16-18. Plus, due to the office closures, OCR will lose regional staff's local expertise and relationships and make it even harder to conduct necessary on-site inspections and interviews. Ex. 3, Gonzales Decl. ¶¶ 14, 20, 23; Lhamon Decl. ¶¶ 32–37; Ex. 2, Doe 1 Decl. ¶ 22. And because of their loss of systems access, investigators will not be able to effectively transition their work. Ex. 2, Doe 1 Decl. ¶ 20; Ex. 9, Doe 3 Decl. ¶ 14. If OCR struggled to deliver on its mandates before the RIF, it will be impossible to do so now.

**IV.    The RIF will irreparably harm plaintiffs and students across the country.**

The RIF will irreparably harm students across the country. Many students turn to OCR because, as a result of discrimination, they endure hostile environments, cannot access key services, miss out on classes or activities, or avoid school altogether. Ex. 2, Doe 1 Decl. ¶¶ 17-19; Ex. 9, Doe 3 Decl. ¶¶ 20-23; Ex. 3, Gonzales Decl. ¶¶ 32-33; Ex. 14, Haller Decl. ¶¶ 8, 12; Ex. 17, Malone Decl. ¶ 10; Ex. 12 (OCR 2024 Annual Report) at 23-65 (describing illustrative cases that OCR resolved). Such students' OCR complaints are time-sensitive; at this moment, many are waiting for OCR to act to restore their educational opportunities. Because of the RIF, OCR will not be able to do so in a timely or meaningful fashion, and students are losing the chance to learn.

**A.  T.R. and A.J.**

Plaintiffs T.R. and A.J. are two examples. Both experienced severe and persistent harassment in school—T.R. based on his race and A.J. based on his disability—and sought OCR's help when their schools would not take meaningful steps to address the hostile environment.

**T.R.** For almost two full school years, a group of other students harassed T.R. with racial epithets and physical violence. Ex. 15, Blunt Decl. ¶¶ 4-8. They called him a "n*gger" and a "monkey," said he had "bird's nest hair," and told him his skin looked like a "turd." *Id.* ¶¶ 4, 7. In October 2022, one of the students pushed T.R. to the ground and stomped on his head, and teachers found T.R. crying in the fetal position. *Id.* ¶ 5. T.R. and his mom, Tara Blunt, reported the harassment to teachers and administrators, but they took minimal action, offered no plan to protect T.R. from the ongoing harassment, and eventually told her they would "no longer discuss the matter" with her. *See id.* ¶ 6-9. With T.R. afraid to return to his public school, Ms. Blunt had to withdraw him from the school district and enroll him in a local private school, where T.R.'s family has had to pay tuition, fees, and other costs. *Id.* ¶ 10. The experience caused T.R. lasting trauma and made him feel unwelcome in his community. *See id.* ¶¶ 10-11.

After Ms. Blunt filed a complaint, OCR opened an investigation into whether the school district violated Title VI because it "failed to respond in a reasonable, timely, and effective manner to notice of a hostile environment based on [T.R.'s] race." Blunt Decl. ¶ 13. But that complaint is pending in OCR's Kansas City office, *id.*, which the RIF flooded with complaints transferred from the closed Dallas office, Ex. 3, Gonzales Decl. ¶ 19. As the Dallas Office's Chief Attorney testified, "[i]t is not possible for the Kansas City enforcement office to absorb this work" and still process its "own caseload," which it is "already struggling" to handle. *Id.* As a result, OCR is unlikely to resolve T.R.'s complaint before next fall, leaving him unable to attend sixth grade public school without reentering the hostile environment. *See* Ex. 15, Blunt Decl. ¶ 16.

**A.J.** Throughout the 2023–24 school year, A.J. was repeatedly harassed based on his life-threatening allergy to dairy. *See* Ex. 16, Josefosky Decl. ¶¶ 6-7. Classmates shoved him, punched him, and waved food with allergens, taunting him to eat it. *Id.* ¶ 6. In two separate incidents, they poured milk on his lunch and on his coat. *Id.* In another, ten students surrounded A.J., pushed him, tripped him, put cutouts of cheese on his desk and his cubby, and put cheese on his head. *See id.* ¶ 7. A.J. and his parents reported the harassment to his school, but officials did not take meaningful action to stop the harassment and denied A.J.'s parents' request to transfer him to a different school in the same district. *See id.* ¶ 8. As a result, to protect A.J. from the harassment, his parents withdrew him from public school and have homeschooled him ever since. *Id.* ¶¶ 9-10. A.J. is depressed and lonely because he cannot go to school with other kids. *Id.* ¶ 25.

After A.J.'s mother, Karen Josefosky, and his father filed a complaint, OCR opened an investigation into whether the school district "failed to investigate promptly and to respond appropriately" to disability-based harassment and to provide A.J. a "free appropriate public education" in violation of Section 504 and Title II. Ex. 16, Josefosky Decl. ¶¶ 13-14. The case was

assigned to OCR's Cleveland office. *See id.* ¶ 15. As the parties were scheduling an OCR-facilitated mediation, OCR froze investigations, *see id.* ¶ 19; *supra* n.4, and the Department imposed the RIF weeks later, Ex. 6 (Mar. 11, 2025 Press Release). Since then, OCR has not scheduled the mediation or indicated that any progress has been made on A.J.'s case. *See* Ex. 15, Josefosky Decl. ¶ 21. Because of the RIF, OCR is unlikely to remedy the hostile environment in time for him to return to school for fifth grade this coming fall. *See id.* ¶ 24; *supra* pp. 8-10.

### B.  Victim Rights Law Center

The RIF has also harmed Plaintiff Victim Rights Law Center (VRLC) and the people it serves. VRLC's mission is to ensure that survivors of sexual violence can access the resources they need to rebuild their lives. Ex. 17, Malone Decl. ¶ 3. To carry out that mission, and satisfy conditions of its funding, VRLC performs three critical functions in the education context: it (1) provides direct legal services to victims of sexual violence, including in OCR investigations, (2) counsels and trains attorneys and advocates about victims' legal rights and the remedies available to them when they are harassed or abused in school, and (3) reviews and advises on school policies and procedures to ensure they accurately describe those rights and remedies. *Id.* ¶ 4.

The RIF has impacted all of these functions. *See* Ex. 17, Malone Decl. ¶¶ 4-30. In 2024, VRLC represented seven students in OCR investigations. *Id.* ¶ 11. When the President took office, three of these complaints were still pending in OCR's Boston office, which is now closed. *Id.* ¶¶ 11-12. Since the RIF, VRLC has attempted to contact OCR to ascertain the status of its pending cases, but it has not received any response. *Id.* ¶ 12. Due to the RIF, OCR is now unlikely to provide VRLC's clients with timely or meaningful relief, and VRLC has had to turn down clients for whom OCR would have been the only path to recourse. *Id.* ¶¶ 13-15. Meanwhile, VRLC must devote hours of time to update training and policy materials and to respond to the many requests

from attorneys and advocates across the country who need to know where to seek relief now that OCR is unlikely to provide the resolutions their clients need. *See id.* ¶¶ 17-31.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction that would preserve the status quo by staying the RIF pending a final decision by this Court. Critically, the "status quo," for purposes of injunctive relief, is not the circumstances that existed "when the litigation began," but rather "the last uncontested status between the parties which preceded the controversy.'" *Baillargeon v. CSX Transportation Corp.*, 463 F. Supp. 3d 76, 83 n.9 (D. Mass. 2020) (quoting *Braintree Lab'ys, Inc. v. Citigroup Glob. Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010)); *accord Maryland v. U.S. Dep't of Agric.*, No. 25-cv-0748, 2025 WL 800216, at *22 (D. Md. Mar. 13, 2025) (holding that "status quo" was situation that existed before reduction in force).

To obtain an injunction, Plaintiffs must show that (1) they are "likely to succeed on the merits, (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor" and (4) "an injunction is in the public interest." *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025). The last two factors—the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs here satisfy all four elements.

## I.    Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits for three reasons. *First*, the RIF is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). *Second*, the RIF is contrary to law, in violation of the APA, because it violates Title IX, Title VI, and OCR's regulations. *Third*, the RIF is ultra vires because it lacks a reasoned explanation and exceeds Defendants' authority under the statutes and regulations that govern the Department and OCR.

**A.  The RIF is arbitrary and capricious in violation of the APA.**

The APA requires a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The "arbitrary and capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Thus, before taking a final agency action, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Even when the agency provides some explanation, it still violates the reasoned explanation requirement when it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The RIF violates this standard several times over.

**1.** Most fundamentally, the Department has failed to supply *any* reasoned explanation for its decision, let alone one that "examine[s] the relevant data and articulate[s] . . . 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43. The closest thing to an explanation the Secretary has provided is the March 11, 2025 press release, which states in conclusory terms that the RIF "reflects" a "commitment to efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." Ex. 6. Those are empty words. The release did not explain how halving the Department's staff and stalling civil rights investigations would lead to "efficiency" or "accountability." Nor did it identify any "resources" the Department was redirecting, where they would go, or how the reallocation

would benefit school communities. *See id.*

"This lack of proper explanation from the Department likely 'will not do'": "'a court [cannot] be expected to chisel that which must be precise from what the agency has left vague and indecisive." *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947)). Based on the press release alone, the Court "cannot say whether the Department properly considered all 'relevant data'" or that it "has not relied on factors which Congress did not intend it to consider." *Id.* at 99 (quoting *State Farm*, 463 U.S. at 43) (cleaned up); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) (holding that agency's "conclusory statements d[id] not suffice to explain its decision"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of *reasoning*.").

**2.** To the extent that any reason for the RIF is decipherable, it is arbitrary and capricious because it relied on a factor Congress did not intend it to consider, *see State Farm*, 463 U.S. at 43: the President's goal to "facilitate the closure of the Department of Education," Exec. Order 14242, 90 Fed. Reg. 13679 (Mar. 25, 2025), an agency Congress established and charged with performing its prescribed functions, *see* 20 U.S.C. §§ 3402, 3411, 3413; 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. Indeed, Congress expressly forbade the Secretary to close Department offices, including OCR, established by statute or to reallocate the functions Congress delegated to them. 20 U.S.C. § 3473(a). Nonetheless, the press release states that the RIF is "part" of the Secretary's "final mission" of closing the Department, Ex. 6, a fact the Secretary confirmed in her public statements, *see supra* p. 7. The Secretary's own words thus confirm that the RIF serves a purpose that was expressly placed off limits by Congress. That violates the APA. An agency's actions must be "tied . . . to the purposes" of its governing statute, not designed to frustrate them. *Judulang v. Holder*,

565 U.S. 42, 55 (2011); *Adams*, 480 F.2d at 1164 (holding that "policies [the agency] adopts and implements" must be "consistent with [its statutory] duties and not a negation of them").

**3.** The Department also ignored "an important aspect of the problem," *State Farm*, 463 U.S. at 43—the likelihood that the RIF would severely undermine OCR's capacity to investigate and resolve its growing backlog of civil rights complaints and deliver on its statutory and regulatory mandates. Titles VI affirmatively "requires the agency to enforce the Act"—a "clear statement of an affirmative enforcement duty" that "should not be discounted." *Adams*, 480 F.2d at 1162 (citing 42 U.S.C. § 2000d-1). Title IX imposes the same obligation to enforce its terms. 20 U.S.C. § 1682. To implement those commands, federal regulations require OCR to do a "prompt investigation" of any complaint that "indicates a possible failure to comply" with the civil rights statutes. 34 C.F.R. § 100.7(c) (Title VI regulations); *see* 34 C.F.R. § 104.61 (incorporating this requirement); 34 C.F.R. § 106.81 (same); 28 C.F.R. § 35.171(a)(3) (same).

A chorus of current and former OCR employees—including the former Assistant Secretary for Civil Rights and the Chief Attorney of the Dallas OCR Office—attests that it will be impossible for OCR to fulfill those legal obligations with only half its staff. Even before the RIF, OCR had a growing backlog of complaints that its 600-plus staff struggled to clear. For the past fifteen years before the RIF, including during the first Trump Administration, OCR repeatedly reaffirmed that a staff of between 500 and 800 full time equivalent employees was "necessary" and "essential" for OCR to deliver on its statutory and regulatory mandates." *Supra* pp. 8-9. Yet the Department has not explained how OCR could comply with those mandates with less than half that number. *See California*, 132 F.4th at 99 (holding Department of Education's decision to terminate teacher training grants was arbitrary and capricious in part because the agency did not "account[] for all relevant impacts of cutting off funding to programs already in place"); *Victim Rts. L. Ctr. v.*

*Cardona*, 552 F. Supp. 3d 104, 132 (D. Mass. 2021) (holding one provision of Department's Title IX rule arbitrary and capricious because agency "failed to consider the consequences" of provision when applied alongside existing regulatory requirements). Nor did it "examine" any "data" about OCR's capacity to process its backlog with its staff cut in half. *State Farm*, 463 U.S. at 43.

The Secretary also failed to consider the "serious reliance interests" of students, families, schools, and other stakeholders throughout the education system who count on OCR to do its job. An agency must consider such interests when it "changes course." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). At the time of the RIF, thousands of students, families, and advocates were relying on OCR to resolve their pending complaints. *See* Ex. 4, Doe 7 Decl. ¶ 16. The OCR process requires complainants to forgo other complaint processes while OCR investigates. *See* Case Processing Manual 10-11 (explaining that OCR will not investigate if the same complaint is pending with a competent state or local agency). Schools rely on OCR for guidance to help them prevent and address discrimination. *See*, *e.g.*, Ex. 18, Carmona Decl. ¶¶ 39-40. Several state agencies are not set up to investigate discrimination complaints because they refer such cases to OCR. *See* Ex. 20, Echelson Decl. ¶¶ 55–61 (Rhode Island); Ex. 19, Ehling Decl. ¶ 19 (New Jersey). Organizations like VRLC have advised clients, developed expertise, and structured their activities in reliance of OCR's continued availability and services. *See* Ex. 17, Malone Decl. ¶¶ 11-15, 22, 27-29. By ignoring these matters, the agency failed to consider another "important aspect of the problem." *State Farm,* 463 U.S. at 43.

**4.** The RIF's inconsistency with the Department's longstanding position that OCR needed *more* full-time equivalent staff to carry out its enforcement mandates makes the decision especially flawed. "[W]hen an agency acts 'inconsistent[ly]' with an 'earlier position,'" it must at least "display awareness that it *is* changing position" and offer "good reasons" for the change. *Food &*

*Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 918 (2025). "[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino*, 579 U.S. at 222. The Department's decision to cut its staff in half is irreconcilable with its annual statements—spanning over fifteen years and administrations from both parties—that far higher staffing levels were "necessary," "essential," or "required" for OCR to do its job, *supra* pp. 8-9 (citing budget requests). Its failure to address that inconsistency is another reason the RIF is arbitrary and capricious.

**B.  The RIF violates OCR's statutory and regulatory mandates.**

The APA also requires courts to hold unlawful and set aside agency action that violates other federal laws. *F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003). An agency may not adopt a policy or practice that "amount[s] to an abdication of its statutory responsibilities." *Mass. Pub. Int. Rsch. Grp., Inc. v. U.S. Nuclear Regul. Comm'n*, 852 F.2d 9, 19 (1st Cir. 1988); *see N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 159 (1st Cir. 1987) (Breyer, J.) (holding that relief would be appropriate under the APA if agency systemically failed to meet its statutory obligation to enforce housing discrimination laws in Boston area). And it may not violate its own regulations. *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir.), *amended on reh'g*, 973 F.3d 143 (1st Cir. 2020). The RIF violates both.

**1.**  As explained above, Title VI and Title IX require OCR to enforce their antidiscrimination provisions, *Adams*, 480 F.2d at 1163 (Title VI); 42 U.S.C. § 2000d-1 (same); 20 U.S.C. § 1682 (Title IX), and federal regulations require OCR to "prompt[ly]" investigate complaints indicating "possible" violations of those statutes or of Section 504 or Title II, 34 C.F.R. § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R. § 104.61; 28 C.F.R. § 35.171(a)(3). A systemic failure to take timely enforcement action violates those commands. *See Adams*, 480 F.2d at 1161 (holding

that OCR's predecessor agency violated its statutory mandate to enforce Title VI when it systemically failed to initiate enforcement proceedings against schools that violated statute).

The RIF has the same effect. By cutting OCR's staff in half and closing more than half its offices, the Department has made it impossible for OCR to promptly investigate complaints or initiate enforcement proceedings. *See supra* 8-9. While OCR has opened a few self-directed investigations into discrete forms of purported discrimination, like diversity programs alleged to discriminate against white students, OCR has not announced a single new investigation or resolution of a complaint of race discrimination against a student of color, sexual harassment, or disability discrimination made by a member of the public since President Trump was inaugurated. *See*, *e.g.*, U.S. Dep't of Educ., Newsroom, https://www.ed.gov/about/news (accessed May 2, 2025); U.S. Dep't of Educ., Open Investigations, https://ocrcas.ed.gov/open-investigations (same). Many students who need immediate relief will continue to suffer discrimination for years—and may even graduate or fail to graduate—before OCR acts on their case, if it ever does. *See supra* pp. 10-12. This violates OCR's mandates to "effectuate" Title IX and Title VI, *Adams*, 480 F.2d at 1162 (quoting 42 U.S.C. § 2000d-1); 20 U.S.C. § 1682, and to promptly investigate *all* complaints that indicate potential violations of the statutes it enforces. 34 C.F.R. § 100.7; 34 C.F.R. § 104.61; 34 C.F.R. § 106.81 (Title IX); 28 C.F.R. § 35.171(a)(3) (Title II).

**2.** By making it impossible for OCR to promptly investigate or resolve discrimination complaints, the RIF also exceeds the Secretary's statutory authority under the DOEA. Although the Secretary may "consolidate, alter, or discontinue" some Departmental units "as may be necessary or appropriate," the statute excludes OCR from the Secretary's authority in that regard. The Secretary may *not* "consolidate, alter, or discontinue" OCR. 20 U.S.C. § 3473(a)(1); S. Rep. 96-49, 83, 1979 U.S.C.C.A.N. 1514, 1597 (explaining that the Secretary may not "consolidate,

alter, or discontinue organizational entities . . . established by statute"); 20 U.S.C. 3413 (establishing OCR by statute). But that is exactly what the RIF does: it eliminates half of OCR's staff and seven of its regional offices, requires over half its cases to be reassigned to distant locations, and makes it impossible for OCR to perform the functions that Congress assigned it.

### C. The RIF is ultra vires.

The Court may also vacate the RIF based on its equitable power to set aside ultra vires executive actions—actions that exceed the Executive's legal authority. Even before the APA, the Supreme Court had long held that federal courts could grant injunctive relief against federal officials who are violating "or planning to violate" federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Under this doctrine, even when APA review is unavailable, the Court may set aside executive action that does not reflect "reasoned decisionmaking" or violates a statutory mandate. *Sears, Roebuck & Co. v. United States Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016); *see Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006).

The RIF exceeds Defendants' lawful authority for at least two reasons. First, as explained above, the RIF is not the product of "reasoned decisionmaking" because it was not "supported by the agency's contemporaneous justification." *Sears, Roebuck & Co.*, 844 F.3d at 265; *see also Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 971, 975 (D.C. Cir. 2022) ("[A]n agency acts ultra vires when its decision is not supported by "contemporaneous justification by the agency itself," but only "*post hoc* explanation [by] counsel."). Second, by making it impossible for OCR to meet its statutory and regulatory mandates, the RIF violates Title IX and Title VI and exceeds the Secretary's authority under the DEOA. *See supra* pp. 18-19.

## II.    Plaintiffs will suffer irreparable harm without a preliminary injunction.

The evidence shows that T.R., A.J., and VRLC are likely to suffer irreparable harm absent

injunctive relief. A party suffers irreparable harm when their injury is not "accurately measurable or adequately compensable by money damages," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 217 F.3d 8, 13 (1st Cir. 2000), so that they have "no adequate remedy at law," *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). District courts have "broad discretion" to determine whether a plaintiff will suffer irreparable harm. *K-Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989). Such harm exists here. Without judicial relief, T.R. and A.J. will continue to be deprived of a public education. Meanwhile, the RIF frustrates VRLC's mission, diverts its time and resources, and will damage its standing in the communities it serves.

### A.  T.R. and A.J. will suffer irreparable harm absent injunctive relief.

As long as OCR remains understaffed and unable to act on their complaints, T.R. and A.J. will be unable to return to public school without facing a hostile educational environment. A student's "loss of [their] right to a free public education, and its likely impact on [their] future opportunities, is not accurately measurable or adequately compensable by money damages." *Johnson v. Collins*, 233 F. Supp. 2d 241, 252 (D.N.H. 2002); *see Murphy v. Fort Worth Indep. Sch. Dist.*, 258 F. Supp. 2d 569, 575 (N.D. Tex. 2003) (holding that student would suffer irreparable harm because, if denied required process, he "would be denied . . . the valuable right to continue his education at his home school"), *vacated on other grounds*, 334 F.3d 470 (5th Cir. 2003).[6] While that exclusion alone constitutes an irreparable harm, the severe psychological

---

[6] Courts across the country agree that lost educational opportunities are an irreparable harm. *See, e.g.*, *P.G. ex rel. C.G. v. Saucon Valley Sch. Dist.*, 571 F. Supp. 3d 430, 444 (E.D. Pa. 2021) ("[C]ompensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time."); *Brown v. Bd. of Educ. of Rochester City Sch. Dist.*, No. 04-CV-6596L, 2005 WL 17838, at *1 (W.D.N.Y. Jan. 4, 2005) (same); *Blackman v. D.C.*, 374 F. Supp. 2d 168, 171 (D.D.C. 2005)(same); *Cox v. Brown*, 498 F. Supp. 823, 829 (D.D.C. 1980) ("[A]bsent injunctive relief, [students] will suffer the irreparable harm of lacking each day of their young lives an appropriate education, one that is sensitive to their particular disabilities, commensurate to their levels of understanding, and fulfilling of their immediate needs.").

distress and stigma that arise from it are also irreparable. *See Tirrell v. Edelblut*, 748 F. Supp. 3d 19, 45 (D.N.H. 2024) (finding irreparable harm where there was evidence of "shame and humiliation of being unable to participate in a school activity" based on student's protected status).

**B. VRLC will suffer irreparable harm absent injunctive relief.**

VRLC is also likely to suffer irreparable harm without injunctive relief. The RIF interferes with VRLC's core legal practice, diverts its resources, and harms its standing in the community.

*First*, the RIF effectively ends VRLC's practice representing students in OCR proceedings. VRLC cannot not responsibly advise clients to pursue a dead-end process. *See* Ex. 17, Malone Decl. ¶ 14. Because VRLC cannot represent people in lawsuits, this leaves VRLC with no way to seek recourse for victims who cannot get it from their schools directly. *See id.* ¶ 15. Such impacts, which "make it more difficult for" VRLC "to accomplish [its] primary mission," cause "irreparable harm." *Massachusetts v. Nat'l Institutes of Health*, No. 25-cv-10338, 2025 WL 702163, at *30 (D. Mass. Mar. 5, 2025) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016)); *see Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600, 611 (D. Mass. 2020) (finding irreparable harm where administrative rule change made it more difficult for legal advocacy organization to obtain relief for its clients); *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 175 (D.D.C. 2021) (holding agency action would irreparably harm legal nonprofit because it would undermine the organization's "ability to serve their existing clients and take on new clients" (cleaned up)).

*Second*, the RIF is forcing VRLC to sink hours of attorney time into investigating alternative avenues of relief for victims nationwide, revising training materials, and revising policies and procedures. Ex. 17, Malone Decl. ¶¶ 21-31. The RIF has unleashed a stream of inquiries from attorneys and advocates nationwide who need to know how to help their clients now

that OCR is no longer a viable path to relief. *See id.* ¶ 21. Whereas before VRLC could rely on its expertise in OCR proceedings, now its attorneys must "conduct hours of research to determine the alternative options available to victims in particular states and territories about which VRLC has little or no prior familiarity." *Id.* ¶¶ 22-26. VRLC will also need to create new materials to train lawyers, advocates, and campus professionals about the alternative remedies available in their states, and it will need to review school policies and procedures to ensure they provide accurate information about where students can file complaints after OCR closed seven offices. *See id.* ¶¶ 28-31. All this work requires time and resources that VRLC could otherwise use to help advance its mission, *id.* ¶¶ 6, 23, 31—and which VRLC cannot recover through a lawsuit. This is irreparable harm. *See*, *e.g.*, *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (holding that "diversion of resources away from the [organizations'] core missions" was irreparable harm); *Ryan v. U.S. Immigr. & Customs Enf't*, 382 F. Supp. 3d 142, 159 (D. Mass. 2019) (same), *reversed on other grounds*, 974 F.3d 9, 33 (1st Cir. 2020); *Mass. Fair Hous. Ctr.*, 496 F. Supp. 3d at 608 (same).

*Third*, while OCR remains hobbled, VRLC's standing and reputation will suffer. "By its very nature[,] injury to goodwill and reputation is not easily measured or fully compensable in damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996); *see Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 2025 WL 1116157, at *22 (D.R.I. Apr. 15, 2025) (finding irreparable harm where action damaged nonprofits' standing in the communities they served). Because the Secretary has rendered OCR an unviable path to relief, VRLC must turn away clients for whom an OCR complaint would have been the only option. *See* Ex. 17, Malone Decl. ¶ 15. This costs VRLC client relationships, and the knowledge that VRLC can no longer help many students will cost VRLC goodwill in the Boston community. *See id.* ¶ 16; *Grimes & Co., Inc. v. Carlson*, No. 4:24-cv-11521-MRG, 2024 WL 5110193, at *8 (D. Mass.

Dec. 12, 2024) (explaining that damage to client relationships is irreparable harm); *Nat'l Institutes of Health*, 2025 WL 702163, at *31 (finding irreparable harm where government action rendered doctors unable to serve patients and thereby damaged their relationships with them). VRLC's reputation as a nationwide consultant and expert on remedies for student victims of gender-based violence will also suffer. *See* Ex. 17, Malone Decl. ¶ 27. While VRLC had accumulated expertise on the OCR process, it lacks the same expertise about local remedies in other states and will not be able to develop it. *See id.* This all diminishes VRLC's value and reputation as a resource for students, families, and professionals across the country. *Id.*

### III.    The balance of equities and the public interest favor an injunction.

The balance of equities and public interest strongly favor an injunction. "The public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006); *see League of Women Voters*, 838 F.3d at 12 (same). Here, T.R., A.J., and VRLC would all face severe and irreparable harms without an injunction. And the RIF impacts students across the country who look to OCR to obtain relief—like commitments from schools to address hostile environments or accommodations they need to learn—but who will not receive that relief while OCR cannot resolve cases in a timely manner. *See supra* pp. 10-12. The harm to those students in the form of lost educational opportunities, the stigma of unremedied discrimination, and, in many cases, being unable to attend school at all, is immeasurable. *See supra* pp. 21-22.

On the other hand, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Nat'l Insts. of Health*, 2025 WL 702163, at *32 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see Woonasquatucket*, 2025 WL 1116157, at *23 (holding that order that "simply enjoin[ed] sweeping agency action that was likely arbitrary and capricious and in excess of statutory authority"—by requiring the government to distribute funds

it owed nonprofits—would not harm the government).

And the government would not suffer harm from staying the RIF under the circumstances of this case. Although the government may incur monetary costs in retaining employees that it would prefer to terminate, that money will not go to waste: There is a large backlog of OCR cases that OCR must resolve, and that affected employees can continue to process if allowed to continue their jobs. *See supra* p. 8. Nor will OCR need to rehire employees if relief is granted promptly. The affected employees remain employed by the government; their terminations will not take effect until June 9, 2025. Ex. 2, Doe 1 Decl. at 17. Defendants need only allow them to resume the work Congress directed OCR to perform and appropriated funds to support.

Accordingly, the balance of equities and public interest strongly favor an injunction.

## IV.    The Court should waive the bond requirement or impose a nominal bond.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," "including the discretion to require no bond at all." *Woonasquatucket*, 2025 WL 1116157, at *24. In "suits to enforce important federal rights or 'public interests,'" courts generally do "not require posting of a substantial bond." *Maine v. United States Dep't of Agric.*, No. 1:25-cv-00131, 2025 WL 1088946, at *30 (D. Me. Apr. 11, 2025); *see Maryland*, 2025 WL 973159, at *40 ("[A] nominal bond is common in public-interest litigation cases, as requiring plaintiffs to 'bear up front the total cost of the alleged governmental wrongdoing' will often be effectively to foreclose judicial review altogether."). In line with this practice, the Court should waive bond or set a nominal bond of $1 here. *See*, *e.g.*, *Woonasquatucket*, 2025 WL 1116157, at *24 (waiving bond for nonprofit in APA case).

## CONCLUSION

The Court should grant Plaintiffs' motion: it should stay the RIF and order Defendants to allow affected staff to return to work so that OCR can meet its legal obligations.

Respectfully submitted,

*/s/ Sean Ouellette*
Sean Ouellette
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
souellette@publicjustice.net

L. Reid Skibell
Jonathan H. Friedman
GLENN AGRE BERGMAN & FUENTES, LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 970-1600
rskibell@glennagre.com
jfriedman@glennagre.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE AND RULE 7.1 CERTIFICATION**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified in the Notice of Electronic Filing.

*/s/ Sean Ouellette*
Sean Ouellette