# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*,

   Plaintiffs,

              v.

LINDA McMAHON, *et al.*,

   Defendants.

C.A. No. 1:25-cv-10601

**DECLARATION OF CATHERINE E. LHAMON**

## DECLARATION OF CATHERINE E. LHAMON

I, Catherine E. Lhamon, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a resident of the state of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.     I twice served as Assistant Secretary for the United States Department of Education, Office for Civil Rights (OCR). In that role, I served as the principal advisor to the United States Secretary of Education on civil rights matters.  I was first nominated to the position in 2013 by President Obama and unanimously confirmed by the Senate. I remained in this position until January 2017. In 2021, I was again nominated to the position by President Biden and confirmed by the Senate, serving until January 2025.

3.     As Assistant Secretary for Civil Rights, I enforced federal civil rights laws in schools nationwide, supervised and reviewed the generation of regulations, published policy guidance, and oversaw the Civil Rights Data Collection, a mandatory survey of the nation's

1

schools that collects civil rights data about students' experiences. I oversaw a fulltime staff of approximately 600 employees in OCR's headquarters in Washington D.C., and OCR's 12 regional enforcement offices around the country.

4. I have spent my career of nearly three decades litigating and enforcing civil rights. I have a B.A. in American Studies from Amherst College and a J.D. from Yale Law School. Prior to my second appointment as Assistant Secretary for Civil Rights, I was Deputy Assistant to the President for Racial Justice and Equity from January to October 2021. Before that, I served as Chair of the United States Commission on Civil Rights from December 2016 to January 2021. Prior to that I was Legal Affairs Secretary to California Governor Gavin Newsom from January 2019 to January 2021. I have spent over a decade as a civil rights litigator at offices including National Center for Youth Law, Public Counsel, and ACLU Foundation of Southern California. I began my career as a Law Clerk to the Honorable William A. Norris in the United States Court of Appeals for the Ninth Circuit.

5. I am providing this declaration in connection with the announcement by the Department of Education ("the Department") on March 11, 2025 that it would be reducing its staff by 50%. *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"). I am also aware of the comments that same evening by Secretary of Education Linda McMahon that this reduction in force (RIF) marks the "first step" toward implementing President Trump's directive that she "shut down" the Department of Education. *Education Secretary: Mass Layoffs First Step Toward Total Shutdown*, The Hill (Mar. 12, 2025),

https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/.

6.      I understand from reviewing the March 11, 2025 Press Release, that the Department initiated this RIF impacting nearly 50% of the Department's workforce; that the RIF affected all offices within the Department, with some offices undergoing significant reorganization; and that impacted Department staff will be placed on administrative leave beginning Friday, March 21, 2025.

**Background on the Office for Civil Rights (OCR)**

7.      OCR enforces several federal civil rights laws that prohibit discrimination in programs or activities that received federal financial assistance from the Department of Education. OCR protects the civil rights of more than 49 million students in public pre-K-12 schools in more than 18,000 public school districts and over 19 million students in over 6,000 colleges and universities.  *Protecting Civil Rights: Highlights of Activities, Office for Civil Rights (2021-2025)*, U.S. Dep't of Educ., (Jan. 2025) https://www.ed.gov/media/document/protecting-civil-rights-109409.pdf.

8.       OCR enforces and investigates complaints related to federal civil rights laws including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and Boy Scouts of America Equal Access Act. During my tenure, OCR employed about 400 investigators across 12 regional offices to process complaints and take on proactive investigations.

9.      OCR investigates claims of discrimination based on disability, sex, race and national origin, and age as well as claims of retaliation discrimination and sexual assault. For

example, past investigations have covered claims that schools have failed to address harassment based on race, claims that schools have failed to provide physically accessible facilities to students with mobility disabilities, and claims that schools have failed to adequately respond to allegations of sexual harassment.

10.     OCR regional staff conduct investigations and negotiate resolutions.

11.      OCR investigators review complaints filed to determine whether OCR has jurisdiction, whether the complaint was timely filed, and whether OCR needs consent to proceed with investigation. When OCR opens a case for investigation the investigation typically includes requests for, and review of, documents and relevant information from various parties, interviews with school staff, witnesses, and others, and follow-up for additional documents and interviews as necessary. OCR investigative staff determine if the law as applied to the facts confirms a violation.

12.     OCR may begin negotiations with recipients of federal funds to resolve violations or concerns that it identifies during the course of an investigation. OCR's Complaint Processing Manual specifies time periods for conducting these negotiations. OCR investigators follow a rigorous process upholding statutory requirements to provide schools with the opportunity to remedy any violation or concerns. The majority of investigations result in voluntary agreements, and fund termination is extremely rare.

13.     Following resolution by agreement, OCR monitors to ensure the recipient of federal funds implements the terms of the agreement. In this monitoring phase, OCR often analyzes data and reviews whether policy changes were effective and legally compliant. If they are not, OCR continues working to secure more fulsome compliance. OCR does not cease monitoring until the resolution agreement is satisfied.

14.     OCR also provides trainings and technical assistance to state and local educational agencies nationwide. OCR answers questions from schools, community organizations, and parent associations on topics including the laws in OCR's jurisdiction, OCR process, and types of civil rights harms. The office frequently receives questions about the law, and regional staff respond to these inquiries. It is very common, for example, to offer trainings on Section 504 of the Rehabilitation Act focused on access to school for students with disabilities. During my second appointment, regional office staff provided hundreds of legal trainings.

15.     OCR issues policy guidance and drafts regulations related to the laws that OCR enforces. During the Biden administration, I oversaw the issuance of 65 policy guidance documents that explained the law to schools and communities. We also worked for years to develop the most comprehensive regulations to Title IX issued since 1975. We were working to update regulations to Section 504 of the Rehabilitation Act, which would have been the first update in nearly five decades.

16.     OCR administers the Civil Rights Data Collection and publishes summaries of the data. OCR also maintains a public website with the data itself so that the data are available to the community. The public website includes data snapshots and reports related to equity indicators. Any individual can look at data for any single school, district, or state and pull indicators that are visually available on the website. These data are available to anyone, including researchers, parents, school principals and superintendents, and OCR investigators.

17.     During my second appointment to OCR, I oversaw an update to the Complaint Processing Manual to create for first time an option for complainants to request at the time of filing for OCR to mediate their concerns. Mediation was an option prior to that, but it was not an

explicit option on the complaint form until this update. Following this update, OCR was able to resolve hundreds more cases through mediation, sometimes in as few as 12 days.

18.     As part of this update, OCR provided mediation training to staff in every office to ensure they were prepared to accommodate mediation requests. OCR also trained staff about the various legal issues relevant to OCR's work to ensure every staff member was ready to respond.

19.     OCR has a rapid resolution procedure that could be used at any stage of investigation. For example, if staff found a legal violation during the evaluation stage, they could invoke the rapid response procedure and immediately start negotiating a resolution.

20.     The rapid resolution procedure led to fast, effective resolutions for heartbreaking issues. For example, a parent of a kindergartener who used a wheelchair reached out when the school refused to allow the student to bring their wheelchair on campus unless and until an Individualized Education Program meeting could be held. This type of meeting could take months to schedule, meaning the student would miss the start of the school year. OCR contacted the school to explain the legal violation and outline the remedy. Due to the rapid response, not only was the student was able to start school on time, but the school also changed the way it interacted with students with disabilities. OCR's efficient process was immensely consequential in the life of that five-year-old and future students.

21.     I also worked directly with staff discussing issues and questions. As one example, I met twice a week with regional staff and the relevant Enforcement Director and the Deputy Assistant for Enforcement to talk through cases and move investigations efficiently.

### The Harmful Impact of the RIF on OCR

22.     On information and belief, OCR staff has been cut by approximately 50% as part of a massive RIF.

23.     On information and belief, seven of the twelve regional offices—Boston, Dallas, New York, Chicago, Cleveland, San Francisco, and Philadelphia—will be closed in June 2025 and their staff placed on administrative leave as of March 21, 2025.

24.     On information and belief, the remaining offices will take on open matters from closed offices and be responsible for processing new complaints and investigations from those regions.

25.     At the time I left OCR, the average caseload was approximately 50 cases per OCR investigator.

26.     On information and belief, the average caseload is now as high as 80 cases per investigator. With the closure of more than half of the regional offices, I expect that average to dramatically increase as high as 120 cases per investigator.

27.     In my experience, 50 cases per investigator was already an untenable caseload. President Biden made budget requests to Congress every year in office to appropriate additional funds for hundreds more investigators. Despite instituting many efficiencies, including those described herein, more investigators were still needed.

28.     I expect that investigators having more cases to handle will also result in investigations resolutions becoming slower and less comprehensive or thorough. Staff members will be swamped with a deluge of cases on their dockets which will impede the efficiency and effectiveness of their work.

29.     Congress guarantees in the civil rights laws OCR enforces that no person shall experience discrimination in schools funded by the Department of Education. Congress created OCR to be a federal backstop against discriminatory harm to ensure we do not cross that line.

What is happening now is the Department is erasing that line and creating a situation where students who experience discrimination will have no federal redress.

30.    Given my experience, I believe the Department's RIF will render the Department unable to fulfill its statutory functions. There are no extraneous functions in OCR. To remove seven of twelve regional offices and approximately half of OCR's enforcement personnel means the office will exist in name but not in actual function.

31.    The Department claims it has updated the OCR Complaint Processing Manual in February 2025. I reviewed the latest version and found minimal changes that will not make up for losing half the staff. With the complaint volume, complaint processing changes could not make up for the significant loss of the investigators who do the work.

32.    This RIF will cause great harm to school communities.

33.    Civil rights enforcement staff in OCR have the most concentrated expertise in the country when it comes to civil rights in the education context. There is no other entity that has the expertise that OCR does because OCR has been doing this work for decades in every state and as applied to the very wide variety of kinds of civil rights harms that could and do occur in schools. Even the newest investigators have the benefit of robust training materials and are able to work on their cases with experienced and knowledgeable staff.

34.    Often school communities may not understand the application of a particular law, but OCR does. And OCR has the benefit of institutional knowledge and experience, having often seen fact patterns or issues that may be novel to a particular school community. In those situations, what is new and unfamiliar to that community often is an issue that someone on the OCR staff has seen before and knows how to investigate, address, and resolve. Losing this

expertise by indiscriminately terminating half of the workforce is guaranteed to slow down justice for students and families.

35.    The RIFs will not only result in the loss of institutional knowledge but also in the loss of community relationships built over decades. In theory and practice, the regional offices know the school communities they serve. They often know school administrators as well as the specific state and local laws and requirements. These relationships and knowledge allow them to more effectively navigate investigations. School mores and practices are different in different states. Regional staff familiarity with these mores and practices allows the office to negotiate resolutions more quickly. That familiarity also means people in the community are often willing to reach out to OCR based on established relationships. It is dangerous and counterproductive not to have people with those relationships at OCR.

36.    For example, regional office expertise and relationship building helped resolve an investigation in a school district regarding whether Native American students were subject to discriminatory discipline and lacked access to rigorous coursework in comparison to their white peers. During an investigative interview, the superintendent repeatedly said that Native American families operated on "Indian time" and that's why their kids had higher truancy rates and experienced greater discipline. OCR worked with local Tribes to confirm that the superintendent's characterization was untrue and based on stereotypes. It matters that regional office staff have local relationships.

37.    Cutting staff means cutting expertise and relationships. That seems to me designed to result in insufficient relief for kids.

38.    OCR promises that it will investigate every case within its jurisdiction that is timely filed. It is an exceptionally beautiful promise to fulfill Congress's charge that no person

shall experience discrimination in school. Families are entitled to timely answers to their civil rights questions and concerns.

39.     During my tenure as Assistant Secretary, OCR got lean, effective, and efficient. During my second stint in the job, I had the particular benefit of having served in the role before, so I was not learning about OCR's work and processes for the first time. And yet, I cannot think of anything else we could have done to make the work move more quickly with the resources we had.

40.     During my second term as Assistant Secretary, OCR managed the highest caseload in its history and resolved the second, third, and fourth highest number of cases per year during fiscal years 2022, 2023, and 2024. U.S. Dep't of Educ., cited *supra* ¶ 7.

41.     Even though OCR saw a 64% increase in complaint volume during the Biden-Harris Administration compared to the prior Trump Administration, OCR resolved 14% more cases during the Biden-Harris Administration than OCR resolved during the prior Trump Administration. In fact, during the four years of the Biden-Harris Administration OCR resolved fully 80% of the total number of cases OCR had resolved during all eight years of the Obama Administration. *Id.*

42.     But despite these successes, OCR strained to meet the volume of need. It was heartbreaking to OCR staff not to be able to answer every question in the most timely fashion.

43.     A RIF of this size will devastate OCR and render it unable to meet the existing need for its services. If this RIF proceeds as announced, it is impossible to conceive how OCR can service its function and fulfill Congress's promise for the nation's families.

**The Harmful Impact of the RIF on Other Department of Education Functions**

44.    As Assistant Secretary for Civil Rights, I also worked closely with other offices within the Department.

45.    I worked closely with the Department of Education Office of General Counsel (OGC) in many different areas. The Department's practice under Presidents Obama and Biden was to have intra-agency review of any policy document to be published. If an office published guidance, both OCR and OGC would review for legal sufficiency. OCR's review focused on civil rights laws, and OGC's review encompassed a broader legal charge.

46.    On information and belief, OGC will lose of the vast majority of its staff as a result of this RIF.

47.    I do not know how OGC could now complete legal sufficiency review for guidance and grants. I cannot imagine they could assure lawfulness of those drafts. I am aghast that OGC would have so few people in it given this critical responsibility.

48.    I know from working with colleagues across offices that people draft their proposed guidance and grant solicitations with every good intention, but there is value in having the eyes of different offices review to ensure one office's policy is not in conflict with the work of another. If not crafted this way, I expect there will be wrong answers and information that does not comply with the law in what the Department of Education publishes, causing great harm to states and schools.

49.    Without the lawyers in OGC to explain what is unlawful, I expect unlawful actions will follow. Losing OGC expertise means guidance or grant applications or other publications from the Department will be likely to be legally insufficient because nonlawyers in

the Department offices may not know about statutory limitations or conflicts with other laws, and that will harm delivery of education in the states.

50.     During my time at OCR, I benefitted from working with OGC on decisions related to hiring and personnel actions. From my experience of federal hiring over many years, OGC's great expertise clarifies a sometimes Byzantine process and provides necessary guardrails to protect against unlawful action. I expect the Department to be harmed in its ability to carry out lawful hiring and personnel actions without OGC expertise in determining what is and is not permissible

51.     I also spent three years working on two large bodies of regulation that we crafted hand in glove with OGC. They reviewed our view of legal sufficiency in draft regulations and also covered laws beyond OCR's jurisdiction.

52.     Publication of regulations must go through interagency review. OGC negotiates those conversations among agencies including, Health and Human Services, Equal Employment and Opportunity Commission, and any other federal agency with interest in the topic to be regulated.

53.     When the President issues an Executive Order, typically that draft undergoes this interagency review before publication. OGC navigates that process among the agencies. OGC helped negotiate differences of opinion so that the Executive Order accurately stated the law and the obligations of various entities. I expect this will be harder to do with much fewer staff to do it. And, I expect, it will either slow down the issuance of regulations and Executive Orders that can impact many millions of people or that those regulations and Executive Orders will be promulgated without sufficient review.

54.     I also worked closely with Office of Special Education and Rehabilitative Services (OSERS) which enforces the Individuals with Disabilities Education Act (IDEA) because OCR enforces a separate, but related law, Section 504 of the Rehabilitation Act.

55.     On information and belief, OSERS staff who worked on policy drafting have been eliminated as well as staff in outreach to school communities. I cannot imagine how students with disabilities served under IDEA can be effectively served without these staff.

56.     During my tenure under the Obama administration, the Department received reports that the state of Texas had set a cap on number of students with disabilities it would serve. And OSERS policy and outreach staff negotiated to correct that. If those staff do not exist, and a state, for example, again limits services to students with disabilities, this violation of the law would not be remedied by the Department. I know from my enforcement experience in OCR, including from resolving a specific investigation in which a school district outside of Texas had similarly imposed a cap on students with disabilities being served, that violations of this type continue to happen. I know, therefore, how important it is not to lose these staff in OSERS.

57.     OCR and OSERS resources provide necessary information and resources for state and local education entities. But OSERS guidance on issues that can range, for example, from services to students with disabilities, to student restraint, to behavioral assessment are not likely to be published and updated without the staff. This will leave the states and their educators without answers to questions they encounter every day in classrooms.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 19, 2025, at Takoma Park, Maryland.


*/s/ Catherine E. Lhamon*
_____
Catherine E. Lhamon