# EXHIBIT 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> LINDA McMAHON, *et al.*, <br><br> Defendants. | C.A. No. 1:25-cv-10601 <br><br> **DECLARATION OF TERRI GONZALES** |

## DECLARATION OF TERRI GONZALES

I, Terri Gonzales, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of Texas. I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2. I am the Chief Attorney at the U.S. Department of Education's Office for Civil Rights (OCR) regional enforcement office based in Dallas, Texas. The Department placed me on administrative leave on January 31, 2025. I understand that the Department placed me on administrative leave due to President Donald Trump's executive order banning "DEI programs" in the federal government. *Ending Radical and Wasteful Government DEI Programs and Preferencing,* Executive Order 14151 (January 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.

1

3. I hold a bachelor's degree in English, with a minor in Women's Studies, from the University of Louisville in Louisville, KY; and a Juris Doctor from the University of Denver College of Law.

4. I have been employed at OCR for fifteen years and spent the last three years as Chief Attorney. As Chief Attorney, I share oversight of OCR's regional enforcement office in Dallas, which has jurisdiction over the States of Texas, Louisiana, and Mississippi. I am primarily responsible for the legal sufficiency and factual accuracy of all work relating to complaints, compliance reviews, investigations, and technical assistance. Before I became Chief Attorney, I was a Team Leader and Staff Attorney with OCR.

5. I submit this declaration in connection with the announcement by the Department of Education ("the Department") on March 11, 2025, that it would be reducing its workforce by nearly 50%. *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release").

6. On March 12, 2025, I received an email from the Chief Human Capital Officer, Jacqueline Clay, at the Department notifying me that my unit, the Dallas enforcement office of OCR, was being abolished, along with all positions within the unit. Along with this notification email there were attachments with instructions and resources for the employees impacted by the March 11 reduction in force (RIF). The instructions stated I would receive an official employee specific RIF notice on April 9, 2025. Because I was in communication with other offices, it is my understanding that other OCR regional enforcement offices received the same notice on March 12, 2025, that their offices were being abolished.

## OCR and its Critical Regional Enforcement Offices

7.      OCR enforces several federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department of Education, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, Age Discrimination Act of 1975, Title II of the Americans with Disabilities Act of 1990, and Boy Scouts of America Equal Access Act.

8.      OCR resolves individual and class complaints of discrimination, initiates investigations (typically called "compliance reviews" or "directed investigations"), conducts investigations, and provides technical assistance to help recipients of federal funds achieve voluntary compliance with the civil rights laws that OCR enforces.

9.      Most of OCR's activities are conducted by its twelve regional enforcement offices throughout the country.  These regional enforcement offices carry out OCR's core work—preventing, identifying, ending, and remedying discrimination against America's students.

10.     The Dallas enforcement office has approximately fifty-five employees, including about forty-five investigative staff.  Almost all of these employees were impacted by the RIF announced on March 11.  In addition, approximately four staff members were placed on or went on leave in January due to the President's Executive Order *Ending Radical and Wasteful Government DEI Programs and Preferencing*.  One of these four employees who was placed on administrative leave, plus another three employees, committed to a fork-in-the-road letter and are not covered by the RIF.  All of the employees that were placed on administrative leave in January except for the one who committed to the fork-in-the-road offer were terminated.

11. The Dallas enforcement office has a very large case load that has increased dramatically, particularly in the last seven years. By the time I was placed on administrative leave, most team leaders (or supervisors) were supervising six to seven staff members and approximately 250 to 300 cases per team.

12. In addition to the volume of work, the Dallas enforcement office is one of the highest performing offices with the highest quality of work in the country. The Dallas enforcement office handles large-scale, OCR directed compliance reviews, where complaints and/or media coverage prompts investigations into systemic problems.

13. The Dallas enforcement office consistently reaches Resolution Agreements that provide robust remedies for students after large-scale investigations of systemic problems. For example, the Dallas enforcement office recently reached two separate Resolution Agreements after large-scale investigations found and resolved systemic civil rights compliance concerns and violations arising in two large suburbs of Dallas. In one suburb there were civil rights compliance concerns related to physical restraint of elementary and secondary school students. In the other district, we found violations in the district's responses to claims of sexual harassment, including sexual violence. Because of their knowledge of the area, including the school districts and regions, and the Dallas office's proximity to the suburbs in question, the office was successful in gathering vital information through witness interviews and data collection. After reaching these Resolution Agreements, the Dallas office initiated monitoring of both districts to ensure compliance with the terms set forth in each Resolution Agreement as well as the statutes and regulations that were at issue. Our office is currently monitoring these two districts' compliance with the Resolution Agreements. Before we can release the districts from

the monitoring, we must determine that they are in compliance with both the law and the Agreements.

14. The success of the Resolution Agreements with the two school districts is an example of how regional enforcement offices, including the Dallas office, enable staff at those offices to develop regional expertise. Because their work is focused on a specific region, staff within regional enforcement offices know the educational institutions and the communities in their jurisdictions well and can better identify systemic issues.

15. In addition to the very large-scale compliance reviews, the Dallas enforcement office handles a large volume of individual cases enforcing the civil rights laws in the context of elementary and secondary education, as well as post-secondary education. These cases arise out of:

   a. Title VI of the Civil Rights Act of 1964, which are cases that arise due to discrimination on the basis of race, color, and national origin, including shared ancestry. Our typical Title VI case involves disparate treatment, harassment, and retaliation.

   b. Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990. These cases constitute the vast majority of our work and assess whether students with disabilities are receiving a free and appropriate public education and have equal access to the elementary and secondary educational environment to which they are entitled by law. For example, our cases include complaints alleging school districts' failure to respond to students who need accommodations for a full range of disabilities including for example, mobility and learning disabilities, severe allergies, and diabetes. Our Dallas office investigates

        whether school districts properly evaluate and implement Individualized Education Plans for disabled students pursuant to Section 504.  Our office investigates complaints of school districts not responding to student who are being harassed because of a disability.  We also handle restraint and seclusion cases involving disabled elementary and secondary school students.  In the post-secondary context, our office investigates the responsiveness to college students who need academic adjustments due to a disability such as extended time on exams because of a learning disability.

    c. Title IX of the Education Amendments Act of 1972, under which the Dallas office handles cases involving discrimination on the basis of sex and sexual harassment at all levels.  Our case load includes addressing incidents of sexual violence in elementary, secondary, and post-secondary schools.

    d. Additionally, the Dallas office has jurisdiction to investigate complaints based on age discrimination; for those, we work in conjunction with the U.S. Equal Employment Opportunity Commission.

16.    One of the great services the Dallas enforcement office provides is a quick and thorough response to inquiries from the public.  Anyone can contact the Dallas enforcement office via phone call or email and receive a response from a team member.  We receive inquiries and complaints from parents and students who cannot afford an attorney.  We receive inquiries from school administrators regarding their obligations under Title IX.  This is an invaluable public resource to individuals and families regardless of socio-economic status.

17.    The Dallas enforcement office provides technical assistance to private organizations as well.  Team members offer presentations at conferences and assist organizations with policy decisions and compliance under all the civil rights laws OCR enforces.

**Substantial and Irreparable Harm**

18. Given my experience, I do not think that the Department can meet its obligations to address complaints, complete investigations, and ultimately enforce civil rights laws.

19. It is my understanding that all of the Dallas enforcement office's estimated 2,000 cases, from seven teams, as well as all new cases, will be transferred to the Kansas City enforcement office. The Kansas City enforcement office is much smaller than the Dallas enforcement office, and already struggling with its own case load. It is not possible for the Kansas City enforcement office to absorb this work and expand its jurisdiction to the areas served by the Dallas office, which includes not only Texas, but also Mississippi and Louisiana.

20. Additionally, closing the Dallas enforcement office will eliminate an important regional asset and regional enforcement tools that are critical in investigations. Appropriately conducted investigations often require on-site inspections. For Title IX investigations, staff may need to observe athletic facilities and equipment. Similarly, for Section 504 investigations, staff may need to inspect specific accessibility at a particular school. For example, if there is an issue regarding access and utilization of a steep ramp that provides physical accessibility, regional enforcement staff must visit the location to measure the slope of the ramp at issue. Similarly, if there is a complaint of inadequate parking spaces available for disabled persons, it is critical that the spaces in the specific location are counted. In large-scale investigations, team members must be able to conduct in-person forums to speak with and interview students and witnesses.

21. Individuals in the Kansas City enforcement office will be deluged with the Dallas office's large case load and, without regional knowledge, will likely be unable to identify systemic problems that may arise in Texas, Mississippi, or Louisiana, especially in the rural areas of those states. Additionally, the remaining regional enforcement offices will not have the

regional knowledge and regular communication with recipients of federal funds and stakeholders in the covered region necessary for effective technical assistance and aid in coming into compliance.

22. There are also school districts within the Dallas enforcement office's jurisdiction that are currently operating under de-segregation court orders. The Dallas office still receives complaints regarding racial harassment occurring at these school districts.

23. Eliminating entire regional enforcement offices and staff, including the Dallas office and staff, will further deplete the already-understaffed OCR, cause chaos and inefficiency, and preclude OCR's ability to meaningfully resolve complaints and address systemic discrimination.

24. Shifting the existing and new cases to a region already strained with their own case load means the cases have no chance of thorough or timely investigation. Students with issues that require redress could graduate before a request for accommodation is even answered. Students with special education needs that are not addressed will not be able to progress from grade to grade or graduate. The result will be a generation of students that are not prepared for their future.

25. In my experience, even without the reduction in force and closures of regional enforcement offices, each investigative staff member in the Dallas enforcement office already carried a high case load of between 50-80 complaints each. It is hard to imagine how these existing complaints will ever be answered or investigated, let alone resolved.

26. Not only would it be virtually impossible for the Department to address existing and new complaints filed by individuals, but also the remaining OCR regional enforcement

offices would no longer have bandwidth to assess systemic issues and open compliance reviews to provide wide relief to more students.

27. The diminishing bandwidth of OCR collectively will especially hurt rural communities, as they often are the most impacted from lack of resources. Having only a few regional enforcement offices will impede OCR's ability to reach rural areas.

28. As explained above, regional enforcement offices like the Dallas office allow for regional expertise held by the staff and offices, and closing regional enforcement offices and terminating the staff within will cause OCR to irreparably lose that regional expertise.

29. Necessary investigative components such as witness interviews and on-site inspections for critical fact-gathering will likely no longer occur or substantially diminish due to the high caseload and administrative and financial burdens. With the staff reductions and closures of regional enforcement offices, remaining investigative staff will have to travel even farther to conduct essential fact-gathering like on-site inspections, making any travel even more costly.

30. The shortage of staff and diminishing bandwidth will also make effective technical assistance difficult. Without technical assistance, recipients of federal funds will be less aware of their legal obligations to comply with civil rights laws.

31. Without meaningful enforcement by OCR, bad actors will be empowered, and discrimination will be rampant. Not resolving discrimination complaints and not assessing systemic discrimination will have devastating, life-or-death consequences for students and education.

32. In my time at OCR, I have worked on a case where an elementary school student was raped on the bus while another student video-taped it, a case where a high school student

was raped in a school stairwell, a compliance review wherein children with disabilities were being restrained to the point of physical injury, and cases wherein students were being severely harassed due to their race, including being subjected to racial slurs.  I have seen some cases where the harassment became so bad that the students attempted suicide.

33. My dedicated colleagues and I at OCR were working often around the clock to address such cruelties.  And with this effort to remove most of these colleagues, I fear that the resulting harms will be devastating and irreparable.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 21, 2025, at Dallas, Texas.

*/s/ Terri Gonzales*
_____
Terri Gonzales