# EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

STATE OF NEW YORK, *et al.*,

  Plaintiffs,

    v.

LINDA McMAHON, *et al.*,

  Defendants.

C.A. No. 1:25-cv-10601

**DECLARATION OF DOE DECLARANT 7**

**DECLARATION OF DOE DECLARANT 7**

I, Doe Declarant 7, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am providing this declaration pursuant to 5 U.S.C. § 2302(b)(8) and (b)(9).

2. I am a senior attorney at the Office for Civil Rights ("OCR"), of the United States Department of Education ("Department"), Cleveland field office. I have been in this position for over 18 years. Before this position, I worked at a non-profit, and was an attorney at the U.S. Department of Justice, Antitrust Division. I have a J.D. and a bachelor's degree.

3. In 2021, I took a 10-month data science training program with the Department of Education's Office of the Chief Data Officer and as part of the Department of Education's implementation of the Foundation for Evidence-based Policymaking Act of 2018.

4. As a senior attorney, I was the lead attorney on 36 active investigations into complaints regarding civil rights violations at K-12 and institutions of higher education in Ohio and Michigan. During active investigations, my tasks included reviewing complaints, make determinations regarding whether the complaints were appropriate for investigation, drafting data and document requests, reviewing documents, preparing for and conducting witness interviews, analyzing and synthesizing facts, drafting internal memos and external correspondence, and negotiating resolution agreements.

1

5. I was responsible for monitoring 12 resolution agreements and their implementation. I provided technical assistance to public entities, parents and guardians, students, and the public on civil rights issues.

6. In addition to my legal work as senior attorney, as part of my regular day-to-day duties, I was also responsible for creating, maintaining, obtaining data for, analyzing, and internally publishing nationwide OCR data dashboards.

7. I regularly obtained data for and published the following data categories on the dashboards, including:

   a) the total number of investigators at each field office;

   b) the total number of active cases (disaggregated by type of claim);

   c) the number of active cases per investigator;

   d) the number of monitoring cases per field office;

   e) average number of active cases per investigator at each field office;

   f) the number of cases closed at each field office;

   g) the percentage of cases that were closed by day 180 in a field office.

8. I last refreshed the dashboards on March 11, 2025.

9. I am providing this declaration in connection with the announcement by the Department of Education on March 11, 2025 that it would be reducing its staff by 50% and that this was a "significant step" towards the Department's "final mission." *U.S. Department of Education Initiates Reduction in Force*, Press Release, Department of Education (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("March 11 Press Release"). The Department initiated a reduction in force ("RIF") impacting nearly 50% of the Department's workforce, who were placed on administrative leave beginning Friday, March 21, 2025.

10. On March 11, 2025, I received the RIF email that my position was eliminated and that I had until March 21, 2025 to close out my job.

11. I am providing this declaration to explain certain immediate and irreparable harms resulting from the RIF.

12. I have received several emails from colleagues informing me that the RIF closed the Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco OCR field offices (collectively, the "Closed Offices"), and left the Atlanta, Denver, Kansas City, DC Metro, and Seattle OCR field offices open (collectively, the "Open Offices").

13. I have heard that the Trump Administration explained that the administration chose to close the lowest performing offices, and that the Open Offices can and will absorb the additional work. This is blatantly false.

14. First, I know that my hardworking colleagues in all the field offices did their very best with the resources that OCR gave them. The Closed Offices were no more or less efficient than the Open Offices. For fiscal year ("FY") 2024, 55% of the cases at the Atlanta field office (Open Office) were closed within 180 days, compared to 74% of the cases that were closed within 180 days at the Chicago field office (Closed Office).

15. The Seattle field office (Open Office) closed 64% of its cases within 180 days, compared to 73% at the Cleveland office (Closed Office). Kansas City (Open Office), with 26 full time investigators, closed 817 cases in FY 2024, compared to Boston (Closed Office), with 20 full time investigators, closed 874 cases in FY 2024.

16. Second, it is impossible for the remaining investigative staff to absorb the additional cases in a way that will continue to meaningfully enforce civil rights laws in the education systems of this country. In January 2025, there were an estimated 379 total investigators at OCR across the country. However, this number does not reflect the many investigators that I personally know who have left OCR since January as a result of the Trump Administration's various efforts to reduce the size of the Department. The investigators at the Closed Offices were investigating a total of 9,180 active cases, 57% of the total number of active OCR cases (16,022). At least 7,037 of the active cases that were being investigated by staff at a Closed

Office included an allegation or claim of noncompliance with Section 504 of the Rehabilitation Act of 1973 or Title II of the Americans with Disabilities Act of 1990.

17. The Closed Offices had an aggregate of 208 full time investigators and 4 part time investigators, approximately 55% of the total number of OCR investigators (379).

18. After the RIF, OCR will have no more than 167 investigators assigned to 16,022 cases, an approximate average of 95 cases per investigator. However, the true estimate is likely higher, given the number of OCR investigators that I personally knew who had left the office since January.

19. This is a completely untenable caseload and will likely decrease the efficiency and quality of OCR investigations. The data supports this conclusion. Denver, the office with the highest percentage of cases resolved within 180 days (83%), also had one of the lowest caseloads per investigator (30 cases per investigator). Atlanta, the office with the highest caseload per investigator (56 cases per investigator), also had the lowest number of cases resolved within 180 days (55%).

20. As a senior attorney with 18 years of experience at OCR, if I were assigned 95 active cases, I would either be forced to conduct cursory investigations that are investigations in name only in order to resolve the cases in a timely fashion or allow cases to languish for an unreasonably long time.

21. The more time passes, the more difficult it is to investigate a complaint. Witness memories fade. Documents are lost or destroyed. Complaining victims move on with their lives and do not want to be retraumatized. As a result, meritorious complaints may be denied justice due to the prolonged delay caused by the RIF.

5

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed March 21, 2025, at Cleveland, Ohio.

/s/ Doe Declarant 7
---
DOE DECLARANT 7