# EXHIBIT 11



# PROTECTING CIVIL RIGHTS

## HIGHLIGHTS OF ACTIVITIES

Office for Civil Rights 2021-2025



**U.S. Department of Education**
**Office for Civil Rights**



**U.S. Department of Education**
**Office for Civil Rights**

**U.S. Department of Education**

Miguel Cardona, Secretary
Catherine E. Lhamon, Assistant Secretary for Civil Rights

Lyndon Baines Johnson Building
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202-1100

Telephone: 800-421-3481
FAX: 202-453-6012; TDD: 800-877-8339
Email: OCR@ed.gov

**www.ed.gov/ocr**

*Availability of Alternate Formats*: *Requests for documents in alternate formats such as Braille or large print should be submitted to the Alternate Format Center by calling 202.260.0852 or by contacting the Section 508 Coordinator via e-mail at om_eeos@ed.gov.*

*Notice to Limited-English-Proficient Persons*: *If you have difficulty understanding English, you may request language assistance services for Department information that is available to the public. These language assistance services are available free of charge. If you need more information about interpretation or translation services, please call 1-800-USA-LEARN (1.800.872.5327) (TTY: 1.800.877.8339) or e-mail us at ED.Language.Assistance@ed.gov. You also can write to U.S. Department of Education, Information Resource Center, LBJ Education Building, 400 Maryland Ave. SW, Washington, DC, 20202.*

# TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

The Laws OCR is Responsible for Enforcing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

Civil Rights Data Collection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

Policy Resources Timeline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

Eradicating Discriminatory Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

     Confronting Race / National Origin Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     Countering Discrimination Based on Shared Ancestry . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     Combatting All Forms of Sex-Based Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          Discrimination Against LGBTQI+ Students . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

     Redressing Disability Harassment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Ensuring Equity for Students with Disabilities, Including During the COVID-19 Pandemic . . . . . . . . . . . . . . . . . . . **28**

Ensuring Equal Access to School Offerings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

Removing Barriers to Opportunity Due to Language or National Origin . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

Race, National Origin, and Disability Discrimination in School Discipline . . . . . . . . . . . . . . . . . . . . . . . . **33**

Discrimination in Dress Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

Overlapping Forms of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

Title IX and Athletics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

Discrimination Based on Pregnancy or Related Conditions and Parental Status . . . . . . . . . . . . . . . . . . . . **43**

Protecting Parents' Rights Against Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **47**

Looking Ahead . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**

**Addendum**: Policy Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **51**

# INTRODUCTION

The U.S. Department of Education's Office for Civil Rights (OCR) has, over the past four years, robustly enforced each of the laws in our jurisdiction to fulfill Congress' longstanding nondiscrimination guarantees for the more than 49 million students in the nation's P-12 schools and the more than 19 million students in colleges and universities across the country. These four years have involved both unprecedented challenges to educational opportunity as well as an expansion of the kinds of discrimination school communities have persistently experienced over time. OCR has nonetheless secured unqualified wins for civil rights and delivered the justice Congress has long charged the Office to safeguard.

OCR began the Biden-Harris Administration with a massive backlog of old, hard cases to resolve: on the first day of this Administration, OCR had 915 cases pending that were already four or more years old. Then, during this Administration, OCR received the highest number of complaints in OCR history for three consecutive fiscal years, closing out the Administration with an all-time high of 22,687 complaints filed in a single fiscal year. *See Figure 1.* The total complaint volume during this Administration was a 64% increase over the complaint volume OCR received during the last administration.

In addition, the nation witnessed a proliferation of hate perpetrated in schools, new school discrimination challenges raised in a pandemic context, as well as changes in longstanding civil rights law as interpreted in courts, rendering OCR's work increasingly complex.

And during all that time, Congress persistently rebuffed President Biden's requests for significant additional funds to hire new enforcement staff and effectively address the civil rights concerns the nation's families and students were bringing to OCR. Whereas President Biden year after year[1] sought Congressional appropriation of funds sufficient to increase OCR enforcement staff by hundreds of investigators, Congress instead twice flat funded OCR



**Figure 1.** Complaints 2009-2024 (by fiscal year)

| Year | Complaints |
|------|-----------|
| 2009 | 6,364 |
| 2010 | 6,933 |
| 2011 | 7,841 |
| 2012 | 7,833 |
| 2013 | 9,950 |
| 2014 | 9,989 |
| 2014 | 10,392 |
| 2016 | 16,720 |
| 2017 | 12,842 |
| 2018 | 12,435 |
| 2019 | 9,990 |
| 2020 | 9,711 |
| 2021 | 8,934 |
| 2022 | 18,804 |
| 2023 | 19,201 |
| 2024 | 22,687 |

[1] See OCR FY 2022 budget request ($144M); OCR FY 2023 budget request ($161.3M); OCR FY 2024 budget request ($177.6M); and OCR FY 2025 budget request ($162.4M).

and overall appropriated for OCR a budget increase that did not even match the cost-of-living increases in staff salaries during that time.

Notwithstanding these many challenges, OCR bested our own prior practices to achieve groundbreaking and consequential results for many millions of students and school communities. That success – and the justice for students that follows from it – is a testament to the talent, expertise, and commitment of OCR's staff, who daily stave off discriminatory harms that otherwise limit or deny students' equal access to education. As these pages describe, OCR during these four years translated legal guarantees against harm into the actual experience of students in schools — at their desktops and in their science labs, on their playing fields, and in every aspect of their educational experience, fulfilling this nation's promise of nondiscriminatory schooling. These pages share these results and highlight exemplary resources to shore up the national understanding of and fulfillment for civil rights guarantees in schools. Here, first, OCR offers a summary of the four years:

OCR produced the highest number of policy resources during this Administration than the Office has ever produced. Before 2013, OCR had never produced more than four policy resources in a single year. In every year of the Biden-Harris Administration, OCR exceeded that number and in FY 24 alone OCR produced 23 such resources. Whereas during the prior administration OCR produced only eight policy resources, and during all eight years of the Obama presidency OCR produced 38 policy resources – which was until that time an all-time high – OCR has during the four years of the Biden-Harris Administration produced 64 such resources.

These numbers tell only part of the story. The policies OCR shared during these four years address issues including the use of artificial intelligence in schools, the rights of students against sex discrimination in their access to

equal athletic opportunity in school, the rights of students against discrimination based on stereotypes about their national origin or shared religious or other ancestral identities, and civil rights guardrails when considering and imposing discipline related to students with disabilities.

OCR also issued a resource, jointly with the Department of Justice, sharing relevant law related to nondiscrimination on the basis of race, color, and national origin related to school discipline, reflecting through examples how OCR has consistently addressed that issue in enforcement across three presidential administrations.

OCR published a resource explaining the rights of students with disabilities who are also English Learners. And OCR shared multiple resources explaining the application of disability civil rights protections to specific disabilities, resources addressing the rights of students with disabilities in the COVID-19 pandemic context, as well as resources focused on lawful consideration of race in school programming and, again together with the Department of Justice, advising school communities of lawful consideration of race following the Supreme Court's decision in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College* and *Students for Fair Admissions, Inc. v. University of North Carolina et al*. In addition to these and many other policy resources, OCR worked across the Department and with the Department of Justice and other federal agencies to finalize on behalf of the Department the most comprehensive regulations to Title IX of the Education Amendments of 1972 since the Department first regulated in 1975.

In addition to OCR's most robust policy productivity during these four years, OCR not only managed the highest caseload in our history but resolved the second, third, and fourth highest number of cases per year during fiscal years 2022, 2023, and 2024. In total, OCR received 71,385 cases during the Biden-Harris presidency[2] and resolved 56,383 cases during that time, including significant

---

[2] The number of cases received and the number resolved are calculated from January 20, 2021, the date President Biden took office, through December 23, 2024.

efforts to overcome a persistent backlog. *See Figure 2.* In comparison, during the prior administration OCR received 43,555 cases and resolved 48,809 cases. In total, OCR resolved 7,574 more cases in this Administration than the Office resolved during the previous administration – a 14% increase. And for further comparison: during all eight years of President Obama's Administration, OCR received 77,904 cases and resolved 70,385 cases. That means that, in these four years, OCR resolved fully 80% of the total cases resolved during all eight years of the Obama Administration.



**Figure 2.** Complaints Received and Resolved



OCR did not just wait for complaints to come in. OCR also initiated more compliance reviews, which proactively address OCR's concerns regarding civil rights satisfaction in school communities where a complaint has not yet been filed regarding the specific issues OCR investigates. During this Administration, OCR initiated 129 compliance reviews, addressing issues ranging from web accessibility for schools' educational programs to equal access to high rigor coursework for students with disabilities to language access equality in schools, among many other topics. In comparison, during the previous administration, OCR initiated 50 compliance reviews. During this Administration, OCR has resolved 114 compliance reviews; during the prior administration OCR resolved 57; and during all eight years of the Obama Administration OCR resolved 132. In short, OCR opened 158% more proactive compliance reviews and resolved 100% more than we did during the last

administration, maximizing our expertise to address issues not coming to us through complaints. *See Figure 3.*

**Figure 3.** Compliance Reviews Initiated and Resolved



These data, again, tell only part of the story of OCR's civil rights protective impact during the Biden-Harris Administration. When a student secures relief because OCR investigated and determined that a school district or college or university violated that student's rights – or because OCR and the school community resolved civil rights compliance concerns before an investigation concluded – the results can be transformative for more than just a single student's educational life.

For just one example, a single resolution OCR secured with a school district in 2022 yielded more than 1,014,600 hours of compensatory services for 9,310 students. OCR had found in April 2022 that the Los Angeles Unified School District in California had, during remote learning that took place during the COVID-19 pandemic from March 2020 through the end of school year 2021-2022, limited the services provided to students with disabilities based on considerations other than the students' individual educational needs, did not conduct evaluations of students with disabilities before making significant changes to their placements, and did not ensure that the placement decisions were made by a group of persons knowledgeable about the students' needs, all in violation of Section 504 of the Rehabilitation Act of 1973. In addition, OCR found that the district had failed to accurately or sufficiently track services provided

to students with disabilities and failed to develop and implement a plan adequate to remedy the instances during remote learning in which students with disabilities were not provided the free appropriate public education to which Section 504 entitles them. The district's fulfillment of the terms of the resolution agreement in this single case yielded transformative results for these 9,310 students.

For another example, the Executive Director of Hillel at the University of Vermont published an op-ed[3] in December 2024 describing the impact of an April 2023 resolution OCR secured as having ensured that "Jewish life is thriving" at the university:

*Five years ago in 2019, a group of brave Jewish students had finally had enough of the antisemitic hatred they faced and could no longer continue being ignored. They pleaded with Hillel to amplify their experience and better advocate for them with the university. In 2021 when a sexual assault survivor student group expelled Jewish women for "being Zionist" and the institutional response was indifference, they had enough and called on the Department of Education's Office of Civil Rights to intervene.*

*Back then, when an incident of antisemitic bias was reported to the university it could take days, weeks, and even months for a response. And when Jewish students did finally report the bias and harassment, they faced for their identity they were told it wasn't actually antisemitism and nothing can be done about free speech. Jewish students felt dejected and rejected from the institution they called home. For some students, their entire experience at UVM was defined by antisemitism and the uphill battle for basic recognition of one's identity. I don't mention this to dwell in the past but it's important to note so we can reflect on how far we have come.*

*Today with new leadership, a new approach for people and planet, and policy changes in the wake of the federal investigation into antisemitism at UVM, Jewish life is thriving.*

The results in these two cases are a subset of the total impact of OCR's enforcement impact during these four years. Below, this report offers a further summary of that impact and underscores the continued urgency of making good on the longstanding federal civil rights promise that, as Congress has long put it in the statutes we enforce, no person shall be subjected to discrimination on the bases of race, color, national origin, sex, disability, and age in the nation's schools and other institutions that receive funding from the U.S. Department of Education. OCR during these four years stood sentry against that discriminatory harm and is poised so to continue for all the years to come.

---

[3] Matt Vogel, "From Bias to Box-Graters:  Jewish Life Then & Now at UVM," *Times of Israel*, Dec. 7, 2024, at https://blogs.timesofisrael.com/bias-to-box-graters-jewish-life-then-now-at-uvm/.

# THE LAWS OCR IS RESPONSIBLE FOR ENFORCING

OCR ensures equal access to education for our nation's students by enforcing federal civil rights laws and implementing regulations that prohibit discrimination on the basis of race, color, national origin, sex, disability, and age in all programs and institutions that receive financial assistance from the Department. The laws OCR is responsible for enforcing include:

- Title VI of the Civil Rights Act of 1964 (prohibiting race, color, and national origin discrimination)
- Title IX of the Education Amendments of 1972 (prohibiting sex discrimination)
- Section 504 of the Rehabilitation Act of 1973 (prohibiting disability discrimination)
- Age Discrimination Act of 1975 (prohibiting age discrimination)
- Title II of the Americans with Disabilities Act of 1990 (prohibiting disability discrimination in state and local government services – whether or not programs receive federal financial assistance)
- Boy Scouts of America Equal Access Act of 2001 (prohibiting public elementary and secondary schools, local educational agencies, and state educational agencies from denying equal access or a fair opportunity to meet, or discriminating against, any group officially affiliated with the Boy Scouts of America, or any other youth group listed as a patriotic society in Title 36 of the United States Code)

# CIVIL RIGHTS DATA COLLECTION

Since 1968, the Civil Rights Data Collection (CRDC) has been an important aspect of OCR's overall strategy for administering and enforcing the civil rights statutes for which OCR has jurisdiction. OCR generally has conducted the CRDC as a biennial survey of the nation's K-12 public schools. Local educational agencies, or school districts, are statutorily required to submit CRDC information.

The CRDC collects data on leading civil rights indicators related to access and barriers to educational opportunity from early learning programs through high school. Data from the CRDC informs ongoing decisions regarding additional support that schools, educators, and students need to succeed, and assists OCR in meeting its mission to ensure schools and districts are complying with civil rights laws.

This Administration collected data from the 2020-21 school year and then again in the 2021-22 school year. This was the first time OCR had conducted a CRDC, including all public school districts and their schools, two years in a row, rather than following our usual biennial schedule. For the 2020-21 CRDC, 100% of school districts submitted and certified data; for 2021-22 CRDC, 99.9% of school districts did so. OCR is currently collecting data for the 2023-24 CRDC, which should be ready to be released in early 2026.

This Administration has made CRDC data more available to the public than ever. OCR released results for the 2020-21 CRDC in November 2023, as well as analysis and corrected data for the 2017-18 CRDC in the Spring/Summer of 2021. OCR released the results of the 2021-22 CRDC in January 2025. In addition, this Administration made available to the public the data collected from 1968 to 1998 through its Archival Data Download Tool.

The information compiled through the CRDC includes student enrollment and educational programs and services data that are disaggregated by race/ethnicity, sex, English learner status, and disability. The data show that there are various disparities relating to factors that include, for example, access to advanced courses, imposition of discipline, and teacher-to-student or staff-to-student ratios, that impact the educational opportunities available to Black and Latino students, girls, English learners, and students with disabilities.

The Biden-Harris Administration was the first to collect data in the CRDC about nonbinary students from those public school districts that were already collecting that information. Some school districts had informed OCR that because the CRDC had previously limited "permitted values" to male or female, some school districts were not reporting the experiences of all their students to the CRDC because those districts classified students as male, female, or nonbinary. By allowing school districts to report nonbinary students if they made the local choice to collect the data in that way, OCR relieved school districts of the burden of trying to classify a student as a male or female for purposes of a federal data collection when their own records do not identify them as such. The decision to permit school districts to report in this manner gave recognition to a student population about whom little data has been collected to date and that the CRDC should reflect the experiences of all students.

# SPOTLIGHT

## Resolution of older cases

OCR placed a premium during these four years on keeping pace with new case filings and our proactive docket while also resolving the body of cases left as a backlog before this Administration even began. Among the 915 pending cases that were four or more years old on the first day of the Biden-Harris Administration were cases involving serious allegations of harms to students and school communities within OCR's jurisdiction. OCR has, in this Administration, secured relief, for example, regarding:

- alleged antisemitic discrimination against a university in a complaint that had been filed in November 2016.

- a school district that so systemically failed to coordinate its response to sexual assault through its Title IX coordinator that the Title IX coordinator did not participate in any of the 41 documented incidents OCR reviewed; that failed even to investigate a complaint of a sexual assault that occurred on school grounds; and that did not take required steps responsive to possible Title IX violations in more than a third of the 41 case files OCR reviewed, among other violations. OCR had opened this investigation in 2015.

- a college student respondent in a sexual harassment investigation who appears not to have received timely notice when his college twice reopened its investigation against him, first following receipt of additional witness names from the complainant and second when the complainant made new allegations on appeal. During this Administration, OCR resolved this case – which OCR had received in 2015 – with changes to ensure the university provided an equitable process to all parties.

- alleged unequal access based on race to gifted and talented programming in a school district as well as unequal access based on race to school resources, in two cases filed in 2014 and 2015 respectively.

- a school district that OCR found to have limited – for at least five years – the total number of students who could be evaluated for learning disabilities, delayed provision of services to students who have or were suspected to have disabilities, and sometimes served an even smaller number of students with disabilities than the systemic cap the evidence showed the district had placed on students who could be served, even when the district had reason to believe a larger number of students should be evaluated and served. OCR had received this case in 2016.

## POLICY RESOURCES – 2021-2024

# 2021

**Harassment of AAPI individuals** – Reminds schools of their obligations to investigate and address harassment directed at Asian American and Pacific Islander (AAPI) students.

**COVID-19** – Answers common questions on civil rights and school reopening relating to the COVID-19 pandemic.

**Confronting COVID-19-Related Harassment in Schools** – OCR produced this resource with the Department of Justice to address an increase in reports of COVID-19-related harassment directed at Asian American and Pacific Islander individuals.

**COVID-19** – Addresses disparate impacts of COVID-19 on America's students.

**LGBTQI+ Students** – Explains the Department's interpretation, following *Bostock v. Clayton County*, that Title IX's prohibition on discrimination based on sex encompasses discrimination based on sexual orientation and gender identity.

**Confronting Anti-LGBTQI+ Harassment in Schools** – This joint resource with the Department of Justice shares information about schools' obligation to investigate and address discrimination against students because of their sexual orientation or gender identity.

**Long Covid** – Explains the rights, under Section 504 and IDEA, of young children and students who are experiencing long-term adverse health effects of COVID-19, commonly referred to as Long COVID.

**Confronting Discrimination Based on National Origin and Immigration status** – This joint resource with the Department of Justice reminds school communities that all children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents' or guardians' immigration status.

**Title IX** – Explains the impact on the 2020 Title IX regulation of a court decision with respect to consideration of any statement from a person who did not submit to cross-examination at a live hearing.

**Risk of Self-Harm** – Explains protections for students with mental health disabilities who are at risk of self-harm.

**Intersex Students** – Confirms that federal civil rights law protects all students, including intersex students, from sex discrimination.

# 2022

**COVID-19** – Reviews the obligation of K-12 schools under Section 504 to provide evaluations and services, including compensatory services, to students with disabilities during the COVID-19 pandemic.

**Digital Accessibility** – Series of 20 videos addressing digital access in education.

**Student Veterans** – Explains how Section 504 covers veterans with disabilities who apply to or attend college.

**Title IX** – FAQs on schools' responsibilities under the 2020 Title IX regulations.

**Student Discipline** – Describes schools' responsibilities under Section 504 to ensure nondiscrimination against students when imposing student discipline.

**Pregnancy** – Reminds school communities that Title IX protects students and employees from discrimination based on pregnancy and related conditions.

# 2023

**Shared Ancestry** – Describes ways Title VI protects from discrimination students who are or are perceived to be Jewish, Christian, Muslim, Sikh, Hindu, Buddhist, or of another religious group.

**DEI Activities** – Assists school communities in understanding that diversity, equity, and inclusion training and similar activities in most factual circumstances are consistent with Title VI.

**Title IX Athletics** – Explains how to determine if a school is meeting its obligation to provide equal athletic opportunity regardless of sex consistent with Title IX.

**Title IX Athletics – K-12** – Explains how to evaluate whether a K-12 school is meeting its obligation to provide equal athletic opportunity regardless of sex consistent with Title IX .

**Title IX Athletics – Higher Education**– Explains how to evaluate whether a university is meeting its obligation to provide equal athletic opportunity regardless of sex consistent with Title IX.

**Shared Ancestry** – Describes schools' legal obligation under Title VI to provide all students, including students who are or are perceived to be Jewish, a school environment free from discrimination.

**Student Discipline** – This joint resource with the Department of Justice explains schools' obligation not to discriminate based on race, color, or national origin related to their disciplinary process and highlights examples of relevant investigations the Departments resolved under three presidential administrations.

**Web Accessibility** – This joint resource with the Department of Justice addresses barriers that prevent people with disabilities from participating in online services, programs, and activities that postsecondary institutions make available to students and the public.

**Unaccompanied Children** – Highlights specific access to education challenges faced by unaccompanied children and explains school responsibilities to serve unaccompanied children under federal civil rights laws.

**Migratory Children** – Highlights access to education challenges faced by migratory children and explains schools'

# 2023

responsibilities to serve migratory children under federal civil rights laws.

**English Learners** – Explains schools' obligation to ensure equal access to advanced and specialized programs for students who are English learners.

**College Admissions** – FAQ regarding implementing lawful college and university admissions programs in compliance with the U.S. Supreme Court's decision in the *SFFA* cases.

**Race and School Programming** – Clarifies the circumstances under which schools can – consistent with Title VI – develop curricula or engage in activities that promote racially inclusive school communities.

**Shared Ancestry** – Reminds schools of their legal obligations under Title VI to provide students who are or are perceived to be Jewish, Israeli, Muslim, Arab, or Palestinian, a school environment free from discrimination.

**GER / GERD** – Provides information on how students with GER (gastroesophageal) and GERD (gastroesophageal reflux disease) are protected under Section 504.

**Shared Ancestry** – Reminds schools of their legal obligation under Title VI to provide students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.

**Title IX** – Describes the major provisions of the 2024 Title IX Regulations and the changes from the 2020 Title IX Regulations

**Title IX** – Highlights the protections and requirements of the 2024 Title IX Regulations

**Title IX** – Drafting resource for developing school Title IX policies that comply with the 2024 Title IX regulations.

**Shared Ancestry** – Shares information about the obligations of schools to ensure nondiscrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.

**70th Anniversary of *Brown v. Board of Education*** – Compiles resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin.

**Epilepsy** – Provides information on how students with epilepsy are protected under Section 504.

**Cancer** – Provides information on how students with cancer are protected under Section 504.

**Sickle Cell Disease** – Provides information on how students with sickle cell disease are protected under Section 504.

**Title IX** – Lists the key components of the 2024

Title IX regulations to support schools in preparing for implementation.

**Title VI Harassment** – Reminds schools of their federal civil rights obligations under Title VI to respond to harassment that creates a hostile environment.

**Small Entity Compliance** – Serves as "small entity compliance guide" to assist small entities to comply with Title IX.

**Anxiety Disorders** – Provides information on how students with anxiety disorders are protected under Section 504.

**Bipolar Disorder** – Provides information on how students with bipolar disorder are protected under Section 504.

**Depression** – Provides information on how students with depression are protected under Section 504.

**Eating Disorders** – Provides information on how students with eating disorders are protected under Section 504.

**Title IX Coordinators** – Highlights new and updated requirements for Title IX Coordinators in the 2024 Title IX regulations.

**Pregnancy or related conditions** – Highlights protections under the 2024 Title IX regulations related to pregnancy or related conditions,

and parental, family, or marital status.

**English Learners with Disabilities** – Describes civil rights protections for students who are English Learners with disabilities.

**Privacy** – FAQ regarding individuals who file complaints and/or contact OCR for technical assistance.

**Artificial Intelligence** – Explains application of civil rights laws to schools' use of artificial intelligence (AI).

**Inflammatory Bowel Disease** – Provides information on how students with inflammatory bowel disease (IBD) are protected under Section 504.

**Migraine** – Provides information on how students with migraine are protected under Section 504.

**Narcolepsy** – Provides information on how students with narcolepsy are protected under Section 504.

**Stutter** – Provides information on how students who stutter are protected under Section 504.

**Retaliation** – Explains protection in the federal civil rights laws enforced by OCR against retaliation.

# 2024

**Asthma** – Provides information on how students with asthma are protected under Section 504.

**Diabetes** – Provides information on how students with diabetes are protected under Section 504.

**Food Allergies** – Provides information on how students with food allergies are protected under Section 504.

# 2025

**Individualized Assessment** Reminds postsecondary institutions that Section 504 requires individualized assessment to determine whether academic adjustments are required for students with disabilities.

**Hostile Environment** – Describes how schools have resolved hostile environment allegations under Title VI.

**Digital Harassment** Highlights that Title IX's requirement to address sexual harassment encompasses online harassment.

# ERADICATING DISCRIMINATORY HARASSMENT

## RACE/NATIONAL ORIGIN

Between FY 2021 and FY 2024, OCR received 3,871 complaints related to bullying or harassment on the basis of race and national origin. OCR's investigations during these four years confirmed serious harms to students persisting in schools related to harassment prohibited under Title VI.

### Policy Resources

**July 2024** *Fact sheet* on harassment based on race, color, or national origin on school campuses

- describing schools' obligations to address and remedy a hostile environment that violates Title VI and provides hypothetical examples to help schools understand their Title VI obligations.

**January 2025** *Resource* on resolving hostile environments

- describing the actions agreed to by a number of schools to resolve resolve Title VI investigations. The resource also summarizes a sampling of OCR investigations from the last decade involving allegations of a hostile environment for students on the basis of race, color, or national origin, including shared ancestry and ethnic characteristics.

### Illustrative Cases

**Ottumwa Community School District (IA)**: An OCR investigation determined that a student had been subjected to a hostile environment for two years due to race harassment and that the school district violated Title VI because it had notice of the hostile environment but failed to take necessary steps to protect the student. The harassment included racial slurs, including calling the student the "n" word, a "slave" to white students, "blackie," and "cotton-picker." Students also made monkey noises in class toward the student and raised their fists in the air to mock Black Power. One white student used the term KKK as a reference to the "Kool Kids Klub," and another knelt on a Gatorade bottle in the student's presence and said, "It can't breathe," mimicking George Floyd's death. OCR concluded that school administrators were insufficiently responsive to these incidents and that the district disregarded its obligations to investigate whether its response to the reported harassment was effective in eliminating the hostile environment. OCR also did not find evidence that the district addressed either the cumulative effect of the incidents on the harassed student or the impact the widespread conduct may have had on other students.

In December 2022, the district entered into a resolution agreement committing it to publishing an anti-harassment statement, reviewing and revising its policies and procedures to address Title VI's prohibition on harassment, training district staff, providing age-appropriate information programs to address race harassment, conducting a climate survey to assess the prevalence of harassment in the student's former school, and providing suggestions for effective ways that the district can address harassment.

**Torrington Board of Education (CT)**: In September 2023, OCR resolved an investigation of the school district's response to race-based harassment, which included multiple students being called racial slurs in an online group chat. The online chat was then shared and discussed among students while in the classroom. In response, the district initiated disciplinary proceedings for "inappropriate language," but it did not follow its own nondiscrimination procedures or otherwise take steps to ensure that it addressed a potential racially hostile environment. OCR's investigation also indicated systemic concerns with the district's tracking of and response to race-based incidents. For instance, the district originally asserted that no other race-based complaints existed

but subsequently produced nearly two dozen case files of such incidents, most of which were incomplete and signaled inadequate mechanisms to track and address Title VI complaints.

To remedy these concerns, the school district committed to provide a forum for impacted students to discuss the incident with the Superintendent and to offer individual supports to these students. The agreement also requires the district to revise district procedures to ensure appropriate processing of race-based complaints, comprehensive annual trainings for all district staff, age-appropriate instructional programming for district middle- and high-school students, a climate survey for students with an annual audit and responsive action plan based on the results, and an obligation to create and maintain accurate recordkeeping systems for race-based complaints.

**John Doe School District**[4]: An OCR investigation determined that two biracial siblings had been subjected to a hostile environment for months due to severe, pervasive verbal race-based harassment. Despite repeated notice from the students, their parent, and their bus driver, the district did not take reasonable steps to eliminate the hostile environment. The district often responded to severe verbal harassment — including pervasive use of the n-word in school and on its buses — with mild discipline, including short, in-school suspensions, without treating the reported incidents as cumulative acts of race-based harassment. OCR's investigation revealed that the district's interventions failed to put an end to the harassment and led to recurring incidents involving similar race-based epithets by the same and different harassers. This ineffective response to the repeated harassment also led to escalated behavior among the students, including physical fights. Furthermore, OCR had concerns that in determining appropriate consequences for the harassed students for the action they took in response to the hostile environment, the district did not assess whether the repeated instances of race-based harassment and the

district's ineffective responsive actions contributed to the students' decision to engage in misconduct.

To resolve the allegations, in June 2024, the district agreed to reimburse the students and their parent for costs associated with academic support incurred as a result of the district's failure to provide an environment free from harassment; publish an anti-harassment statement; review and revise its policies and procedures to address Title VI's prohibition on harassment; train district staff; provide age-appropriate information programs to address race harassment; conduct a climate survey to assess the prevalence of harassment; audit Title VI complaints for two school years to ensure they are complying with the law, and engage the services of a third-party organization to provide resources and assistance on the issue of racial tensions in the community.

**Norwin School District (PA)**: In September 2024, OCR resolved a Title VI investigation, finding that over the course of 10 months, students engaged in repeated racially harassing conduct that the district failed to evaluate, recognize, or address as race-based harassment. For example, the school district received reports that students engaged in social media exchanges and group chats that advocated hanging and setting Black people on fire, wore Confederate flag attire to school, and included a reference to the Ku Klux Klan in a social media caption to a photo of the Confederate-flag-clad students. Although the district referred the first matter to the local police, it ignored its Title VI obligation to consider whether the posts and other conduct — even if made on private social media accounts or off-campus — created a racially hostile environment for students, and if so, whether it necessitated action by the district to redress the hostile environment.

In response to OCR's findings, the district agreed to review the incidents to determine any necessary steps to ensure the hostile environment does not persist and provide remedial services for impacted students; provide all administrators, faculty, and staff with Title VI training; provide age-appropriate orientation sessions

---

[4] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

for all students on the district's racial discrimination and harassment policies; conduct a climate survey and create an action plan for OCR's approval; post a notice online and in its back-to-school communications information regarding complaint procedures; conduct an investigation into any complaints filed as well as an audit of all racial harassment complaints filed from 2021 through 2024 to ensure that the district is responding and compliant with Title VI; and retain or designate an expert consultant to assist with the development and delivery of training and a climate survey.

## COUNTERING DISCRIMINATION BASED ON SHARED ANCESTRY

Complaints specifically alleging discrimination based on shared ancestry — addressing discrimination allegations with respect to students and school community members who are or are perceived to be Jewish, Israeli, Muslim, Arab, Sikh, South Asian, Hindu, or Palestinian or students of any other faith or whose families come from any other region of the world-- increased significantly during these four years. OCR received 27 such complaints in FY 2021 and 514 in FY 2024, an increase of 1803%. In total, OCR received 641 such complaints during these four years. During the prior four years, OCR received a total of 96 shared ancestry complaints.

**Consistent with these complaint increases, OCR devoted the most resources in our history to addressing shared ancestry discrimination. OCR opened and resolved more cases for investigation on this topic than in any prior administration, specifically securing resolution agreements from more than four times as many schools and school districts than OCR secured during the prior administration; OCR issued more policy resources addressing this topic than in any prior administration; and OCR provided technical assistance training to school communities throughout the country to explain applicable civil rights laws and OCR's complaint and investigation process.**

### Policy Resources

**January 2023** *Fact Sheet* on protecting students for discrimination on the basis of shared ancestry or ethnic characteristics

- describing how Title VI protects students who are, or are perceived to be, Jewish, Christian, Muslim, Sikh, Hindu, Buddhist, or members of another religious group from discrimination, including harassment based on shared ancestry.

**May 2023** *Dear Colleague* letter on addressing discrimination against Jewish students

- reminding schools of their legal obligations under Title VI to provide all students, including students who are or are perceived to be Jewish, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.

**November 2023** *Dear Colleague* letter on discrimination, including harassment, based on shared ancestry or ethnic characteristics

- reminding schools of their legal obligations under Title VI to provide all students, including students who are or are perceived to be Jewish, Israeli, Muslim, Arab, or Palestinian, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.

**March 2024** *Dear Colleague* letter on addressing discrimination against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian Students

- reminding schools of their obligations under Title VI to address discrimination against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian students.

**May 2024** *Dear Colleague* letter on protecting students from discrimination, such as harassment, based on race, color, or national origin, including shared ancestry or ethnic characteristics

**CIVIL RIGHTS ENFORCEMENT ACTIVITIES**: SHARED ANCESTRY DISCRIMINATION

- explaining, with hypothetical examples, the application of Title VI to allegations of discrimination in schools based on shared ancestry or ethnic characteristics, including discrimination against students and school community members who are, or are perceived to be, Jewish, Israeli, Muslim, Arab, Sikh, South Asian, Hindu, or Palestinian.

See also July 2024 *Fact Sheet* on harassment based on race, color, or national origin on school campuses (referenced above on p. 12)

**Illustrative Cases**

**Brown University (RI)**: Before resolving this investigation in July 2024, OCR reviewed some 75 reports to the university of harassment based on shared ancestry, including students calling a Jewish peer wearing a Star of David a "Zionist pig Jew," students preventing a Jewish student from attending a pro-Palestinian rally, and a student berating their roommate for weeks based on the roommate's Palestinian-American identity. In many of these cases, the university appeared to have taken no or little action in response other than to acknowledge receipt

## SPOTLIGHT

### Freedom of Expression and Nondiscrimination Under Title VI

"Hate and discrimination proliferate when we don't speak up...Visible and sustained leadership on inclusivity and intolerance for hate, including antisemitic and anti-Arab and other national origin discrimination, is critical to ensuring full satisfaction of the Title VI nondiscrimination guarantee. That leadership can be accomplished without violating core tenets like academic freedom and free expression."

— *Assistant Secretary Lhamon, University of California National Center for Free Speech and Civic Engagement (April 18, 2024)*

Many school communities experienced student protests in Fall 2023 and Spring 2024. As campuses across the country grew increasingly tense, administrators faced tremendous pressure to

police the boundary between students' freedom of speech and schools' federal obligations to prevent discrimination on the basis of race, color, and national origin (including shared ancestry.) In a May 2024 Dear Colleague Letter on Title VI of the Civil Rights Act, OCR provided clear guidance and examples to assist school leaders in navigating these challenges.

Title VI and its implementing regulations do not require or authorize a school to restrict any rights otherwise protected by the First Amendment. But even protected activities may still contribute to a hostile learning environment prohibited under Title VI. The fact that harassment may involve conduct that includes speech in a public setting or speech that is also motivated by political or religious beliefs does not relieve a school of its Title VI obligation. Through resolution agreements with Brown University, the University of California system, and others, OCR spotlighted campuses that have made steps in the right direction and expressed willingness to take further corrective action through resolution agreements.

of the reports, offer support resources, and request to meet with complainants. The investigation revealed distinct variation among the half-dozen university entities responding to these reports, leaving university students and staff without consistent redress. Notwithstanding the Title VI compliance concerns these university records reflect, the university revised its practices during OCR's investigation to address a campus climate the university characterized as marked by anxiety, tension, and fear. As a result, OCR determined that monitoring the university's fulfillment of its revised commitment to, as the university described it, "[t]aking the strongest possible stance against . . . unlawful discrimination based on actual or perceived shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity" would effectively ensure its Title VI compliance. The specific terms the university agreed to include: further revising its policies and procedures to ensure all university offices consistently and effectively comply with Title VI, including with respect to protests and demonstrations; conducting annual training on nondiscrimination and harassment for all students and employees; maintaining records related to complaints or reports of discrimination under Title VI; conducting a review of the university's response to complaints and reports of antisemitic and other shared ancestry discrimination during the 2023-2024 and 2024-2025 academic years, and taking remedial actions if required; and analyzing the results of, and creating an action plan in response to, climate surveys and/or other reviews focused on shared ancestry discrimination. The university specifically agreed that its protest and demonstration policy would state that it applies equitably and in a manner that complies with Title VI.

**Ann Arbor Public Schools (MI)**: In September 2024, OCR resolved an investigation of the district's compliance with Title VI in response to reports of discrimination and harassment based on shared Muslim/Arab Palestinian ancestry. The investigation confirmed that a school counselor responded to a request from a student, who is Muslim and of Palestinian ancestry, by saying "I don't

negotiate with terrorists." The district appears not to have assessed whether a hostile environment followed from this incident, even after the district received notice, including at its board meetings, that the student himself no longer felt welcomed or safe at school and that district community members perceived the incident as reflecting an escalation of animus directed at Muslim, Palestinian, and Arab students.

During investigation, OCR also learned that the district's Title VI procedures limited who can file a complaint and required the district to respond only to written complaints, in violation of its obligation to respond promptly and effectively to any hostile environment about which it has knowledge, through written complaints or other means. To resolve OCR's concerns, the district entered into a resolution agreement to conduct a climate assessment with respect to race, color, and national origin, including Muslim/Arab ancestry, and the extent to which students are subjected to or witness this particular type of discrimination; analyze the results of the climate assessment and create an action plan; draft a policy, subject to OCR approval, that governs how the district will meet its Title VI obligations, including its response to notice of a hostile environment; and provide training to students, staff, school board members, and parents on the new policy and Title VI's prohibition of discrimination and harassment, including on the basis of shared ancestry.

**School District of Philadelphia (PA)**: In December 2024, OCR resolved allegations of antisemitic discrimination in the district. The investigation yielded Title VI compliance concerns regarding the district's response to repeated notice of antisemitic harassment, its recordkeeping, and retaliation by district staff against parents who exercised their right to complain regarding antisemitic harassment. The district had received extensive notice of alleged antisemitic discrimination, including incidents such as Nazi salutes, swastikas drawn on doors and a smart board, reported antisemitic slurs, threats to "kill the jews," students "dress[ing] up like Nazis, with a swastika tied around each of their arms, spewing fake German

and hailing Hitler through the hallways," and allegations that district teachers and administrators engaged in harassing social media and other conduct. One example of harassing conduct from a teacher took place when a teacher who stood on stage at a school-wide assembly and asked the assembled students "was it really the quote unquote antisemitism that made you uncomfortable or was it the truth?"  The district also received notice of retaliation, including that a teacher posted on social media the names of parents who complained to OCR and to the district regarding antisemitic harassment, and other teachers shared that social media post. Notwithstanding this extensive notice, the district did not demonstrate – except in one instance – that the district fulfilled its Title VI obligations to evaluate whether a hostile environment existed based on the information about which it had notice and if so that it took steps reasonably designed to eliminate any such hostile environment and prevent its recurrence. The district likewise offered no evidence that it assessed whether the teacher's social media post was retaliatory, and if so, steps taken to address it.

To resolve the Title VI compliance concerns OCR identified during the course of investigation, the district agreed to disseminate an anti-harassment statement; review and revise its Title VI policies and procedures; develop or revise its procedure for documenting each report or complaint of harassment; annually train all administrators, faculty, and staff on Title VI; annually train investigative staff on relevant district policies and procedures for complaints of discrimination on the basis of race, color, and national origin; provide an age-appropriate information program for all 6th through 12th grade students to address discrimination; review its response to reports of discrimination and/or harassment on the basis of shared ancestry received during the previous two school years; audit each school that serves 6th through 12th grade students to review compliance with the district's non-discrimination policies and procedures; administer a climate assessment and report the findings and responsive steps taken to OCR; and designate one or more expert consultants to help develop and deliver the training and the climate survey, and help with any other actions to prevent and address discrimination on the basis of shared ancestry.

**University of California (CA)**: OCR resolved nine complaints filed with OCR against five University of California campuses in Los Angeles, Santa Barbara, Davis, San Diego, and Santa Cruz, in December 2024, alleging that these universities failed to respond promptly or effectively to harassment of their students based on their actual or perceived national origin (including shared Jewish, Israeli, Muslim, Palestinian, and Arab ancestry), and some of these universities subjected these students to different treatment with respect to students' access to campus or university programs. During investigation, OCR confirmed that each of the five universities had notice of notice of alleged shared-ancestry-based harassment of students in the 2023-2024 academic year, and at least a possible hostile environment for these students but the universities appear to have failed to take steps reasonably calculated to eliminate and prevent the recurrence of any possible or apparent hostile environment.

For example, at UCLA and its law school, OCR identified compliance concerns stemming from the university's response to more than 150 reports of protests and rallies in October and November 2023, and from its response to complaints related to an encampment on campus in spring 2024. These reports described rally chants such as, "death to Israel," "[t]here is no peace until they're dead," "intifada now," and "there is only one solution." A separate video reviewed by OCR depicted a group that included students beating an effigy of Israel's Prime Minister and shouting "beat that f*cking Jew" on the campus. The university had received reports of checkpoints at a spring 2024 encampment that allegedly denied entry to Jewish students who refused to "denounce their Zionism." The university also received reports of violence against Jewish and Israeli students by protesters at the encampment and of a violent assault by counter-protestors on pro-

Palestinian protesters, with delayed or ineffective law enforcement response. OCR identified a specific concern that UCLA's police response appears to have exacerbated a hostile environment for Palestinian, Muslim, and Arab students.

Similarly, the evidence gathered by OCR showed that UC Santa Barbara, UC Davis, UC San Diego, and UC Santa Cruz also had widely reported incidents of alleged harassment against students based on their national origin, including shared ancestry, indicating that these universities also had notice of a potential hostile environment for their students of Jewish, Israeli, Palestinian, Muslim, and/or Arab ancestry. While some of the alleged incidents of harassment based on shared ancestry at the universities likely constituted protected speech, to the extent these incidents contributed to or created a hostile environment based on national origin, including shared ancestry, OCR was concerned that the universities did not demonstrate in the record produced to date that they fulfilled their legal obligation under Title VI to promptly evaluate if such a hostile environment existed, and if so, how to redress its effects. OCR also had a compliance concern that the universities' responses to notice of possible hostile environments appeared not to have been effective at stopping the harassment, preventing its recurrence, and remedying its effects.

OCR also identified a Title VI compliance concern regarding unlawful different treatment at three of the five universities: UCLA, UC Santa Barbara, and UC San Diego. The UCLA Chancellor acknowledged that "students on their way to class have been physically blocked from accessing parts of the campus," and evidence produced during OCR's investigation indicates that UCLA had notice specifically that this denial of access occurred because students are or were perceived to be Jewish and/or Israeli, including for example the Jewish student OCR interviewed who stated that he was denied entry at a checkpoint due to being Jewish and a Zionist. OCR is concerned that UCLA did not appear to have taken prompt and effective steps to restore this access for students of shared Jewish ancestry. In addition, some UC San Diego

faculty appear to have provided academic credit to students for participating in anti-Israel protests or to have canceled classes to encourage student participation in anti-Israel protests, inconsistent with a university policy that prohibits the canceling of classes to encourage student participation in protests; this apparent different application of the policy prohibiting such conduct may have denied Jewish students – but not other students – equal access to academic credit opportunities and the educational class programming. At UC Santa Barbara, signs posted at a university center and briefly on the center's website explicitly stating that Zionists were not welcomed and that Jewish students should "stay away" from the center kitchen, likely in reference to a Shabbat meal planned at the center, raised a concern that Jewish students appear to have been denied equal access to the university center based on their shared ancestry.

To resolve the Title VI compliance concerns that OCR identified, the University of California system and the five individual universities committed to reviewing complaints and reports of harassment and other discrimination based on shared ancestry to determine if the alleged conduct created a hostile environment; reporting to OCR how the universities responded to reports of harassment; revising as needed and with OCR approval university policies and procedures to ensure that they comply with Title VI; training university employes and public safety and campus police officers who are responsible for investigating complaints of shared ancestry discrimination, and administering a climate assessment and identifying responsive steps for OCR's review and approval. In addition, the universities committed to remedy individual instances of discrimination, including for example at UCLA, through counseling, academic adjustments, opportunities to make up any missed classes or coursework, tuition reimbursement, and removal of any academic or disciplinary consequences related to harassment or disparate treatment.

## COMBATTING ALL FORMS OF SEX-BASED HARASSMENT

Title IX's protections have paved the way for tremendous strides in access to education and more for millions of students across the country and have opened doors for generations of women and girls. Despite this historic progress, rates of sex-based harassment in our nation's schools and colleges remain high. To fully effectuate Title IX's promise that no person experiences sex discrimination in federally funded education, the Department issued a Title IX Final Rule in April 2024.[5] Among other things, the Final Rule strengthens vital protections from all forms of sex-based harassment, including sexual violence and unwelcome sex-based conduct that creates a hostile environment by limiting or denying a person's ability to participate in or benefit from a school's education program or activity. Under the Final Rule, sex-based harassment includes sexual harassment and other harassment on the basis of sex, including sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. The Final Rule also requires recipients to take prompt and effective action when notified of conduct that reasonably may constitute sex-based harassment in their education programs or activities and to prevent recurrence and remedy its effects.

During FY 21 through FY 24, OCR received 3,366 complaints alleging sex-based harassment.

### Policy Resources

**April 2024** *Notice of Final Rule* (see also pp. 22 & 44)

- explaining the provisions in the 2024 Title IX regulations, including an analysis of the public comments and discussion of changes in the final regulations since the publication of the July 2022 notice of proposed rulemaking.

**April 2024** *Fact Sheet* on 2024 Title IX Final Rule

- Highlighting the protections and requirements of the 2024 Title IX Regulations, including that schools must take prompt and effective action to end sex discrimination, including sexual violence and other forms of sex-based harassment – and to prevent its reoccurrence and remedy its effect.

**September 2024** *Resource* for Drafting Nondiscrimination Policies, Notices of Nondiscrimination, and Grievance Procedures under the 2024 Title IX Regulations

- providing recipients information to support their drafting Title IX policies that comply with the 2024 Title IX regulations, including the requirements for nondiscrimination policies, notices of nondiscrimination, and grievance procedures.

**September 2024** *Resource* on 2024 Title IX Regulations: Impact on Title IX Coordinator Duties

- highlighting new or updated requirements for Title IX Coordinators in the 2024 Title IX regulations, including those related to sex-based harassment.

**January 2025** *Resource* on digital harassment

- highlighting, under the 2020 Title IX regulations, that Title IX requires a school to address sexual harassment in its education program or activity, including harassment that occurs online or using technology.

### Illustrative Cases

**Chino Valley Unified School District (CA)**: In April 2022, OCR found that the district violated Title IX by failing to respond promptly and effectively to notice of sexual harassment of students on a high school athletic team by some of their teammates. OCR's investigation uncovered repeated and pervasive harassment by some team members on the team bus, in locker and weight rooms,

---

[5] On January 9, 2025, a federal district court issued a decision vacating the 2024 Final Rule. Consistent with the court's order, the 2024 Title IX regulations are not effective in any jurisdiction.

and in the physical education classroom. Some team members subjected others to harassment that was so serious that it limited their ability to access the athletics program. The harassing conduct included videotaped assaults of teammates, students forcibly physically overpowering other students and sharing photos of their genitals among the team and on social media, and students placing their genitals on and near other students' faces and bodies. The response from administrators, including coaches, to these incidents was insufficient to end the harassing conduct and did not prevent its recurrence. Additionally, the district's response following its investigations did not address the conduct adequately and failed to consider interim supportive measures to protect student athletes from sexual harassment.

To remedy these violations, the district agreed to contact all former athletes from the school's fall 2017 team and offer counseling services or reimbursement for such services received to address the effects of the district's failure to address known sexual harassment on the team; conduct a climate survey for the school's athletics team; train district leaders, school administrators, and coaches about their responsibilities for responding effectively to sexual harassment; conduct Title IX education for student athletes; and report to OCR on the district's training and responses to complaints of sexual harassment through the end of the 2022-2023 school year.

**Garland Independent School District (TX)**: In July 2023, OCR resolved an investigation of this school district's handling of sexual assault allegations, determining that it had violated Title IX by routinely delaying its investigation of Title IX complaints when law enforcement was involved, and, in some instances, failing ever to conduct a Title IX investigation and instead relying on law enforcement findings. In addition, OCR found that the district failed to provide interim measures to protect students and the campus environment; failed to adequately train relevant staff and ensure proper coordination between the district and its Title IX Coordinator; failed to ensure

that the district's grievance procedures and notice of nondiscrimination included the necessary clarity and information required by Title IX; and lacked a centralized recordkeeping system for Title IX complaints.

OCR found that 42 of the 48 student-involved district files reviewed contained no evidence that the district considered, offered, and/or provided interim supportive measures to the allegedly harassed student at any juncture of the Title IX process. These case files revealed inadequate district responses under Title IX —  including an incident for which school video footage reflected a student forcing another student to perform a sex act but no evidence showed that the district provided a prompt and equitable Title IX response to the harassed student, such as by providing her support or assessing and addressing the impact the harassment had on her. In another case file OCR reviewed, the district inexplicably waited 35 days after completing an investigation — until after law enforcement arrested the harassers — to discipline two students who harassed and assaulted two other students daily over several weeks.

As part of its resolution agreement, the district committed to reviewing and revising its Title IX grievance procedures and notice of nondiscrimination; developing and implementing a centralized record-keeping system that enables the district to accurately document and preserve all complaints of sexual harassment and sexual assault; providing OCR with information regarding the district's processing of each formal complaint of sexual harassment and sexual assault filed with the district during the next three school years; offering training on Title IX and its revised grievance procedures to district staff; offering age-appropriate student training districtwide regarding sexual harassment sexual assault, including how and to whom to report sexual harassment; and developing and conducting a climate survey of its students and staff regarding sexual harassment, including sexual assault.

**John Doe School District**[6]: In September 2024, OCR resolved allegations that the district failed to respond as required by Title IX to a report of sexual assault of a student by a group of students. The incident occurred in the locker room and involved four boys holding down a teammate, pulling his hand off a locker as he tried to get away, and placing another team member's genitals on the restrained student's face. After receiving the complaint of the alleged sexual assault, the district classified the incident as hazing and harassment rather than as sexual assault. Although the district's Title IX coordinator was involved in the investigation, the district did not treat the incident as a Title IX matter. As a result, while the district disciplined the perpetrating students for bullying, the perpetrators did not receive the process protections guaranteed to them under Title IX. At the same time, the district did not inform the targeted student how to file a Title IX complaint, which the district had been required under Title IX to do. Nor did the students receive an offer of individualized supportive services, or other nondiscrimination protections Title IX provided to them. To resolve the violations OCR found, the district agreed to revise its sexual harassment policies and procedures; train the Title IX Coordinator, employees, and students about responding to incidents of potential sexual harassment; maintain relevant records and report to OCR all reports and formal complaints of sexual harassment the district receives for two school years, for OCR's review to determine whether the district's responses present Title IX compliance concerns; and offer to reimburse the parent of the targeted student for costs related to the consequences of the district's insufficient response under Title IX.

**Lawrence Technological University (MI)**: In September 2024, OCR resolved an investigation alleging discrimination on the basis of sex when the university failed to respond to notice of sexual harassment of a female student who was harassed by a male teammate while working on a group project. For example, one of the student's male teammates sent the student a "joke"

image with a punchline that implied that women belong in the kitchen washing dishes. When she reported their behavior to the team's advisor, the advisor — instead of advising the woman of her right to file a Title IX complaint — told her to consult with female professors in the department. The advisor also told the student that she would be dealing with these types of behaviors for the rest of her career, so she should just figure out what to do on her own and move on. Rather than submit to continued harassment, the student left the project team.

OCR's investigation revealed that the university failed to provide this student with basic Title IX protections, and these failures occurred at every level, with one result being that even after the university initiated an investigation, additional Title IX violations occurred. To remedy its noncompliance, the university agreed to train all enrolled students, faculty, and staff regarding the university's Title IX grievance procedures; engage an expert to help conduct a review of the department in which the student had been enrolled, to determine whether there is ongoing sex discrimination. This process will include a public meeting with students as well as a climate survey; identifying a counselor to provide services to members of the university community who have reported sex discrimination; and publish contact information for the counselor on the university's website in a conspicuous location.

---

[6] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

# SPOTLIGHT

## What Is Sex Stereotyping?

Sexual harassment is a prohibited form of discrimination under Title IX, including harassment based on sex or sex stereotyping.[8] Sex stereotypes may include beliefs about how a someone "should" dress, behave, express themselves, identify, and more, based on their sex. This form of harassment, and the stereotypes that drive it, can be harmful to all students.

**John Doe School District[9]**: In December 2024, OCR resolved investigation of a complaint that a female, cisgender middle school student reported being repeatedly harassed by classmates and staff because she dresses androgynously and is 6 feet tall with short hair. OCR found that the district had actual knowledge of allegations that student peers repeatedly – as frequently as on a daily basis – subjected the student to harassing conduct based on sex stereotypes, including questioning why she would be in the girls' section in show choir; asking if she was transgender; telling her she looked like a boy and looked gay; calling her "transgender," "trans," and "queer" as derogatory terms; calling her a boy; and calling her "fat and ugly."

The evidence further established the district's actual knowledge of allegations that this sex stereotyped sexually harassing conduct caused significant harm to the student's mental health and wellbeing. The district thus had actual knowledge of alleged conduct that could constitute sexual harassment, especially when considering the totality of the circumstances as it involved multiple incidents across two school years; and the district repeatedly investigated this conduct that could constitute sexual harassment entirely outside the Title IX process, instead investigating only

some of the reports under its anti-bullying policy. The district thus failed to fulfill the Title IX regulatory requirements that the district notify the complainant about how to file a formal complaint, offer her individualized supportive services whether or not she files a formal complaint and, if she does file a formal complaint, investigate pursuant to a compliant Title IX process. Although school administrators investigated some incidents and disciplined some students for misconduct, the district did nothing to address the fact that the sexual harassment of the student was persistent and widespread throughout the school, involving multiple student harassers. Based on the established pattern of inadequate responses to the student's and/or parent's multiple reports of sexual harassment, OCR determined that the district responded with deliberate indifference in violation of Title IX. OCR also determined that the district did not provide the student prompt or adequate supportive measures.

As a result of the resolution agreement, the district committed to provide supports and services to the student as well as revise its Title IX policies and proceedings, implement a system for recordkeeping, provide regular training for all staff involved in implementing Title IX, and provide age-appropriate training to students on the district's policies and procedures prohibiting sexual harassment.

**Nash County Public Schools (NC)**: In September 2023, OCR resolved investigation of a complaint that, at the beginning of the 2022-2023 school year, this school district had held a dress code assembly only for girls — without holding any such assembly for boys — with the purpose, in part, to address "inappropriate"

---

[8] see [85 Fed. Reg. 30179](#) .

[9] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

# SPOTLIGHT CONTINUED

messages on social media by students that threatened sexual violence against other students. During this assembly, district staff appeared to blame the girls for the harassment they experienced, saying that their manner of dress was "opening the door" to harassment and that they should not then "wonder why they [boys] disrespect you." These facts, among others (including that the district had disciplined boys for dress code violations as often as they disciplined girls but did not hold an assembly for boys to address their noncompliance), led to concerns that the district did not respond as Title IX requires to notice of possible sexual harassment and that the district selectively enforced its dress code based on sex stereotypes.

**Pflugerville Independent School District (TX)**: In August 2023, OCR determined that this school district had violated Title IX by failing to respond equitably to notice that a student had been sexually assaulted by another student within the school building. A third-party investigator retained by the district interviewed only the student who alleged she had been raped, and no one else, because — based on the student's responses to questions about the alleged incident and her physical demeanor — the investigator concluded that the assault did not happen. Because the district relied on stereotypes about how a person should respond to sexual assault, the investigation failed to provide the accused student an opportunity to be heard regarding the allegation, failed to interview relevant witnesses, and failed to make a determination as to whether the student was subjected to a hostile environment.

**John Doe School District**[7]: In December 2024, OCR resolved an investigation that confirmed the district had notice that peer students harassed a Native American student for appearing, in the harassing students' view, as too feminine, directing derogatory comments at the student because of his long hair, pulling his hair, and calling him "F*gg*t American," "f*gg*t" and "p***y." The harassment was so severe that one of the reasons the student gave to OCR for cutting his hair between his 6th and 7th grade years, even though having long hair is core to his Native American identity, was to lessen the sex-stereotype harassment by other students. OCR has a concern that even though the district had notice of ongoing sexual harassment of the student by other students, the evidence the district had produced suggests that the district's response was not designed to eliminate and prevent recurrence of the hostile environment and in fact did not because incidents continued into the following school year. The resolution agreement the district entered to resolve the concerns OCR identified commits the district to offer reimbursement to the student for expenses related to the harassment the student experienced, review and revise its policies and grievance procedures related to compliance with Title IX and its response to reports and complaints of sex-based harassment to ensure they are compliant with the requirements of Title IX. Additionally, the district will require all administrators, staff, and teachers at the student's school to attend annual training regarding the District's updated policies and procedures, provide training to students, and track all reports of harassment and report them and the district's response to OCR for review.

---

[7] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

## Discrimination Against LGBTQI+ Students

The laws OCR enforces protect everyone against the discrimination the laws prohibit. OCR has long enforced consistent with that principle and in fact the Department explained, in the preamble to the 2020 regulations to Title IX, that "These final regulations focus on prohibited conduct, irrespective of a person's sexual orientation or gender identity. . . . These final regulations include sexual harassment as unwelcome conduct on the basis of sex that a reasonable person would determine is so severe, pervasive, and objectively offensive that it denies a person equal educational access; this includes but is not limited to unwelcome conduct of a sexual nature and may consist of unwelcome conduct based on sex or sex stereotyping. The Department will not tolerate sexual harassment as defined in [the regulation] against any student, including LGBTQ students."[10]

> **"The Department will not tolerate sexual harassment as defined in [the regulation] against any student, including LGBTQ students."**
>
> **Department of Education 2020 Title IX Final Rule**

### Policy Resources

**April 2024** *Notice of Final Rule* (see also pp. 19 & 44)

- clarifying that Title IX's prohibition on sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and that preventing students from participating in school consistent with their gender identity subjects them to sex-based harm.[11]

**October 2021** *Fact sheet* on supporting intersex students

- confirming that federal civil rights law protects all students, including intersex students, from sex discrimination.

**June 2021** *Notice of Interpretation*

- clarifying that, in light of the Supreme Court's decision in *Bostock v. Clayton County*, the Department interprets Title IX to prohibit sexual orientation and gender identity discrimination.[12]

**June 2021** *Fact sheet* on confronting anti-LGBTQI+ harassment in schools[13]

- sharing information about schools' obligation to investigate and address discrimination, including harassment, against students because of their sexual orientation or gender identity.

### Illustrative Cases

**Tamalpais Union High School District (CA)**: In June 2022, OCR determined that this district violated Title IX by failing to respond promptly and effectively to repeated notice of ongoing sex-based harassment of a transgender student by another student, predicated on sex stereotyping. During the investigation, OCR found that the district failed to investigate allegations that the other student had repeatedly harassed the transgender student about her appearance, her voice, her body, her name, and her pronouns during the school year OCR investigated. OCR found that this failure to investigate, in addition to the district's failure to respond promptly or effectively to later notice of continuing harassment, permitted the student to be subjected to a hostile environment that was sufficiently serious to deny or limit her ability to participate in or benefit from the school's program.

---

[10] 85 FR 30026, 30179 (2020).
[11] See note 5, *supra*.
[12] See note 5, *supra*.
[13] See note 10, *supra*.

**CIVIL RIGHTS ENFORCEMENT ACTIVITIES**: LGBTQI+ HARASSMENT

The resolution agreement committed the district to reimburse the student and her family for counseling costs incurred because of the harassment, review and revise district policies and procedures to clarify that harassment based on sex includes harassment based on sex stereotyping, train school staff and contractors on their obligations under Title IX, and document to OCR that the district's responses to complaints of sex-based harassment during the most recent two school years complied with the resolution agreement and with Title IX.

**Rhinelander School District (WI)**: In July 2023, OCR resolved the investigation of this school district after identifying concerns that its response to a student's report of persistent harassment had limited the student's participation in school activities. OCR's investigation found that in school year 2021-2022, a nonbinary student repeatedly was mocked and targeted by other students and referred to using the wrong pronouns by multiple teachers. OCR also reviewed evidence that students bumped into the harassed student in the hallways and called them a derogatory slur for LGBTQI+ people. Ultimately, the student was removed from a class altogether on the ground that the teacher could not protect them from other students' harassment. The school limited the student to three in-person classes and required them to take their remaining classes through self-directed study. To resolve the compliance concerns OCR identified, the school agreed to evaluate the harassed student to see if they need compensatory services due to the instructional time they missed when attending in-person classes on a part-time basis; train all district administrators and staff regarding their obligation to respond to complaints of sex-based harassment; educate the students, in an age-appropriate manner, on what sex-based harassment is and what they should do if they see it; and conduct a climate survey to assess the prevalence of sex-based harassment and report to OCR for approval of any responsive action.

**John Doe School District**[14]: In March 2024, OCR resolved an investigation of alleged sexual harassment of a transgender middle school student. OCR's investigation reflected that the district received notice of at least six incidents of alleged harassment that occurred within a span of the first five days of the school year for a student who was new to the school, including for example, a peer telling the student that she was in the wrong bathroom, a teacher asking the student if she was or preferred to be called a boy or a girl, and peers and staff misgendering the student. The student's parent reported to the district that these incidents left the student feeling humiliated and sad. The district investigated some of the incidents reported, established that they occurred, but determined no response was needed because there was no harmful intent involved. For example, according to the district, the student peer who told her that she was in the wrong bathroom genuinely believed she had used the wrong bathroom based on her appearance. OCR identified Title IX compliance concerns that the district's misapplication of the legal standard – not considering how the cumulative conduct based on the student's nonconformance with stereotypes of masculinity and femininity, about which the district had notice and that it established had occurred, could have contributed to a hostile environment for the student regardless of the intent of the other parties involved – prompted inaction on the district's part. To resolve these compliance concerns, the district agreed to invite the student's parent to be included in the district's LGBTQ Outreach Committee, which works to prevent harassment related to gender identity; allow the student to submit complaints for incidents that were not investigated; provide Title IX training to district staff; conduct learning sessions for district students; and administer a climate survey to identify any needed next steps to ensure a nondiscriminatory school environment.

---

[14] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

**CIVIL RIGHTS ENFORCEMENT ACTIVITIES**: DISABILITY HARASSMENT

**Park City School District (UT)**: In March 2024, OCR addressed this district's Title IX violations when it failed to notify reporting students and parents about how to file a Title IX complaint or offer those students supportive measures whether or not they filed a complaint – both of which the Department's regulations to Title IX as amended in 2020 require – when the district received notice of conduct that could meet the definition of sexual harassment. OCR's investigation confirmed that the district had received such notice, repeatedly, such as when students reported feeling depressed, anxious, and nervous about attending school following threats and targeted harassment such as a peer saying, "I hate that fag" and when the district documented notice that a student was, in the district's words, "subjected to offensive sexually explicit comments about body parts and gender identity." The resolution agreement commits the district to conduct a climate survey to assess the prevalence of harassment and needed responses; review, revise, and disseminate districtwide policies for handling reports of harassment; provide support and remedies to affected students; and report to OCR about how the district responds to reports and complaints of harassment based on sex (as well as race, national origin, or disability) for two school years. The comprehensive resolution agreement addresses these and other violations that OCR found.

## REDRESSING DISABILITY HARASSMENT

Bullying or harassment on any basis of a student with a disability can result in a denial of the free appropriate public education (FAPE) to which students with disabilities are entitled under Section 504. As a result, when students with disabilities experience harassment in school, their school districts are required under Section 504 to assess whether the students' needs have changed as a result of the effects of the harassment such that the students are no longer receiving FAPE. When school districts fail to do so, OCR has entered into resolution agreements to ensure that that denial of FAPE is remedied and does not recur.

## Illustrative Cases

**Marshfield Public Schools (MA)**: OCR investigated whether this school district had discriminated following a serious bullying incident against a student with a disability, yielding concerns that the district may not have satisfied its Section 504 and Title II obligations. Although the district disciplined the student who engaged in bullying and took steps to support a return to school for the student who had been bullied, it did not convene the bullied student's IEP team to consider the impact of the bullying incident on their receipt of FAPE. In addition, OCR's investigation yielded evidence suggesting that the student who was bullied missed multiple disability services, including occupational therapy and counseling sessions, due to his absences related to the bullying incident.

In November 2022, to remedy OCR's concerns, the district committed to assessing the impact of the bullying on the student and the need for compensatory services. The agreement also required the school to conduct staff training on Section 504 and Title II and to provide one year of data on the school's response to bullying incidents targeted at students with disabilities.

**Allegheny Valley School District (PA)**: In September 2023, OCR concluded that this school district violated Section 504 and Title II when it failed to respond adequately to ongoing, disability-based harassment of a student. The evidence showed that the harassing conduct directed at the student, including repeated slurs and assault, created a hostile environment that impacted the student's ability to participate in the educational program. The evidence also reflected that the district did not investigate all reported incidents and that the district discounted videotaped and eyewitness reports of harassment as not being disability-related. In addition, the investigation confirmed that the district did not convene the student's IEP team until more than six months after the first reported incident of disability harassment and that, when the IEP team did convene, the IEP team did not consider whether the harassment impacted the student's receipt of a FAPE or supported a need for adjustments to the student's IEP.

In response to OCR's findings, the district agreed to take corrective steps that included distributing a memorandum to staff that states the district's obligations under Section 504 and Title II of the ADA; training all school staff; offering individual remedies to the student, such as counseling, academic, or other therapeutic services to remedy the effects of the harassment; convening the student's IEP team, as appropriate, to determine whether the student's receipt of a FAPE had been impacted by the harassment; reviewing all bullying incidents for a three-year period at the school to determine any needed additional remedies; and conducting a climate assessment to evaluate any needed additional supports to ensure a nondiscriminatory school environment for all students with disabilities.

**John Doe School District**[15]: In August 2024, OCR concluded an investigation that confirmed a teacher had required a student with a disability to sit in front of the class with tape over his mouth and under his eye as a consequence for the student's disability-based impulsive behavior in the classroom. The teacher drew a tear drop on tape under the student's eye and held a lit match near his face in front of the class, waiting for the student to flinch. OCR found the school failed to respond as required under Section 504 and Title II to the teacher's harassment of the student on the basis of disability. To remedy its violation of Section 504 and Title II, the district agreed to meet with the child and his parents to discuss a plan for remedial measures as needed, train staff about harassment based on disability, and revise policies to better address disability discrimination.

**John Doe School District**[16]: OCR identified concerns regarding the harassment experienced by a seventh-grade student with cerebral palsy and cognitive disabilities who primarily uses a wheelchair. The complaint alleged that a paraprofessional assigned to the student made the

student cry after telling him that he was stupid, asking him why he did not understand basic tasks, and predicted that he would never get very far. In addition, another paraprofessional mocked the student for asking what the "L" stood for on a pair of headphones, by reciting the alphabet up to the letter "L" and calling the student a jerk. The final allegation of harassment involved a Snapchat video – recorded by another student – that showed the student crawling across the floor a school restroom to reach his wheelchair. The video was shared to a student Snapchat group.

During investigation, OCR identified a concern that while the district was responsive to the incidents, its response was incomplete as the district had not conducted the assessment required to determine whether the student was receiving FAPE following these incidents. In October 2024, the district entered into a resolution agreement, committing to convene the student's IEP team to examine whether, in response to the paraprofessional comments and Snapchat video, the student needed to receive different or additional services to ensure that he receives FAPE.

---

[15] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

[16] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

# ENSURING EQUITY FOR STUDENTS WITH DISABILITIES, INCLUDING DURING THE COVID-19 PANDEMIC

Between 2021 and 2024, OCR received 27,620 disability-related complaints, with their number rising by 78% from 2021 to 2024.

## Policy Resources

**July 2021** *Fact sheet* on Long Covid under Section 504 and the IDEA: A Resource to Support Children, Students, Educators, Schools, Service Providers, and Families

- explaining that Long Covid is a disability, and federal civil rights laws protect students with Long Covid from discrimination.

**October 2021** *Resource* on supporting and protecting the rights of students at risk of self-harm in the era of COVID-19 (released jointly with DOJ)

- providing information about federal legal requirements governing school decisions about how to respond to students at risk of self-harm.

**February 2022** *Resource* on providing students with disabilities Free Appropriate Public Education during the COVID-19 pandemic and addressing the need for compensatory services under Section 504

- clarifying the obligation for schools to provide compensatory services for students with disabilities who did not receive evaluations or services to which they were entitled to during the pandemic.

**May 2022** *FAQs* on the disability-related rights of student veterans with disabilities

- describing when veterans with disabilities are

entitled to academic adjustments and how they may request them.

**May 2022** *20-Part Video Series* on digital accessibility (in partnership with the ADA National Network)

- covering a variety of topics on digital access in education, including how people with disabilities use technology, applicable Federal regulations, and identifying and remediating barriers to access.

## Illustrative Cases

**Los Angeles Unified School District (CA)**: In April 2022, OCR resolved a directed investigation of whether the district provided the free appropriate public education (FAPE) to which federal civil rights law entitles students with disabilities during the COVID-19 pandemic. OCR's investigation found that during remote learning, the district limited the services provided to students with disabilities based on considerations other than the students' individual educational needs; failed to accurately or sufficiently track services provided to students with disabilities; directed service providers to include attempts to communicate with students and parents — including emails and phone calls — as the provision of services, documenting such attempts on students' service records; informed staff that the district was not responsible for providing compensatory education to students with disabilities who did not receive FAPE during COVID-19-related school closures because the district was not at fault for the closure; and failed to develop and implement a plan adequate to remedy the instances in which students with disabilities were not provided FAPE during remote learning.

The district agreed to resolve these violations by creating and implementing a comprehensive plan to address the compensatory education needs of students with disabilities due to the COVID-19 pandemic. Through implementation of the resolution agreement, the district agreed to develop and implement a plan to appropriately assess and provide compensatory education to students

with disabilities who did not receive FAPE during the COVID-19 pandemic; designate a plan administrator to implement the plan for assessment of compensatory education; convene IEP and Section 504 teams to determine whether students were not provided the regular or special education and related aids and services designed to meet their individual needs during remote learning and determine compensatory education; track and report to OCR the implementation of the plan for compensatory education; and conduct outreach to parents, guardians, students, and other stakeholders to publicize the plan for compensatory education and the roles of the plan administrator and independent ombudsperson.

**Puerto Rico Department of Education (PR)**: In May 2022, OCR resolved a complaint alleging that the Puerto Rico Department of Education (PRDOE) discriminated on the basis of disability by requiring students with disabilities enrolled in a multi-grade self-contained special education classroom at a PRDOE school to wear orange shirts as part of their school uniforms rather than the shirt in the color that corresponded to their grade levels, like all other children in the school wore. During the investigation, OCR found that the school's Facebook page included images of uniform shirts in different colors based on grade level, assigning the students in the multi-grade self-contained special education classroom the same color as the pre-kindergarten students, while assigning students in other grades shirts in various colors. The investigation also reflected information that directors of other PRDOE schools required students with disabilities to wear uniform shirts that are different in color from those worn by students without disabilities.

To address the concerns OCR identified, the PRDOE agreed to notify all school directors and boards that they must not discriminate on the basis of disability in their uniform policies; notify school staff, parents/guardians, and students that the schools will not assign students' school uniforms based on disability and provide information about how to file a complaint if needed; and train all school directors and boards about their obligations under Section 504 and Title II.

**Fairfax County Public Schools (VA)**: In November 2022, OCR resolved an investigation of this school division's provision of FAPE to students with disabilities during the COVID-19 pandemic. OCR's investigation found the school division had failed to provide thousands of students with disabilities with services identified in the students' IEPs and 504 plans during remote learning. Specifically, the school division had reduced and placed limits on special education services based on considerations other than the students' individual education needs; failed to accurately or sufficiently track services provided to students with disabilities; and inaccurately informed staff that the school division was not required to provide compensatory education to students with disabilities who did not receive a FAPE during the COVID-19 pandemic because the school division was not at fault. The school division agreed to resolve these violations by creating and implementing a comprehensive plan to address the compensatory education needs of students with disabilities due to the COVID-19 pandemic. This included designating a plan administrator who will oversee the creation and implementation of the plan; convening IEP and Section 504 teams to determine whether students were not provided the regular or special education and related aids and services designed to meet their individual needs during remote learning and determine compensatory education; tracking and reporting to OCR the implementation of the plan for compensatory education; providing written guidance and/or training about the plan to all school division staff with responsibilities under Section 504 and Title II; and conducting outreach to parents, guardians, students, and other community members to publicize the plan for compensatory education.

**Tempe Union High School District (AZ)**: In April 2023, OCR resolved a complaint that alleged this school district had discriminated against students with disabilities by segregating them in classes and in the cafeteria, limiting their ability to select courses, failing to consider a student's individual needs, and failing to provide reasonable modifications to or accommodations for non-academic and

extracurricular activities. OCR's investigation confirmed that students with disabilities all shared the same elective courses and learned with only 1.2% of the general school population, segregating these students from the rest of the school. To resolve the Investigation, the district agreed to develop a policy for making individualized determinations when placing students and not placing students based on stereotypes; conduct an audit of the course schedules for all students with disabilities to ensure that decisions are made based on the individualized needs of each student; provide individual remedies for all impacted students; and ensure that students with disabilities are integrated to the maximum extent appropriate to their needs with non-disabled students.

# ENSURING EQUAL ACCESS TO SCHOOL OFFERINGS

OCR addressed discrimination in access to school offerings in a wide range of circumstances. Complaints received and resolved during this Administration addressed unequal access for students based on sex under Title IX; race, color, and national origin under Title VI;  and disability under Section 504 and Title II.

## Illustrative Cases

**Brandeis University (MA)**: In November 2023, OCR resolved a complaint that that the university discriminated on the basis of sex because the men's baseball team had access to practice and competitive facilities superior to those provided to the women's softball team. In this investigation, OCR compared the practice and competitive facilities of the baseball and softball teams because all of the university's other men's and women's teams shared the same facilities for practice and competition. OCR identified concerns about the quality, size, and features (including lights, press box, backstop, foul poles, and dugouts) of the university's softball facilities as compared to those available to the baseball team. The university committed to conducting an assessment to ensure that athletes are provided with equivalent benefits, opportunities, and treatment on the basis of sex with respect to the provision of locker rooms and practice and competitive facilities; and creating and implementing a corrective action plan to identify and address the various inequities that OCR's investigation identified.

**John Doe University**[17]: During investigation of this complaint, OCR learned that the complainant and another student, who was also a student of color, had not been allowed to proceed in a nursing program after failing a course, but that three white students in a previous term had been allowed to continue in the same program after receiving failing grades, albeit in a different course. The university asserted that unlike the course that the students of color failed, the course the white students failed was not considered foundational. However, the university could not provide documentation distinguishing which courses were foundational and was unable to provide documentation regarding decision-making to allow students to continue. OCR also observed that the program's handbook did not contain a notice of nondiscrimination. To resolve the Title VI compliance concerns OCR identified regarding apparent different treatment based on race, the university committed in April 2024 to provide Title VI training to the specific departments' faculty, administrators, and other staff; include a compliant notice of nondiscrimination in the handbook; revise the program's policies and procedures to make clear the distinction between "foundational" and "non-foundational" courses and the process for petitioning for an exception; provide documentation of the petition process to OCR for the next three terms; offer the complainant the option of enrolling with the next cohort to re-take the class the student failed at

---

[17] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

a discounted rate and to resume their progression in the program; and issue a tuition credit to the student's classmate who already re-took the class.

**John Doe University[18]**: In February 2023, OCR resolved an investigation of this university's treatment of a student athlete with a disability. During the student's first few weeks at school, she had trouble with medication management for her mental health disability and went home in distress. Her coach sent her mother a text message saying he felt it best that the student not return to school and that he felt "deceived in the recruiting process" because he was unaware of her disability. This message raised concerns regarding decision-making based on stereotypes about students with mental health disabilities, rather than individualized decision-making based on the student's particular needs. To remedy OCR's concerns, the university agreed to issue a memorandum to all athletics department staff reminding them of their obligations under Section 504 and Title II, train athletics department staff regarding the university's Section 504 obligations, revise its policies and procedures for addressing student threats of self-harm, maintain records and report to OCR on threat assessments, and refund the student's monetary loss.

**Genesee Intermediate School District (MI)**: In March 2024, OCR resolved concerns that a school bus transporting students with disabilities to a district program was late every day, resulting in students on the bus missing 20 minutes of classroom time. OCR had cause for concern that the district denied FAPE to the students when it did not address their late arrivals but instead shortened these students' school day. To remedy OCR's concerns, the district restored the students' school day to the full number of hours it was prior to the bus delays; issued a memorandum to staff and to the parents of the students in the program to inform them that school days for program students may not be shortened due to transportation issues or for the purposes of administrative

convenience; ensured that staff maintain logs of arrival and departure times for program students for the remainder of the school year; and convened the Section 504 or IEP teams of each of the program students to determine the amount of instructional time each student lost as a result of their tardy transportation and investigate each student's need for compensatory education or remedial services.

**Colonial School District (DE)**: In July 2024, OCR resolved a compliance review examining whether students with disabilities were afforded the same opportunity as students without disabilities to access Advanced Placement (AP) courses offered in the district. OCR's investigation revealed data anomalies in the district's CRDC reporting compared to the data it reported to OCR during the investigation, raising concerns about the district's recordkeeping practices. The investigation also showed that although the district had known for years that strikingly few students with disabilities enrolled in Advanced Placement courses in the district – as few as two or nine students with disabilities during a given school year, compared to the overall Advanced Placement enrollment of 370 or 334 students – the district did not take steps specifically designed to ensure equal access for students with disabilities to the district Advanced Placement offerings. To address these concerns, the district agreed to improve communication regarding the availability of AP courses; evaluate its academic counseling services to ensure students with disabilities receive counseling that informs them of available AP course options; and correct its recordkeeping and CRDC reporting.

---

[18] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

# REMOVING BARRIERS TO OPPORTUNITY DUE TO LANGUAGE OR NATIONAL ORIGIN

OCR continued its strong enforcement measures to ensure equitable access to instruction, opportunities, and resources for English learners (ELs) and Multilingual Learners (ML), as well as effective communication with limited English proficient (LEP) parents or guardians.

## Policy Resources

**August 2021** *Fact sheet* on Confronting Discrimination Based on National Origin and Immigration Status

- underscoring that all children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents' or guardians' immigration status.

**June 2023** *Fact sheet* on Protecting Access to Education for Unaccompanied Children

- highlights specific challenges some migratory children and unaccompanied children may face while accessing public education and reminds public schools of their responsibilities to them under Title VI.

**June 2023** *Resource* on Ensuring Meaningful Participation in Advanced Coursework and Specialized Programs for Students Who Are English Learners

- discussing legal requirements for ensuring English learners' access to specialized programs and reminds schools that students who are English learners are entitled to appropriate language assistance services.

## Illustrative Cases

**Weld County School District (CO)**: In November 2023, OCR investigated allegations that the district discriminated against multilingual learner (ML) students on the basis of national origin by failing to identify and assess ML students needing assistance on a timely basis; failing to provide ML students with a language assistance program that is proven successful; and treating ML students differently than their non-ML peers by requiring them to change campuses. OCR's investigation revealed the district failed to evaluate two students altogether, and the English as a second language (ESL) class was a study hall rather than explicit language instruction. Additionally, OCR identified concerns related to the district's Newcomer Program, which neither adequately defined an eligible student nor adequately notified parents/guardians that the program was voluntary and limited in time. The resolution agreement requires the district to revise the district's English Learner Guidebook; conduct a mid- and end-of-year audit at the school to ensure all ML students are timely identified; provide professional development and in-classroom support to ML staff, core content teachers of ML students, and evaluators of teachers and staff who work with ML students; conduct a program evaluation of the middle school Newcomer Program; and, revise and issue to parents/guardians communications regarding the Newcomer Program in a language that they understand.

**Legacy Traditional Schools (AZ)**: In September 2024, OCR's compliance review of this network of 21 charter schools found that the network failed to timely identify English learner (EL) students or to adequately notify their parents of their EL status and their ability to receive or opt out of the network's English Language Development (ELD) program; failed to provide some EL students with ELD services and did not have enough teachers who were trained and qualified to deliver such services; failed to train administrators to evaluate teachers who provide ELD services; and failed to periodically assess the effectiveness of the ELD program or take steps needed to ensure its

success. Additionally, OCR's investigation uncovered that the network did not adequately monitor the academic progress of current and former EL students to determine their meaningful participation; and failed to notify some parents with limited English proficiency (LEP) in a language they could understand about school programs and activities of which other parents were made aware. Finally, OCR found that some LEP parents' decision to opt out of placing their children in EL programs may not have been knowing and voluntary based on the information provided to them, and that the network may not have provided equitable space for EL students by serving them in a cafeteria instead of a classroom.

The network entered into a resolution agreement with OCR requiring the network to timely identify EL students and place them in the network's ELD program; notify EL students' parents of their child's language needs and options; provide EL students with targeted ELD based on their level of English and integrated ELD to help them meaningfully access instruction; train ELD teachers to instruct EL students effectively; ensure that ELD instructional materials are appropriate and comparable to those provided for non-EL students; monitor all EL students' progress and offer struggling students a chance to opt-in; monitor academic progress of former EL students to identify persistent barriers; observe ELD teachers' classes and lesson plans to ensure targeted and integrated ELD; evaluate the network's EL program for success; notify employees of the interpretation and translation needs of parents with LEP and provide them with appropriate services; provide essential information to parents in English and Spanish and notify other parents how to access free translation services; and provide free translation or interpretation.

# RACE, NATIONAL ORIGIN, AND DISABILITY DISCRIMINATION IN SCHOOL DISCIPLINE

Across successive administrations, OCR continues to investigate schools that discriminate against students on the basis of their race, ethnicity, national origin, or disability related to school discipline.

## Policy Resources

**July 2022** *Dear Colleague* letter on supporting students with disabilities and avoiding the discriminatory use of student discipline under Section 504 of the Rehabilitation Act of 1973

- explaining the nondiscrimination requirements that public elementary and secondary schools must follow with regard to the discipline of students with disabilities under Section 504.

**May 2023** *Resource* on confronting racial discrimination in student discipline

- highlighting examples of the Departments' investigations of discrimination in student discipline on the basis of race, color, or national origin under Title VI of the Civil Rights Act of 1964 and the Departments' Title VI regulations.

## Illustrative Cases

**Volusia County School District (FL)**:  In June 2022, OCR resolved an investigation of a parent's allegations that she had notified the district that her child has ADHD and had repeatedly requested an evaluation for the student but the school had disciplined the student for disability based behaviors. District records showed the student had

49 discipline offenses for the 2021-2022 school year with 37 taking place during the spring semester. The student received out-of-school suspension for a total of 15 days in the spring semester. The evidence available to OCR showed that the district assigned the student an excessive number of discipline referrals during the 2021-2022 school year and that the district did not timely evaluate the student for special education services. To resolve OCR's concerns, the district agreed to hold an IEP meeting to determine whether the student needs compensatory services and to conduct school staff training regarding Section 504 evaluation requirements.

**Victor Valley Union High School District (CA)**: In August 2022, OCR found that this district violated Title VI by disciplining Black students more frequently and more harshly than similarly situated white students. OCR identified a pattern of disparate disciplinary actions across types of discipline (e.g., suspensions, expulsions, truancy, law enforcement citations), across schools, and across grade levels that imposed greater harms — including in significant lost learning time — on Black students than on their white peers. For example, OCR identified instances in which Black students received harsher discipline than similarly situated white students for cutting class, wearing their pants low or "sagging," engaging in a mutual altercation, or making disruptive noises. This reported discrimination was consistent with statistical evidence of racial disparities in student discipline, as well as with district records reflecting specific instances of harsher discipline of Black students as compared to white students who engaged in similar behavior. OCR's investigation also revealed that some of the district's discipline practices that disproportionately harmed Black students departed from district policies and state law. Additionally, OCR found that the district failed to maintain and produce timely, complete, and accurate records regarding student discipline to demonstrate its compliance with Title VI.

To remedy these violations, the district committed to examine the causes of racial disparities in the district's student discipline practices and to develop and implement a corresponding corrective action plan; establish a

stakeholder equity committee to inform the district's implementation of the plan and agreement; revise its discipline policies and procedures, including regarding law enforcement involvement in student discipline; ensure accurate and complete student discipline record-keeping and reporting; regularly analyze student discipline data and other information to address possible areas of discrimination; clarify prohibited discipline practices through a memorandum to appropriate staff; provide training for staff on the revised discipline policies, practices, and record-keeping; conduct student and parent information sessions regarding student discipline policies; publicly report disaggregated discipline data; conduct school climate surveys to assess perceptions of fairness and safety in the district; and provide compensatory education to students subjected to discriminatory discipline policies and practices.

**Four Rivers Special Education District (IL)**: In September 2024, OCR resolved a compliance review of this single-school district, which is designed to serve students with emotional disabilities and receives students from 19 area school districts when the sending districts could not provide the necessary level of supports for the students. OCR's investigation revealed that the district routinely referred students with disabilities to the police for noncriminal behaviors, referring students 96 times in one school year, which was more than the total number of students enrolled that year. These law enforcement referrals were often for behavior that could have been based on disability such as "disruption" and use of "inappropriate language" notwithstanding the district's advertised specialization in meeting the needs of students with disabilities. The district did not evaluate whether the students needed compensatory services or different supports when they had been referred to the police and it likewise did not evaluate those same issues when it sent students to its crisis room, even when students were in the crisis room not receiving instruction for as long as four hours and 20 minutes in a single day.

To remedy OCR's concerns, the district agreed to take several actions, including convening an IEP meeting for

each student who was subjected to law enforcement contact or was sent to the crisis room multiple times to examine the need for compensatory education and/or remedial services; developing procedures governing contacts with law enforcement and removals to the crisis room to ensure that all students with disabilities receive a FAPE; and implementing a record-keeping system to ensure accurate, complete and timely documentation of each law enforcement contact and each use of the crisis/regulation room.

**Fall River Joint Unified School District (CA)**: In December 2024, OCR resolved an investigation of discriminatory discipline of Native American students. OCR found persistent overrepresentation of Native American students in discipline for each year analyzed from the 2013-14 through 2022-23 school years, and many instances where the district appeared to sanction Native Americans more harshly than similarly situated white students for the same or similar offenses, even when their discipline histories were comparable or worse than those of the Native American students.

For example, OCR's investigation found that Native American students were 10.2 times more likely than white students to receive the district's most severe discipline outcomes of expulsion, a transfer to an alternative school, and a district referral to law enforcement. District records further reflected that the district administered more severe and exclusionary discipline to Native American students than white students for the same or less serious behavior, including dress code and cell phone violations, even when the white student's discipline history was comparable to or more extensive than the discipline history of the Native American student.

While Native American students constituted 12% of district enrollment, they constituted 22.8% of students suspended out of school and 52.4% of students with the most severe discipline consequences of expulsion, disciplinary transfers, and referrals to law enforcement.

To resolve this investigation, the district agreed to establish a stakeholder equity committee that includes tribal members and other community members to inform the district's discipline policies, practices, and implementation of the OCR agreement; employ a director to oversee the district's discipline practices and implementation of the OCR agreement, and to ensure nondiscrimination in student discipline; improve the collection of student discipline data and regularly analyzing such data to identify and, as needed, to address possible areas and causes of discrimination; revise its discipline policies and procedures to help ensure nondiscriminatory and consistent treatment of students in discipline; train district employees on the revised discipline policies and procedures; conduct school climate surveys to identify student and community concerns about discipline; and hold parent and student information sessions to explain the disciplinary process.

# DISCRIMINATION IN DRESS CODES

School dress codes can lead to violations of students' civil rights on the basis of race and/or sex when they are applied in a discriminatory manner.

## Policy Resources

**May 2023** *Resource* on confronting racial discrimination in student discipline

- highlighting examples of the OCR investigations of discrimination in student discipline on the basis of race, color, or national origin under Title VI, including dress code violation cases.

**April 2024** *Title IX Final Rule*

- explaining the provisions in the 2024 Title IX regulations, including amendments clarifying that sex-specific appearance codes, including sex-specific dress and grooming codes, are subject to Title IX and explaining that a recipient may adopt an appearance code with some sex-based distinctions only to the extent those distinctions do not cause more than de minimis harm.

**November 2024** *Resource* on avoiding the discriminatory use of artificial intelligence (AI)

- assisting school communities with ensuring that AI is used in a nondiscriminatory manner consistent with federal civil rights laws.

## Illustrative Cases

**Orland Joint Unified School District (CA)**: In July 2022, OCR identified concerns after investigating allegations that a school principal required a Black student to remove his do-rag and then threatened to change the school's dress code to prohibit the wearing of do-rags after the student's mother complained that the principal's action discriminated

based on race. Although the principal stated that he associated do-rags with gang activity, OCR's investigation indicated that the district had no information to suggest a connection between wearing do-rags and gang affiliation. OCR's investigation also found that the principal knew the student was one of very few Black students in the school and, therefore, one of very few students to whom the policy change would specifically apply.

To resolve the complaint with OCR, the district agreed to communicate in a letter to the parent and student the district's commitment to provide an educational environment free from discrimination, including retaliation, for all its students as well as its commitment to resolving incidents implicating race, color, or national origin in a manner consistent with its internal complaint procedures; designate a school employee to serve as a supportive contact for the student; issue a statement to parents and guardians at the school stating that the district does not tolerate discrimination, including retaliation; communicate to all students, in an age-appropriate manner, the prohibition against discrimination, including retaliation, and how to report an incident involving discrimination; issue a written guidance memorandum to school employees regarding its anti-discrimination/anti-retaliation statement on the basis of race, color, or national origin, and the steps staff should take when they witness or are told of discrimination/retaliation; provide training for school employees on how to recognize conduct that may constitute discrimination, including retaliation; and develop a written self-evaluation plan for monitoring the climate at the school.

**John Doe School District**[20]: In February 2024, OCR resolved an investigation of whether the district discriminated against a student on the basis of sex when a teacher required the student to change clothing and commented on the student's anatomy, in violation of Title IX. During investigation, OCR identified concerns regarding the district's Title IX investigation of the incident because the information the district produced during investigation reflects that it failed to promptly inform the complainant

or the student about available support measures or the Title IX process in the district. OCR also became concerned that the teacher may have treated the student differently than similarly situated students based on sex with respect to enforcement of the district's dress code and may have applied the dress code against the student on the basis of sex and sex stereotypes. Nothing in the district or school's dress code policy explicitly prohibited the student's outfit; the complainant stated that the student wore the same outfit once a week; and the teacher stated that she acted as she did because she was "especially" concerned about how male students would react to the student's attire and whether they might tease the student. OCR did not obtain evidence that a male student at the school had ever been required to change clothes based on a teacher's concern with that student's undergarments, whereas the teacher required this student to change on that basis. Under the resolution agreement, the district agreed to revise its dress code policies to include a nondiscrimination statement as well as information on how to file a Title IX complaint, conduct staff training on Title IX, and track nondiscriminatory enforcement of the dress code at the school where the incident occurred.

**Hickory City Schools (NC)**: In April 2022, OCR resolved a complaint alleging that the district discriminated on the basis of sex at a district middle school in its enforcement of the school's dress code. OCR's investigation indicated that the district held assemblies only for girls but not boys to discuss hygiene issues and dress code enforcement and that a school employee commented during one of these assemblies about girls needing to "sav[e] leggings for marriage." The evidence also reflected that school staff issued warnings during the girls-only assemblies that students would be suspended for dress code violations, whereas the district dress code stated that schools should require compliance with the code "with the least amount of disciplinary action."

To resolve the complaint, the district agreed to revise its dress code to include a statement that the district will not discriminate on the basis of sex in the administration of its dress code and a statement that students, parents, and staff may contact the district's Title IX Coordinator to file a complaint if they believe that the dress code has been administered in a discriminatory manner. Additionally, the district agreed to provide training to staff regarding the revised dress code and the school's responsibilities under Title IX; revise the School's Handbook/Code of Conduct; and monitor to ensure that the school is enforcing the dress code in a manner that does not discriminate on the basis of sex.

**Wayne Highlands School District (PA)**: In July 2022, OCR resolved a complaint that alleged the district discriminated against a male student when it prohibited him from wearing an earring in school. OCR was concerned that the district's dress code policy relied on sex stereotypes that prohibited boys but not girls from wearing earrings. To resolve the investigation, the district agreed to revise its dress code to comply with Title IX; distribute a memorandum to all staff, students, parents, and guardians in the district advising them of the revised dress code policy; and issue a formal apology to the student and his parent, including a copy of the revised dress code policy, and advising the student that he may wear an earring to school.

# OVERLAPPING FORMS OF DISCRIMINATION

Discrimination students experience can be based on more than one prohibited criterion – for example, race- and sex-based harassment or unequal access to programs based on sex and disability. OCR investigates and addresses discrimination under each of the statutes OCR enforces in order to achieve resolutions that comprehensively remediate harm that has occurred.

[20] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

## Illustrative Cases

**Pickerington Local School District (OH)**: A July 2021 resolution addressed concern that since 2015 the district had not evaluated any EL students under Section 504 at the school regarding district provision to LEP parents of adequate notice of and meaningful access to information about school district programs, services, and activities; that the district lacked a centralized source to provide district staff with information regarding LEP parents' language assistance needs at the building- and district-level; and that the district did not have a process to identify what documents need to be professionally translated.

The district agreed to: provide training to relevant staff on the district's obligations to students with disabilities under Section 504 and Title II, including Section 504's requirements for timely identification, evaluation, and placement of students suspected of having a disability, and the district's responsibility to provide procedural safeguards; develop and submit to OCR for review and approval a written plan to provide language assistance to LEP parents/guardians and to ensure LEP parents and guardians have meaningful access to the district's programs and activities; adopt and implement the approved language assistance plan; develop a written plan for the annual evaluation of the effectiveness of its new language assistance plan; and adopt and implement the approved plan.

**San Juan Bautista School of Medicine (PR)**: In May 2022, OCR resolved complaints of sex and race discrimination in this university's handling of Title IX investigations. OCR determined that the school failed, over more than four years, to investigate a student's report that

another student sexually assaulted her. OCR also found that the school's procedures for resolving complaints of sexual harassment did not comply with Title IX. OCR also identified compliance concerns regarding both the promptness and equity of the school's investigation of allegations of race and sex discrimination, including because school records reflected that the school did not follow its own procedures for investigating discrimination complaints and that the school predetermined an investigation outcome before contacting the complainant to schedule an interview. To resolve the complaints, the school agreed to conduct the missing sexual assault investigation, reimburse the complainant for specified coursework, train relevant employees, and update its grievance procedures to comply with Title IX.

**Forsyth County Schools (GA)**: This school district received complaints from some parents and community members who stated that certain school library books were inappropriate because of sexual content. The district responded by limiting access to certain books. Students appeared at school board meetings, where they stated that they understood books were being screened to exclude diverse authors and characters who were LGBTQI+ and/or not white and shared the impact of the book removals on them. The students reported that the school environment had become "more harsh" in the aftermath of the book removals and that there was increased fear about going to school, being out as LGBTQI+ at school, and checking out books by and about people of color. OCR's investigation revealed that the district had notice based on students' statements that the district's library book screening process may have created a hostile environment for students

## SPOTLIGHT

### Book Bans as a Civil Rights Issue

In response to the exponential rise in book bans in school districts throughout the country, OCR named a book ban coordinator to support public and school communities in understanding the civil rights impact that book restrictions can have by providing trainings on the potential civil rights implications of book bans for schools, libraries, parents, teachers, and other education stakeholders.

based on race and sex, and that the district's responses were insufficient to ameliorate any resultant racially and/or sexually hostile environment. In May 2023, to remedy the concerns, the district committed to issue statements explaining that its review focused on sexually explicit material and that no books were removed based on characteristics of the book's author or characters. The district also agreed to acknowledge that the screening process had created an environment that may have impacted students and to give notice that students who feel impacted may receive supportive measures.

**San Diego Unified School District (CA)**: In August 2024, OCR completed a compliance review of the district's responses to reports and complaints of sexual harassment. After examining 253 reports and complaints of sexual harassment of students over a span of three school years, OCR found that the district more often than not did not fulfill its Title IX regulatory requirement to respond equitably to allegations of sexual harassment of its students. These failures led to serial perpetration of harassment that received an insufficient district response.

While evaluating the district's responses to sexual harassment under Title IX, OCR identified a related concern that the district may have denied FAPE to students with disabilities. OCR learned that the district received notice regarding students with disabilities who were alleged perpetrators as well as victims of sexual harassment. Despite being placed on notice, case files produced by the district included no information indicating that the district took steps to evaluate the students whose behaviors gave reason to suspect they had a disability or to reevaluate students with disabilities whose persistent and escalating behaviors provided grounds to review existing supports and accommodations.

To resolve these violations and compliance concerns, the district agreed to conduct a review of previous incidents of reported sexual harassment; provide an annual age-appropriate sexual harassment training to students; administer annual climate surveys of parents, students, and district employees with respect to sexual harassment;

and annually train district employees on their obligations under Title IX, Section 504, and Title II. The district further agreed to review and revise its policies governing sex discrimination to ensure compliance with Title IX and implement a system for maintenance of data and records relating to investigations of sexual harassment.

**Poudre School District (CO)**: In September 2024, OCR found a charter school failed to respond as Title VI requires to peer harassment on the basis of race. OCR's investigation revealed that the school had notice that the student was subjected to months of harassment, including being called the n-word, called a monkey, and saying he "belonged in a cage." The school did not take prompt or effective action to stop the harassment. In the course of investigation, OCR also learned when reviewing the student's records that they did not reflect the school having convened an IEP team meeting for the student to evaluate the impacts of the harassment on the student and his receipt of FAPE. The school agreed to resolve the Title VI violation OCR identified as well as OCR's Section 504 compliance concern by convening the student's IEP team to discuss the peer harassment of the student and discuss whether the student needs additional or different services and/or supports. The school also agreed to review and revise its policies and procedures governing student-to-student harassment, provide staff training, and to systemize its complaint process for harassment complaints.

**Española Public Schools (NM)**: In September 2024, OCR found that this district violated Title IX by failing to respond to reports of sexual assault by employees and students, to adopt and implement Title IX grievance procedures that provide for equitable resolution of complaints, and to coordinate its responses to such reports through its Title IX coordinator. These failures led to repeated instances of harassment in the district with insufficient district response, leaving district students vulnerable to the sex discrimination in school that Title IX forbids. Among other incidents, the district allowed a teacher reported to have inappropriately

touched students to resign without conducting a Title IX investigation to determine if the teacher sexually harassed the students or created a hostile environment for the students, or adequately notifying the students or the student's families regarding the district's response. It also did not treat an allegation that a teacher sexually assaulted a student with disabilities as a Title IX matter even though the district found "substantial evidence" that the conduct occurred and reported the incident to law enforcement. Additionally, the district failed to ensure the targeted student continued to have equal access to education after the assault.

To redress the Title IX violations and Section 504 and Title II concerns, the district agreed to implement a new system and policy for maintenance of data and records related to reports, complaints, and investigations of sexual harassment; train its employees on their obligations to report sexual harassment under Title IX, as well as their other obligations under Title II and Section 504; train students on how to recognize and report sexual harassment; provide a public notice to the school community that it would review reports of allegations of sexual harassment over the past seven years and administer an annual climate survey of parents, students, and district employees with regard to sexual harassment that occurs in district schools.

**San Bernardino City Unified School District (CA)**: In November 2024, OCR resolved a complaint related to the district's response to an alleged sexual assault. OCR's investigation found that the district violated Title IX in several ways, including: failure to promptly explain to the parent how to file a formal complaint of sexual harassment, disciplining students without following the grievance process, failure to promptly notify the parties of the allegations, failure to adhere to reasonably prompt timeframes, failure to allow the parties to review the evidence, failure to create and investigative report, and failure to issue a sufficient written determination. OCR's investigation also identified Title VI concerns as the district

did not translate the Title IX complaint form, the Title IX Coordinator's drafting of the parent's Title IX complaint in English may have resulted in it containing minimal detail, and the district did not give the parent translated copies of certain letters sent by the district about her complaint. The resolution agreement requires the district to issue a guidance memorandum, provide Title IX training to relevant District employees, provide individual remedies, and develop a procedure to ensure that district employees provide Title IX information to parents and guardians with limited English proficiency in a language they understand.

# TITLE IX AND ATHLETICS

Title IX has dramatically increased athletic opportunities for generations of girls and women. Despite this progress, girls and women across the country continue to face pervasive barriers in sports, from unequal funding, resources, and coaching for girls' and women's sports teams to worse facilities, sex-based harassment on and off the field, and fewer scholarship opportunities. To address this, in February 2023 OCR released resources designed to help elementary and secondary school and college and university communities, including students, parents, coaches, athletic directors, and school officials evaluate whether a school is meeting its legal duty to provide equal athletic opportunity based on sex consistent with Title IX.

## Policy Resources

**February 2023** *Resource* on supporting equal opportunity in school athletic programs

- providing a high-level overview of the Title IX requirements related to athletics, including examples of the kinds of situations that could, depending upon facts and circumstances, raise Title IX concerns and information about what to do if you think a school is not offering equal opportunity under Title IX in its

**CIVIL RIGHTS ENFORCEMENT ACTIVITIES**: TITLE IX AND ATHLETICS

athletic program.

**February 2023** *Resource* on Title IX and athletic opportunities in colleges and universities

- explaining the rights that students have to participate in intercollegiate, intramural, or club athletic programs free from discrimination based on sex and the relevant Title IX regulatory provisions to help college and university communities, including students, coaches, athletic directors, and school officials evaluate whether their college or university's athletic program is providing equal opportunity consistent with Title IX.

**February 2023** *Resource* on Title IX and athletic opportunities in K-12 schools

- explaining the rights that students have to participate in interscholastic, intramural, or club athletic programs free from discrimination based on sex and the relevant Title IX regulatory provisions to help school communities, including students, parents, coaches, athletic directors, and school officials evaluate whether their school's athletic program is providing equal opportunity consistent with Title IX.

## Illustrative Cases

**Cleveland County Schools (NC)**: In July 2021, OCR resolved a complaint alleging that the district discriminated against female student athletes on the high school softball team with respect to practice and competitive facilities and equipment and supplies. During the investigation, OCR identified several concerns about inequities in the treatment of the high school softball players as compared to the high school baseball players. In particular, OCR learned that the high school baseball field underwent a $2.8 million upgrade in 2013, with additional improvements to the stadium in more recent years, while the high school softball team used a softball field that was constructed in 2014 and was located behind a middle school over a mile away from the high school.

Witnesses informed OCR that the route to the softball field was dangerous and that there was no transportation for the softball players walking to the softball field with their equipment. In addition, the baseball dugouts had hooks and cubbies for helmets and other items, which the softball dugouts did not have. Also, the baseball foul poles were marked with distances but there were not similar distance markers on the softball field foul poles. Regarding equipment, witnesses reported that baseball players typically received two hats each season, whereas the softball players had to purchase their own for the 2018 season, and the former softball coach provided them with hats in prior seasons.

The district entered into a resolution agreement with OCR in which it agreed to provide transportation for high school softball athletes and coaches to and from the softball field for practices and competitions and to ensure that the softball field dugouts have hooks and helmet cubbies comparable to those in the baseball field dugouts and that the softball field has distance markers and batting cages comparable to those at the baseball field. The district also committed to prepare and maintain the softball field surface in a manner that is appropriate for practice and competition, including its turf, drainage, grading, and more, and to have a policy in place for equal athletic program benefits and services to members of male and female teams consistent with Title IX. In addition, the district agreed to assess the equipment and supplies it provides to each team at the high school to ensure that all athletic equipment, uniforms, and other athletic supplies at the high school (e.g., practice balls, hats, and jerseys) are either provided to both male and female teams equally or shared equitably by both male and female teams.

**University of Maryland, Eastern Shore (MD)**: In May 2023, OCR resolved a complaint alleging that this university had discriminated on the basis of sex when it failed to properly investigate whether the softball program was being treated less favorably than other athletic programs on the basis of sex. The complaint

also alleged that the university failed to provide equal opportunities to female athletes in a variety of ways in its intercollegiate athletic program. During investigation, OCR identified concerns that the university was not providing equal athletic opportunities with respect to the underrepresentation of women in the athletics program; the quality of the equipment and supplies used; the unavailability of indoor practice time for the women; the travel and per diem allowance; the absence of an academic advisor; the insufficient number of coaches; the quality of the locker rooms, practice, and competitive facilities; the availability of trainers; the availability of media personnel; and the scholarship monies available for recruitment. In addition, OCR was concerned that the university's nondiscrimination policy did not clearly apply to complaints of different treatment on the basis of sex and that the University appeared to have failed to adhere to its policy when it responded to a complaint it received regarding the softball program offerings.

To resolve OCR's concerns, the university agreed to revise its policy for addressing complaints of sex discrimination and committed to investigating the complaint in line with the new policy. In addition, the university also agreed to provide opportunities for female and male students that equally and effectively accommodate the athletic interests and abilities of members of both sexes. Accordingly, the university agreed to provide athletic participation opportunities that are either substantially proportionate to each sex's enrollment in its programs or demonstrate that the interests and abilities of female students are fully and effectively accommodated by the university's current athletic programs. The university also agreed to provide male and female students equal athletic opportunity in the provision of equipment and supplies; the scheduling of games and practice times; with respect to travel and per diem allowance; in the availability, assignment, and compensation of tutors; the assignment and compensation of coaches; in the provision of locker room, practice, and competitive facilities; the provision of medical and training facilities and services; the provision of publicity; and with respect to recruitment.

**Salem-Keizer School District No. 24J (OR)**: In November 2022, OCR resolved an investigation in which it learned that the boys' baseball program at a district high school had superior playing fields, dugouts, bullpens, fencing, landscaping, bleachers, batting cages, and storage compared to what was provided for girls' softball. Additionally, players on the boys' baseball team had access to a team room, whereas players on the girls' softball team did not, and the district provided boys' baseball teams with superior and newer uniforms than the district provided for girls' softball teams. In addition, OCR's investigation uncovered that the girls' softball teams also had less opportunity to receive coaching as compared to the boys' baseball teams because the girls' softball head coach did not receive a prep period to prepare the fields immediately before practices and games, while the boys' baseball head coach did receive such a prep period.

To remedy the concerns, the district committed to conducting assessments of the facilities, equipment, and supplies. The district also committed to providing opportunities for coaching to the boys' and girls' interscholastic athletic teams at the district high school to ensure that members of both sexes are provided with equivalent benefits, opportunities, and treatment. Additionally, the district agreed to create and implement a corrective action plan to address any inequities that the district identifies.

**Minneapolis Public Schools (MN)**: In August 2024, OCR resolved a complaint alleging the district discriminated on the basis of sex by failing to effectively accommodate the athletic interests and abilities of female students and in the provision of practice facilities, competitive facilities, and locker rooms to female athletes. OCR's investigation revealed that some girls' teams had inferior practice and competition facilities compared to the boys' teams; the various softball facilities used by the district's softball teams were not regulation for fast pitch softball and lacked adequate fencing and amenities, while the district boy's baseball teams generally practiced and competed

at higher quality baseball fields with better amenities that were regulation for competition.

During its investigation, OCR also became concerned that, in comparison to male athletes, a higher proportion of female athletes had responsibilities to prepare for their sports practices and competitive events. The girls' volleyball teams and several girls' badminton teams were responsible for setting up nets for practices and competitions. Lastly, the investigation revealed disparities between girls' enrollment rate and their interscholastic athletics participation rate at several district high schools and in the district overall. The district acknowledged, moreover, that it had not conducted a student athletic interest survey in ten years.

To resolve these compliance concerns, the district agreed to conduct a full assessment of how the district can equally and effectively accommodate athletic interest and abilities to provide equal opportunities for girls in its high school athletics program; develop a plan, with timeframes, to increase participation opportunities for girls as necessary to demonstrate compliance with Title IX; create a stakeholder committee to work collaboratively with the district to create district-wide policies and procedures; assess and develop a plan with respect to the provision of locker rooms, practice, and competitive facilities at each high school in the district; equally and effectively accommodate the athletic interest and ability of all students by providing equal opportunities in the provision of locker rooms, practice, and competitive facilities; and train its Title IX coordinators, athletic directors, principals, and coaches on their responsibilities under Title IX and its application to athletics, including how funding from any source can affect the balance of equivalent benefits for male and female athletes.

# DISCRIMINATION BASED ON PREGNANCY OR RELATED CONDITIONS AND PARENTAL STATUS

In the decades since Title IX was signed into law women have made tremendous progress in access to education, but many students still see their education derailed because of discrimination based on pregnancy and parental status. To address this need, the Department updated longstanding Title IX protections against discrimination based on pregnancy and parental status in its Title IX Final Rule issued in April 2024. Among other things, the Final Rule updates longstanding existing protections for students, employees, and applicants against discrimination based on pregnancy, childbirth, termination of pregnancy, lactation, related medical conditions, or recovery from these conditions. Specifically, the Final Rule strengthens requirements that schools provide reasonable modifications for students based on pregnancy or related conditions, allow for reasonable break time for lactation for employees, and access to a clean, private lactation space for students and employees. The Final Rule also requires that when a student, a parent of a minor student, or other authorized legal representative informs a school employee of a student's pregnancy or related conditions, the employee then must provide the individual with information about the school's obligations to prevent discrimination and ensure equal access. The Final Rule also prohibits schools from disclosing personally identifiable information they obtain through complying with Title IX, including information about reasonable modifications for pregnancy or related conditions, with limited exceptions.

## Policy Resources

**April 2024** *Notice* of Final Rule (see also pp. 19 & 22)

- explaining the provisions in the 2024 Title IX regulations, including an analysis of the public comments and discussion of changes in the final regulations since the publication of the July 2022 notice of proposed rulemaking.

**April 2024** *Fact sheet* on 2024 Title IX Final Rule

- highlighting the protections and requirements of the 2024 Title IX Regulations, including protections for students, employees, and applicants from discrimination based on pregnancy or related conditions and parental status.

**September 2024** *Resource* on the Title IX Regulations: Nondiscrimination Based on Pregnancy or Related Conditions and Parental, Family, or Marital Status

- providing information regarding how Title IX applies to discrimination based on pregnancy or related conditions and parental status, including an overview of the relevant provisions in the 2024 Title IX regulations.

**September 2024** *Resource* on the Title IX Regulations: Impact on Title IX coordinator duties

- highlighting new or updated requirements for Title IX Coordinators in the 2024 Title IX regulations, including those related to pregnancy.

## Illustrative Cases

**Salt Lake Community College (UT)**: In June 2022, OCR resolved a student's complaint of pregnancy discrimination after learning in its investigation, among other things, that the student reported to the college that a professor had encouraged her to drop a course due to her pregnancy, that college administrators did not appropriately address the student's report, and that the college had not provided the student with accommodations during her pregnancy. OCR determined

that the college violated Title IX by failing to respond promptly and equitably to the student's complaint of pregnancy discrimination, failing to excuse her pregnancy-related absences or allow her to submit work following those absences, and failing to engage in an interactive process to provide her with academic adjustments or necessary accommodations during her pregnancy. OCR also found that the college violated Section 504 by failing to consider whether her pregnancy caused a temporary disability requiring academic adjustments.

To remedy these violations, the college agreed to revise its nondiscrimination notice and grievance procedures to comply with Title IX; publish information on its website for pregnant students about their Title IX rights and how to seek academic adjustments, special services, or excused absences; train its Title IX coordinator, Disabilities Resource Center staff, and other school employees regarding Title IX's and Section 504's protections for pregnant students and the academic adjustments and special services available to pregnant students; complete and document its investigation of the student's complaint of pregnancy discrimination; and take other measures to remedy the discrimination against the student.

**Troy University (AL)**: In January 2023, OCR resolved an investigation that addressed concerns regarding this university's response to a student's requests for pregnancy-related adjustments during the 2020-2021 school year. OCR's investigation confirmed that a student had notified the university of her pregnancy before the start of the fall semester. OCR's investigation found repeated instances in which the student experienced negative consequences stemming from a lack of accommodations for her pregnancy. For example, when the student became unable to fit into a classroom desk due to her pregnancy, she requested a table for one of her classes but never received one. She also was penalized in a class for poor attendance and received a failing grade in another class because she was denied the ability to make up work. OCR's investigation identified concerns that the university did not make reasonable and responsive adjustments following the student's pregnancy-related

requests; that the responses the university offered to the student's requests were ad hoc and uncoordinated; that the Title IX Coordinator did not consistently or timely intervene when the student alerted him to issues with certain classes; that no evidence reflected that the Title IX Coordinator responded to a professor who sought guidance in addressing the student's requests; and that the lack of information about how to obtain pregnancy-related adjustments may have contributed to the university's uncoordinated response, requiring the student to make multiple requests through both the university's Title IX Coordinator and individual professors.

To resolve OCR's concerns, the university agreed to reimburse the student for documented expenses related to courses she had to retake since the semester when she was pregnant; adjust grades that were negatively impacted by the university's handling of her requests; review and, as necessary, revise its policies pertaining to Title IX protection of individuals who are pregnant and publish the policies on its website; develop a system for tracking pregnancy-related adjustments made for students; and provide Title IX training to all faculty and staff involved in providing Title IX resources, in addition to conducting a survey to ascertain the effectiveness of that training.

**Hinds Community College (MI)**: In April 2024, OCR found that the college violated Title IX after neither providing a pregnant student with accommodations nor responding

appropriately to the student's reports of pregnancy-based harassment and discrimination. The student informed college staff of her pregnancy at the beginning of the semester, and throughout the semester she repeatedly asked for academic accommodations that would allow her to occasionally leave instruction a few minutes early for pregnancy-related medical appointments, remotely attend a lecture while hospitalized for pregnancy-related conditions and take breaks to express milk after delivering her child. The college declined to provide these academic adjustments. Instead, it encouraged the student to withdraw and finish the program later. As a result of the college's failure to accommodate her requests, the student was relegated, at times, to pumping in a restroom.

To remedy these violations, the college agreed to revise its nondiscrimination notice, Title IX policies, and grievance procedures to comply with Title IX; publish information on its website for pregnant students about their Title IX rights and how to seek academic adjustments, special services, or excused absences; train its Title IX coordinator and other school employees involved in addressing Title IX requests from pregnant students regarding Title IX and Section 504 protections for pregnant students and the academic adjustments and special services available to pregnant students; track and document requests by pregnant students to ensure pregnancy-related adjustments are being provided; and take other measures to directly remedy the discrimination against the student.

# SPOTLIGHT

## Systemic Investigation

When investigating allegations raised in complaints, OCR evaluates whether compliance concerns or violations identified in the investigations apply to similarly situated other students as well. By securing resolution agreements as warranted that address both individual as well as any systemic discrimination, OCR secures justice for harms experienced by affected students.

### Illustrative Cases

**Peoria Unified School District (AZ)**: In September 2022, OCR found that racial harassment from student peers and district employees created a hostile environment for students of color that the district had notice of and failed to adequately address. The investigation uncovered evidence of harassment by fellow students that included race-based slurs; mocking police killings of Black people; pulling eyes back to taunt Asian students; mimicking "Heil Hitler" salutes; drawing Swastikas on photographs of students' faces; and saying that Black people "do not deserve to live" and "should die," a student's skin looked like "burnt" food, and another student should "go back to [their] country" and "eat dog." Harassment by employees involved repeated touching of and comments exclusively about a Black student's hair. The persistent, pervasive, and severe harassment and the district's ineffective response caused significant and enduring academic, social, and emotional harm to the student who was the subject of the OCR complaint. Moreover, though the complaint was lodged by a single Black student, in its investigation OCR found that a schoolwide hostile environment existed because at least a dozen other students of color at the school were likewise harassed based on race, color, or national origin by numerous peers.

Administrators and teachers at the school were aware of widespread harassment based on race, color, and national origin; failed to adequately investigate whether the harassment created a hostile environment for students; and failed to offer any supports or remedies to students who were harassed. OCR found that these failures allowed the harassment to continue on a consistent basis and to create a schoolwide hostile environment. OCR also found that the district failed to identify other students who may have been subjected to a hostile environment but did not report their experiences given the school's repeated failures to respond promptly and effectively to reported harassment.

To remedy the violations, the district agreed to: provide support and remedies to affected students; conduct a climate assessment on the prevalence and school's handling of harassment; review and revise policies, forms, and recordkeeping procedures; and train staff in reporting, cultural competency, and implicit bias. The district also agreed to provide developmentally appropriate educational programs for its students about how to recognize and report harassment based on race, color, and national origin.

**Drexel University (PA)**: In August 2024, OCR resolved a Title VI shared ancestry investigation that initially was prompted by an OCR complaint suggesting that a fire on the dormitory door of a suite where a Jewish student lived was motivated by antisemitism. While OCR confirmed that this specific incident did not involve antisemitic conduct and that the university's response to that incident did not raise Title VI concerns, OCR's investigation reflected that

## SPOTLIGHT CONTINUED

the university generally failed to fulfill its obligations to assess whether incidents of shared ancestry discrimination and harassment reported to it created a hostile environment, and where the university did conduct this assessment, it misapplied the legal standard. The resolution agreement commits the university to conduct a review of its response to complaints and reports of antisemitic and other shared ancestry discrimination and take remedial actions, if required; provide OCR with information regarding any complaints alleging discrimination based on shared ancestry during the next two school years and address any OCR feedback; analyze climate survey results and create an action plan; revise its policies and procedures; train employees and staff responsible for investigating complaints and other reports of discrimination based on shared ancestry or ethnic characteristics (including antisemitism); and conduct annual training on discrimination based on race, color, and national origin, including harassment based on shared ancestry or ethnic characteristics, for all faculty, staff, and students.

**Owasso Public Schools (OK)**: In November 2024, OCR resolved a Title IX complaint alleging that over a three-year period, the school district repeatedly failed to respond appropriately to notice of possible sexual harassment, including reports that a teacher was grooming female students on social media and multiple reports of sex-based slurs, harassment, and physical assault among students — resulting in one student dying by suicide after an altercation in a school restroom. OCR's investigation found that district staff failed to comply with duties outlined in the 2020 Title IX regulations, including explaining to complainants how to file a formal complaint so the school district could initiate an investigation under its grievance process, and discussing the availability supportive measures with the complainant, such as counseling or schedule changes. The resolution agreement commits the district to take steps to ensure that sexual harassment is appropriately addressed, including by issuing an anti-harassment and nondiscrimination statement to the district community, providing Title IX training to staff and students, conducting a sexual harassment climate survey, and reviewing and auditing sexual harassment complaints received over the last three years and the next two school years to ensure consistency with Title IX.

## PROTECTING PARENTS' RIGHTS AGAINST DISCRIMINATION

Each of the laws OCR enforces protects against retaliation, including against parents, for advocating for civil rights. In addition, the laws OCR enforces protect parents' civil rights in specific circumstances, including parents' right to receive information about their children's education in a language they understand and their right to receive reasonable accommodations for any disabilities so they can participate in school activities. Section 504 also specifically entitles parents to examine records relevant to whether a Section 504 Plan is being implemented.[8]

### Policy Resources

**March 2022** _20-Part Video Series_ on digital accessibility (in partnership with the ADA National Network)

---

[8] 34 C.F.R. § 104.36.

- discussing how to identify and remediate different types of technological barriers that can interfere with the ability of parents and students with disabilities to participate in modern American education.

**December 2024** *Resource* on civil rights protections against retaliation

- reminding school communities that all of the federal civil rights laws enforced by OCR prohibit retaliation, including in response to parents' complaints or other involvement in support of their children.

## Illustrative Cases

**Shelton SD No. 309 (WA)**: In investigating a complaint alleging that the district discriminated against limited English proficient (LEP) parents on the basis of national origin, OCR identified concerns that the district may not have been providing LEP parents with effective access to school-related information comparable to English-speaking parents during the school's parent-teacher conferences or in attempts to raise concerns with the principal. The investigation yielded evidence that the district also may not have had a consistent process to ensure interpreters were qualified to provide effective services, or a process to provide school staff consistent notice about the variety of interpretation services available to parents.

To remedy the concerns, the district agreed in November 2021 to review and revise its policies and procedures to ensure that LEP parents and guardians are notified of school activities and other matters in a language they can understand. The district also agreed to notify LEP parents of the availability of free language assistance services with respect to school programs and activities, as well as information on how this assistance may be obtained, and provide LEP parents with a contact person who can answer any questions regarding parental communication and assist parents to access interpreter services or translated documents. Finally, the district agreed to provide training for all school administrators and other

staff members involved in the provision of interpreter and translation services.

**Learning Community Public Charter School (RI)**: After investigating a complaint alleging this school district had discriminated against parents with limited English proficiency (LEP), OCR identified concerns that the district used untrained staff members and other individuals to provide most of its translation and interpretation services. OCR found evidence that the district failed to provide written translations of essential documents to parents and guardians who speak specific languages, raising concerns the district may not have been providing LEP parents with effective access to school-related information comparable to that which English-speaking parents received.

The district's May 2023 resolution agreement requires it to provide qualified interpreter services and to develop a procedure for translating documents. The district also agreed to conduct training regarding communicating essential information to parents and guardians, including training on employees' obligation to review language access needs before scheduling meetings and sending out notices, what information must be translated or interpreted, what constitutes a qualified interpreter or translator, when and how to obtain qualified interpreters and translators, where to find accurate and up-to-date translations of documents when needed, and other best practices for communicating with LEP parents and guardians.

**Academy School District 20 (CO)**: OCR resolved an investigation in March 2023 in response to allegations that this school district had discriminated against female participants in a high school's athletics program with respect to locker rooms, athletic equipment and supplies, modes of transportation to away games, availability of trainers and medical personnel, and support services. The parent who filed the complaint also alleged that the district refused to allow female team managers to attend the football team's field trip to Las Vegas and, in response to her raising these concerns at the school, claimed she experienced retaliation and was prohibited from going on the trip as a volunteer.

The district maintained that it had valid reasons for excluding parents from accompanying the team, but the parent produced an email from the district thanking parent volunteers for accompany the team on the field trip, giving rise to OCR's concern that district retaliated against the parent.

The district agreed to a range of measures to address OCR's concerns. With respect to the student's individual complaint, the district agreed to invite the parent to participate in future volunteering positions. Regarding the systemic concerns that OCR's investigation identified, the district agreed to conduct a comprehensive equity assessment of all teams in interscholastic athletic programs at the school that would examine the disparities identified in the initial complaint. Following this assessment, the district agreed to develop and implement written guidelines to ensure that the district provides equivalent athletic opportunities for male and female athletes. These guidelines included a commitment on the part of the district to address how funding from booster clubs or any other source might affect the balance of equivalent benefits and services for male and female athletes. The district also committed to conduct training of key personnel in the district and at the school.

**Hopi Junior Senior High School (AZ)**: In September 2023, OCR determined that this school district had violated Section 504 and Title II by discriminating against a student based on his disability. OCR's investigation showed that the school required the mother of a student with a disability to join the student at school as a condition of the student's enrollment; disciplined the student for disability-based behaviors; conditioned the student's return to school following suspension on the school director's discretion, as distinct from involving his IEP team; and subjected the student to shortened school days for behavioral reasons without individually determining his needs or consistently documenting these school exclusions.

Additionally, OCR's investigation revealed multiple systemic compliance concerns. OCR was concerned that

the school was regularly asking parents or guardians of students with disabilities to attend school with their children due to staffing shortages. OCR was also concerned that the school was requiring students with disabilities who finished a suspension or temporary alternative placement to attend reinstatement meetings with the principal prior to the implementation of their IEPs — meetings in which the principal unilaterally decided if the student could return to school.

In response to OCR's concerns and violation findings, the school committed to convening knowledgeable individuals to develop a written plan to provide compensatory services to the student, at no cost to the student or his mother, and to identifying any other students with disabilities who were denied the opportunity to return to school after a removal or attend school because their parent or guardian could not accompany them. In the event other students are identified, the school agreed to convene a team to discuss whether a FAPE was denied to those students and, if so, to create plans to provide remedies to them at no cost to the parent or guardian of the student. The school also agreed to train staff and disseminate or make available approved policies and procedures to staff, students, and parents.

**Coatesville Area School District (PA)**: In April 2024, OCR resolved a complaint alleging the district discriminated against a visually impaired parent when the district refused to consider the parents' request to modify the school bus stop in order to allow the parent to safely pick up his children. OCR's investigation identified a concern in that the district did not consider this parent's request as a reasonable accommodation. To resolve OCR's concern, the district agreed to properly consider the parent's request for a reasonable accommodation, create a plan for responding to future requests from parents/guardians for accommodations related to transportation, and publish information on the district's website about how to make disability-based accommodation requests related to transportation services.

# LOOKING AHEAD

OCR achieved these results against long odds. While the total number of complaints OCR receives per year has almost tripled since fiscal year 2009, OCR's staffing had declined dramatically in that time and Congress has not appropriated funding sufficient to allow OCR to hire staff in numbers OCR needs to meet the complaint volume coming in. Through aggressive fiscal management of OCR's budget, OCR nonetheless has achieved current staffing of 611 people, just 18 fewer than we had had in FY 2009 when we received one third of the complaints we now receive. This 611 staff number represents an increase from 571 staff in FY 2024, and OCR would benefit from many hundreds more staff in coming years to be able to efficiently and effectively process the complaints filed with this office. *See Figure 4.*

OCR has, during these four years, maximized resources to deliver important justice for students and school communities across the nation. Particularly if OCR could expand staff numbers to meet the volume of civil rights allegations coming to the office, OCR is positioned to fulfill Congress' crucial charge that OCR enforce federal civil rights guarantees in every school receiving federal funds from the Department of Education, every day, for every student. OCR's steadfast commitment to the application of the laws in OCR's jurisdiction to every student, evaluation of civil rights satisfaction for all similarly situated students, and robust resolutions with effective monitoring to ensure fulfillment of civil rights guarantees support longstanding statutory guarantees of equal educational opportunity for all. The nation's students deserve no less.



**Figure 4.** OCR Staff Level (FTE) and Complaints Received, FY 2009 - 2024

# POLICY RESOURCES

During the Biden-Harris Administration, OCR produced the highest number of policy resources that the office has ever produced in its history. Whereas during the prior administration OCR produced only 8 policy resources, and during all eight years of the Obama presidency OCR produced 38 policy resources – which was until that time an all-time high – OCR produced 64 such resources during these four years.

The policies OCR shared during these four years address complex and timely issues such as civil rights related to the use of artificial intelligence in schools, the rights of students against sex discrimination in equal athletic opportunities, the rights of students against discrimination based on stereotypes about their national origin including shared religious or other ancestral identities, and civil rights guardrails when considering and imposing discipline related to students with disabilities. OCR also issued guidance around Title VI of the Civil Rights Act of 1964 for schools in the wake of the U.S. Supreme Court's decision in the *SFFA* cases and around diversity, equity, and inclusion training and similar activities. We encourage members of the public to download and save PDF versions of these resources.

## 2021

**Questions and Answers on Civil Rights and School Reopening in the COVID-19 Environment** (May 2021)

**Statutes**: Title IX of the Education Amendments of 1972; Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973

This resource answers common questions about schools' responsibilities under the civil rights laws the OCR enforces in the context of the COVID-19 pandemic. This resource also includes links to other resources regarding COVID-19 and school reopening.

**Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students** (June 2021)

**Statutes**: Title IX of the Education Amendments of 1972; Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973

This report spotlights the many ways that COVID-19, with its tragic impacts on individuals, families, and communities, appears to be deepening divides in educational opportunity across our nation's classrooms and campuses.

**Notice of Interpretation – Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*†** (June 2021)

**Statutes**: Title IX of the Education Amendments of 1972

This Notice of Interpretation explains that Title IX's prohibition on discrimination based on sex encompasses discrimination based on sexual orientation and gender identity. The Department's interpretation stems from the landmark U.S. Supreme Court decision in *Bostock v. Clayton County* (2020), which recognized that it is impossible to discriminate against a person based on their sexual orientation or gender identity without discriminating against that person based on sex. 86 Fed. Reg. 32637 (June 22, 2021).

---

† A federal court has "vacate[d]" this document and "enjoined" the Department from "implementing or enforcing" this document against the state of Texas and its respective schools, school boards, and other public, educationally based institutions. *See State of Texas v. Cardona*, No. 4:23-cv-604 (N.D. Tex.) (June 11, 2024). Pursuant to a different Federal court order, the Department has been preliminarily "enjoined and restrained from implementing" this document against the states of Alabama, Alaska, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Ohio, Oklahoma, Tennessee, South Carolina, South Dakota, and West Virginia. *See State of Tenn., et al. v. U.S. Dep't of Educ.*, No. 3:21cv-308 (E.D. Tenn.) (July 15, 2022).

**Fact Sheet: Confronting Anti-LGBTQI+ Harassment in Schools†** (June 2021)

**Statutes**: Title IX of the Education Amendments of 1972

This fact sheet, a resource for students and families, shares information about schools' obligation to investigate and address discrimination, including harassment, against students because of their sexual orientation or gender identity. This resource is also available in Spanish.

**Long Covid Under Section 504 and the IDEA: A Resource to Support Children, Students, Educators, Schools, Service Providers, and Families** (July 2021)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This resource from OCR and the Department of Education's Office of Special Education and Rehabilitative Services explains the rights of young children and students who are experiencing long-term adverse health effects of COVID-19, commonly referred to as Long Covid. The resource provides information about Long Covid as a disability and about schools and public agencies' responsibilities to address Long Covid under Section 504 and Parts B and C of the Individuals with Disabilities Education Act (IDEA).

**Confronting Discrimination Based on National Origin and Immigration Status** (August 2021)

**Statutes**: Title VI of the Civil Rights Act of 1964

This resource, issued jointly with the Department of Justice, serves as a reminder that all children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents' or guardians' immigration status. This resource is also available in languages other than English.

† See note on page 51.

**For Families and Educators: Confronting Discrimination Based on National Origin and Immigration Status** (August 2021)

**Statutes**: Title VI of the Civil Rights Act of 1964

This is a resource for families and educators and serves as a reminder that all children in the United States have an equal right to enroll and participate in public elementary and secondary schools without regard to their or their parents' or guardians' immigration status. This resource is also available in languages other than English.

**Letter Regarding OCR's Enforcement of the 2020 Title IX Regulations Limiting Use of Statements by Parties & Witnesses Not Subject to Cross-Examination at Live Hearing** (August 2021)

**Statutes**: Title IX of the Education Amendments of 1972

This letter provides an update regarding the 2020 Title IX regulations. The letter explains the impact of a court decision vacating the part of 34 C.F.R. § 106.45(b)(6)(i) that prohibits decision-makers in Title IX proceedings at postsecondary institutions from considering any statement from a person who did not submit to cross-examination at the live hearing.

**Supporting and Protecting the Rights of Students at Risk of Self-Harm in the Era of COVID-19** (October 2021)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This resource explains the federal civil rights laws that protect students with mental health disabilities, helps schools meet students' mental health needs and respond to pandemic-related traumas, with examples of incidents OCR investigates.

**Fact Sheet: Supporting Intersex Students** (October 2021)

**Statutes**: Title IX of the Education Amendments of 1972

This fact sheet confirms that federal civil rights law protects all students, including intersex students, from sex discrimination. This resource is also available in Spanish.

## 2022

**Providing Students with Disabilities Free Appropriate Public Education During the COVID-19 Pandemic and Addressing the Need for Compensatory Services Under Section 504** (February 2022)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet reviews the obligation of elementary and secondary schools under Section 504 to provide appropriate evaluations and services to students with disabilities during the COVID-19 pandemic, including schools' responsibilities to provide compensatory services.

**Access for Everyone:  Breaking Down Digital Barriers for People with Disabilities** (May 2022)

**Statutes**:  Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990

This resource consists of 20 short videos covering key topics arising in connection with accessibility to technology for people with disabilities.

**Supporting College Success: FAQs on the Disability-Related Rights of Student Veterans with Disabilities** (May 2022)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This resource helps students and administrators in colleges, universities, and other postsecondary institutions understand how Section 504 covers veterans with disabilities who apply to or attend college.

**Questions and Answers and Appendix on the Title IX Regulations on Sexual Harassment** (June 2022)

**Statutes**: Title IX of the Education Amendments of 1972

This question-and-answer resource describes OCR's interpretation of schools' responsibilities under Title IX and under the Department's 2020 Title IX regulations as it relates to sexual harassment. The Appendix provides examples of Title IX procedures that may be adapted and helpful to schools in implementing the 2020 Title IX regulations.

**Supporting Students with Disabilities and Avoiding the Discriminatory Use of Student Discipline under Section 504 of the Rehabilitation Act of 1973** (July 2022)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This letter describes schools' responsibilities under Section 504 to ensure nondiscrimination against students based on disability when imposing student discipline. Specifically, the guidance explains how compliance with Section 504's requirement to provide a free appropriate public education (FAPE) to students with disabilities can assist schools in effectively supporting and responding to behavior that is based on a student's disability and that could lead to student discipline.

**Section 504 Discipline Fact Sheet** (July 2022)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet reminds public elementary and secondary schools of their obligations under Section 504 of the Rehabilitation Act of 1973 to provide the services, supports, interventions, strategies, and modifications to policies students with disabilities need to address any disability-based behavior, including behavior that could lead to discipline. The guidance explains that when schools do discipline students with disabilities, they must do so in a nondiscriminatory manner.

**Discrimination Based on Pregnancy and Related Conditions - A Resource for Students and Schools** (October 2022)

**Statutes**: Title IX of the Education Amendments of 1972

The resource reminds school communities, including students, faculty, families, and educators, that Title IX of the Education Amendments of 1972 protects students and employees from discrimination based on pregnancy and related conditions. This resource does not reflect changes made in the 2024 Title IX regulations.

## 2023

**Fact Sheet: Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics** (January 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This fact sheet describes ways Title VI of the Civil Rights Act of 1964 covers students who are or are perceived to be Jewish, Christian, Muslim, Sikh, Hindu, Buddhist, or of another religious group. This resource is also available in languages other than English.

**Fact Sheet: Diversity & Inclusion Activities Under Title VI** (January 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This fact sheet confirms that diversity, equity, and inclusion training and similar activities in most factual circumstances are consistent with Title VI of the Civil Rights Act of 1964. This resource is also available in languages other than English.

**Supporting Equal Opportunity in School Athletic Programs** (February 2023)

**Statutes**: Title IX of the Education Amendments of 1972

This resource, along with "Title IX and Athletic

Opportunities in K-12 Schools" and "Title IX and Athletic Opportunities in Colleges and Universities," provides information about how students, parents, coaches, athletic directors, and school officials can evaluate whether a school is meeting its obligation to provide equal athletic opportunity regardless of sex consistent with Title IX.

**Title IX and Athletic Opportunities in K-12 Schools** (February 2023)

**Statutes**: Title IX of the Education Amendments of 1972

This resource provides information about how students, parents, coaches, athletic directors, and school officials can evaluate whether a K-12 school is meeting its obligation to provide equal athletic opportunity regardless of sex consistent with Title IX.

**Title IX and Athletic Opportunities in Colleges and Universities** (February 2023)

**Statutes**: Title IX of the Education Amendments of 1972

This resource provides information about how students, parents, coaches, athletic directors, and school officials can evaluate whether a college or university is meeting its obligation to provide equal athletic opportunity regardless of sex consistent with Title IX.

**Dear Colleague Letter: Addressing Discrimination Against Jewish Students** (May 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This letter is a reminder of schools' legal obligation under Title VI of the Civil Rights Act of 1964 to provide all students, including students who are or are perceived to be Jewish, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics. This resource is also available in languages other than English.

**ADDENDUM:** POLICY RESOURCES

[Resource on Confronting Racial Discrimination in Student Discipline](May 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This resource, issued jointly with the Department of Justice, highlights examples of the Departments' investigations of discrimination in student discipline on the basis of race, color, or national origin under Title VI of the Civil Rights Act of 1964 and the Departments' Title VI regulations. This resource is also available in Spanish.

[Fact Sheet: Protecting Access to Education for Migratory Children](June 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This fact sheet highlights specific access to education challenges faced by migratory children, explains to families where they can go for help, and aims to help public schools understand their responsibilities to serve these children under federal civil rights laws. This resource is also available in languages other than English.

[Ensuring Meaningful Participation in Advanced Coursework and Specialized Programs for Students Who Are English Learners](June 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This document serves as a reminder that schools must ensure that eligibility for advanced and specialized programs, including appropriate evaluation and testing procedures, do not screen out students who are English learners (EL) because of their limited English proficiency unless an advanced or specialized program is demonstrated to require proficiency in English for meaningful participation. This resource is also available in languages other than English.

[Fact Sheet: Protecting Access to Education for Unaccompanied Children](June 2023)

**Statute**: Title VI of the Civil Rights Act of 1964

This fact sheet highlights specific access to education challenges faced by unaccompanied children, explains to individuals caring for unaccompanied children where to go for help, and aims to help public schools understand their responsibilities to serve unaccompanied children under federal civil rights laws. This resource is also available in languages other than English.

[Dear Colleague Letter on Race and School Programming](August 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This letter clarifies the circumstances under which recipients of federal financial assistance from the U.S. Department of Education can – consistent with Title VI and its implementing regulations – develop curricula or engage in activities that promote racially inclusive school communities. It explains that schools may be in violation of Title VI when they separate students based on race even if programming of reach group is identical and they may also be in violation of Title VI when they create, encourage, accept, tolerate, or fail to correct a racially hostile educational environment.

[Dear Colleague: Resources on *Students for Fair Admissions, Inc v. President and Fellows of Harvard College and Students for Fair Admissions, Inc. v. University of North Carolina et al.* (*SFFA* cases)](August 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This joint OCR and Department of Justice letter aims to help colleges and universities understand and comply with the U.S. Supreme Court's decision in the *SFFA* cases and reaffirms the Departments' commitment to ensuring that educational institutions remain open to all, regardless of race.

**Questions and Answers Regarding the Supreme Court's Decision in _Students for Fair Admissions, Inc. v. Harvard College and University of North Carolina_** (August 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This Q&A document provides information to help colleges and universities understand the U.S. Supreme Court's decision in the _SFFA_ cases and offers examples of steps colleges and universities can lawfully take to achieve a student body that is diverse across a range of factors, including race and ethnicity, such as: targeted outreach, recruitment, and pathway programs; collection and consideration of demographic data; evaluation of admission policies; and retention strategies and programs.

**Dear Colleague Letter: Discrimination, Including Harassment, Based on Shared Ancestry or Ethnic Characteristics** (November 2023)

**Statutes**: Title VI of the Civil Rights Act of 1964

This letter reminds schools of their legal obligations under Title VI of the Civil Rights Act of 1964 and its implementing regulations to provide all students, including students who are or are perceived to be Jewish, Israeli, Muslim, Arab, or Palestinian, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity.

## 2024

**Fact Sheet: Section 504 Protections for Students with Asthma** (February 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with asthma are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Diabetes** (February 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with diabetes are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Food Allergies** (February 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with food allergies are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with GER or GERD** (February 2024)

**Statutes:**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with GER (gastroesophageal) and GERD (gastroesophageal reflux disease) are protected under Section 504.

**Dear Colleague Letter: Addressing Discrimination Against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian Students** (March 2024)

**Statutes**: Title VI of the Civil Rights Act of 1964

This letter reminds schools of their legal obligation under Title VI of the Civil Rights Act of 1964 and its implementing regulations to provide students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics. This includes an obligation to address discrimination against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian students.

---

\* On January 9, 2025, a federal district court issued a decision vacating the 2024 Final Rule. Consistent with the court's order, the 2024 Title IX regulations are not effective in any jurisdiction.

**2024 Title IX Regulations: Resource for Drafting Nondiscrimination Policies, Notices of Nondiscrimination, and Grievance Procedures\*** (April 2024)

**Statutes**: Title IX of the Education Amendments of 1972

This resource is intended to help schools draft Title IX policies that comply with the 2024 Title IX regulations.

**Fact Sheet: Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After _Brown v. Board of Education_** (May 2024)

**Statutes**: Title VI of the Civil Rights Act of 1964

Released in connection with the 70th anniversary of the Supreme Court's _Brown_ decision, this fact sheet summarizes applicable policy resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin.

**Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics** (May 2024)

**Statutes**: Title VI of the Civil Rights Act of 1964

This letter shares information about federal civil rights obligations of schools and other recipients of federal financial assistance from the U.S. Department of Education to ensure nondiscrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics.

**Fact Sheet: Section 504 Protections for Students with Epilepsy** (June 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with epilepsy are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Sickle Cell Disease** (June 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with sickle cell disease are protected under Section 504.

**Fact Sheet: Harassment based on Race, Color, or National Origin on School Campuses** (July 2024)

**Statutes**: Title VI of the Civil Rights Act of 1964

This fact sheet reminds schools of their federal civil rights obligations under Title VI of the Civil Rights Act of 1964 and its implementing regulations to take prompt and effective action to respond to harassment that creates a hostile environment. The fact sheet describes how OCR determines the existence of a hostile environment, details school obligations to address and remedy a hostile environment, and provides hypothetical examples.

**2024 Title IX Regulations: Pointers for Implementation\*** (July 2024)

**Statutes**: Title IX of the Education Amendments of 1972

This resource lists the key components of the 2024 Title IX regulations to support schools in preparing for implementation.

**2024 Title IX Regulations: Small Entity Compliance Guide\*** (August 2024)

**Statutes**: Title IX of the Education Amendments of 1972

This resource, which summarizes and explains the 2024 Title IX regulations, is intended as a "small entity compliance guide" under Section 212 of the Small Business Regulatory Enforcement Fairness Act of 1996, as amended.

\* See note on p. 56.

**Fact Sheet: Section 504 Protections for Students with Anxiety Disorders** (September 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with anxiety disorders are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Bipolar Disorder** (September 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with bipolar disorder are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Depression** (September 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with depression are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Eating Disorders** (September 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with eating disorders are protected under Section 504.

**2024 Title IX Regulations: Impact on Title IX Coordinator Duties*** (September 2024)

**Statutes**: Title IX of the Education Amendments of 1972

This resource highlights new or updated requirements for Title IX Coordinators in the 2024 Title IX regulations.

**2024 Title IX Regulations: Nondiscrimination Based on Pregnancy or Related Conditions & Parental, Family, or Marital Status*** (September 2024)

**Statutes**: Title IX of the Education Amendments of 1972

This resource highlights nondiscrimination protections under the 2024 Title IX regulations related to pregnancy or related conditions, and parental, family, or marital status.

**Dear Colleague Letter: Responding to Bullying of Students with Disabilities** (October 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This letter provides examples and explains that bullying of a student with a disability, on any basis, may result in a denial of FAPE under Section 504, in addition to incidents OCR investigates.

**Parent Fact Sheet: What are Public Schools Required to Do When Students with Disabilities Are Bullied** (October 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet explains schools' responsibilities to address bullying of students with disabilities and provides additional resources.

**Equal Access to Elementary and Secondary Education for Students Who Are English Learners with Disabilities** (November 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973; Title VI of the Civil Rights Act of 1964

This fact sheet outlines several protections that federal civil rights laws enforced by OCR provide to students who are English Learners with disabilities.

* See note on p. 56.

**Avoiding the Discriminatory Use of Artificial Intelligence** (November 2024)

**Statutes**: Title IX of the Education Amendments of 1972; Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975

This resource assists school communities with ensuring that artificial intelligence (AI) is used in a nondiscriminatory manner in the nation's elementary and secondary schools and institutions of higher education consistent with federal civil rights laws. The resource provides information on the legal analyses that OCR uses to determine whether discrimination exists, and provides examples of conduct that could, depending on facts and circumstances, present OCR with sufficient reason to open an investigation.

**Frequently Asked Privacy-Related Questions About Filing a Complaint with OCR** (November 2024)

**Statutes**: Title IX of the Education Amendments of 1972; Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975

This resource is intended to respond to questions frequently raised to OCR by individuals who file complaints and/or contact OCR for technical assistance. The FAQ also provides general information on civil rights protections for individuals who submit a complaint of discrimination or participate in an investigation.

**Fact Sheet: Section 504 Protections for Students with Inflammatory Bowel Disease (IBD)** (December 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with inflammatory bowel disease (IBD) are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Migraine** (December 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with migraine are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students with Narcolepsy** (December 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students with narcolepsy are protected under Section 504.

**Fact Sheet: Section 504 Protections for Students who Stutter** (December 2024)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet provides information on how students who stutter are protected under Section 504.

**Civil Rights Protections Against Retaliation** (December 2024)

**Statutes**: Title IX of the Education Amendments of 1972; Title VI of the Civil Rights Act of 1964; Section 504 of the Rehabilitation Act of 1973; Age Discrimination Act of 1975

This resource reminds school communities that all of the federal civil rights laws enforced by OCR prohibit retaliation. The resource explains the key elements of retaliation, outlines how OCR assesses retaliation claims, and provides examples that, depending on the facts and circumstances, could raise concerns of unlawful retaliation.

## 2025

**Individualized Assessments for Students with Disabilities in Postsecondary Education** (January 2025)

**Statutes**: Section 504 of the Rehabilitation Act of 1973

This fact sheet informs schools, colleges, and universities of their legal obligation, under Section 504, to provide

academic adjustments, such as reasonable modifications or auxiliary aids or services, to qualified students with disabilities.

**Resolving a Hostile Environment Under Title VI, Discrimination Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics** (January 2025)

**Statutes**: Title VI of the Civil Rights Act of 1964

This resource describes the actions taken by school communities to resolve Title VI investigations in response to allegations of hostile environment and summarizes a sampling of OCR investigations from the last decade involving allegations of a hostile environment for students on the basis of race, color, or national origin, including shared ancestry and ethnic characteristics.

**Online or Digital Sex-based Harassment under the Title IX Regulations: A Resource for Students, Families, and Educators** (January 2025)

**Statutes**: Title IX of the Education Amendments of 1972

This resource describes the regulatory requirements of the 2020 regulations, reminding school communities that Title IX's prohibition on sexual harassment in school education programs or activities includes harassment that occurs online or using technology.