# EXHIBIT 12

# 2024 Fiscal Year Annual Report

REPORT TO
THE PRESIDENT
AND SECRETARY
OF EDUCATION



U.S. Department of Education
Office for Civil Rights

# U.S. DEPARTMENT OF EDUCATION
# OFFICE FOR CIVIL RIGHTS

Catherine E. Lhamon, Assistant Secretary for Civil Rights

2024

This report is submitted under Section 203(b)(1) of the Department of Education Organization Act of 1979, Pub. L. No. 96–88, which provides: "The Assistant Secretary for Civil Rights shall make an annual report to the Secretary, the President, and the Congress summarizing the compliance and enforcement activities of the Office for Civil Rights and identifying significant civil rights or compliance problems as to which such Office has made a recommendation for corrective action and as to which, in the judgment of the Assistant Secretary, adequate progress is not being made." 20 U.S.C. §3413(b)(1).

This report is in the public domain. Authorization to reproduce it in whole or in part is granted.

The report's citation should be:

U.S. Department of Education, Office for Civil Rights

Report to the President and Secretary of Education Under Section 203(b)(1) of the Department of Education Organization Act, FY 2024, Washington, DC, 20202.

This report is also available on the Office for Civil Rights website at http://www.ed.gov/ocr.

Any updates to this report will be available at this website.

Report to THE PRESIDENT and SECRETARY OF EDUCATION




UPHOLDING THE CIVIL RIGHTS OF ALL PERSONS

# TABLE OF CONTENTS

Message from the Assistant Secretary for Civil Rights .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. 4

Executive Summary and Report Highlights .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. 5

The Office for Civil Rights: Overview and Trends .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. 6

Amplifying the Impact: Notable Outreach and Collaborative Activities .. .. .. .. .. .. .. .. .. .. .. .. .. .10

Policy Resources: An Overview .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .11

The Civil Rights Data Collection .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .13

Title VI: Discrimination Based on Race, Color, or National Origin .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .20

Title IX: Discrimination Based on Sex .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .38

Section 504 and ADA Title II: Discrimination Based on Disability .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .52

Enforcement Activity Under Other Statues .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .64

Looking Ahead .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .65

Report to THE PRESIDENT and SECRETARY OF EDUCATION



# MESSAGE FROM THE ASSISTANT SECRETARY FOR CIVIL RIGHTS

Fiscal Year 2024 coincided with the 60th anniversary of the passage of the Civil Rights Act of 1964 and the 70th anniversary of the U.S. Supreme Court's *Brown v. Board of Education* decision, ruling unconstitutional legally required racial segregation of children in public schools. This landmark anniversary year for civil rights nationally also was a landmark year for OCR's civil rights enforcement in schools specifically. Confronted with the third annual striking increase in complaint volume – resulting in complaints this year roughly doubling the annual receipts OCR received during the prior administration – in addition to changes in applicable law, a dramatic rise in reported hate incidents in schools, and increasing complexity in complaint allegations, OCR more than met the moment: In FY 2024, OCR increased our complaint resolutions in specific jurisdictional areas, issued 23 concrete and detailed policy resources to help school communities comply with the law, worked across the Department of Education and the federal government to finalize the most comprehensive sex discrimination regulation since the Department of Education first regulated Title IX in 1975, and secured needed change in schools affecting many millions of students, the commitments for which OCR will monitor in coming years to ensure that school promises translate into students' experiences at their desktops, in their dorm rooms, on playing fields, in their schools' web accessibility, and in every aspect of their educational experiences.

This fiscal year saw a marked proliferation of reported hate incidents in schools, reminiscent of decades past that led to the civil rights anniversaries we celebrated this year and whose aims our nation promises to fulfill every year. OCR's enforcement experience confirmed the existence of such incidents, and their consequential harm to students, including through confirmation that hateful deprivation of equal access to education occurred and through confirmation that school after school did not meet its federal civil rights obligations in response, failing to protect affected students as federal civil rights law requires.

This fiscal year, as OCR does every year, OCR staff stood sentry against harm Congress has long promised that "no person" shall experience in school. Now, as always, OCR remains steadfastly committed to using all the tools legally available to ensure that education is provided to all, on equal terms. I thank OCR's committed and expert staff for bringing their talent to this important work and delivering the justice they secured in FY 2024. That work mattered to millions of students, and to our nation, and I am deeply grateful for the change OCR staff brought to students' educational lives and to school communities all over this great nation. It is my strongest hope that OCR will continue in this vein in the coming year and for all the years thereafter.

Sincerely,

Catherine E. Lhamon

Assistant Secretary for Civil Rights

# EXECUTIVE SUMMARY AND REPORT HIGHLIGHTS

Fiscal year 2024 was OCR's busiest and most productive fiscal year in history. In FY 2024, OCR received the highest volume of complaints ever, totaling 22,687 complaints. That number represented an 18% increase over our previous record high in FY 2023 of 19,201 complaints.

Even as the number of civil rights complaints continued to mushroom in FY 2024, OCR:

- supported school communities' civil rights compliance through publication of 23 sets of policy resources and guidance;

- conducted 211 technical assistance presentations;

- issued the 2024 Title IX Final Rule, which is the most comprehensive regulation since the Department first regulated in 1975;

- implemented optional opt-in mediation, resulting in more expeditious case resolutions;

- hired 57 new staff to help manage our docket effectively;

- responded to more than 11,000 inquiries and 1,236 Freedom of Information Act (FOIA) requests for information;

- initiated 12 proactive, targeted compliance reviews; and

- secured a 36% increase in the number of case resolution agreements compared to the prior fiscal year (which had already been an increase compared to the one before that).

Despite receiving a record number of complaints in FY 2024, OCR nonetheless resolved three times the number of cases finding noncompliance under Title IX, 24% more Title VI cases, and 12% more disability cases compared with FY 2023. OCR relied on important efficiencies to achieve these increased case resolutions this fiscal year, resolving in FY 2024 41% more cases than in FY 2023 through use of OCR's newly available voluntary mediation process and resolving 88% more cases through OCR's Rapid Resolution Procedure.

In November 2023, OCR released the Civil Rights Data Collection (CRDC), a detailed survey of the nation's K-12 schools. The 2023 release reported data collected during the 2020-21 school year from 17,821 school districts, comprised of 95,575 schools. Their data, generally disaggregated by race, ethnicity, sex, English proficiency, and disability, reflect student enrollment; access to academic programs; Internet and devices; school discipline; and the ratio of teachers and school support staff to students. The 2020-21 CRDC for the first time also reflects additional data on sexual violence and harassment or bullying.

OCR doubled the number of policy resources published in FY 2024 compared to FY 2023, and the OCR OPEN Center answered more than 11,000 inquiries from the public in FY 2024, compared to approximately 4,400 inquiries answered in FY 2023 – nearly a threefold increase.

OCR hosted 211 technical assistance presentations addressing topics such as the application of Title VI to discrimination based on shared ancestry and ethnicity; the 2024 Title IX Final Rule; and how book bans may violate civil rights. This report describes the breadth and extent of our work to protect civil rights in our nation's K-12 schools, colleges, and universities in FY 2024.

Report to THE PRESIDENT and SECRETARY OF EDUCATION

# THE OFFICE FOR CIVIL RIGHTS: OVERVIEW AND TRENDS

## MISSION AND SCOPE

OCR's mission is to ensure equal access to education and to promote educational excellence across the nation through the vigorous enforcement of civil rights laws. The office safeguards the rights of students through the investigation of possible violations of civil rights laws, including Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act of 1990 (Title II), the Age Discrimination Act of 1975, and the Boy Scouts of America Equal Access Act of 2001. In addition, OCR safeguards students' rights by developing policy guidance to assist schools and other educational institutions receiving federal financial assistance in understanding how OCR interprets and enforces federal civil rights laws, by disseminating information and technical assistance about students' rights and schools' responsibilities, and by collecting and reporting data on key education and civil rights issues in our nation's public schools.

OCR's mandate to eliminate discriminatory barriers in education reaches more than 79 million individuals at institutions that receive federal funds, including all state educational agencies; approximately 18,100 local educational agencies; approximately 6,000 postsecondary institutions, including proprietary schools and community colleges; 78 state vocational rehabilitation agencies and their sub-recipients; and other institutions that receive U.S. Department of Education financial assistance, such as libraries, museums, and correctional institutions.

## JURISDICTION

OCR ensures equal access to education for our nation's students by enforcing the following federal civil rights laws and their implementing regulations that prohibit discrimination on the basis of race, color, national origin, sex, disability, and age in all education programs and activities that receive financial assistance from the Department (see Figure 1):

- Title VI of the Civil Rights Act of 1964 (prohibiting race, color, and national origin discrimination, including discrimination based on shared ancestry or ethnic characteristics);

- Title IX of the Education Amendments of 1972 (prohibiting sex discrimination);

- Section 504 of the Rehabilitation Act of 1972 (prohibiting disability discrimination);

- Title II of the Americans with Disabilities Act of 1990 (prohibiting disability discrimination in State and local government services – regardless of whether programs receive federal financial assistance);

- Age Discrimination Act of 1975 (prohibiting age discrimination); and

**Figure 1**: OCR Enforcement Jurisdiction Timeline



Report to THE PRESIDENT and SECRETARY OF EDUCATION

- Boy Scouts of America Equal Access Act of 2001 (prohibiting public elementary and secondary schools, local educational agencies, and state educational agencies from discriminating against, or denying equal access or a fair opportunity to meet to, any group officially affiliated with the Boy Scouts of America, or any other youth group listed as a patriotic society in Title 36 of the United States Code).

## STRUCTURE AND FUNCTIONS

The Assistant Secretary for Civil Rights, who serves at the pleasure of the President of the United States and is appointed with the advice and consent of the U.S. Senate, leads the Office for Civil Rights. During FY 2024, the Office of the Assistant Secretary for Civil Rights included a Principal Deputy Assistant Secretary, a Deputy Assistant Secretary for Enforcement, a Deputy Assistant Secretary for Policy, a Deputy Assistant Secretary for Strategic Operations and Outreach, a Deputy Assistant Secretary for Management and Operations, a Chief of Staff, three Senior Counsels, one Special Assistant, and one Confidential Assistant.

OCR serves our nation's students through a headquarters office and 12 regional offices located across the country. Our headquarters and the DC Metro regional office are located in Washington, D.C. The remaining 11 regional enforcement offices are in Atlanta, Boston, Chicago, Cleveland, Dallas, Denver, Kansas City, New York, Philadelphia, San Francisco, and Seattle (see Figure 2).



**Figure 2**: Map of the OCR Regional Offices

| OCR REGIONAL OFFICE | STATE, DISTRICT, OR TERRITORY |
|---|---|
| WASHINGTON, DC (METRO) | DC, VA, NC, SC |
| ATLANTA, GA | GA, TN, AL, FL |
| BOSTON, MA | MA, ME, VT, NH, RI, CT |
| CHICAGO, IL | IL, IN, IA, WI, MN, ND |
| CLEVELAND, OH | OH, MI |
| DALLAS, TX | TX, LA, MS |
| DENVER, CO | CO, WY, UT, AZ, NM |
| KANSAS CITY, MO | MO, SD, NE, KS, OK, AR |
| NEW YORK, NY | NY, NJ, PUERTO RICO, U.S. VIRGIN ISLANDS |
| PHILADELPHIA, PA | PA, DE, MD, WV, KY |
| SAN FRANCISCO, CA | CA |
| SEATTLE, WA | WA, OR, ID, MT, NV, AK, HI, AMERICAN SAMOA, GUAM, NORTHERN MARIANA ISLANDS |

Report to THE PRESIDENT and SECRETARY OF EDUCATION

## ENFORCEMENT AND STAFFING TRENDS

FY 2024 saw still another new record number of complaints filed with OCR, at 22,687 complaints received, up from 19,201 in FY 2023. The total number of complaints has almost tripled since FY 2009, and during this same period OCR's number of full time equivalent (FTE) staff has decreased from 629 to 588. Typically, over the years, the majority of complaints received have raised allegations regarding disability. In FY 2024, however, complaints containing allegations of disability discrimination comprised 37% (8,457) of all complaints received; complaints containing allegations of race, color, or national origin discrimination comprised 19% (4,307); complaints containing allegations of sex discrimination comprised 52% (11,815, of which 6,749 were filed by a single complainant); age discrimination complaints comprised 3% (712); and complaints under the Boy Scouts of America Equal Access Act comprised 0.1% (28) (See Figure 3)[1]. Sections of the report that follow contain data on the number of complaints resolved, broken down by the statutes OCR enforces, and summaries that provide an overview of the range of OCR's enforcement and describe some of OCR's notable resolutions.

Over the life of the agency, OCR's overall staffing level has declined significantly – falling from nearly 1,100 FTE staff in FY 1981 to 588 FTE staff in FY 2024. This reduction comes even as the volume of complaints received has grown significantly, increasing from under 3,000 in FY 1981 to 22,687 in FY 2024.



**Figure 3:** Percentage of Complaints Received by Type of Alleged Discrimiation (FY 2024)

*\*6,749 complaints were filed by a single individual*

*The numbers above do not reflect the total number of complaints received in FY 2024 because some complaints cover more than one statute.*

## FULFILLING FREEDOM OF INFORMATION ACT REQUESTS AND RESPONDING TO PUBLIC INQUIRIES

In FY 2024, OCR responded to 1,236 FOIA requests and achieved a 37.4% overall decrease of its FOIA backlog.

In addition, OCR's OPEN Center responded to 11,128 electronic and hard copy inquiries – an average of 214 per week – regarding the scope and reach of the laws OCR enforces. The OPEN Center also processed more

than 47,000 emails sent as part of 27 separate write-in campaigns. Through the Reading Room, OCR provided information to educational institutions, state and local educational agencies, parents, students, and members of the general public about complaints filed, resolution agreements, correspondence, and policy resources, among other topics.

## MAXIMIZING EFFICIENCY AND EFFECTIVENESS IN ENFORCEMENT

OCR continues to make mediation available for any complaint topic at complainants' request at the time of filing. This innovation has allowed for speedy resolution of complaints using OCR's mediation expertise where OCR has jurisdiction and the parties are willing to mediate. Through mediation, OCR redressed allegations in FY 2024 ranging from discriminatory harassment to physically

---

[1] It is not uncommon for a single OCR complaint to contain allegations of multiple types of discrimination. Thus, the percentage of complaints containing allegations of a single type of discrimination includes complaints that contain allegations of discrimination under more than one statute.

inaccessible school buildings to disparate treatment on the basis of race and national origin, among many other issue areas.

In total in FY 2024, OCR successfully mediated 778 complaints – 651 complaints via mediation requested by the complainant at the time of filing and 127 complaints when OCR determined during investigation that mediation may be appropriate and offered it as an option to the parties. Mediation facilitated OCR's management of its expanding caseload and helped school communities achieve results in as few as 17 days from complaint filing to signed agreement.

In addition, OCR investigators made efficient and effective use of our Rapid Resolution Procedure, resolving a total of 638 cases through this process. As just one example, in April 2024, OCR resolved an investigation of allegations that the Apache Junction Unified School District in Colorado discriminated against students with emotional disabilities by requiring the students to earn points to attend non-academic services, including art, music, library, and physical education instruction. OCR's investigation yielded concerns regarding equal access to non-academic

services for students with disabilities, and a failure to make individualized placement decisions by a team of persons knowledgeable about the student, evaluation data, and placement options. District records, including student schedules, confirmed students enrolled in the district's program for emotional disabilities were required to earn points to access non-academic services.

Only 63 days after OCR opened the investigation, the district resolved the case with an agreement to conduct an internal audit of all students in the district's programs for emotional disabilities and an integrated kindergarten program to determine whether any students with disabilities were excluded from participation in or denied equal access to non-academic services for reasons other than an individualized determination and, if so, to revise the students' schedules to provide equal access and consider whether the students required compensatory education or remedial measures. The district also agreed to revise its policies and disseminate information regarding the district's obligations under Section 504 and Title II to all district administrators, teachers, and special education staff.




# AMPLIFYING THE IMPACT: NOTABLE OUTREACH AND COLLABORATIVE ACTIVITIES

The nation marked two anniversaries of foundational developments in federal civil rights protections during FY 2024. In May 2024, for the 70th anniversary of the U.S. Supreme Court's school desegregation decision in *Brown v. Board of Education*, OCR partnered with the Civil Rights Division of the U.S. Department of Justice on a program discussing the decision's legacy and the ongoing work to fulfill Brown's promise. In addition, as described more fully below, OCR released a compendium of relevant policy resources to increase public awareness of ongoing nondiscrimination obligations consistent with the *Brown* decision.

For the 60th anniversary of President Lyndon B. Johnson signing the Civil Rights Act of 1964, OCR co-sponsored a program with the Equal Employment Opportunity Commission (EEOC) and the Justice Department's Civil Rights Division that discussed the landmark law's historical and current importance and impact in schools and in the workplace.

In the wake of the Hamas attacks in Israel on October 7, 2023, and the ensuing Israel-Hamas war, with increased reports of shared ancestry discrimination in the nation's P-12 schools and colleges and universities, OCR increased outreach and technical assistance to support school communities in understanding their obligations to address shared ancestry discrimination under Title VI, as well as OCR's investigation and enforcement practices. In FY 2024, through both in-person and virtual convenings, OCR's

regional offices provided 211 technical assistance sessions to schools, communities, and organizations on various aspects of the civil rights laws OCR enforces.

Responsive to the recent nationwide rise in book bans in schools, OCR conducted trainings and presentations for more than 1,000 stakeholders, including teachers, librarians, parents, school administrators, school board members, elected officials, and civil rights advocates to explain how book bans that target specific communities may violate federal civil rights laws.



OCR continued collaborations with federal agencies, including participating in interagency working groups, policy committees, and task forces addressing, for example, Violence Against Women Act compliance; safe and inclusive STEM environments; countering antisemitism, Islamophobia, and related forms of bias and discrimination; artificial intelligence and civil rights, school safety; and standards for collecting and reporting data on race and ethnicity (including disaggregation by detailed categories) as well as to sexual orientation and gender identity; and multilingual learners.

# POLICY RESOURCES: AN OVERVIEW

During FY 2024, OCR published 23 policy resources addressing a wide range of civil rights topics, as summarized in Figure 4 below.

| Figure 4: Policy Resources Issued in FY 2023 | | |
|---|---|---|
| **Statute** | **Issue/Release Date** | **Description** |
| Title VI | **Dear Colleague Letter: Discrimination, including Harassment, Based on Shared Ancestry or Ethnic Characteristics**<br><br>November 7, 2023 | Reminds schools of their legal obligations under Title VI of the Civil Rights Act of 1964 to provide all students, including students who are or are perceived to be Jewish, Israeli, Muslim, Arab, or Palestinian, a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity |
| | **Dear Colleague Letter: Addressing Discrimination Against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian Students**<br><br>March 14, 2024 | Reminds schools of their obligations to address discrimination against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian students. |
| | **Dear Colleague Letter: Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics**<br><br>May 7, 2024 | Explains, with hypothetical examples, the application of Title VI to allegations of discrimination in schools based on shared ancestry or ethnic characteristics, including discrimination against students and school community members who are, or are perceived to be, Jewish, Israeli, Muslim, Arab, Sikh, South Asian, Hindu, or Palestinian. |
| | **Fact Sheet: Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After *Brown v. Board of Education***<br><br>May 17, 2024 | Compendium of resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin. |
| | **Harassment based on Race, Color, or National Origin on School Campuses**<br><br>July 2, 2024 | Describes schools' obligations to address and remedy a hostile environment that violates Title VI and provides hypothetical examples to help schools understand their Title VI obligations. |
| Title IX | **Fact Sheet on 2024 Title IX Final Rule**<br><br>April 19, 2024 | Highlights the protections and requirements of the 2024 Title IX Regulations. |
| | **Brief Overview of Key Provisions of the Department of Education's 2024 Title IX Final Rule**<br><br>April 19, 2024 | Describes the major provisions of the 2024 Title IX Regulations and the changes from the 2020 Title IX Regulations. |
| | **2024 Title IX Regulations: Resource for Drafting Nondiscrimination Policies, Notices of Nondiscrimination, and Grievance Procedures**<br><br>April 19, 2024 | Aids recipients in drafting Title IX policies that comply with certain provisions of the 2024 Title IX Regulations. |

Report to THE PRESIDENT and SECRETARY OF EDUCATION

| Statute | Issue/Release Date | Description |
|---|---|---|
| Title IX | **2024 Title IX Regulations: Pointers for Implementation**<br><br>July 27, 2024 | Lists key components of the 2024 Title IX Regulations to support schools in preparing to implement the regulatory requirements. |
| | **2024 Title IX Regulations: Small Entity Compliance Guide**<br><br>August 1, 2024 | Summarizes the requirements of the 2024 Title IX Regulations for recipients of Federal funds from the Department that are small entities. |
| | **2024 Title IX Regulations: Nondiscrimination Based on Pregnancy or Related Conditions & Parental, Family, or Marital Status**<br><br>September 12, 2024 | Explains the requirements related to pregnancy or related conditions and parental, family, or marital status under the 2024 Title IX regulations. |
| | **2024 Title IX Regulations: Impact on Title IX Coordinator Duties**<br><br>September 12, 2024 | Highlights new and updated requirements for Title IX Coordinators in the 2024 Title IX Regulations. |
| Section 504/ Title II | **Fact Sheet: Section 504 Protections for Students with Asthma**<br><br>February 20, 2024 | Reminds school communities of their respective rights and responsibilities under Section 504 of the Rehabilitation Act of 1973. |
| | **Fact Sheet: Section 504 Protections for Students with Diabetes**<br><br>February 20, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Food Allergies**<br><br>February 20, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with GER or GERD**<br><br>February 20, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Cancer**<br><br>August 15, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Epilepsy**<br><br>August 15, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Sickle Cell Disease**<br><br>August 15, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Anxiety Disorders**<br><br>September 24, 2024 | |

| Statute | Issue/Release Date | Description |
|---|---|---|
| | **Fact Sheet: Section 504 Protections for Students with Bipolar Disorder**<br>September 24, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Depression**<br>September 24, 2024 | |
| | **Fact Sheet: Section 504 Protections for Students with Eating Disorders**<br>September 24, 2024 | |

# THE CIVIL RIGHTS DATA COLLECTION

Since 1968, the Civil Rights Data Collection (CRDC) has been an important aspect of OCR's overall strategy for administering and enforcing the civil rights statutes for which OCR has jurisdiction. OCR generally conducts the CRDC as a biennial survey of the nation's K-12 public schools. Local educational agencies, or school districts, are statutorily required to submit CRDC information.

The CRDC collects data on leading civil rights indicators related to access and barriers to educational opportunity from early learning programs through high school. Data from the 2020–21 CRDC informs ongoing decisions regarding additional support that schools, educators, and students need to succeed, and assists OCR in meeting its mission to ensure schools and districts are complying with civil rights laws.

In addition, the public dissemination of the CRDC shares information for the public on the equity health of public schools. Information compiled through the CRDC includes student enrollment and educational programs and services data that are disaggregated by race/ethnicity, sex, English learner status, and disability. The CRDC is a valuable resource for other Department offices and federal agencies, policymakers and researchers, educators and school officials, parents and students, and the public who seek data on student opportunity and equity.

## CRDC: AT A GLANCE

In November 2023, OCR released civil rights data from the 2020–21 school year, offering critical insight regarding civil rights indicators during the COVID-19 pandemic year. A total of 17,821 school districts, comprised of 97,575 schools from all 50 states, the District of Columbia, and Puerto Rico participated in the 2020–21 CRDC. Also, throughout fiscal year 2024, OCR released 10 data reports and snapshots, including *A First Look: Students' Access to Educational Opportunities in U.S. Public Schools*. The *First Look* report comprehensively highlights data from the 2020–21 CRDC on student enrollment; access to preschool programs; mathematics, science, computer science courses, and other academic programs; Internet and devices; school climate factors; and teachers and school support staff. Below are select data highlights:

### Preschool

**Approximately** 61% of public school districts (approximately 10,800) offered public preschool programs and services.

- Most children enrolled in public preschool programs and services were White (44%) or Latino (29%).

- Of the 1.2 million children enrolled in public preschool programs and services, 24% were students with disabilities served under the Individuals with Disabilities Education Act (IDEA). Unless inconsistent with state law or practice, or a relevant court order, IDEA requires

all school districts to provide a free appropriate public education to children with disabilities ages 3 through 5.

- 10% of children enrolled in public preschool programs and services were English learners.

### College and Career Readiness

**Algebra I is considered a "gateway course" because it is critical to preparing students for subsequent advanced mathematics, science, and computer science coursework.** Students who take Algebra I early in their academic years (i.e., by grade 8) will have more time to take the advanced mathematics courses often required for college science, technology, engineering, and mathematics majors.[2]

- Despite the benefits of taking Algebra I early, 39% of the approximately 31,100 public middle schools that offered grades 7 or 8 did not offer the course.

**There were approximately 5,500 public high schools with high enrollments of Black and Latino students (i.e., greater than 75% of students).[3] These schools offered fewer mathematics, science, and computer science courses than the 12,300 public high schools with low enrollments of Black and Latino students (i.e., less than 25% of students).[4]** (See Figure 5)



**Figure 5:** Percent of high schools offering mathematics, science, and computer science courses, by course and Black and Latino enrollment

**Mathematics**

| Course | Schools with high enrollment | Schools with low enrollment |
|---|---|---|
| Algebra I | 85% | 88% |
| Geometry | 85% | 88% |
| Algebra II | 80% | 86% |
| Advanced Mathematics | 61% | 71% |
| Calculus | 35% | 54% |

**Science**

| Course | Schools with high enrollment | Schools with low enrollment |
|---|---|---|
| Biology | 89% | 90% |
| Chemistry | 74% | 79% |
| Physics | 56% | 64% |

**Computer Science**

| Course | Schools with high enrollment | Schools with low enrollment |
|---|---|---|
| Computer Science | 40% | 54% |

Schools with high enrollment of Black and Latino students ▨    Schools with low enrollment of Black and Latino students ■

*SOURCE: U.S. Department of Education, Office for Civil Rights, 2020-21 Civil Rights Data Collection, released November 2023, available at* *https://civilrightsdata.ed.gov.*

---

[2] See U.S. Department of Education, A Leak in the STEM Pipeline: Taking Algebra Early (November 2018), retrieved August 12, 2023, from A Leak in the STEM Pipeline: Taking Algebra Early; see also Jill Walston and Jill Carlivati McCarroll, Eighth-Grade Algebra: Findings From the Eighth Grade Round of the Early Childhood Longitudinal Study, Kindergarten Class of 1998–99 (ECLS-K), Statistics in Brief, Institute of Education Sciences, National Center for Education Statistics (October 2010), https://nces.ed.gov/pubs2010/2010016.pdf.

[3] Black and Latino enrollment is the aggregate enrollment of Black or African American students and Hispanic or Latino students of any race. Schools with high Black and Latino student enrollment have a student body of greater than 75% of Black and Latino students.

[4] Schools with low Black and Latino student enrollment have a student body of fewer than 25% of Black and Latino students.

- Approximately 35% of schools with high enrollments of Black and Latino students offered calculus, compared to 54% of schools with low enrollments of Black and Latino students.

- About 40% of schools with high enrollments of Black and Latino students offered computer science courses, compared to 54% of schools with low enrollments of Black and Latino students.

**Approximately 2.9 million public high school students across the nation were enrolled in at least one Advanced Placement (AP) course. However, rates of student enrollment in AP courses differed by race** (see Figure 6)**.**

- Black students represented 15% of total high school student enrollment, but they accounted for 10% of students enrolled in AP computer science, 8% of the students enrolled in AP science, and 6% of students enrolled in AP mathematics.

- Latino students represented 27% of total high school student enrollment, but they accounted for 20% of students enrolled in AP science and AP computer science, and 19% of students enrolled in AP mathematics.

- Asian students represented 5% of total high school student enrollment, but they accounted for 17% of students enrolled in AP science and AP mathematics, and 22% of students enrolled in AP computer science.

**Nearly 960 public high schools enrolled approximately 168,000 students in the International Baccalaureate (IB) Diploma Programme.[5] Student enrollment in IB differed by sex.**

- Girls were overrepresented in IB programs, accounting for 57% of students enrolled in IB, but 49% of high school student enrollment. Conversely, boys were underrepresented in IB programs, accounting for 43% of students enrolled in these programs and 51% of high school enrollment.

---

[5] When schools offer it, IB is typically available to students ages 16-19 who wish to take academically challenging courses designed to prepare them for colleges or universities. For additional information, see https://ibo.org/programmes/diploma-programme/what-is-the-dp/key-facts-about-the-dp/.



**Figure 6:** Percent of students enrolled in public high school AP Mathematics, AP Science, and AP Computer Science courses, by race/ethnicity

*SOURCE: U.S. Department of Education, Office for Civil Rights, 2020-21 Civil Rights Data Collection, released November 2023, available at https://civilrightsdata.ed.gov.*

Report to THE PRESIDENT and SECRETARY OF EDUCATION

## Student Discipline

**Preschool children with disabilities served under IDEA represented 24% of preschool enrollment, but 34% of preschool children who received one or more out-of-school suspensions and 62% of preschool children who were expelled.**

**American Indian or Alaska Native boys, Black boys, White boys, and certain students with disabilities were overrepresented among students who received corporal punishment.**

- American Indian and Alaska Native boys comprised 2% of students subjected to corporal punishment, as compared to 1% of total enrollment.

- Black boys comprised 18% of students subjected to corporal punishment, as compared to 8% of total enrollment.

- White boys accounted for 24% of total K-12 student enrollment, but 50% of students who received corporal punishment.

- Students with disabilities served only under Section 504 of the Rehabilitation Act represented 3% of total K-12 student enrollment, but 5% of students who received corporal punishment.

**Black boys attending K-12 public schools were disciplined at higher rates, compared to boys of other races.**

- Black boys represented 8% of total K-12 student enrollment, but 15% of students who received one or more in-school suspensions, 18% of those who received one or more out-of-school suspensions, and 18% of those who were expelled.

**Students with disabilities attending public school were overrepresented in referrals to law enforcement and school-related arrests.**

- Students with disabilities served under IDEA represented 14% of total K-12 student enrollment, but 22% of students referred to law enforcement and 22% of students subjected to school-related arrests.

- Students with disabilities served only under Section 504 of the Rehabilitation Act represented 3% of total K-12 student enrollment, but 5% of students referred to law enforcement and 6% of students subjected to school-related arrests.




## Restraint and Seclusion

**Schools subjected Black students, students of two or more races, boys, and students with disabilities served under IDEA to restraint and seclusion at higher%ages than their K-12 student enrollments.[6]**

- Black students represented 15% of total K-12 student enrollment, but accounted for 19% of students secluded, 21% of students physically restrained, and 42% of students mechanically restrained.

- Students of two or more races accounted for 4% of total K-12 student enrollment, but 7% of students physically restrained, and 7% of students secluded.

- Boys represented 51% of total K-12 student enrollment, but accounted for 82% of students mechanically restrained, 83% of students physically restrained, and 82% of students secluded.

- Students with disabilities served under IDEA represented 14% of total K-12 student enrollment, but 32% of students mechanically restrained, 81% of students physically restrained, and 75% of students secluded.

## Harassment or Bullying

**Black students and students of two or more races attending public schools were overrepresented in reports of being harassed or bullied on the basis of race.**

- Black students represented 15% of total K-12 student enrollment, but 37% of students who reported being harassed or bullied on the basis of race.

- Students of two or more races represented 4% of total K-12 student enrollment, but 10% of students who reported being harassed or bullied on the basis of race.

**American Indian or Alaska Native students attending public schools accounted for 1% of the total K-12 student enrollment, but 2% of the students who were reported as harassed or bullied on the basis of race, sex, or disability.**

**White students attending public schools were overrepresented in reports of being harassed or bullied on the basis of sex and disability.**

- White students represented 46% of total K-12 student enrollment, but 68% of students who reported being harassed or bullied on the basis of sex, and 70% of students who reported being harassed or bullied on the basis of disability.

**Boys in public schools were overrepresented in reports of being harassed or bullied on the basis of race or disability.**

- Boys represented 51% of total K-12 student enrollment but accounted for 60% of the students who reported as being harassed or bullied on the basis of race, and 65% of the students who reported as being harassed or bullied on the basis of disability.

**Girls in public schools were overrepresented in reports of being harassed or bullied on the basis of sex, while boys were more often disciplined for harassment or bullying on the basis of sex.**

---

[6] The 2020-21 CRDC used the following definitions for mechanical restraint, physical restraint, and seclusion: Mechanical restraint refers to the use of any device or equipment to restrict a student's freedom of movement. The term does not include devices implemented by trained school personnel, or utilized by a student that have been prescribed by an appropriate medical or related services professional and are used for the specific and approved purposes for which such devices were designed, such as: Adaptive devices or mechanical supports used to achieve proper body position, balance, or alignment to allow greater freedom of mobility than would be possible without the use of such devices or mechanical supports; Vehicle safety restraints when used as intended during the transport of a student in a moving vehicle; Restraints for medical immobilization; or orthopedically prescribed devices that permit a student to participate in activities without risk of harm. Physical restraint refers to a personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arms, legs, or head freely. The term physical restraint does not include a physical escort. Physical escort means a temporary touching or holding of the hand, wrist, arm, shoulder, or back for the purpose of inducing a student who is acting out to walk to a safe location. Seclusion refers to the involuntary confinement of a student alone in a room or area from which the student is physically prevented from leaving. It does not include a timeout, which is a behavior management technique that is part of an approved program, involves the monitored separation of the student in a non-locked setting, and is implemented for the purpose of calming.

**Figure 7:** Percent of allegations of harassment or bullying in public schools, by basis



- Religion - 3%
- Disability - 9%
- Sexual Orientation - 19%
- Race - 29%
- Sex - 40%

*SOURCE: U.S. Department of Education, Office for Civil Rights, 2020-21 Civil Rights Data Collection, released November 2023, available at https://civilrightsdata.ed.gov.*

- Girls made up 49% of the total K-12 student enrollment but accounted for 63% of the students who reported as being harassed or bullied on the basis of sex.

- Boys represented 51% of total K-12 student enrollment but accounted for 78% of students who were disciplined for harassment or bullying on the basis of sex.

**Students with disabilities in public schools represented 17% of total K-12 student enrollment but accounted for 50% of students who reported as being harassed or bullied on the basis of disability.**

**Public school students reported to school employees over 42,500 allegations of harassment or bullying on the basis of sex, race, sexual orientation, disability, or religion** (see Figure 7)**.**

### Offenses
**School Districts reported approximately 274,700 offenses. These reported offenses occurred in school buildings or during school-sponsored events.**

- Physical attack without a weapon accounted for 78% of school offenses—the majority of all incidents.

- Threats of physical attack without a weapon accounted for 15% of school offenses.

- Public schools reported over 3,000 incidents of rape or attempted rape and sexual assault (other than rape).

- Approximately 180 schools (<1%) reported at least one incident involving a school-related shooting, and about 100 schools (<1%) reported a homicide of a student, faculty member, or staff member at school.

### Teachers and School Support Staff
**Over half a million students, the majority of whom are students of color, attended schools where fewer than half of the teachers met all state certification requirements.**

- Approximately 522,400 students, or 1% of total student enrollment, attended public schools where fewer than half of the teachers met all state certification requirements. Of the students attending those schools, a majority (66%) were Black and Latino students.

**Although 77% of public schools had at least one school counselor, 17% of high schools did not have a school counselor.**

**Nearly 1.7 million students attended a public school with a sworn law enforcement officer (SLEO) or security guard, but without a school counselor.**

- Compared to white students, Native Hawaiian and Other Pacific Islander students and American Indian or Alaska Native students were 1.4 times more likely to attend a school with an SLEO or security guard, but without a school counselor.

- Black students and students of two or more races were 1.2 times more likely to attend a school with an SLEO or security guard, but without a school counselor.





# TITLE VI: DISCRIMINATION BASED ON RACE, COLOR, OR NATIONAL ORIGIN

Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in programs and activities operated by recipients of federal funds. It states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." Title VI's protections apply to all public elementary and secondary schools and to all colleges and universities—public or private—that receive federal financial assistance. Its protections extend to all aspects of these institutions' programs and activities. When enforcing Title VI, OCR works to ensure equal access to education services and benefits, and to prevent acts of retaliation against those who report Title VI violations.

## POLICY RESOURCES

During FY 2024, OCR issued several resources to support full implementation of Title VI, including the following:

- In November 2023, OCR released a Dear Colleague Letter on Discrimination, including Harassment, Based on Shared Ancestry or Ethnic Characteristics, describing how Title VI protects all students, including students who are, or are perceived to be, Jewish, Israeli, Muslim, Arab, or Palestinian, from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity.

- In March 2024, OCR released a Dear Colleague Letter on Addressing Discrimination Against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian Students, reminding schools of their Title VI obligations to address discrimination against Muslim, Arab, Sikh, South Asian, Hindu, and Palestinian students, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; or is based on the country or region where a student is from, or is perceived to have come from, including, for example, discrimination based on a student's accent or name, a student's limited English proficiency, or a student speaking a language other than English. The letter is one component of the Biden-Harris Administration's National Strategy to Counter Islamophobia and Related Forms of Bias and Discrimination, portions of which were announced ahead of the March 15, 2024, International Day to Combat Islamophobia.

- In May 2024, OCR released a Dear Colleague Letter on Protecting Students from Discrimination, such as Harassment, Based on Race, Color, or National Origin, Including Shared Ancestry or Ethnic Characteristics, describing the Title VI obligations of schools and other recipients of federal financial assistance from the Department to ensure nondiscrimination based on race, color, or national origin, specifically with respect to students and school community members who are or are perceived to be Jewish, Israeli, Muslim, Arab, Sikh, South Asian, Hindu, or Palestinian, or students of any other faith or whose families come from any other region of the world. This resource includes hypothetical examples to help recipients carry out Title VI's requirements. The letter is a component of the Biden-Harris Administration's National Strategy to Counter Antisemitism and the National Strategy to Counter Islamophobia and Related Forms of Bias and Discrimination.

- In May 2024, OCR issued a fact sheet, Ensuring Educational Opportunities for All Students on Equal Terms 70 Years After *Brown v. Board of Education*. This fact sheet highlights the anniversary of *Brown v. Board of Education*, the 1954 U.S. Supreme Court decision holding that legally mandated racial segregation of children in public schools is unconstitutional.

Report to THE PRESIDENT and SECRETARY OF EDUCATION

The fact sheet notes that seventy years after this landmark decision, student access to education and to educational resources still differs by race, color, and national origin in schools across the United States. This resource summarizes applicable policy resources describing federal legal obligations to ensure that all students have equal access to education regardless of race, color, or national origin.

- In July 2024, OCR issued a fact sheet, Harassment based on Race, Color, or National Origin on School Campuses reminding schools of their Title VI obligations to take prompt and effective action to respond to harassment that creates a hostile environment. The fact sheet explains that depending on the facts and circumstances, students who are subjected to slurs or taunts, or threatened or attacked based on race, color, or national origin — including stereotypes about their race, color, or national origin — may be limited or denied access to educational programs or activities in violation of Title VI. The fact sheet also describes how OCR determines the existence of a hostile environment and details schools' obligations to address and remedy a hostile environment. The fact sheet includes questions and answers, as well as hypothetical examples to help schools assess their Title VI obligations, including the requirement to promptly and effectively address alleged acts of discrimination, including harassment.



**Figure 8:** Title VI Complaint Allegations Received in FY 2024

| Allegation | Count |
| --- | --- |
| Academic Evaluation/Grading | 80 |
| Access to Advanced Courses (including Gifted & Talented) | 12 |
| Admissions & Recruitment (non-affirmative action) | 56 |
| Affirmative Action | 62 |
| Different Treatment/Denial of Benefits | 1,977 |
| Discipline | 384 |
| English Learners Services | 52 |
| Extracurricular Activities | 19 |
| Financial Assistance/Scholarships | 65 |
| Graduation/Degree/Diploma Requirements | 10 |
| Limited English Proficiency—Parental Communication | 4 |
| Limited English Proficiency—Testing | 1 |
| National Origin Involving Religion | 556 |
| Racial Harassment | 981 |
| Resource Equity and Comparability | 32 |
| Retaliation | 954 |
| Special Education for English Language Learners | 5 |
| Science, Technology, Engineering & Math (STEM) | 3 |
| Testing | 5 |
| Other | 427 |

Total Number of Complaints Raising Title VI Issues, **FY 2024 = 4,307**

Note: A single complaint can raise multiple issues; therefore, the total number of issues raised will exceed the number of complaints received.

## ENFORCEMENT

In FY 2024, OCR resolved 3,707 Title VI complaints that, collectively, addressed Title VI-related issues in institutions across the nation (see Figure 5) that range from allegations of race harassment to allegations of discrimination against English Learner students and their families. The following case resolutions illustrate OCR's investigative work over the fiscal year to enforce Title VI.

### Harassment Based on Race, Color, or National Origin

**Norwin School District (PA):** In September 2024, OCR resolved this Title VI investigation, finding that over the course of 10 months, students engaged in repeated racially harassing conduct, including by posting to social media and in group chats race-based slurs and other racially offensive material. OCR found that after the district was made aware of severe and pervasive incidents of racial harassment, it failed to evaluate whether the incidents created a racially hostile environment for students, failed to recognize some incidents as race-based harassment, and generally failed to take action reasonably designed to redress the racially hostile environment and mitigate its effects on students and the larger community. For example, when a student posted a video with what the district termed "racially offensive" material on their social media account, the district did not take any steps to redress the effects of the video – even though a student, who was one of the only 1.4% of students at the school who were Black, had written to the principal and other staff: "Things like this affect me often. This video just lets you see a little part of what it is like for a black person in our majority white school."

Similarly, in response to reports of racially offensive postings in a social media exchange, and then later in a group chat, that involved promoting the hanging of Black people and setting Black people on fire, the district referred the matters to the local police but did not otherwise respond – at all – to the reports, including by considering and redressing their effects on district students' access to education. The district ignored



its obligation under Title VI to consider whether the posts – even if made on private social media accounts or off campus – created a racially hostile environment for students, and if so, whether it necessitated action by the district to redress the hostile environment. Following these repeated and escalating incidents of race harassment, the district again failed to take action reasonably designed to redress the racially hostile environment or mitigate its effects the following fall when the district high school hosted theme days during homecoming week. One theme day was called "'Merica Monday" and two students, who had participated in prior racially harassing incidents the district had declined to address as harassment, wore Confederate flag attire to the district high school. The district also received notice that a photo of the students wearing the Confederate flag attire circulated on social media with a caption titled "kool kids klub" to refer to the Ku Klux Klan.

Despite the evidence of a severe and pervasive racially hostile environment presented to the district in the form of voluminous student, former student, parent, teacher and community emails, none of the district administrators whom OCR interviewed considered the "'Merica Monday" incident to be racial harassment or as contributing to a racially hostile environment. Worse, the then-superintendent minimized the severity of the conduct in

an email to school board members, and in a press release that same evening. Because the district failed to recognize the existence of a racially hostile environment, it once again failed to take any reasonable steps to eliminate the hostile environment and redress its effects on the school community. In fact, district documents show one of the Confederate flag-wearing students shortly thereafter drew a Confederate flag on his arm, visible at school, within weeks of the 'Merica Monday incident, reflecting the insufficiency of the district response.

In response to OCR's findings, the district agreed to review the incidents to determine any necessary steps to ensure the hostile environment does not persist and provide remedial services for impacted students; provide all administrators, faculty, and staff with Title VI training; provide age-appropriate orientation sessions for all students on the district's racial discrimination and harassment policies; conduct a climate survey and create an action plan for OCR's approval; post a notice online and in its back-to-school communications information regarding complaint procedures; conduct an investigation into any complaints filed as well as an audit of all racial harassment complaints filed from 2021 through 2024 to ensure that the district is responding and compliant with Title VI; and retain or designate an expert consultant to assist with the development and delivery of training and a climate survey.



**Poudre School District (CO):** In September 2024, OCR found a charter school failed to respond as Title VI requires to peer harassment on the basis of race. OCR's investigation revealed that the school had notice that the student was subjected to months of harassment, including being called the n-word, called a monkey, and saying he "belonged in a cage." The school did not take prompt or effective action to stop the harassment. In the course of investigation, OCR also learned when reviewing the student's records that they did not reflect the school having convened an IEP team meeting for the student to evaluate the impacts of the harassment on the student and his receipt of FAPE. The school agreed to resolve the Title VI violation OCR identified as well as OCR's Section 504 compliance concern by convening the student's IEP team to discuss the peer harassment of the student and discuss whether the student needs additional or different services and/or supports. The school also agreed to review and revise its policies and procedures governing student-to-student harassment, provide staff training, and to systemize its complaint process for harassment complaints.

**Lancaster Central School District (NY):** In September 2024, OCR resolved a complaint alleging the district discriminated on the basis of national origin by failing to take prompt and effective action to end and prevent the recurrence of a hostile environment created by the use of a "Redskin" as its mascot, and the display of related imagery throughout district schools. Although the district had voted to retire the use of the "Redskin" mascot, the district continued to display the former mascot and in doing so may have perpetuated a hostile environment for students. Furthermore, following the district's decision to remove the mascot, the district continued to receive reports of harassment against Native American students, and OCR found no evidence that the district investigated these incidents.

To resolve OCR's compliance concerns, the district entered into an agreement committing to discontinue its use of "Redskin" across district campuses, except for "legacy or memorial items" and to display a plaque next to each legacy or memorial item denoting it as such.

The agreement further required the district to provide OCR with documentation of the district's responses to all complaints and oral reports alleging discrimination, including harassment, on the bases of race, color, and/or national origin/ethnicity during school years 2024-2025, and 2025-2026. The district further committed to provide discrimination and harassment training for students and staff to incorporate the protected categories of race, color, and/or national origin/ethnicity and include information regarding the district's responsibilities to address such discrimination; the disciplinary sanctions applicable to students who engage in discrimination; and the prohibitions against retaliation for complainants.

**Camas and Vancouver School Districts (WA):** In June 2024 and September 2024, OCR resolved two investigations of racial harassment stemming from an interscholastic baseball game between the two districts at which the players from the Camas School District allegedly shouted racial slurs at a player from the Vancouver School District. During OCR's investigation, OCR learned that Camas School District had actual notice of reports of racial harassment at other interscholastic athletic games and practices and at the high school as well. OCR's investigation gave rise to concerns that neither district took steps reasonably designed to remedy a racially hostile environment at its respective high schools. OCR had concern that the Vancouver School District appeared to have failed to provide the student who was the target of the racial slurs with individual supports, although the student continued to be negatively impacted by the incident. OCR had concern that the records produced by Camas School District did not reflect responses sufficient to redress and prevent recurrence of hostile environments for students at the high school and during interscholastic athletic events which revealed inconsistent practices in connection with the recordkeeping requirements under Title VI.

In response to the concerns raised by OCR, the Camas School District agreed to review and revise its race, color,

or national origin harassment policies; administer a climate survey of students at the high school and use the results of the survey to develop an action plan addressing the concerns identified; conduct training for employees and high school students; and provide OCR with a yearly summary of reported race, color, and national origin harassment reports at the high school which reflects the responsive actions taken by the District.

The Vancouver School District committed to offer services to the affected student to remedy the effects of the district's failure to respond effectively to the harassment, including counseling. The district also agreed to provide training to athletic staff and administrators regarding the district's obligations under Title VI to take prompt and effective steps reasonably calculated to end the harassment based on race, to eliminate any hostile environment and its effects, and to prevent the harassment from recurring.

**John Doe School District[7]:** An OCR investigation determined that two bi-racial siblings had been subjected, for months, to a hostile environment due to severe, pervasive verbal race-based harassment. Despite repeated notice from the students, their parent, and their bus driver, the district did not take reasonable steps to eliminate the hostile environment. The district often responded to severe verbal harassment—including pervasive use of the n-word in school and on its buses—with mild discipline, including short, in-school suspensions, without treating the reported incidents as cumulative acts of race-based harassment. OCR's investigation revealed that the district's interventions failed to put an end to the harassment and led to recurring incidents involving similar race-based epithets by the same and different harassers. This ineffective response to the repeated harassment also led to escalated behavior among the students, including physical fights. Furthermore, OCR had concerns that in determining appropriate consequences for the harassed students for the action they took in response to the hostile

_____

[7] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

environment, the district did not assess whether the repeated instances of race-based harassment and the district's ineffective responsive actions contributed to the students' decision to engage in misconduct.

To resolve the allegations, in June 2024, the district agreed to reimburse the students and their parent for costs associated with academic support incurred as a result of the district's failure to provide an environment free from harassment; publish an anti-harassment statement; review and revise its policies and procedures to address Title VI's prohibition on harassment; train district staff; provide age-appropriate information programs to address race harassment; conduct a climate survey to assess the prevalence of harassment; audit Title VI complaints for two schools years to ensure they are complying with the law, and engage the services of a third-party organization to provide resources and assistance on the issue of racial tensions in the community.



**John Doe School District[8]:** In May 2024, OCR determined that this district violated Title VI by failing to respond to multiple incidents of peer racial harassment of which the district had notice. For months, peers repeatedly mocked and taunted a middle school student using slurs and epithets on the basis of the student's race, color, and national origin. Peers called the student "Blackie," "spear-thrower," "monkey," "gorilla," and the N-word; taunted her about her dark skin and told her they would date her only if she were light skinned; and mocked her for coming to this country from a country in Africa, showing her pictures of malnourished children in Africa and asking whether those children were her relatives. Fully three months after being placed on notice regarding the harassment, the district finally offered to change some of the student's classes to separate her from the students who were harassing her, but the district did not address her report that students were still harassing her even after the schedule change. OCR determined that student peers' harassment of the targeted student created a hostile environment based on race, color, and national origin; that her peers retaliated against the student for reporting the harassment; and that the district failed to respond in a reasonable, timely, and effective manner to notice of the harassment. In resolving the complaint, the district committed to hold a a restorative meeting with students, parents, and school community members to train on racial harassment, student and parent rights, and the district's obligation to respond consistent with Title VI; and agreed to issue an anti-harassment statement, provide Title VI training to employees as well as antidiscrimination training for students, and conduct a climate assessment.

**Park City School District (UT):** In March 2024, OCR resolved seven complaints that had alleged student-to-student harassment based on race, national origin, disability, and sex created a hostile environment for students at three district schools. District records documented more than 180 reports of students harassing other students based on protected bases at three schools during two school years. Harassment included physically assaulting students; telling Asian students to "go eat cat" and mocking a student's "Chinese eyes"; widespread use of the N-word; threatening to "kill all the Jews" and posting swastikas; calling Latino students "illegal" and telling them they are good at cleaning "because I guess that's what you're going to do when you grow up";

_____
[8] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

threatening to stick items up girls' genitals; and calling students "whore," "slut," "faggot," "tranny," "crip," and "retarded." Interviews uncovered persistent harassment on the basis of sex and students reported apprehension about attending school in fear for their safety. Evidence indicated the district had notice of these actions but had either failed to respond at all or responded ineffectively, in turn, leaving students to try to learn in the persistently hostile environment. In particular, the district repeatedly failed to investigate allegations of race-based and antisemitic harassment; take effective steps to end hostile environments based on race and antisemitic harassment that the district confirmed; and provide complainants information about the availability of supportive measures and how to file a formal complaint of sexual harassment, as required under Title IX. The resolution agreement commits the district to conduct a climate survey to assess the prevalence of harassment and needed responses; review, revise, and disseminate districtwide policies for handling reports of harassment; provide support and remedies to affected students; and report to OCR about how the district responds to reports and complaints of harassment based on race, national origin, sex, or disability for two school years.

> **ALSO...**
>
> **See Park City School District**, p. 48 (addressing sex discrimination and harassment based on race and national origin)

**John Doe School District[9]:** In February 2024, OCR resolved an investigation that confirmed a Black student's parent repeatedly notified several school administrators about race-based harassment including the pervasive use of the "N" word, students claiming they received N-word passes, and a staff member and student peers repeatedly touching the student's hair without permission. The student was one of five Black students among the 494 students enrolled in her school. OCR's investigation found the district's recordkeeping grossly inadequate, raising serious questions about the sufficiency of the district response under Title VI. For example, district records did not reflect responses the district staff reported for some incidents alleged. Nonetheless, the repetition of the harassment confirmed in district records suggests that the student experienced race-based harassment that was both pervasive and severe. OCR also identified a compliance concern regarding the district's application of the correct legal standard to the facts because the school principal – who testified to OCR that a racially hostile environment did not exist because the only reports came from one of the five Black students at the school – appeared to take the mistaken position that the school or district failure to investigate whether other students experienced a racially hostile environment about which the district has notice establishes that no such environment exists.

To address OCR's Title VI compliance concerns, the district agreed to send a letter to the student reaffirming its obligations to provide an educational environment free from discrimination for all students and committing to resolving incidents of race, color,

> "
> The District takes this information and the Resolution very seriously. These incidents do not reflect the values of this community and the expectations of the schools or the school district. . . . This important work begins immediately and will continue over the next several years. . . . The district is wholeheartedly committed to creating and maintaining a safe and welcoming environment for all students free from harassment and discrimination."
>
> **_The Park City School District_**

---

[9] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

or national origin discrimination consistent with Title VI; offer to reimburse the complainant for any out-of-pocket expenses for counseling services received by the student in the applicable school years; publish an anti-harassment statement on the district's website, printed in appropriate publications reaching all parents, students, and employees, and posted in prominent locations at the schools; provide written notice of non-discrimination under Title VI to the parents of all district students; provide all administrators, faculty, and staff with effective annual training on the district's policies and procedures that address racial discrimination and harassment; offer a mandatory, annual, age-appropriate training session for all students on the district's policies and procedures prohibiting racial discrimination and harassment; and maintain documents relating to specific complaints or other reports of racial harassment of students to ensure that the district's files contain all information necessary to process complaints under Title VI.

### Countering Antisemitic, Anti-Muslim, Anti-Arab, and Other Forms of Discrimination Based on Shared Ancestry

**Muhlenberg College (PA):** In September 2024, the college entered into a resolution agreement to remedy Title VI compliance concerns OCR identified regarding the college's fulfillment of its obligations responsive to repeated reports in a single semester that a professor's classroom statements and social media posts created a hostile environment for Jewish students at the college.

College administrators spoke to the professor about the reported conduct and acknowledged that it "was having enough of an impact on our student's [sic] ability to engage in college activities." The college's documentation reflected that the college only assessed whether the professor's conduct created a hostile environment in, at most, two of the eight reported incidents, and did not evaluate the totality of the circumstances, as required by Title VI, after having recognized the existence of a hostile environment resulting from prior reports. The documentation further showed that the college did not fulfill its obligations to take steps reasonably calculated to

## SHARED ANCESTRY

In FY 2024, OCR received 515 complaints alleging discrimination based on shared ancestry—a sevenfold increase over the 59 such complaints OCR received in FY 2023. OCR opened 142 shared ancestry complaints for investigation in FY 2024, four times more than OCR opened in FY 2023. By comparison, during the previous Presidential administration OCR opened 28 Title VI investigations regarding shared ancestry and resolved six over its entire four years.

OCR posts all complaints and notification letters involving alleged shared ancestry discrimination to the OCR public Reading Room. In addition, OCR created a webpage, updated weekly, listing the newly filed Title VI shared ancestry complaints that have been opened for investigation.

redress the hostile environment, in part because it did not communicate to affected students the college's efforts to ensure equal access.

To address these Title VI compliance concerns, the college committed to reviewing all complaints against the professor and determine whether the professor created a hostile environment for Jewish students and whether supportive services are required; revisiting its response to previous reports of shared ancestry discrimination for the 2023-24 school year to ensure the college made a determination whether there was a hostile environment, including reports of off-campus and online incidents; providing training to all employees and staff responsible for investigating discrimination complaints on Title VI and the college's anti-harassment policies and procedures; and administering a climate assessment for students and staff with respect to shared ancestry discrimination and the extent to which students and staff are subjected to or witness such discrimination.

**Ann Arbor Public Schools (MI):** In September 2024, OCR resolved an investigation of the district's compliance with Title VI in response to reports of discrimination and



harassment based on shared Muslim/Arab Palestinian ancestry. The investigation confirmed that a school counselor responded to a request from a student, who is Muslim and of Palestinian ancestry, by saying "I don't negotiate with terrorists." The district appears not to have assessed whether a hostile environment followed from this incident, even after the district received notice, including at its board meetings, that the student himself no longer felt welcomed or safe at school and that district community members perceived the incident as reflecting an escalation of animus directed at Muslim, Palestinian, and Arab students.

During investigation, OCR also learned that the district's Title VI procedures limited who can file a complaint and required the district to respond only to written complaints, in violation of its obligation to respond promptly and effectively to any hostile environment about which it has knowledge, through written complaints or other means. To resolve OCR's concerns, the district entered into a resolution agreement to conduct a climate assessment with respect to race, color, and national origin, including Muslim/Arab ancestry, and the extent to which students are subjected to or witness this particular type of discrimination; analyze the results of the climate assessment and create an action plan; draft a policy, subject to OCR approval, that governs how the district

will meet its Title VI obligations, including its response to notice of a hostile environment; and provide training to students, staff, school board members, and parents on the new policy and Title VI's prohibition of discrimination and harassment, including on the basis of shared ancestry.

**University of Illinois – Urbana Champaign (IL):** OCR's review of 139 incidents of shared ancestry discrimination reported to the university from 2015 through 2023 did not reflect that the university met its obligation under Title VI to assess whether a hostile environment was created for students, faculty, or staff related to any of the complaints the university received.  These unassessed incidents included an allegation that a student attacked a Jewish student and ripped off "his Jewish chain" and later said to the Jewish student that he had attacked him because he is Jewish and that, "I wish my ancestors finished the job on you"; flyers were distributed around campus via plastic bags containing rocks stating, "Every single aspect of the Covid agenda is Jewish," and a student threw a rock toward an event at the Hillel Center.

OCR's investigation also uncovered harassment on the basis of shared Arab and Muslim ancestry, including a university employee who sent messages on social media such as, "I won't tolerate Islam," and a pro-Palestinian student protestor who reported being struck multiple times by a counter-protesting employee. Evidence reflected that university programs charged with responding to complaints of national origin harassment lacked coordination and inconsistently applied university policies and procedures, leading to potential gaps in the university's ability to address a hostile environment on the basis of national origin discrimination, on the basis of shared ancestry or ethnic characteristics.

In September 2024, to remedy the Title VI compliance concerns OCR identified, the university agreed to review and, if necessary, revise its policies and procedures related to nondiscrimination, including with respect to protests and demonstrations; provide training to the staff responsible for investigating complaints of discrimination;

review its response to complaints received in 2023-24 and take remedial actions if necessary; provide OCR with information about any complaints alleging discrimination on the basis of shared ancestry or ethnic characteristics during the 2024-2025 school year; and conduct a climate survey.

**Drexel University (PA):** Before resolving this investigation in August 2024, OCR reviewed 35 incidents of discrimination reported to the university from October 2022 through January 2024 that showed evidence of a growing hostile environment resulting from antisemitic incidents that included the presence of swastikas and derogatory antisemitic graffiti throughout campus, mezuzahs removed from students' doors, repeated threatening social media posts that connected Jewish students to Israel, and a group of masked individuals vandalizing the university's Center for Jewish Life. While the university had taken proactive steps to support a nondiscriminatory campus environment, including through public statements, offers of training, support and resources, meetings for impacted campus leadership, and increased security for Jewish students and institutions, documents the university produced to OCR reflected that the university's actions were limited to inconsistently addressing each incident on an individual basis without considering whether broader and more responsive action was necessary.

These documents showed the university did not consistently conduct an assessment as to whether the conduct reported to it created a hostile environment. For example, when a student reported that an individual made racist and discriminatory jokes about people who wear hijabs; how "Indian people smell"; and that Ashkenazi Jews are inferior, the university simply offered supportive resources and outreach to the reporting student, without any assessment or determination regarding whether the underlying conduct created or contributed to a hostile environment. Finally, when the university did consider the existence of a hostile environment, it misapplied the legal standard in making its determination. For example, the university did not consider that harassing conduct need not be targeted at

a particular person and failed to consider whether off-campus or online remarks could create or contribute to a hostile campus environment.

To resolve the compliance concerns OCR identified, the university committed to review past complaints and if required, take remedial action; provide OCR with information about shared ancestry complaints for the following two school years; revise its policies and procedures for responding to Title VI complaints; train employees and staff responsible for investigating complaints; conduct annual training on Title VI for the entire school community; and conduct a climate survey, analyze the results, and create a responsive action plan for OCR's review and approval.



> It is clear that they [OCR] are sending a message to universities that they need to take antisemitism allegations very, very seriously."
>
> **_Kenneth L. Marcus_**, _founder and chairman of The Louis D. Brandeis Center for Human Rights Under Law_

**Brown University (RI):** Before resolving this investigation in July 2024, OCR reviewed some 75 reports to the university of harassment based on shared ancestry, including students calling a Jewish peer wearing a Star of David a "Zionist pig Jew," students preventing a Jewish student from attending a pro-Palestinian rally, and a student berating their roommate for weeks based on the roommate's Palestinian-American identity. In many of these cases, the university appeared to have taken no or little action in response other than to acknowledge receipt of the reports, offer support resources, and request to meet with complainants. The investigation revealed distinct variation among the half-dozen university entities responding to these reports, leaving university students and staff without consistent redress. Notwithstanding the Title VI compliance concerns these university records reflect, the university revised its practices during OCR's investigation to address a campus climate the university



characterized as marked by anxiety, tension, and fear. As a result, OCR determined that monitoring the university's fulfillment of its revised commitment to, as the university described it, "[t]aking the strongest possible stance against . . . unlawful discrimination based on actual or perceived shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity" would effectively ensure its Title VI compliance. The specific terms the university agreed to include: further revising its policies and procedures to ensure all university offices consistently and effectively comply with Title VI, including with respect to protests and demonstrations; conducting annual training on nondiscrimination and harassment for all students and employees; maintaining records related to complaints or reports of discrimination under Title VI; conducting a review of the university's response to complaints and reports of antisemitic and other shared ancestry discrimination during the 2023-2024 and 2024-2025 academic years, and taking remedial actions if required; and analyzing the results of, and creating an action plan in response to, climate surveys and/or other reviews focused on shared ancestry discrimination. The university specifically agreed that its protest and demonstration policy would state that it would be applied equitably and in a manner that complies with Title VI.

**Carmel Unified School District (CA):** In July 2024, OCR resolved a complaint alleging that this district failed to respond effectively to reports of antisemitic harassment. OCR's investigation determined that over the span of two school years, the district received notice of fifteen instances involving swastikas or other vandalism or harassment at the school that created a hostile environment for students based on their race, color, or national origin, including shared Jewish ancestry. These incidents included the use of swastikas and/or the N-word, including graffiti scrawled in a bathroom, swastikas written or etched on two classroom desks, the "SS" symbol drawn on a classroom desk, a swastika on a ruler handed out to students in class, a swastika visible on the skin of a student, and a student expressing a desire "to kill all Jews and burn them in their homes". OCR found that the district violated Title VI by failing to take effective steps reasonably calculated to eliminate the known hostile environment and to prevent its recurrence. The investigation revealed that in some instances the district failed to evaluate whether a hostile environment existed for affected students and if they needed remedies to address the effects of that environment. OCR also identified a compliance concern that the district appears did not appear to meet its Title VI obligation to maintain the records related to the district's responses to notice of antisemitic harassment.

To remedy the violations and compliance concern, the district agreed to review, revise, and disseminate districtwide policies and procedures for responding to reports of harassment and maintaining related records to ensure they satisfy the requirements of Title VI; issue written guidance to staff on the updated harassment policies and procedures; notify all students and parents that discrimination based on race, color, and national origin, including shared ancestry, is prohibited in the district; implement a plan to educate students and parents about reporting harassment; conduct a districtwide assessment of school climate, specifically with respect to antisemitic incidents, with an emphasis on harassment and submit any proposed responsive action to OCR for review and approval; train all administrators,

faculty, and staff on the new policies, procedures, and forms; train all school administrators who are responsible for processing, investigating, and/or resolving complaints of discrimination on how to investigate and document them; and report to OCR the district's responses to reports and complaints of harassment based on race, color, and national origin during the 2024-2025 and 2025-2026 school years.



**Lafayette College (PA):** In June 2024, OCR resolved a complaint investigation after identifying compliance concerns that the college appeared not to have fulfilled its obligation to take steps reasonably designed to redress any hostile environment affecting its campus, and that the college misapplied the Title VI legal standard with respect to harassment occurring on social media, in response to allegations of shared ancestry harassment. OCR's investigation focused on the college's response to an October 2023 protest and to reports of shared ancestry harassment throughout the fall of 2023. College records show inconsistent responses to the same conduct depending on whether it occurred on or off campus, and particularly when the conduct occurred online and on private social media accounts. For example, after a protesting student carried a sign at a campus protest, the college met with the student repeatedly and secured a commitment from the student never to the use the

phrase on the sign again in campus protests, but failed to respond to reports of the same phrase being used by students on social media or to other reports of social media content disparaging Jewish students that created a hostile environment. Additionally, the college appears generally not to have addressed allegations of antisemitic harassment occurring on social media unless they considered the harassment to constitute a direct threat, not recognizing its Title VI obligation – which is not limited to conduct that occurs on campus or outside social media – to redress a hostile environment.

The college agreed to review its response to previous reports of discrimination and/or harassment based on shared ancestry for the 2023-2024 academic year to ensure the college made a determination regarding whether the alleged conduct created a hostile environment; provide OCR with documentation of the college's response to all complaints alleging discrimination, including harassment, on the basis of shared ancestry, for the next two school years; review and revise its policies and procedures, and provide training to staff and students about Title VI.

**John Doe School District[10]:** In June 2024, OCR resolved a complaint alleging that the school failed to respond to repeated instances of antisemitic harassment occurring over two school years. After wearing an Israeli international baseball team shirt to school, a student was harassed by peers on the basis of his perceived shared ancestry, although the student was not Jewish. The harassing conduct included calling the student "a dirty Jew," "fucking Jew," and making comments such as "the ovens are over there," "get your gas mask ready," "go to the chambers," and "go back to the concentration camp." The investigation raised concerns that the school had notice of harassment and consistently failed to take prompt and effective steps to redress the hostile environment for both the student and the school community at large. The investigation also raised a concern that because the district did not maintain proper documentation of its investigations into incidents

---

[10] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

of harassment, the school may not have been able to determine whether a hostile environment existed for other students.

Under the resolution agreement, the school offered to reimburse the student's parents for counseling, academic, and therapeutic services; issue an anti-harassment statement; review and revise relevant policies; develop or revise its record-keeping procedures; provide relevant training to staff and age-appropriate information to students; conduct an audit at the end of the following school year to review the application of and compliance with non-discrimination and anti-harassment policies and procedures; audit discipline incidents coded as "Inappropriate Language/Disrespect" during the past two school years to determine if any constituted discrimination on the basis of actual or perceived shared ancestry and ethnic characteristics, and, if any incidents were harassing in nature and created a hostile environment, take steps to remedy the harassment; and administer a climate assessment during the forthcoming school year.



**City University of New York, Systemwide (NY):** In June 2024, OCR resolved nine complaints against the City University of New York (CUNY) and several of its campuses, addressing allegations of shared ancestry discrimination dating from the 2019-20 through 2023-24 academic years. Based on information OCR confirmed during investigation of the first-filed complaint against CUNY Hunter College, as well as information gathered during investigation of the other eight CUNY system complaints, OCR identified concerns that system-wide at the 25 CUNY schools the CUNY system was not addressing shared ancestry discrimination allegations as required under the Title VI standard.

For example, OCR's investigation confirmed that students and faculty at the CUNY Hunter College campus disrupted two sessions of a required course by taking over the entire course discussion to call for the decolonization of Palestine, preventing students from ever accessing the material the course professors intended to impart. A Jewish student reported that the students and faculty who took over the course told the Jewish students, when they

tried to speak, that they should be listening instead of speaking. Even though several Jewish students expressed that the experience made them fearful and at least one student left the class early, the campus applied the wrong legal standard to their allegations, evaluating the incident against a hate speech standard rather than under the Title VI nondiscrimination standard; and appeared to focus on whether the speech could be punished as distinct from the Title VI consideration of whether the college took steps sufficient to end and prevent the recurrence of a hostile environment. In addition, the college reached its determination that the whole-class disruption did not create a hostile environment for Jewish students without even interviewing the affected students to understand what happened in the class – and notwithstanding its determination that some of the conduct during those classes was antisemitic.

Having reached a determination that CUNY Hunter applied an incorrect legal test and conducted a legally deficient investigation, raising serious concerns regarding the university's Title VI compliance, OCR examined the allegations and information produced to date from the other CUNY campuses and identified compliance concerns about complete application of the legal standard across these other campuses, too. In addition, OCR identified evidence of different treatment based on shared ancestry, for example when the CUNY School of Law abruptly canceled a scheduled a Muslim Law Students Association

event in November 2023 on the ground that the Law School required additional security that was not part of its policy for approving events and that was based on safety concerns that had been both knowable and addressable at the time the Law School approved the scheduled event.

Based on the compliance concerns OCR identified regarding systemwide fulfillment of CUNY's federal nondiscrimination obligations, CUNY committed to ensure every one of the 25 CUNY campuses protects all students against shared ancestry discrimination. Specifically, the university committed to reopen or initiate investigations of national origin and shared ancestry discrimination complaints; provide OCR with the results of these investigations and report to OCR for OCR approval any remedial actions needed; provide training to employees responsible for investigating shared ancestry discrimination complaints; provide training for campus law enforcement on Title VI, effective engagement with the campus community, and accurate collection of complaints; ensure that each CUNY campus administers at least one climate survey to students; and continue third-party reviews of nondiscrimination and antisemitism policies.

**University of Michigan (MI):** OCR's review of 75 reports the university received of shared ancestry discrimination from September 2022 through February 2024 did not reflect that the university met its Title VI obligations to assess whether the incidents individually or cumulatively created a hostile campus environment and if so took steps to address it. For example, after protestors on the university's central campus shouted for "Nazi liberation,", the university's only documented response was to refer the incident to its public affairs department for a response, without evaluating whether this Nazi valorizing chanting created a hostile environment for university students – on their central campus – warranting university remedy and response. Additionally, after a Jewish student was harassed online by a graduate student instructor, the university told the student that online speech was protected by the First Amendment and offered no formal complaint resolution process. OCR's document review also uncovered allegations of incidents of anti-Arab and anti-Palestinian discrimination without sufficient redress from the university reflected in the documents. For example, after a student participating in a pro-Palestinian protest was told that she had "terrorist friends", the university held a "restorative circle" but did not reflect that the university evaluated whether a hostile environment resulted from the widely reported incident.

OCR's investigation raised an overarching concern that the university's policies did not provide the campus community with clear guidance about how it responds to shared ancestry discrimination, and that the university's equity office neither evaluated all reports of Title VI discrimination nor oversaw responses to determine Title VI compliance.

The June 2024 resolution agreement commits the university to review each report of shared ancestry discrimination during the 2023-24 school year to determine whether the alleged conduct created a hostile environment and whether any further action is needed; monitoring that includes reporting to OCR on its responses to reports of discrimination during the 2024-25 and 2025-26 school years; revise university policies and procedures to ensure compliance with Title VI, including its prohibition of shared ancestry discrimination, and ensure that these policies and procedures include a description of nondiscriminatory factors the university will consider prior to requesting law enforcement responses



to protests or demonstrations in addition to ensuring that such responses are applied equitably and in a manner that complies with Title VI; ensure Title VI compliance through its equity office; provide Title VI training to university employees and law enforcement; and administer a climate assessment for students and employees, and identify responsive steps.

**Red Clay Consolidated School District (DE):** In January 2024, OCR resolved an investigation of allegations of antisemitic harassment of a student in the district. The investigation confirmed that classmates threw a paper airplane at the student with "Blood of the Jews" and multiple swastikas as well as bloody imagery scrawled on it, targeting the student because she is Jewish. Soon after, in the same area of the school, classmates raised their arms in a "Heil Hitler" salute, apparently directed toward the student. One week later, the student discovered a swastika drawn on her desk on two separate occasions. OCR's investigation showed the district responded to most of the harassing incidents, but the responses were often haphazard; were inconsistently enforced and reflected in district documentation; did not consistently include effective or timely steps to mitigate the effects of the harassment on the student or other students; and did not appear to respond to escalating and repeated incidents. Due to the district's poor and inconsistent record-keeping of each incident, OCR was unable to assess whether additional reported incidents of alleged harassment created a hostile environment.

To resolve OCR's Title VI compliance concerns, the district agreed to reimburse the student's parents for counseling, academic, or therapeutic services obtained as a result of the harassment; widely publicize an anti-harassment statement; review its policies and procedures to ensure Title VI compliance, including its prohibition of discrimination based on shared ancestry; develop or revise its procedure for documenting the district's investigation of reports of harassment; provide annual Title VI and shared ancestry training for all administrators, faculty and staff, including staff responsible for investigating complaints; provide an informational program for students to address discrimination and harassment; conduct an audit of all Title VI complaints

received during the 2023-24 school year and an audit of all incidents at the school during the 2021-22 and 2022-23 school years to determine if any incidents constituted shared ancestry discrimination, and take any appropriate steps to remedy the harassment; and conduct and provide OCR with a summary of a student climate survey and the district's proposed corrective actions.

## Addressing Discrimination in Discipline Based on Race and National Origin

**Rapid City Area School District (SD):** OCR's investigation revealed persistent and statistically significant disparities in the imposition of discipline on Native American students as compared to their white peers and in the participation rates of Native American students in advanced courses as compared to their white peers.

District documents and administrator interviews reflected different treatment in specific instances of Native American students with respect to discipline, notably frequently regarding truancy, compared with white students, across all the years OCR reviewed. In addition, OCR noted with concern that the Superintendent and multiple school administrators relied on biased stereotypes regarding Native American people, including a perception that particular tribes do not value education and operate on what the Superintendent termed "Indian Time," to explain causes of high truancy rates. When OCR interviewed tribal leaders regarding the values the Superintendent attributed to the tribes, tribal leaders testified that those perceptions are not correct.

OCR's investigation also raised Title VI compliance concerns with respect to access, referral, identification, and selection for the district's advanced learning program and courses, including honors courses and Advanced Placement courses. District data indicates that over many years Native American students have participated in advanced courses, including Advanced Placement courses, at substantially lower rates than their white peers. OCR observed that a district high school heavily populated with Native American students offered fewer than half the Advanced Placement programs offered at another district high school with a lower Native American population. And

OCR noted with concern that the district has not taken action to address whether it offers equal access to these courses.

To resolve the concerns identified in the compliance review, in May 2024, the district agreed to examine their discipline and advanced learning programs to identify the root causes of possible discrimination and implement corrective action plans; employ a discipline equity supervisor with expertise in nondiscriminatory discipline practices and an advanced learning coordinator with experience in addressing Native American underrepresentation to implement the corrective action plans; establish a committee of Native American community members to inform implementation of plans; revise its advanced learning policies and discipline and truancy policies, including law enforcement involvement; regularly analyze and track student discipline and advanced learning data to address possible areas of discrimination; provide training to staff on revised policies; and report discipline and advanced learning data.



We have these numbers, and I've been mulling over them all weekend. I felt a heaviness in my heart. I was trying to imagine what it would be like to read these numbers and words. As a board member, I apologize for not listening, for not hearing all the way, and for needing federal permission to realize the weight of this."

*Christine Stephenson, Rapid City School Board Second Vice President*

**John Doe School District:** In August 2024, OCR found that the district discriminated against a student based on his race when the district treated the student differently than similarly situated students of other races with respect to discipline and did not provide a legitimate, non-discriminatory reason for the different treatment. OCR's investigation confirmed that the district disciplined a multiracial Black and Latino student as if he had engaged



in vandalism even though the district confirmed that he had not and confirmed that many similarly situated white students received less significant discipline for like and more egregious behaviors. During investigation, OCR reviewed multiple student discipline files and identified additional concerns with regard to the district's responses to reports of both antisemitic harassment under Title VI and possible sexual harassment by students under Title IX. OCR noted concerns that the district did not respond to the reported harassment consistent with its harassment policies and procedures, but rather treated the conduct as disruption.

To remedy these concerns and the specific Title VI violations, the district agreed to appoint a climate director with expertise in nondiscriminatory student discipline; establish a Stakeholder Equity Committee to evaluate the district's progress in ensuring nondiscrimination in discipline; revise its discipline policies and procedures to promote their nondiscriminatory application; develop a corrective action plan to examine and eliminate the root causes of race disparities in discipline of students at the school; and collect and analyze discipline data to identify and eliminate any racial discrimination in the disciplinary process. The district further committed to hold student and parent information sessions to explain its student discipline and Title VI and Title IX harassment policies and conduct annual climate surveys to monitor student and

teacher perceptions of the school's discipline practices and the district's harassment based on race, color, national origin, and sex under Title VI and Title IX.

## Ensuring Equal Opportunities for English Learners

**Legacy Traditional Schools (AZ)**: In September 2024, OCR's compliance review of this network of 21 charter schools found that the network failed to timely identify English learner (EL) students or to adequately notify their parents of their EL status and their ability to receive or opt out of the network's English Language Development (ELD) program; failed to provide some EL students with ELD services and did not have enough teachers who were trained and qualified to deliver such services; failed to train administrators to evaluate teachers who provide ELD services; and failed to periodically assess the effectiveness of the ELD program or take steps needed to ensure its success. Additionally, OCR's investigation uncovered that the network did not adequately monitor the academic progress of current and former EL students to determine their meaningful participation; and failed to notify some parents with limited English proficiency (LEP) in a language they could understand about school programs and activities of which other parents were made aware. Finally, OCR found that some LEP parents' decision to opt out of placing their children in EL programs may not have been knowing and voluntary based on the information provided to them, and that the network may not have provided equitable space for EL students by serving them in a cafeteria instead of a classroom.

The network entered into a resolution agreement with OCR requiring the network to timely identify EL students and place them in the network's ELD program; notify EL students' parents of their child's language needs and options; provide EL students with targeted ELD based on their level of English and integrated ELD to help them meaningfully access instruction; train ELD teachers to instruct EL students effectively; ensure that ELD instructional materials are appropriate and comparable to those provided for non-EL students; monitor all EL students' progress and offer struggling students a chance to opt-in; monitor academic progress of former

EL students to identify persistent barriers; observe ELD teachers' classes and lesson plans to ensure targeted and integrated ELD; evaluate the network's EL program for success; notify employees of the interpretation and translation needs of parents with LEP and provide them with appropriate services; provide essential information to parents in English and Spanish and notify other parents how to access free translation services; and provide free translation or interpretation.



**Weld County School District (CO):** In November 2023, OCR investigated allegations that the district discriminated against multilingual learner (ML) students on the basis of national origin by failing to identify and assess ML students needing assistance on a timely basis; failing to provide ML students with a language assistance program that is proven successful; and treating ML students differently than their non-ML peers by requiring them to change campuses. OCR's investigation revealed the district failed to evaluate two students altogether, and the English as a second language (ESL) class was a study hall rather than explicit language instruction. Additionally, OCR identified concerns related to the district's Newcomer Program, which neither adequately defined an eligible student nor adequately notified parents/guardians that the program was voluntary and limited in time. The resolution agreement requires the district to revise the district's English Learner Guidebook; conduct a mid- and end-of-year audit at the school to ensure all ML students

are timely identified; provide professional development and in-classroom support to ML staff, core content teachers of ML students, and evaluators of teachers and staff who work with ML students; conduct a program evaluation of the middle school Newcomer Program; and, revise and issue to parents/guardians communications regarding the Newcomer Program in a language that they understand.

## Securing Access to Equal Educational Opportunity

**John Doe University[11]:** During investigation of this complaint, OCR learned that the complainant and another student, who was also a student of color, had not been allowed to proceed in a nursing program after failing a course, but that three white students in a previous term had been allowed to continue in the same program after receiving failing grades, albeit in a different course. The university asserted that unlike the course that the students of color failed, the course the white students failed was not considered foundational. However, the university could not provide documentation distinguishing which courses were foundational and was unable to provide documentation regarding decision-making to allow students to continue. OCR also observed that the program's handbook did not contain a notice of nondiscrimination. To resolve the Title VI compliance concerns OCR identified regarding apparent different treatment based on race, the university committed in April 2024 to provide Title VI training to the specific departments' faculty, administrators, and other staff; include a compliant notice of nondiscrimination in the handbook; revise the program's policies and procedures to make clear the distinction between "foundational" and "non-foundational" courses and the process for petitioning for an exception; provide documentation of the petition process to OCR for the next three terms; offer the complainant the option of enrolling with the next cohort to re-take the class the student failed at a discounted rate and to resume their progression in

the program; and issue a tuition credit to the student's classmate who already re-took the class.

## Eliminating Retaliation for Exercising Civil Rights

**John Doe School District[12]:** In September 2024, OCR determined this district retaliated against a former employee in violation of Title VI for bringing and supporting complaints of race discrimination on behalf of athletes of color. After the former employee raised concerns about the differential treatment and harassment of players of color, the district prevented the employee from both coaching any sports and refereeing games. The resolution agreement requires the district to offer the coach the opportunity to apply for coaching positions at the school; instruct coaches and administrators who worked at the school during the 2020-21 school year not to disparage the coach and to direct employment inquiries about the coach to the human resources department; consider taking personnel action against the employees found to have retaliated against the coach; revise the district's policies and procedures prohibiting retaliation; and provide training on retaliation to coaches and administrators.

---

[11] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

[12] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

# TITLE IX: DISCRIMINATION BASED ON SEX

Title IX of the Education Amendments of 1972 (Title IX) states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance." Title IX applies to recipients of federal financial assistance, including colleges, universities, and public-school districts. OCR enforces Title IX to ensure equal access to educational opportunities.



## TITLE IX FINAL RULE AND POLICY RESOURCES

- During FY 2024, the Department issued its Final Rule amending the Department's Title IX regulations to advance Title IX's promise of ensuring that no person experiences sex discrimination in federally funded education. The 2024 Title IX Regulations went into effect on August 1, 2024, and apply to allegations of sex discrimination that occur on or after that date.[13]

- In April 2024, concurrent with the release of the 2024 Title IX Regulations, OCR issued three resources: a Fact Sheet that highlights the protections and requirements of the 2024 Title IX Regulations; a Brief Overview of Key Provisions of the Department of Education's 2024 Title IX Final Rule that describes the major provisions of the 2024 Title IX Regulations and the changes from the 2020 Title IX Regulations; and a Resource for Drafting Nondiscrimination Policies, Notices of Nondiscrimination, and Grievance Procedures that aids recipients in drafting Title IX policies that comply with specified provisions of the 2024 Title IX Regulations.

- In July 2024, OCR released 2024 Title IX Regulations: Pointers for Implementation, which lists key components of the 2024 Title IX Regulations to support recipients as they prepared to implement the requirements of the 2024 Title IX Regulations.

- In August 2024, OCR issued the 2024 Title IX Regulations: Small Entity Compliance Guide, which summarizes the requirements of the 2024 Title IX Regulations for small entities.

- In September 2024, OCR published two additional resources explaining the requirements of the 2024 Title IX Regulations with regard to specific issues: 2024 Title IX Regulations: Impact on Title IX Coordinator Duties highlights new and updated requirements for Title IX Coordinators in the 2024 Title IX Regulations; and 2024 Title IX Regulations: Nondiscrimination Based on Pregnancy or Related Conditions & Parental, Family, or Marital Status explains the requirements related to pregnancy or related conditions and parental, family, or marital status under the 2024 Title IX regulations.

---

[13] As of November 25, 2024, pursuant to Federal court orders, the Department is currently enjoined from enforcing the 2024 Title IX regulations in the states of Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming; the Department is also currently enjoined from enforcing the 2024 Title IX regulations at the schools on the list located at https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/list-of-schools-enjoined-from-2024-t9-rule. Per court order, this list of schools may be supplemented in the future. Pending further court orders, the Department's 2020 Title IX regulations remain in effect in those states and schools. Any updates on the status of the 2024 Title IX regulations will be posted at https://www.ed.gov/laws-and-policy/civil-rights-laws/title-ix-and-sex-discrimination/sex-discrimination-overview-of.



**Figure 9:** Title IX Complaint Allegations Received in FY 2024

Total Number of Complaints Raising Title IX Issues, **FY 2024 = 11,815**

Note: A single complaint can raise multiple issues; therefore, the total number of issues raised will exceed the number of complaints received.

## ENFORCEMENT

In FY 2024, OCR resolved 4,379 Title IX complaints, addressing a broad range of Title IX issues across the nation, including sexual harassment at the elementary, secondary, and postsecondary levels; equal access to athletic opportunities; and pregnancy discrimination (see Figure 9). The following cases illustrate OCR's Title IX resolutions in FY 2024.

### Eradicating Sexual Harassment, including Sexual Violence

**John Doe School District[14]:** In September 2024, OCR resolved allegations that the district failed to respond as required by Title IX to a report of sexual assault of a student by a group of students. The incident occurred in the locker room and involved four boys holding down a teammate, pulling his hand off a locker as he tried to get away, and placing another team member's genitals on the restrained student's face. After receiving the complaint of the alleged sexual assault, the district classified the incident as hazing and harassment rather than as sexual assault. Although the district's Title IX coordinator was involved in the investigation, the district did not treat the incident as a Title IX matter. As a result, while the district disciplined the perpetrating students for bullying, the perpetrators did not receive the process protections guaranteed to them under Title IX. At the same time, the district did not inform the targeted student how to file a Title IX complaint, which the district had been required under Title IX to do. Nor did the students receive

---

[14] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

an offer of individualized supportive services, or other nondiscrimination protections Title IX provided to them. To resolve the violations OCR found, the district agreed to revise its sexual harassment policies and procedures; train the Title IX Coordinator, employees, and students about responding to incidents of potential sexual harassment; maintain relevant records and report to OCR all reports and formal complaints of sexual harassment the district receives for two school years, for OCR's review to determine whether the district's responses present Title IX compliance concerns; and offer to reimburse the parent of the targeted student for costs related to the consequences of the district's insufficient response under Title IX.

**Española Public Schools (NM):** In September 2024, OCR found that this district violated Title IX by failing to respond to reports of sexual assault by employees and students, to adopt and implement Title IX grievance procedures that provide for equitable resolution of complaints, and to coordinate its responses to such reports through its Title IX coordinator. These failures led to repeated instances of harassment in the district with insufficient district response, leaving district students vulnerable to the sex discrimination in school that Title IX forbids. Among other incidents, the district allowed a teacher reported to have inappropriately touched students to resign without conducting a Title IX investigation to determine if the teacher sexually harassed the students or created a hostile environment for the students, or adequately notifying the students or the student's families regarding the district's response. It also did not treat an allegation that a teacher sexually assaulted a student with disabilities as a Title IX matter even though the district found "substantial evidence" that the conduct occurred and reported the incident to law enforcement. Additionally, the district failed to ensure the targeted student continued to have equal access to education after the assault.

To redress the Title IX violations and Section 504 and Title II concerns, the district agreed to implement a new system and policy for maintenance of data and records related to reports, complaints, and investigations of sexual harassment; train its employees on their obligations to report sexual harassment under Title IX, as well as their other obligations under Title II and Section 504; train students on how to recognize and report sexual harassment; provide a public notice to the school community that it would review reports of allegations of sexual harassment over the past seven years and administer an annual climate survey of parents, students, and district employees with regard to sexual harassment that occurs in district schools.



**University of Virginia (VA):** In September 2024, OCR found that the university violated Title IX because its grievance procedures mandated the removal of alleged student perpetrators (respondents) in pending Title IX investigations from academic good standing and prohibited them from receiving a diploma if a Title IX investigatory process was still pending. Title IX regulations prohibit imposing disciplinary sanctions against a respondent prior to the completion of the grievance process. To address this violation, the university agreed to immediately end its practice of withholding diplomas from, and removing from academic good standing, student respondents in pending Title IX grievances; revise its Title IX grievance process to comply with the Title IX implementing regulation; and train relevant staff on Title IX and the revised grievance process.

**Lawrence Technological University (MI):** In September 2024, OCR resolved an investigation alleging discrimination on the basis of sex when the university failed to respond to notice of sexual harassment of a female student who was harassed by a male teammate while working on a group project. For example, one of the student's male teammates sent the student a "joke" image with a punchline that implied that women belong in the kitchen washing dishes. When she reported their behavior to the team's advisor, the advisor—instead of advising the woman of her right to file a Title IX complaint—told her to consult with female professors in the department. The advisor also told the student that she would be dealing with these types of behaviors for the rest of her career, so she should just figure out what to do on her own and move on. Rather than submit to continued harassment, the student left the project team.



OCR's investigation revealed that the university failed to provide this student with basic Title IX protections, and these failures occurred at every level, with one result being that even after the university initiated an investigation, additional Title IX violations occurred. To remedy its noncompliance, the university agreed to train all enrolled students, faculty, and staff regarding the university's Title IX grievance procedures; engage an expert to help conduct a review of the department

in which the student had been enrolled, to determine whether there is ongoing sex discrimination. This process will include a public meeting with students as well as a climate survey; identifying a counselor to provide services to members of the university community who have reported sex discrimination; and publish contact information for the counselor on the university's website in a conspicuous location.

**San Diego Unified School District (CA):** In August 2024, OCR completed a compliance review of the district's responses to reports and complaints of sexual harassment. After examining 253 reports and complaints of sexual harassment of students over a span of three school years, OCR found that the district more often than not did not fulfill its Title IX regulatory requirement to respond equitably to allegations of sexual harassment of its students. These failures led to serial perpetration of harassment that received an insufficient district response.

While evaluating the district's responses to sexual harassment under Title IX, OCR identified a related concern that the district may have denied FAPE to students with disabilities. OCR learned that the district received notice regarding students with disabilities who were alleged perpetrators as well as victims of sexual harassment. Despite being placed on notice, case files produced by the district included no information indicating that the district took steps to evaluate the students whose behaviors gave reason to suspect they had a disability or to reevaluate students with disabilities whose persistent and escalating behaviors provided grounds to review existing supports and accommodations.

To resolve these violations and compliance concerns, the district agreed to conduct a review of previous incidents of reported sexual harassment; provide an annual age-appropriate sexual harassment training to students; administer annual climate surveys of parents, students, and district employees with respect to sexual harassment; and annually train district employees on their obligations under Title IX, Section 504, and Title II. The district further agreed to review and revise its policies governing sex

discrimination to ensure compliance with Title IX and implement a system for maintenance of data and records relating to investigations of sexual harassment.

**Memphis-Shelby County School District (TN):** In August 2024, OCR resolved a compliance review of this district's handling of sexual harassment cases, including incidents involving student and staff misconduct that violated Title IX. The district did not have a designated Title IX coordinator for substantial periods of time during the review period, and when there was a coordinator in place, they participated in only a minority of documented incidents of sexual assault. The district had neither harassment policies nor a nondiscrimination statement that complied with applicable Title IX regulations. The district lacked adequate recordkeeping practices sufficient for either OCR or the district itself to make compliance determinations. In fact, the district did not have any file for the majority of cases addressing sexual assault allegations.

OCR's investigation found that the district did not respond promptly or equitably to complaints of sexual assault of students by staff during the three school years OCR reviewed. In one case, an elementary school teacher allegedly pulled down the pants of male students and brought students to his home without permission. While the district contacted the Department of Children's Service and law enforcement in response to these allegations and placed the teacher on administrative leave, there is no evidence the district took any measures to support the students' equal access to education, nor did the file for the alleged sexual assault case show any involvement of a Title IX Coordinator.

In another incident, after a teacher allegedly showed pornography to his students and encouraged them to touch themselves on multiple instances, the district contacted law enforcement and placed the teacher on leave, but OCR did not find any indication that the district: completed an investigative report; contacted the parties regarding the outcome of an investigation; supported the

students; or utilized a Title IX Coordinator at any point during the investigation.

To address the noncompliance OCR found, the district agreed to designate, train, and publicize the contact information for its Title IX coordinator; revise its policies concerning its response to sexual harassment to ensure their compliance with Title IX; review all complaints of student and staff involved sexual assault during the 2022-2023 and 2023-2024 school years to ensure each complaint was resolved in compliance with Title IX, and if not, offer appropriate remedies; train district staff on the Title IX process; and conduct a survey of students and parents to determine if the district needs to take any additional steps to address sexual harassment in its schools.



**John Doe School District[15]:** In July 2024, OCR found that this district violated Title IX by failing to designate and provide notice of its Title IX coordinators; adopt and publish grievance procedures that complied with the Title IX regulation; maintain adequate recordkeeping practices; and respond promptly to the multiple allegations of sexual harassment. In one egregious example of repeatedly reported teacher sexual misconduct, the district delayed investigation, misapplied the Title IX legal standard, and

---

[15] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

ultimately never assessed whether the targeted students had been subjected to a hostile environment once the teacher had been placed on leave. OCR also identified compliance concerns with respect both to Title IX coordination for the latter half of the review period and allegations of sexual harassment by that same teacher raised by other students.

To resolve these violations, the district committed to revising its grievance procedures; modifying recordkeeping practices and its Title IX grievance procedures to ensure compliance with Title IX; crafting a written description of the Title IX Coordinator's responsibilities to ensure consistency and coordination; conducting annual Title IX training; and administering a climate survey of students in grades 6-12 that serves as the basis for a climate improvement plan at each school where concerns are identified.



**John Doe School District[16]:** In July 2024, OCR resolved two sexual harassment complaint investigations against this district. The more recent of the two complaints alleged that in 2022, in an incident that was captured on videotape, a nine-year-old disabled child was sexually assaulted on a school bus and no adult intervened. The second complaint concerned allegations that a tenth-grade student who participated in a district school's Junior

Reserve Officers' Training Corps (JROTC) program was sexually harassed by several male students who, among other things, inappropriately touched her, hit her, and threatened to rape her. The complaint further alleged that the JROTC teacher left the students unsupervised for extended periods of time.

In the case of the nine-year-old student, the school did not conduct a Title IX investigation of these allegations, nor did it assess whether the alleged behavior created a hostile environment for the student or for the other students (including her sibling) who were on the bus and witnessed the assault. In the case of the student in the JROTC program, the school stated that it conducted an investigation that found no evidence that she was sexually harassed, but that investigation did not comply with the procedural requirements of Title IX.

OCR found multiple violations of Title IX, including that the district had noncompliant grievance procedures; evaluated Title IX allegations through an IEP team rather than a Title IX coordinator; and failed to ensure proper Title IX training for transportation service contractors. OCR also identified compliance concerns regarding the district's response to receiving actual knowledge of sexual assault, equity in the district's Title IX process, and regarding its recordkeeping.

To resolve the violations and concerns, the district committed to revise its grievance procedures for reports and formal complaints alleging sexual harassment, including sexual violence; develop a recordkeeping process for sexual harassment complaints that complies with Title IX; create an electronic spreadsheet of all reports and complaints of sexual harassment for the current school year and the previous two school years; and provide training to all district employees and contractors for responding to and investigating sexual harassment complaints. With respect to the allegations concerning the nine-year-old, the district's Title IX coordinator agreed to make a factual determination as to what happened on the school bus and how all students

---

[16] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

riding the bus that day were impacted and will consider offering them supportive measures. In the case of the JROTC student, the district committed to issue a letter of apology for its failure to provide a timely and full explanation of any investigation findings.

**Redlands Unified School District (CA):** OCR's investigation uncovered a systematic failure on the part of the district to investigate or redress sexual assault allegations after they were reported to law enforcement or other state agencies. The district did not coordinate its response to sexual harassment through its designated Title IX coordinator, and it had no system in place to monitor whether schools' responses to such harassment complied with Title IX's requirements. Due to its incomplete recordkeeping, the district was unable to identify emergent patterns or systemic problems with respect to individual schools or districtwide. In 74% of the incidents OCR reviewed, the district did not provide evidence that it took action to address the effects of harassing conduct on targeted students.

In April 2024, the district agreed to a multifaceted plan to strengthen the Title IX coordinator's role and visibility; revise existing policies to ensure compliance with Title IX's sexual harassment regulations; improve its recordkeeping system to maintain required records of reports of sexual harassment; administer an annual school climate survey to the school community with regard to sexual harassment; and identify new responsive steps in light of survey results. The district also agreed to review case files for reported incidents of sexual harassment for a three-year period, to ensure equitable resolution of each incident as required under Title IX.

**Morgan State University (MD):** In April 2024, OCR resolved a complaint, finding that the university failed to comply with the requirements of Title IX in a prompt and equitable manner in connection with the hearing the university held to review a student's report of sexual assault. Because the university did not offer any accommodations for the complainant to participate without being in the presence of the respondent after the complainant expressed reservations about participating in his presence, the complainant did not attend the hearing.



> We will fully implement the necessary improvements described in the agreement to further enhance and ensure safe and equitable learning environments for all students as this is our number one priority."
>
> **_Alex Vara_**, _Redlands Unified School Board President_

Further, even if she had attended the hearing, the Code of Conduct in effect at the time did not provide the reporting party with an opportunity to meaningfully participate in the hearing by providing evidence, witnesses, and opening or closing statements, or an opportunity to question the witnesses. OCR's investigation also revealed the university failed to obtain timely and relevant evidence for the hearing, including a video recording filmed and relevant text messages sent on the night of the incident, and that the university did not provide the complainant an equal opportunity to appeal university findings. Lastly, OCR also found that, at the time the student filed her complaint with the university, the university did not have a designated Title IX Coordinator, nor did it appropriately publicize and disseminate the contact information for the Title IX Coordinator.

To remedy these violations, the university agreed to assess appropriate remedies for the student and similarly situated students who were subjected to an inequitable grievance process. Upon completion of this review, the university agreed to provide OCR with a report of its conclusions, including documentation of any offers of individual remedies. Further, the university committed to conducting a climate survey and submit documentation of its proposed actions in response to the survey responses.

**San Francisco Conservatory of Music (CA):** OCR investigated whether this conservatory responded in a manner consistent with Title IX to a student's complaint that she had been sexually assaulted twice and then stalked by another student. OCR determined the conservatory violated Title IX at every stage of investigation and resolution. Specifically, the conservatory

failed to offer or provide the student with individualized supportive services to preserve equal access to educational programs, leading to a series of unwelcome interactions with her alleged stalker and causing her to miss several classes, lessons, and concerts. The conservatory failed to notify the parties about the scope of the allegations being investigated, nor did it provide the parties an opportunity to review the evidence in the investigative report.

To address this noncompliance, in January 2024, the conservatory agreed to review and revise its Title IX policies and grievance procedures, which had been found to have not been updated in light of the 2020 Title IX regulations; issue a written guidance memorandum and train its Title IX Coordinator and all other staff members responsible for responding to reports of sexual harassment, and to provide OCR with all information about complaints of sexual harassment in the 2022-2023 and 2023-2024 school years

**John Doe Academy**[17]: In November 2023, OCR resolved an investigation of a small cosmetology school's response to notice of sexual harassment. OCR found that a student was sexually assaulted by her instructor in class, in front of other students, as part of an instruction for how to conduct Brazilian waxing. During and after the assault, the instructor made comments to the student victim, mocking her for the assault, including saying during the class that the student "like[s] it rough" and later saying in front of other people, "I've been inside of you." The student reported to her school that as a result of the assault and harassing comments from the instructor, the student experienced anxiety, post-traumatic stress, depression, and suicidal ideation, causing her to miss school, and that she feared for her fellow students because she believed the instructor was a sexual predator. The school responded by asking her if she needed counseling and gave her the names of different cosmetology schools to which she could transfer. The school also gave her a 2-week leave of absence, but it did not offer to evaluate whether the absences she previously had experienced imposed a financial cost on her as the school charged for the absences, even though the absences could have been related to the assault, entitling the student to supports that could include a fee waiver. A second student reported the same instructor for sexual harassment, to which this postsecondary institution also did not respond as required under Title IX. Ultimately, the school terminated the instructor's employment for having violated the school's policies regarding sexual harassment. However, the school did not follow the grievance procedures required under Title IX.

OCR found that the school violated Title IX by failing to respond to the student victim's written complaint of sexual harassment, did not conduct an investigation of the allegations, did not provide remedies designed to preserve equal access to the education program, and failed to fulfill Title IX procedural requirements. Under the resolution agreement, the school agreed to assess the impact of the sexual harassment on two students identified in OCR's investigation and provide them with appropriate remedies. The school also committed to contact more than 180 current and former students to determine if they were subject to sexual harassment while attending the school. The agreement requires training for staff and students regarding sexual harassment and training for responsible staff on how to respond appropriately to sexual harassment. Further, the school agreed to collect other information relevant to the Title IX issues investigated to assist it in developing plans to



---

[17] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

Report to THE PRESIDENT and SECRETARY OF EDUCATION

improve its practices. Finally, the school committed to take steps to ensure that information about its grievance procedures and Title IX Coordinator are published in a manner consistent with Title IX's requirements.



**Arcadia University (PA):** In October 2023, OCR resolved two sex discrimination complaints alleging the university failed to respond promptly and equitably to notice of sexual harassment by a professor, despite receiving repeated reports of the professor's misconduct for a number of years. Once the university belatedly initiated an investigation of the complaints it received regarding professor's conduct, it neither completed its inquiry nor made a determination regarding the allegations due to the professor's resignation. The investigation revealed that administrators believed – incorrectly – that the university could not pursue an investigation of the allegations regarding the professor since he had tenure and that the allegations did not fall under the guise of Title IX, because the conduct did not include inappropriate touching. OCR found that the university's response violated Title IX.

To resolve these violations the university agreed to complete its investigation of the filed complaints against the professor and to reimburse the complainants for counseling costs if the university determines the conduct alleged is substantiated; review its Title IX complaints from three school years, as well as earlier complaints

against the professor, to assess whether his conduct created a hostile environment on the basis of sex on earlier occasions, and if any other students are entitled to remedies; survey its students to determine whether the university needs to take additional steps to address sexual harassment on campus; review all its sexual harassment complaints from fall 2024 to spring 2025; and review and revise its Title IX policy and procedures as necessary.

**New London Public Schools (CT):** In October 2023, OCR found that this district violated Title IX by not ensuring adequate Title IX coordination and oversight, failing to adopt and publish Title IX grievance procedures that complied with the Title IX regulation, and failing to respond equitably to complaints of employee-involved sexual harassment. For example, OCR found that the district violated its Title IX obligation to investigate allegations of sexual harassment of students by two employees while the matters were simultaneously being investigated by a state agency and law enforcement. OCR also identified compliance concerns regarding the district's Title IX recordkeeping practices and its responses to complaints of student-involved sexual harassment.

To resolve this compliance review, the district agreed to revise its Title IX grievance procedures to ensure consistency and compliance with the Title IX regulation; modify its recordkeeping procedures; provide OCR with the district's responses to all reports of sexual harassment between the 2021-22 and 2024-25 school years; prepare a written description of its Title IX Coordinator's responsibilities to ensure Title IX coordination; conduct annual Title IX training for all administrators, staff, Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process; and issue, and assess for remedial action, a student climate survey.

**John Doe School District[18]:** In October 2023, OCR found that this district violated Title IX in its responses to allegations that a very young child in the district experienced sexual assault in a school program. A principal's written notes state that the mother reported

_____

[18] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

her son's "legs were riddled with bruises, he had marks on his neck, and his penis was purple and swollen." Nonetheless, the principal dismissed the parent's formal complaint alleging her son had been sexually assaulted on the – incorrect – ground that "the alleged conduct, even if proved, would not constitute sexual harassment." In addition, the principal impermissibly relied on local police and child protective services decisions in determining that Title IX sexual harassment must not have occurred and the district failed to provide the student victim with supportive measures, in violation of Title IX.

To the extent that the district conducted any investigation, it failed to interview witnesses who may had observed such conduct and limited interviews to staff who would not have been able to see what happened, missing the opportunity either to corroborate the allegation or determine if the alleged harassment was limited to only one student.

To resolve the Title IX violations OCR found, the district agreed to ensure staff and students receive annual training on identifying, reporting, and preventing sexual harassment; share information with students and families about resources available for students who have been subjected to or wish to report sexual harassment; and



provide OCR with information regarding its responses to any other complaints of sexual harassment so that OCR can assist the district in developing action plans identifying opportunities to improve its practices. Lastly, the district committed to take steps to ensure that information about its grievance procedures and Title IX Coordinator are published in a manner consistent with the requirements of Title IX.

### Eliminating Discrimination Against and Harassment of LGBTQI+ Students

**John Doe School District[19]:** In March 2024, OCR resolved an investigation of alleged sexual harassment of a transgender middle school student. OCR's investigation reflected that the district received notice of at least six incidents of alleged harassment that occurred within a span of the first five days of the school year for a student who was new to the school, including for example, a peer telling the student that she was in the wrong bathroom, a teacher asking the student if she was or preferred to be called a boy or a girl, and peers and staff misgendering the student. The student's parent reported to the district that these incidents left the student feeling humiliated and sad. The district investigated some of the incidents reported, established that they occurred, but determined no response was needed because there was no harmful intent involved. For example, according to the district, the student peer who told her that she was in the wrong bathroom genuinely believed she had used the wrong bathroom based on her appearance. OCR identified Title IX compliance concerns that the district's misapplication of the legal standard – not considering how the cumulative conduct based on the student's nonconformance with stereotypes of masculinity and femininity, about which the district had notice and that it established had occurred, could have contributed to a hostile environment for the student regardless of the intent of the other parties involved – prompted inaction on the district's part. To resolve these compliance concerns, the district agreed to invite the

---

[19] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

student's parent to be included in the district's LGBTQ Outreach Committee, which works to prevent harassment related to gender identity; allow the student to submit complaints for incidents that were not investigated; provide Title IX training to district staff; conduct learning sessions for district students; and administer a climate survey to identify any needed next steps to ensure a nondiscriminatory school environment.

**Park City School District (UT):** In the March 2024 resolution referenced above, OCR addressed this district's Title IX violations when it failed to notify reporting students and parents about how to file a Title IX complaint or offer those students supportive measures whether or not they filed a complaint – both of which the Department's regulations to Title IX as amended in 2020 require – when the district received notice of conduct that could meet the definition of sexual harassment. OCR's investigation confirmed that the district had received such notice, repeatedly, such as when students reported feeling depressed, anxious, and nervous about attending school following threats and targeted harassment such as a peer saying, "I hate that fag" and when the district documented notice that a student was, in the district's words, "subjected to offensive sexually explicit comments about body parts and gender identity." The comprehensive resolution agreement described above addresses these and other violations OCR found.

> ## ALSO...
>
> **See Park City School District**, p. 26 (addressing sex discrimination and harassment based on race and national origin)

**Taft College (CA):** In October 2023, OCR determined this college violated Title IX when it failed to respond to allegations that a transgender student was harassed on the basis of sex for more than a year. OCR's investigation found that the college repeatedly received notice that the student alleged experiencing almost daily harassment. OCR investigated evidence that a professor told the student, in front of her whole class, that based on her



"physical appearance" the professor did not consider the student "feminine enough" to be addressed as a woman and that an administrator of the student college program knowingly excluded the student when addressing other female students as "ladies" in class. This student reported telling a professor that she felt depressed and suicidal as a result of the sex-based, sex-stereotyping harassment she experienced, and the college confirmed to OCR that a professor, a dean, and another administrator were aware of her circumstances, but the college neither investigated the harassment nor took responsive steps, in violation of Title IX. OCR also identified a compliance concern that the college may not have provided adequate notice to students, staff, and faculty about how to make a complaint of sex-based harassment under Title IX and may have failed to adequately notify the college community of its Title IX coordinator and how to contact this person.

To remedy the violations and compliance concerns identified by the investigation, the college agreed to reimburse the student for counseling to address the effects of the sex-based harassment; review and revise, as necessary, its policies and procedures to clarify that harassment based on sex includes harassment based on sex stereotyping; train its employees who respond to sex-based harassment about the college's Title IX obligations; and provide OCR with documentation demonstrating that the college's responses to complaints of sex-based harassment comply with Title IX.

## Equal Access to Athletic Opportunities and Benefits

**Minneapolis Public Schools (MN):** In August 2024, OCR resolved a complaint alleging the district discriminated on the basis of sex by failing to effectively accommodate the athletic interests and abilities of female students and in the provision of practice facilities, competitive facilities, and locker rooms to female athletes. OCR's investigation revealed that some girls' teams had inferior practice and competition facilities compared to the boys' teams; the various softball facilities used by the district's softball teams were not regulation for fast pitch softball and lack adequate fencing and amenities, while the district boy's baseball teams generally practiced and competed at higher quality baseball fields with better amenities that were regulation for competition.

During its investigation, OCR also became concerned that, in comparison to male athletes, a higher proportion of female athletes had responsibilities to prepare for their sports practices and competitive events. The girls' volleyball teams and several girls' badminton teams were responsible for setting up nets for practices and competitions. Lastly, the investigation revealed disparities between girls' enrollment rate and their interscholastic athletics participation rate at several district high schools and in the district overall. The district acknowledged, moreover, that it had not conducted a student athletic interest survey in ten years.

To resolve these compliance concerns, the district agreed to conduct a full assessment of how the district can equally and effectively accommodate athletic interest and abilities to provide equal opportunities for girls in its high school athletics program; develop a plan, with timeframes, to increase participation opportunities for girls as necessary to demonstrate compliance with Title IX; create a stakeholder committee to work collaboratively with the district to create district-wide policies and procedures; assess and develop a plan with respect to the provision of locker rooms, practice and competitive facilities at each high school in the district; equally and effectively accommodate the athletic interest and ability of all

students by providing equal opportunities in the provision of locker rooms, practice, and competitive facilities; and train its Title IX coordinators, athletic directors, principals, and coaches on their responsibilities under Title IX and its application to athletics, including how funding from any source can affect the balance of equivalent benefits for male and female athletes.



> It's stunning that one complaint about a lack of support for one high school girls athletic program uncovered such an extensive pattern of disparities and failures by Minneapolis Public Schools. We are grateful that this concern was brought to our attention, and we applaud the Office [for] Civil Rights for their diligence in investigating this complaint."
>
> **_Sara Jane Baldwin_**, _Senior Staff Attorney, Gender Justice_

**Brandeis University (MA):** In November 2023, OCR resolved a complaint that that the university discriminated on the basis of sex because the men's baseball team had access to practice and competitive facilities superior to those provided to the women's softball team. In this investigation, OCR compared the practice and competitive facilities of the baseball and softball teams because all of the university's other men's and women's teams shared the same facilities for practice and competition. OCR identified concerns about the quality, size, and features (including lights, press box, backstop, foul poles, and dugouts) of the university's softball facilities as compared to those available to the baseball team. The university committed to conducting an assessment to ensure that athletes are provided with equivalent benefits, opportunities, and treatment on the basis of sex with respect to the provision of locker rooms and practice and competitive facilities; and creating and implementing a corrective action plan to identify and address the various inequities that OCR's investigation identified.

**Morgan Hill Unified School District (CA):** In October 2023, OCR resolved a complaint alleging that a district school's athletic program discriminated on the basis of sex in connection with the provision of equipment and supplies; scheduling of games and practice times; travel and per diem; coaching; locker room, practice, and competitive facilities; medical and training facilities and services; and publicity. OCR's investigation revealed that the district's boys' baseball program had two fields, while the girls' softball program had only one field—a disparity



that adversely impacted the softball teams' ability to practice. Additionally, the softball field, unlike the baseball field, lacked features such as lighting, a scoreboard, and a PA system. OCR also had concerns that the girls' programs, as compared to the boys' programs, may not have had similar quality or quantity of equipment and supplies, equal access to the school's weight room and athletic trainer, equal access to the school's athletic locker room, and equitable publicity from the school's social media accounts. Evidence indicated that some boys' programs enjoyed charter bus transportation to games whereas girls' programs relied on their own transportation. Finally, female athletes at the school may have had less opportunity to receive coaching than male athletes at the school.

To address these compliance concerns, the district agreed to create committees to ensure that differences in fundraising between teams will not create disparities in athletic equipment, uniforms, or supplies based on sex; renovate the school's existing varsity softball field to include the same features as its varsity baseball field; convert the school's existing practice baseball field to a multipurpose field that can be used for softball and baseball and ensuring that the softball team has equal access to the renovated multipurpose field; provide equal access to and use of locker room facilities for female athletes, including equitable access to the athletic locker room; give female athletes equivalent opportunities to receive coaching; equalize the school's girls' and boys' athletics teams' access and opportunity to use vans, buses, or charter buses for transportation to away games and matches; train its employees who are involved in athletic programs about the district's obligations under Title IX and its application to athletics; and ensure the school's girls' and boys' athletics teams have equitable access to the school's athletic trainer, weight room, and training facilities.

### Preventing Discrimination Based on Pregnancy or Parental Status

**Hinds Community College (MI):** In April 2024, OCR found that the college violated Title IX after neither providing a pregnant student with accommodations nor responding appropriately to the student's reports of pregnancy-based harassment and discrimination. The student informed college staff of her pregnancy at the beginning of the semester, and throughout the semester she repeatedly asked for academic accommodations that would allow her to occasionally leave instruction a few minutes early for pregnancy-related medical appointments, remotely attend a lecture while hospitalized for pregnancy-related conditions and take breaks to express milk after delivering her child. The college declined to provide these academic adjustments. Instead, it encouraged the student to withdraw and finish the program later. As a result of the college's failure to accommodate her requests, the student was relegated, at times, to pumping in a restroom.

To remedy these violations, the college agreed to revise its nondiscrimination notice, Title IX policies, and grievance procedures to comply with Title IX; publish information on its website for pregnant students about their Title IX

rights and how to seek academic adjustments, special services, or excused absences; train its Title IX coordinator and other school employees involved in addressing Title IX requests from pregnant students regarding Title IX and Section 504 protections for pregnant students and the academic adjustments and special services available to pregnant students; track and document requests by pregnant students to ensure pregnancy-related adjustments are being provided; and take other measures to directly remedy the discrimination against the student.



**The Barber School (UT):** In March 2024, OCR resolved an investigation of allegations the school discriminated against a student on the basis of sex and disability by terminating her enrollment because of absences due to a high-risk pregnancy. The investigation raised concerns that the school did not excuse pregnancy-related absences or waive fees associated with them, offer the student an opportunity to request a leave of absence, or engage in an interactive process to determine whether her high-risk pregnancy caused a temporary disability requiring academic accommodations. The resolution agreement requires the School to re-admit the student; waive any fees for absences related to her pregnancy or other medical conditions; engage in the required interactive process with the student regarding any pregnancy related leave or modification needs; publish the name and contact information for the school's Title IX and Section 504 Coordinators; revise the school's non-discrimination

statements, grievance procedures, attendance policies, and leave of absence policy; develop procedures for students with disabilities to request academic adjustments; notify staff and students about the School's new policies and procedures; and train staff on those new policies and procedures.

## Sex Discrimination and Dress Codes

**John Doe School District[20]:** In February 2024, OCR resolved an investigation of whether the district discriminated against a student on the basis of sex when a teacher required the student to change clothing and commented on the student's anatomy, in violation of Title IX.

During investigation, OCR identified concerns regarding the district's Title IX investigation of the incident because the information the district produced during investigation reflects that it failed to promptly inform the complainant or the student about available support measures or the Title IX process in the district. OCR also became concerned that the teacher may have treated the student differently than similarly situated students based on sex with respect to enforcement of the district's dress code and may have applied the dress code against the student on the basis of sex and sex stereotypes. Nothing in the district's or school's dress code policy explicitly prohibited the student's outfit; the complainant stated that the student wore the same outfit once a week; and the teacher stated that she acted as she did because she was "especially" concerned about how male students would react to the student's attire and whether they might tease the student. OCR did not obtain evidence that a male student at the school had ever been required to change clothes based on a teacher's concern with that student's undergarments, whereas the teacher required this student to change on that basis. Under the resolution agreement, the district agreed to revise its dress code policies to include a non-discrimination statement as well as information on how to file a Title IX complaint, conduct staff training on Title IX, and track nondiscriminatory enforcement of the dress code at the school where the incident occurred.

---

[20] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

# SECTION 504 AND ADA TITLE II: DISCRIMINATION BASED ON DISABILITY

OCR protects the rights of persons with disabilities under two federal laws prohibiting discrimination in education. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits discrimination based on disability in any program or activity operated by recipients of federal funds. It states: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . . ." Title II of the Americans with Disabilities Act of 1990 (Title II) prohibits discrimination based on disability by public entities, regardless of whether they receive federal financial assistance. It states: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." With regard to educational institutions, OCR shares enforcement of compliance with Title II with the Department of Justice. 28 C.F.R. § 35.190(b)(2).

## POLICY GUIDANCE AND RESOURCES

During FY 2024, OCR issued eleven fact sheets on specific medical conditions (anxiety disorders, asthma, bipolar disorder, cancer, depression, diabetes, eating disorders, epilepsy, food allergies, GER/GERD, and sickle cell disease) addressing how and why students, at all levels of education, who are experiencing the medical conditions may be protected by Section 504. The fact sheets explain when a student with the condition may qualify as a student with a disability under Section 504 and how the student's condition may affect them at school. The fact sheets also provide examples of the steps schools may be required to take to address the needs of a student whose condition substantially limits one or more major life activities, and thus has a disability, and discuss remedies that may be necessary if a school does not appropriately address the needs of a student whose disability results from the condition.

## ENFORCEMENT

In FY 2024, OCR resolved 7,164 Section 504/Title II-related complaints, addressing the broad range of issues raised with OCR in complaints under these laws (see Figure XX). The following cases illustrate OCR's enforcement work related to discrimination on the basis of disability.

### Combating Bullying and Harassment on the Basis of Disability

**John Doe School District[21]:** In August 2024, OCR concluded an investigation that confirmed a teacher had required a student with a disability to sit in front of the class with tape over his mouth and under his eye as a consequence for the student's disability-based impulsive behavior in the classroom. The teacher drew a tear drop on tape under the student's eye and held a lit match near his face in front of the class, waiting for the student to flinch. OCR found the school failed to respond as required under Section 504 and Title II to the teacher's harassment of the student on the basis of disability. To remedy its violation of Section 504 and Title II, the district agreed to meet with the child and his parents to discuss a plan for remedial measures as needed, train staff about harassment based on disability, and revise policies to better address disability discrimination.

### ALSO...

**See Poudre School District**, p. 23 (harassment based on race and disability)

---

[21] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

Report to THE PRESIDENT and SECRETARY OF EDUCATION



**Figure 10:** Section 504/Title II Complaint Allegations Received in FY 2024

| | |
|---|---|
| Academic Adjustments | 722 |
| Accessibility (programs & facilities) | 409 |
| Accessibility (technology) | 287 |
| Admissions | 43 |
| Designation of Responsible Employee | 5 |
| Different Treatment/Exclusion/Denial of Benefits | 2,338 |
| Disability Harassment | 695 |
| Direct Threat (Title II) | 12 |
| Discipline | 441 |
| Communications (Title II) | 311 |
| Employment | 296 |
| Free Appropriate Public Education | 3,089 |
| Grievance Procedures | 42 |
| Housing | 37 |
| Modifications of Policies and Procedures (Title II) | 61 |
| Non-Academic Services | 115 |
| Resource Equity & Comparability | 20 |
| Restraint and Seclusion | 186 |
| Retaliation | 1,880 |
| Service Animals | 99 |
| Testing | 33 |
| Treatment of Postsecondary Students | 127 |
| Other | 1,462 |

Total Number of Complaints Raising Disability Issues, **FY 2023 = 8,457**

Note: A single complaint can raise multiple issues; therefore, the total number of issues raised will exceed the number of complaints received.

**John Doe University**[22]: In December 2023, OCR resolved a complaint alleging that this college discriminated against a student-athlete with multiple disabilities, when, over the course of four months, the student's coach allegedly harassed the student based on his disability and age, and retaliated against him after the student reported the coach's conduct.

OCR's investigation identified concerns arising from the coach's public discussion of the student's grades, the coach's request that the student speak to a class about his disability, and comments made by the coach regarding the student's disabilities and age during an exit interview at which the coach expressed an intent to withhold support for the student's scholarship request. OCR also identified concerns with the college's investigation of a complaint submitted by the student's parent. Notably, the college did not involve the Section 504 Coordinator in its investigation but instead involved the athletic director, who was not trained to investigate allegations of harassment, was not provided a copy of the complaint, and concluded his investigation without investigating

---

[22] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

all allegations. OCR's investigation surfaced evidence suggesting the Coach's conduct may have created a hostile learning environment for the student.

To address these compliance concerns, the college agreed to revise grievance procedures for complaints alleging discrimination based on age and disability, train staff responsible for investigating discrimination complaints, and improve documentation of these investigations by developing a record-keeping policy.

### Ensuring Equal Access to Comparable Educational Opportunities

**Colonial School District (DE):** In July 2024, OCR resolved a compliance review examining whether students with disabilities were afforded the same opportunity as students without disabilities to access Advanced Placement courses offered in the district. OCR's investigation revealed data anomalies in the district CRDC reporting compared to the data it reported to OCR during the investigation, raising concerns about the district's recordkeeping practices. The investigation also showed that although the district had known for years that strikingly few students with disabilities enrolled in Advanced Placement courses in the district — as few as two or nine students with disabilities during a given school year, compared to the overall Advanced Placement enrollment of 370 or 334 students — the district did not take steps specifically designed to ensure equal access for students with disabilities to the district Advanced Placement offerings. To address these concerns, the district agreed to improve communication regarding the availability of AP courses; evaluate its academic counseling services to ensure students with disabilities receive counseling that informs them of available AP course options; and correct its recordkeeping and CRDC reporting.

**John Doe University[23]:** In March 2024, OCR resolved a complaint alleging that the university denied a student admission into the university's Professional Counseling Program because of his disability. OCR's investigation revealed that although the student was a qualified individual with a disability who met the academic requirements for admission into the program, he was denied enrollment because he did not meet the Program's "nonacademic requirements," which was criteria that was not communicated by the university as a requirement for admission. The evidence reviewed demonstrated that the university considered the nature of the student's disability and cited assumptions and stereotypes about people with disabilities as a reason to deny his admission into the program. To remedy the violations OCR identified, the university agreed to establish Section 504 grievance procedures that provide for prompt and equitable resolution of complaints alleging discrimination on the basis of disability. The university also agreed to provide training on the grievance procedures to staff and offer the student an opportunity to re-apply to the program.



**Washington County School District (FL):** In January 2024, OCR resolved an investigation of the district examining whether three students received a FAPE when their Exceptional Student Education teacher missed a substantial portion of the school year, and their district did not appear to have provided them replacement services during those absences or compensatory services. OCR's investigation revealed that the teacher's absences, totaling 248.5 hours, may have resulted in

---

[23] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

a failure to provide IEP service for these students and a denial of a FAPE. In response to OCR's investigation concerns, the district agreed to take corrective steps that included convening IEP meetings for the three students to determine the need for compensatory or remedial services, reviewing services for other affected students, and committing to train pertinent staff on Section 504, IEPs, and the provisions in Title II of the ADA regarding the district's obligation to ensure a free appropriate public education to students.

**Conejo Valley Unified School District (CA):** In October 2023, OCR resolved a complaint alleging the district discriminated against a student on the basis of disability when it denied his interdistrict transfer request. During the investigation, the district sought to justify its denial of the student's interdistrict transfer request on the grounds that it lacked the staff needed to provide the speech and languages services required by the student's IEP in the home district, because the district could not provide such services to 99 of its own students when the student applied for a transfer. OCR's investigation raised concerns that the district did not take any steps to obtain any information about the student or his transfer request before denying it other than the information stated in his IEP about his need for speech services. The evidence also showed that the district did not consider any alternative or comparable means of providing the needed speech services to the student.

To resolve OCR's concerns, the district committed to revise its interdistrict transfer policy and related forms and communications with parents to include a statement of nondiscrimination based on disability. The district also agreed to provide training and guidance to district staff involved in the interdistrict transfer program, and to conduct a review to determine what compensatory education services are needed for the 99 students who did not receive their required speech/language services due to the district's shortage of speech/language pathologists.

### Ensuring Appropriate Educational Supports for Students with Disabilities

**Davidson County Schools (NC):** OCR resolved a complaint alleging the district failed to provide speech-language services required by students' IEPs. OCR's investigation identified a concern that the district did not provide speech-language services to students at a particular school for several months because there was no speech-language pathologist on staff and that, as a result, the students may have been denied FAPE. In August 2024, to remedy OCR's concerns, the district committed to determining whether each affected student required compensatory and/or remedial services. The district also agreed to provide relevant training to school administrators and staff and revise as needed its policies and/or procedures for service provider absences.

> ### ALSO…
>
> See **Española Public Schools**, p. 40 (provision of FAPE and sexual harassment)

### Ensuring Accessibility of Programs, Services, and Facilities

**Saddle Mountain Unified School District #90 (AZ):** In August 2024, OCR resolved an investigation of allegations that the district discriminated against middle school students with autism, denying them equal access to non-academic services and activities by prohibiting them from



eating lunch in the cafeteria and limiting their access to physical education, technology, assemblies, and field trips. OCR's investigation reflected that decisions regarding the least restrictive environment were not being made on an individualized basis, and that at least one of the impacted student's IEPs was not effectively implemented. Under the resolution agreement, the district agreed to hold IEP team meetings for all impacted students to determine the need for and delivery of compensatory services, to consider and revise class schedules for impacted students, and to disseminate a training memorandum for all district administrators.

**San Francisco Unified School District (CA):** In June 2024, OCR resolved two complaints finding the district discriminated against deaf and hard-of-hearing students by failing to provide adequate American Sign Language (ASL) interpretation services that were necessary for effective communication and, in so doing, denied multiple deaf and hard of hearing students access to FAPE. OCR's investigation revealed the district failed to implement the interpretation services provisions and general education minute requirements of the students' IEPs and failed to provide adequate ASL services to ensure effective communication. For the entire 2022-2023 school year and part of the 2023-2024 school year, the district denied deaf and hard of hearing students whom it placed in education settings with non-disabled peers' access to classes such as general education math, physical education, art, and library because the district failed to provide qualified ASL interpreters, as required by each student's IEP. OCR identified a related concern that the lack of a district-wide policy concerning effective communication and the absence of a consistent practice to ensure adequate coverage for, and tracking of, ASL interpretation services may have contributed to an ongoing failure to provide students with FAPE as required by their individual IEPs.

To resolve the violation and compliance concern OCR identified, the district agreed to provide qualified ASL interpreters to students with disabilities who require

them in order to receive effective communication in connection with the district's programs, services, and activities. The district also agreed to identify all students who did not receive ASL interpretation services in general education settings during the 2022-2023 and 2023-2024 school years as required by their IEP plans and determine whether those students were entitled to compensatory education due to the district's denial of FAPE to these students. The district also committed to adopt a procedure to request, confirm, and document the provision of ASL interpretation services.



**John Doe School District[24]:** In May 2024, OCR found that the district had violated Section 504 including by requiring a student to change from in-person to virtual learning because of his food allergies, failing to provide needed support for the student to participate in remote learning or ensure that he was actually able to participate or was receiving all of his courses or services, and prohibiting him from coming on school property and thereby excluding him from extracurriculars.

In response to response to the Section 504 violation findings, the district agreed to convene the student's Section 504 team to determine his appropriate placement and services for FAPE and whether he is entitled

---

[24] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

Report to THE PRESIDENT and SECRETARY OF EDUCATION

to compensatory education; provide a comparable experience for the student to replace the extracurricular activities he was not permitted to attend; and provide training on Section 504.

**Coatesville Area School District (PA):** In April 2024, OCR resolved a complaint alleging the district discriminated against a visually impaired parent when the district refused to consider the parents' request to modify the school bus stop in order to allow the parent to safely pick up his children. OCR's investigation identified a concern in that the district did not consider this parent's request as a reasonable accommodation. To resolve OCR's concern, the district agreed to properly consider the parent's request for a reasonable accommodation, create a plan for responding to future requests from parents/guardians for accommodations related to transportation, and publish information on the district's website about how to make disability-based accommodation requests related to transportation services.



**John Doe University[25]:** In April 2024, OCR resolved a complaint alleging the university failed to provide a student with a visual impairment with her approved accommodations of braille transcripts, braille Communication Access Real-Time Translation (CART) services, and braille copies of PDFs. The evidence showed that the student notified the university of her request for disability-related accommodations and auxiliary aids at the start of the school year and of the difficulties she was encountering in receiving her accommodations. OCR's investigation established that the university's Director of Purchasing was non-responsive for a period of two weeks despite multiple emails from university staff requesting necessary approvals to provide time-sensitive transcription services for students with disabilities. The university's delays resulted in the student falling behind in coursework and withdrawing from her classes.

To remedy OCR's concerns, the university agreed to issue a memo to all faculty and administrators reminding them of their obligations under Section 504 and Title II. The university further committed to offer the student reimbursement for related out of pocket costs for her enrollment during the fall 2023 semester, and to identify to OCR any other students who experienced a delay in receiving braille transcription services during the semester. Lastly, the university agreed to develop policies and procedures for coordinating with the Purchasing Department and vendors, to ensure the timely delivery of accessible materials to students with disabilities.

### ALSO...

**See The Barber School**, p. 51 (access to academic adjustments and discrimination based on pregnancy and disability)

**Northern Michigan University (MI):** In February 2024, OCR resolved a complaint that alleged that an instructor at one of the university's vocational programs would not teach or provide academic adjustments to a student with a disability. OCR's investigation identified a concern that the instructor did not appear to be trained to provide academic adjustments, modifications, or other services to students with disabilities. Further, OCR also identified a concern that after the university's disability coordinator reached out to the vocational program

---

[25] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

about the student's difficulty in receiving approved accommodations, the vocational program personnel did not respond. To remedy OCR's concerns, the university agreed to provide the student with an opportunity to re-enroll with appropriate academic adjustments in place, as well as to conduct a two-year self-evaluation of its program to ensure that students with disabilities enrolled in the program received academic adjustments, modifications, related aids and services, or auxiliary aids to which they were entitled.

**Herkimer County Board of Cooperative Educational Services (NY):** In December 2023, OCR resolved a complaint against the board that alleged a student was discriminated against on the basis of disability when the board prohibited the student from attending a field trip because a nurse was not available to attend. OCR's investigation raised a concern that the board may have denied students with disabilities an equal opportunity to participate in or benefit from field trips that also include students without disabilities, contrary to the requirements of Section 504 and Title II.

To remedy OCR's concern, the board agreed to revise its written policies and procedures for field trips and provide OCR with a list of each field trip scheduled for school year 2023-2024. For any student identified as not being able to attend a particular trip, the board agreed to submit documentation to OCR explaining its decision. The board further agreed to provide a training memorandum by email to staff to ensure that students with disabilities are afforded opportunities to participate in field trips, including those with their nondisabled peers.

**Mercy College (NY):** In October 2023, OCR resolved allegations that the college discriminated on the basis of disability when it denied a student's request to have a private bathroom in her dorm room as an accommodation for her disability. The college offered the student a semi-private bathroom rather than a private bathroom and charged the student the higher single-room rate, even though she was approved to live in a single room as a disability-related accommodation and would otherwise have been assigned to a double room and charged the lower double-room rate.

To resolve OCR's concern, the college agreed to provide written notice to the student and other affected students of the availability of a private bathroom as a reasonable housing accommodation, revise its policies governing disability-related housing accommodations, and provide training to all individuals involved in evaluating requests for disability-related housing accommodations for students. The college agreed to investigate housing rates charged for similarly situated students to determine if students were impermissibly charged an additional fee and to develop a plan for reimbursement. Finally, the college committed to review and respond appropriately to any requests from students whose requests for housing related accommodations were denied or modified to determine whether such denial or modification was consistent with the requirements of Section 504.



## Ensuring the Timely Evaluation of Students

**Red Mesa Unified School District (AZ):** In August 2024, OCR resolved an investigation alleging the district discriminated on the basis of disability by failing to reevaluate a student, despite evidence that the student's disability-needs were not being met by his current placement. While the student's behaviors intensified and triggered the need for reevaluation, the district instead attempted to place the student in a residential facility without first conducting an evaluation of the student's needs. OCR's investigation identified concerns with the district's failure under Section 504 and Title II to reevaluate the student, the excessive amount of time spent away from other students, and the district's conduct

in connection with the inspection of student records by the parent's designated representative. To resolve OCR's concerns, the district agreed to provide the requested record and provide trainings to staff that cover the topics of reevaluation, implementation of individualized plans, placement of students with disabilities, retaliation, and the importance of legal advocacy organizations. The district also agreed to convene an IEP meeting to determine whether a reevaluation was warranted, review the student's least restrictive environment, and discuss the need for compensatory or remedial services.



**John Doe School District[26]:** In April 2024, OCR resolved a complaint alleging the district failed to provide FAPE to the student and removed the student from Magnet Program classes due to failing grades as a result of her suspected disabilities. OCR's investigation raised concern that the district imposed an unnecessary evaluation prerequisite by wrongly conveying to the student's parent that a diagnosis by the student's physician was required before the district could begin assessing the student for a Section 504 Plan. OCR became further concerned that that the district's delays in evaluating the student may have impacted the student's ability to make academic progress, resulting in the student's declining grades and ultimate involuntary departure from her Magnet Program classes.

In response to OCR's concerns, the district committed to convening a multidisciplinary team to determine whether the failure to evaluate the student on a timely basis had an adverse effect on the student's grades and her ability to remain in the Magnet Program and whether the student suffered an educational loss and, if so, provide the student with compensatory services. The district also agreed to review all students with disabilities who were removed from the Magnet Program to determine whether any of the students were removed due to issues relating to their disability, and if so, to offer appropriate remedies. The district further committed to training district staff on their obligations under Section 504 and Title II and reviewing all parent-initiated requests for special education evaluations to identify any delays in processing these requests.

**Alexander Central School District (NY):** In October 2023, OCR resolved a complaint alleging the district had conditioned evaluation for Section 504 supports or IEP services on prior medication of the student. OCR's investigation raised a concern that through written and oral communication, the student's teacher may have misinformed the parent that medication of the student was required before the district could begin evaluating the student for special education and/or related aids and services.

To resolve the complaint, the district agreed to convene a meeting and examine whether the student required remedial and compensatory services. The district agreed to identify similarly situated students who had been told of the existence of a medication prerequisite and review their need for remedial and compensatory services. Finally, the district agreed to adopt robust Section 504 and Title II requirements for all district administrators and staff members responsible for identifying, evaluating, and making determinations regarding students' need for special education.

### ALSO...

**See San Diego Unified School District**, p. 41 (addressing timely evaluation of students with disabilities and sexual harassment)

---

[26] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

## Addressing Civil Rights Related to Restraint and Seclusion

**Denton Independent School District (TX):** OCR's investigation of this district's restraint and seclusion practices raised concerns that the district consistently opted to restrain students rather than initiating evaluations to determine whether students may need special education or related services or whether there were appropriate supports that would obviate the need to restrain them. OCR's investigation further revealed concerns that the district permitted School Resource Officers (SROs) to restrain students with disabilities without having been properly trained on student restraint in educational settings or on the district's obligations regarding the provision of FAPE to students with disabilities. Furthermore, the district's documentation of restraint incidents contained significant gaps, hindering the district's capacity to evaluate its satisfaction of its Section 504 and Title II obligations to its students.

To resolve these concerns, the district agreed in April 2024 to review its policies and procedures governing restraint, develop a process to ensure accurate reporting of all student restraints, establish a monitoring program to monitor the use of restraint on students, and provide training to staff and contracted SROs on the district's nondiscrimination obligations pursuant to Section 504 and Title II.



We commend OCR for the diligence and commitment to investigating the systemic use of harmful restraint including by untrained School Resource Officers, which has resulted in trauma and harm to students with disabilities in Denton ISD schools.... Denton ISD must end the use of the cruel practices that endanger students and have resulted in the absolute failure to their accessing a free, appropriate public education. All students deserve better!"

_**Denise Marshall**, CEO, Council of Parent Attorneys and Advocates (COPAA)_

**Folsom Cordova Unified School District (CA):** In October 2023, OCR's compliance review of the district revealed that it held IEP meetings infrequently for students with disabilities after they were restrained or secluded. In one incident, a student was restrained upwards of 20 times in a school year, yet the district failed to convene a meeting to review whether it would be appropriate to conduct an evaluation to determine the need for additional supports or services. OCR also identified a compliance concern that the district may have failed to implement IEPs and Behavior Intervention Plans (BIPs) for some students, thereby denying those students their right to FAPE.

The district agreed to resolve these compliance concerns by making significant changes to its policies, procedures, and training requirements with respect to the use of restraint and seclusion. The district also agreed to remedy prior instances where restraint and seclusion of its students denied or may have denied them FAPE, and to develop a monitoring program to ensure that any future restraint or seclusion complies with Section 504 and Title II.

## Combating Discriminatory Discipline

**Four Rivers Special Education District (IL):** In September 2024, OCR resolved a compliance review of this single-school district, which is designed to serve students with emotional disabilities and receives students from 19 area school districts when the sending districts could not provide the necessary level of supports for the students. OCR's investigation revealed that the district routinely referred students with disabilities to the police for noncriminal behaviors, referring students 96 times in one school year, which was more than the total number of students enrolled that year. These law enforcement referrals were often for behavior that could have been based on disability such as "disruption" and use of "inappropriate language" notwithstanding the district's advertised specialization in meeting the needs of students with disabilities.  The district did not evaluate whether the students needed compensatory services or different supports when they had been referred to the police and it likewise did not evaluate those same issues when it sent students to its crisis room, even when students were in

the crisis room not receiving instruction for as long as four hours and 20 minutes in a single day.

To remedy OCR's concerns, the district agreed to take several actions, including convening an IEP meeting for each student who was subjected to law enforcement contact or was sent to the crisis room multiple times to examine the need for compensatory education and/or remedial services; developing procedures governing contacts with law enforcement and removals to the crisis room to ensure that all students with disabilities receive a FAPE; and implementing a record-keeping system to ensure accurate, complete and timely documentation of each law enforcement contact and each use of the crisis/regulation room.



**Ft. Larned U.S.D. 495 (KS):** OCR investigated whether the district's long-term suspension of a student with a disability for more than ten consecutive school days violated Section 504, because the district failed to conduct the required review, known as a manifestation determination, to determine whether a student's misconduct was caused by the student's disability or the district's failure to implement the student's 504 plan. OCR's investigation raised concern that the district did not make a manifestation determination as required by Section 504 before suspending the student for more than 10 consecutive days. In April 2024, to resolve OCR's concerns, the district agreed to convene the student's 504 team to determine whether the conduct for which he

was suspended was a manifestation of his disability, and if so, to re-evaluate the student for appropriate placement, compensatory education, and remove the long-term suspension from the student's educational record. The district also committed to adopting procedures governing its manifestation determinations, training faculty and staff on the requirements of Section 504 and reviewing district records for the 2022-2024 school years to identify other students who may have also required manifestation determinations prior to being disciplined.

## Shortened School Days for Students with Disabilities

**Chillicothe R-II School District (MO):** OCR's investigation confirmed that the district subjected a third-grade student with disabilities to a shortened school day (leaving school at 12:30) pursuant to a provision in his IEP that had been present for three years, the basis for which no school staff could identify. The IEP provided that the student would "earn" extra time in his school day if he went 10 days without physical altercations with peers and staff. OCR identified FAPE concerns relating to these placement decisions. The district's lack of documentation of its evaluation and placement decisions raised concern as to whether these placements decisions were made in accordance with the procedural requirements of Section 504.

To remedy the compliance concerns, the district agreed in September 2024 to convene an IEP meeting to reevaluate the student's reduced schedule and the student's need for compensatory services. The district also agreed to review district policies and procedures for evaluating, documenting, and providing special education and related aids and services to students with disabilities and to train district administrators and elementary school staff on the district's obligations under Section 504 and Title II. Additionally, the district agreed to provide OCR with documentation of placement decisions for other students with disabilities subjected to a shortened day to ensure compliance with Section 504 requirements.

Report to THE PRESIDENT and SECRETARY OF EDUCATION



**Westminster Public School District (CO):** In September 2024, OCR resolved allegations that the district shortened the school day for a first-grade student with disabilities on the first day of the school year because the student became dysregulated at lunch. OCR's investigation revealed that the district made this placement change without convening a Section 504 team or conducting an evaluation of the student, suggesting that it had preemptively placed the student outside the Section 504 evaluation and placement process. Further, when the district convened a section 504 team – three weeks later– the team did not document the information on which it relied to evaluate the student or determine his placement. In fact, the Section 504 plan itself identified factors unrelated to the student's disability as the basis for his placement, such as his inexperience in a school setting and his parent's "work schedule." The student's Section 504 plan also required the parent, not the district, to provide services to the student, raising additional FAPE concerns that the district did not fulfill its obligation to provide services to the student.

To resolve these compliance concerns, the district agreed to convene the student's Section 504 team, and the team of any student identified to have been improperly placed on a modified school day, to determine whether any compensatory educational services were warranted. The district also committed to review its internal protocols for evaluation and placement of students with disabilities and to provide training to school administrators and staff regarding the district's obligations under Section 504.

**Genesee Intermediate School District (MI):** In March 2024, OCR resolved concerns that a school bus transporting students with disabilities to a district program was late every day, resulting in students on the bus missing 20 minutes of classroom time. OCR had cause for concern that the district denied FAPE to the students when it did not address their late arrivals, but instead shortened these students' school day.

To remedy OCR's concerns, the district restored the students' school day to the full number of hours it was prior to the bus delays; issued a memorandum to staff and to the parents of the students in the program to inform them that school days for program students may not be shortened due to transportation issues or for the purposes of administrative convenience; ensured that staff maintain logs of arrival and departure times for program students for the remainder of the school year; and convened the Section 504 or IEP teams of each of the program students to determine the amount of instructional time each student lost as a result of their tardy transportation and investigate each student's need for compensatory education or remedial services.

### Ensuring the Accessibility of the Web and of Assistive Technology for Students with Disabilities

**North Kansas City School District (MO) and Grand Forks Public Schools (ND):** In September 2024, OCR resolved compliance reviews of two school districts' provision of equal opportunity to access online programs for individuals with disabilities. OCR performed manual audits of each district's public-facing website; third party websites used to communicate online services, programs, and activities; and the district's password-protected parent portals and enrollment platforms. OCR's investigation revealed barriers to access for people with disabilities including, but not limited to, that individuals using computer keyboards for navigation due to their disabilities did not have access to all website and platform contents and functions; form fields and links were not meaningfully labeled and impeded access to people with vision disabilities who used screen readers; documents provided in portable document format (pdf) were

inaccessible to people with vision disabilities who use screen readers; and insufficient contrast between the foreground and background colors hindered people with low vision from accessing important content.

Based on the results of OCR's testing, each district committed to identify and remove barriers to access for people with disabilities on their websites; third-party websites used to host district services, programs, and activities; and on their parent portals and enrollment platforms. The districts each further agreed to report to OCR the results of their testing and remediation efforts to ensure compliance with Section 504 and Title II.



**University of California, Berkeley (CA):** In September 2024, OCR resolved an investigation of two of the university's web applications required for employment: CalTime, an online time and attendance platform, and SumTotal, a professional development training course platform. OCR examined whether the university failed to provide reasonable accommodations to overcome alleged technological barriers to access for people with disabilities on both platforms. OCR's investigation gave rise to concerns that employees who are blind and use assistive technology may have been prevented access to all the features and functions of these employee-facing applications that were available to nondisabled employees and, when combined with allegedly ineffective proffered reasonable accommodations, may have suffered employment consequences as a result.

To remedy OCR's concerns, the university agreed to audit and remediate the CalTime time and attendance system to remove barriers to access for individuals with disabilities and provide appropriate reasonable accommodations. The university agreed, along with the Regents of the University of California who also entered into the Resolution Agreement, to remediate barriers to access on the SumTotal training platform, a platform which is used across the University of California system. The university committed to provide effective reasonable accommodations to employees impacted by the barriers. The university also agreed to conduct a comprehensive evaluation of all employees with disabilities who requested accommodations on either platform to determine if any employee experienced disability discrimination in the form of adverse employment actions, and to engage in good faith efforts to compensate and otherwise fully remediate any employees with disabilities who experienced adverse employment actions due to the technological barriers coupled with ineffective proffered reasonable accommodations.

### Eliminating Retaliation for Exercising Civil Rights

**John Doe Public Schools[27]:** In June 2024, OCR resolved a complaint against the school system, alleging that it discriminated against students based on disability and retaliated against a former employee who raised concerns about the school system's practices. The complaint alleged the school system contracted with a private management company to provide educational services to students, including students with disabilities and during this period, the school system did not provide students with disabilities the disability-related evaluations, placements, and services required by Section 504 and Title II. The complainant also alleged that she was fired after she repeatedly complained about specific instances of discrimination against students with disabilities. OCR's investigation raised concerns that during the time period in question, the school system did not properly evaluate, reevaluate, or place students with disabilities in programs based on their individual needs; did not provide students with disabilities with all

---

[27] OCR has not disclosed the actual name of the institution in this case because of privacy considerations.

of the required disability-related aids and services; did not properly staff all of its special education classrooms; and did not have a Section 504 or Title II coordinator. OCR's investigation also raised concern that the employee was retaliated against for raising allegations of disability discrimination regarding the students.

The school system agreed to resolve OCR's concerns by committing to designate a Section 504/Title II Coordinator and publicize the individual's identity and contact information; develop a staffing plan; issue a school-wide notice of its Section 504 responsibilities, including responsibilities related to compensatory education; provide compensatory education or other remedial services to students with disabilities and those students who were believed to have had a disability during the period but were not evaluated; adequately maintain records for students with disabilities; provide Section 504 and Title II training to staff, including on retaliation; publicly notify management company employees from the 2022-2023 school year of Section 504 and Title II's prohibition against retaliation; and offer to investigate and issue findings on any complaints of retaliation it received from these employees; remove any negative employment references regarding the employee from its records and notify her that it would offer her any available comparable position that opened within the calendar year.

# ENFORCEMENT ACTIVITY UNDER OTHER STATUTES

OCR also has jurisdiction over two additional civil rights laws: the Age Discrimination Act of 1975 and the Boy Scouts of America Equal Access Act (2001).

### THE AGE DISCRIMINATION ACT OF 1975

The Age Discrimination Act of 1975 prohibits discrimination based on age in programs or activities that receive federal financial assistance. This prohibition extends to all state education agencies, elementary and secondary school systems, colleges and universities, vocational schools, proprietary schools, state vocational rehabilitation agencies, libraries, and museums that receive federal financial assistance from the U.S. Department of Education. Programs or activities that receive such funds must provide aids, benefits, or services in a nondiscriminatory manner. These include, but are not limited to, admissions, recruitment, financial aid, academic programs, student treatment and services, counseling and guidance, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, and housing. Though the Act does not limit protections against discrimination to a certain age group, it does allow for exceptions, such as when colleges offer programs that are geared toward providing special benefits to children and the elderly.

In FY 2024, OCR resolved 658 complaints under the Age Discrimination Act. Common remedies in OCR resolutions under this law include provisions that require the recipient to provide training for staff, update and disseminate nondiscrimination policies, and investigate the specific incidents that resulted in the allegation of age discrimination.

### ALSO...

See John Doe University, p. 53 (combating harassment on the basis of disability status and age)

### THE BOY SCOUTS OF AMERICA EQUAL ACCESS ACT

Under this Act, no public elementary school, public secondary school, or state or local education agency that provides an opportunity for one or more outside youth or community groups to meet at the school, before or after school hours, shall deny equal access or a fair opportunity to meet or otherwise discriminate against any group officially affiliated with the Boy Scouts of America or any other youth group listed in Title 36 of the United States Code as a patriotic society. In FY 2024, OCR resolved 97 complaints under the Boy Scouts of America Equal Access Act.

# LOOKING AHEAD

Throughout FY 2024, OCR's nearly 600 staff secured important results, some of which this report highlights, to fulfill the promise, enshrined in federal law, that "no person" shall experience discrimination on the basis of race, ethnicity, national origin, sex or disability. In the coming fiscal year and for all the years to come, OCR looks forward to fulfilling our important mission to ensure nondiscrimination in education programs and activities of all recipients of federal funds from the Department of Education.



**U.S. Department of Education**
**Office for Civil Rights**