UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUTTES

| | |
|---|---|
| VICTIM RIGHTS LAW CENTER, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 25-11042-MJJ |
| U.S. DEPARTMENT OF EDUCATION, et al., | |
| Defendants. | |

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 2

I.      Statutory Background ............................................................................................. 2

II.     Executive Order Regarding the Department ....................................................... 3

III.    Procedural Background ......................................................................................... 4

LEGAL STANDARDS ................................................................................................... 5

ARGUMENT ................................................................................................................... 5

I.      Plaintiffs Are Not Likely to Prevail on the Merits of their Claims.................... 5

      A.     The Court Lacks Jurisdiction Over Plaintiff's Claims............................. 5

            1.     Plaintiffs Lack Standing................................................................ 5

            2.     Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance............................ 8

      B.     Plaintiffs Are Unlikely to Succeed on Their APA Claims in Counts I and II. ........................................................................................................... 13

            1.     Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action.......................................................................................... 13

            2.     Plaintiffs Do Not Identify any Agency Action That is Final. .................. 15

            3.     The Department's Enforcement of Civil Rights Violations is Committed to Agency Discretion. ........................................... 16

            4.     There Are Adequate Alternative Remedies Available............................. 19

            5.     Because the Department Executive Order Expressly Directs the Department to Continue All Actions Required by Law, the Executive Order Does Not Infringe on the Department's Statutory Obligations. ............................................................................... 19

      C.     Plaintiffs' Are Unlikely to Succeed on Their Ultra Vires Claim in Count III.......................................................................................................... 20

II.     Plaintiffs Have Not Shown that They Will Face Irreparable Harm Absent a Preliminary Injunction. ..................................................................................... 21

III.    The Equities and Public Interest Weigh Against Relief. .................................................... 23

IV.    Any Preliminary Injunction Should Be Limited. ................................................................ 23

V.    Any Preliminary Injunction Should Be Accompanied by a Security and Should Be
        Stayed.................................................................................................................................... 24

CONCLUSION .............................................................................................................................. 26

# TABLE OF AUTHORITIES

## CASES

*Adams v. Richardson*,
    480 F.2d 1159 (D.C. Cir. 1973) ........................................................................................ 17

*Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*,
    840 F. Supp. 2d 327 (D.D.C. 2012) .................................................................................. 22

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ........................................................................................ 14

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*,
    No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ................................ 9

*Am. Fed'n of Gov't Emps., AFL-CIO* v. *Tru*mp,
    929 F.3d 748 (D.C. Cir. 2019) ................................................................................ 8, 9, 10, 12

*Am. Foreign Serv. Ass'n v. Trump*,
    Civ. A. No. 25-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ............................... 12

*Ass'n of Priv. Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) .................................................................................. 21

*Axon Enterprise, Inc. v. FTC*,
    598 U.S. 175 (2023) .......................................................................................................... 10

*Bennett v. Spear*,
    520 U.S. 154 (1997) .......................................................................................................... 15

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) .......................................................................................................... 11

*Boston's Children First v. City of Boston*,
    62 F. Supp. 2d 247 (D. Mass. 1999) ................................................................................ 21

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) .......................................................................................................... 19

*Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) .......................................................................................................... 16

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................................................................ 6

*Cobell v. Kempthorne*,
    455 F.3d 301 (D.C. Cir. 2006) .................................................................................... 13, 14

*Common Cause R.I. v. Gorbea*,
  970 F.3d 11 (1st Cir. 2020) ................................................................................. 21

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
  880 F.2d 603 (1st Cir. 1989) .......................................................................... 14-15

*Dep't of Homeland Sec. v. New York*,
  140 S. Ct. 599 (2020) ......................................................................................... 24

*Elgin v. Dep't of the Treasury*,
  567 U.S. 1 (2012) ................................................................................... 9, 10, 13

*Equal Means Equal v. Ferriero*,
  478 F. Supp. 3d 105 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021) ................... 7

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*,
  423 U.S. 326 (1976) ............................................................................................ 19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ......................................................................................... 5, 7

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005) ...................................................................... 10, 12

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980) ..................................................................................... 21, 22

*Gill v. Whitford*,
  585 U.S. 48 (2018) .............................................................................................. 24

*Graham v. Ashcroft*,
  358 F.3d 931 (D.C. Cir. 2004) ............................................................................. 8

*Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*,
  No. 21-CV-10083-DJC, 2022 WL 138629 (D. Mass. Jan. 14, 2022) ...................... 13

*Grosdidier v. Chairman, Broad. Bd. of Govs.*,
  560 F.3d 495 (D.C. Cir. 2009) ........................................................................... 10

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................................................ 22

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ....................................................................................*passim*

*I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*,
  789 F.2d 21 (D.C. Cir. 1986) .............................................................................. 22

*In re Aiken Cnty.*,
  725 F.3d 255 (D.C. Cir. 2013) ............................................................................ 17

*Lacson v. Dep't of Homeland Sec.*,
  726 F.3d 170 (D.C. Cir. 2013) ............................................................................ 12

*Larson v. Domestic & Foreign Com. Corp.*,
  337 U.S. 682 (1949) ............................................................................................ 20

*League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 22

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ............................................................................................ 18

*Lujan v. Defs. Of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................. 6

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ............................................................................................ 13

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ........................................................................................ 23-24

*Mahoney v. Donovan*,
  721 F.3d 633 (D.C. Cir. 2013) ............................................................................ 10

*Markland v. OPM*,
  140 F.3d 1031 (Fed. Cir. 1998) .......................................................................... 18

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .............................................................................................. 5

*Montplaisir v. Leighton*,
  875 F.2d 1 (1st Cir. 1989) ............................................................................... 9, 10

*Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*,
  No. 22-3569, 2023 WL 2043149 (D.D.C. Feb. 16, 2023) .................................. 22

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................ 23

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ........................................................................................ 13, 14

*Nyunt v. Chairman, Broad. Bd. of Govs.*,
  589 F.3d 445 (D.C. Cir. 2009) ...................................................................... 10, 12

*Patel v. Johnson*,
   2 F. Supp. 3d 108 (D. Mass. 2014) ........................................................................ 14

*Payne v. Biden*,
   62 F.4th 598 (D.C. Cir. 2023), *judgment vacated as moot*, 144 S. Ct. 480 (2023) ................. 12

*Petroleum Expl., Inc. v. Pub. Serv. Comm'n of Ky.*,
   304 U.S. 209 (1938) ........................................................................................... 22

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*,
   87 F.3d 1242 (11th Cir. 1996) ............................................................................. 15

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .............................................................................................. 6

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) .............................................................................................. 9

*United States v. Fausto*,
   484 U.S. 439 (1988) ........................................................................... 9, 10, 11, 13

*United States v. Nixon*,
   418 U.S. 683 (1974) ......................................................................................... 6, 20

*United States v. Texas*,
   599 U.S. 670 (2023) .............................................................................................. 5

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ........................................................................................ 18, 19

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) .............................................................................................. 6

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................. 5, 21

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985) .............................................................................. 21

**STATUTES**

5 U.S.C. § 701 ........................................................................................................ 18

5 U.S.C. § 704 ........................................................................................... 15, 16, 19

5 U.S.C. § 706 ........................................................................................................ 15

5 U.S.C. § 1204 ....................................................................................................... 8

5 U.S.C. § 7105 ..................................................................................................... 8

5 U.S.C. § 7123 ..................................................................................................... 8

5 U.S.C. § 7512 ..................................................................................................... 8

5 U.S.C. § 7701 ..................................................................................................... 8

5 U.S.C. § 7703 ..................................................................................................... 8

7 U.S.C. § 608c ..................................................................................................... 11

20 U.S.C. § 3402 ................................................................................................... 2

20 U.S.C. § 3413 ................................................................................................... 2

28 U.S.C. § 1295 ................................................................................................... 8

28 U.S.C. § 1331 ................................................................................................... 8

42 U.S.C. § 2000d-1 ......................................................................................... 16, 17

Department of Education Organization Act,
   Pub. L. No. 96-88, 93 Stat. 668 (1979) ........................................................ 2

**RULES**

Fed. R. Civ. P. 65 ................................................................................................. 24

**REGULATIONS**

5 C.F.R. pt. 2420 .................................................................................................. 8

5 C.F.R. § 2423.22 ............................................................................................... 9

34 C.F.R. § 100.1 ................................................................................................. 2

34 C.F.R. § 100.7 ................................................................................................. 2

34 C.F.R. § 106.1 ................................................................................................. 2

Improving Education Outcomes by Empowering Parents, States, and Communities,
   Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) ................ 3, 18, 19, 23

**OTHER AUTHORITIES**

Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*,
   The Hill (Mar. 12, 2025),

https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ................................................................................................................. 4

Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112 ................................................... 4

Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/ ............................................................................................................................. 4

Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ................................................................................................................. 3, 4, 20

U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (last updated Jan. 14, 2025), https://ocrcas.ed.gov/open-investigations ............................................................... 17

U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission ... 3

## INTRODUCTION

President Trump campaigned on reducing waste and improving efficiencies across the Government. Upon election, and consistent with that promise, the President tasked Secretary of Education Linda McMahon with reducing bureaucratic bloat within the Department of Education. Under her leadership, the Department is in the process of streamlining operations and delivering services at a lower administrative cost to the taxpayer. Part of this process has been to reduce staffing and reorganize offices at the Department's Office of Civil Rights (OCR), which is responsible for investigating and enforcing civil rights violations on behalf of students.

Plaintiffs—a collection of parents, students, and a membership organization whose stated mission is to help victims of sexual and gender-based violence get legal recourse and to promote a national movement committed to seeking justice—disagree with this reorganization. They allege that "[b]ecause of the RIF, OCR will not be able to [restore educational opportunities] in a timely or meaningful fashion, and students are losing the chance to learn." Pls.' Mem. in Supp. of Pls.' Mot. for Prelim. Inj. at 10, ECF No. 19 ("Pls.' Br."). But Plaintiffs do not and cannot identify what level of staffing would be sufficient to allow OCR to function with the degree of alacrity that Plaintiffs believe is necessary; they simply state they are legally entitled to demand that the Department have more staffing.

To remedy their alleged harm, Plaintiffs would have this Court superintend OCR's civil rights enforcement operations. Plaintiffs ask this Court to issue an order "enjoining Defendants from proceeding with the mass termination announced on March 11, 2025 as to OCR." *See* Mot. for Prelim. Inj. at 2, ECF No. 18 ("PI Mot."). But Plaintiffs do not and cannot point to any law that mandates any particular level of civil rights enforcement within OCR, to say nothing of legal authority that would allow them (via the Court) to, in effect, place the Department's OCR operations into receivership. This Court should decline this extraordinary request.

# BACKGROUND

## I.     Statutory Background

The Department of Education was established as part of the Department of Education Organization Act. Pub. L. No. 96-88, 93 Stat. 668 (1979). The purpose of the Department is principally

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

Congress established OCR in the Department of Education. 20 U.S.C. § 3413. OCR has a number of regulations. In particular, OCR regulations state that "no person in the United States shall; on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from the Department of Education." 34 C.F.R. § 100.1. Similarly, OCR regulations are meant to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. 34 C.F.R. § 106.1.

Department regulations allow for the submission of complaints by individuals who may have suffered prohibited discrimination. 34 C.F.R. § 100.7. OCR regulations state there will be "a prompt investigation whenever a… complaint … indicates" prohibited discrimination. *Id.*

## II.    <u>Executive Order Regarding the Department</u>

On March 20, 2025, President Trump signed the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order. Exec. Order No. 14,242, 90 Fed. Reg. 13,679 (Mar. 20, 2025) (the "Department Executive Order"). The Department Executive Order found that the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. For example, the Order identified the Department of Education's "public relations office that includes over 80 staffers at a cost of more than $10 million per year." *Id.* Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.*

Under the Department Executive Order, the Secretary of Education was ordered "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679. The "Secretary of Education shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

The Secretary has described her role pursuant to the Department Executive Order as "an overhaul" of the Department of Education. U.S. Dep't of Educ., *Secretary McMahon: Our Department's Final Mission* (Mar. 3, 2025), https://www.ed.gov/about/news/speech/secretary-mcmahon-our-departments-final-mission. As part of the overhaul, the Department is implementing a reduction in force, which impacts "[a]ll divisions within the Department," and some divisions will require "significant reorganization to better serve students, parents, educators, and taxpayers." Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("RIF Press Release"). The purpose of the reduction in force is

"efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ("Hill Article"). The Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come from Congress, all of that are being met, and none of that's going to fall through the cracks." *Id.* (omission in original). As part of the reduction in force, any staff that may be separated will first be put on administrative leave. RIF Press Release.

After the overhaul, the Department has stated that it "will continue to deliver on all statutory programs that fall under the agency's purview." RIF Press Release. The Secretary stated that she planned to keep fifty percent of the Department "related to expenditures and key programs" for which Congress has appropriated money. Ingraham Angle, *Education secretary says department took first steps to eliminate 'bureaucratic bloat'*, Fox News (Mar. 11, 2025), https://www.foxnews.com/video/6369901522112.

Longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. The Secretary plans to partner with Congress and other federal agencies to determine the best path forward to fulfill the expectations of the President and the American people. Lexi Lonas Cochran, *Linda McMahon gives Education staffers their 'final mission'*, The Hill (Mar. 4, 2025), https://thehill.com/homenews/education/5175086-linda-mcmahon-education-department-trump-musk/.

### III.    Procedural Background

Plaintiffs filed a Complaint on April 21, 2025 seeking broad declaratory relief, namely, that reductions-in-force at OCR are unlawful. Compl. at 31 (Prayer for Relief), ECF No. 1. The Complaint includes three counts. Counts I and II allege violations of the APA, stating that the reductions-in-force of staff at OCR was arbitrary and capricious (Count I) and unlawful (Count

II). *Id.* ¶¶ 79-89. Count III seeks *ultra vires* review of the reductions-in-force. *Id.* ¶¶ 90-95.

Plaintiffs filed a Motion for Preliminary Injunction on May 2, 2025. ECF No. 18; ECF No. 19 ("Pls.' Br."). Plaintiffs seek an order requiring the Department of Education, among other things, to 1) enter a preliminary injunction enjoining Defendants from proceeding with the mass termination announced on March 11, 2025 as to OCR; and 2) enter a preliminary injunction directing Defendants to stay the terminations of, or reinstate, all OCR employees whose employment was terminated or otherwise eliminated as part of the mass terminations announced on March 11, 2025. PI Mot. at 2. *See also* Proposed Order, ECF No. 21.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

## ARGUMENT

I. <u>**Plaintiffs Are Not Likely to Prevail on the Merits of their Claims.**</u>

    A.     **The Court Lacks Jurisdiction Over Plaintiff's Claims.**

        1.     <u>Plaintiffs Lack Standing.</u>

Plaintiffs lack Article III standing. Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80 (citation omitted).

Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Plaintiffs rely on a highly attenuated chain of possibilities that forecloses standing. Plaintiffs allege 1) that the staff at OCR has been reduced by roughly half, and seven of the twelve regional offices are closed, 2) that, notwithstanding OCR still having staff, their complaints will not be investigated, and 3) but for the delay in investigation, they will receive meaningful relief. Pls. Br. at 20. This is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); s*ee also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same).

Even if Plaintiffs could show an imminent, actual harm to a particular Plaintiff—only one part of the chain they must show for standing—they cannot connect it to a statutory violation rather than an exercise of proper discretion. "[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). Here, the individual Plaintiffs have already submitted complaints for investigation on their claims. Pls.' Br. at 12-16. Although Plaintiffs allege that these investigations are proceeding too slowly, *see, e.g.,* Compl. ¶¶ 62-63, they fail to specify how fast would be fast enough to pass legal muster. Nor could they: there is "no meaningful standard against which [the court could] judge the agency's exercise of discretion" in the law enforcement context. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Victims Rights Law Center (VRLC) appears to assert organizational standing,[1] but its arguments there fare no better. To establish organizational standing, a plaintiff must "have an injury distinct from an interest in the problem." *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 122 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021). "Courts, therefore, do not find standing when the organizational goal is one in the same with the injury because those organizations have only a 'mere interest' in a problem." *Id*. A plaintiff-organization does not have standing just because it "diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.,* 602 U.S. at 395. Rather, a plaintiff-organization must show that the defendant's "actions directly affected and interfered with [plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

VRLC has not alleged that its core activities are harmed by Defendants' actions. "VRLC's mission is to help victims of such violence get the legal recourse they need to rebuild their lives and to promote a national movement committed to seeking justice for every victim." Decl. of Stacy Malone ¶ 3, ECF No. 20-17 ("Malone Decl."). VRLC describes its core activities as follows:

> (1) provides direct legal services to victims of rape, sexual assault, dating violence, and stalking, including in investigations by the Department of Education's Office for Civil Rights ("OCR"); (2) counsels and trains attorneys, advocates, and school administrators nationwide about the legal rights of victims of sexual and gender-based violence and the remedies available to them when they face sexual harassment or abuse; and (3) reviews and provides advice on school policies and procedures to ensure they accurately describe the legal rights and remedies available to such victims.

*Id.* ¶ 6. Providing direct legal services in connection with investigations by OCR seems a small part of its activities. And as VLRC states, "VRLC will continue to study state and local remedies

---

[1] VRLC cannot show associational standing. To show associational standing, an organization must demonstrate that associations "must demonstrate that (1) its members have an injury that would make out a justiciable case had the members themselves brought suit… (2) the interests served by the suit are pertinent to the mission of the organization ....[and 3)] the nature of the claim and of the relief sought [does not] require[] the participation of individual members." *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 119 (D. Mass. 2020) (cleaned up), *aff'd*, 3 F.4th 24 (1st Cir. 2021). VRLC has not identified its members or their harms.

to meet our obligations," *id.* ¶ 27, and will "investigate other avenues to relief for our clients and prospective clients and advise them accordingly," *id.* ¶14. Based on its own representations, VLRC will continue its core activity of providing direct legal services. Without its core activities being harmed, VLRC does not have organizational standing.

>    2.    Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs'
>          Claims Arising from Federal Employment into a Distinct System, Not
>          Review in This Court in the First Instance.

Even if Plaintiffs have Article III standing, this Court lacks jurisdiction to adjudicate Plaintiffs' challenges to the employment decisions of federal agencies. Although district courts have jurisdiction over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 754 (D.C. Cir. 2019). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's reductions in force.

The Civil Service Reform Act ("CSRA") and the Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth in the CSRA, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In passing the CSRA, Congress made the Merit Systems Protection Board[2] and Federal Labor Relations Authority ("FLRA")[3] the exclusive means for

---

[2] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

[3] The FLRA was established by Congress as part of the FSM-LRS to conduct hearings and resolve complaints of unfair labor practices, *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id.* § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the

federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*, 567 U.S. 1, 10–15 (2012) (citation omitted); *see also AFGE*, 929 F.3d at 752; *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (finding "the decision in [AFGE] . . . instructive" and dissolving the temporary restraining order and denying the preliminary injunction).

The First Circuit has recognized that under the FLRA, "judicial oversight is 'both prescribed and proscribed' and the district courts are largely omitted from the equation." *Montplaisir v. Leighton*, 875 F.2d 1, 2–3 (1st Cir. 1989) (internal citation omitted). The fact that Plaintiffs "chose not to couch their complaint as an unfair labor practice cuts no mustard." *Id.* at 4. "Where labor-law preemption is an issue, creative labelling cannot carry the day." *Id.* "Rather, the needed reconnaissance focuses upon 'the conduct being regulated, not the formal description of governing legal standards . . . .'" *Id.* (citation omitted).

CSRA's channeling provisions preclude this Court's review of Plaintiffs' reduction-in-force claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court, but instead must pursue before the FLRA or the MSPB.

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754; *Am. Fed'n of Gov't Emps., AFL-CIO*, 2025 WL 470459, at *2 (finding "the decision in *Am.*

---

regulations allow persons or organizations who show that the outcome of the proceeding is likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

*Fed'n of Gov't Emps., AFL-CIO v. Trump* ('AFGE') . . . instructive" and dissolving the temporary restraining order and denying the preliminary injunction).  Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) . . . 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'"  *See AFGE*, 929 F.3d at 754-55 (alteration in original) (citation omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees.  *See Elgin*, 567 U.S. at 10–15; *Fausto*, 484 U.S. at 455.  Likewise, the D.C. Circuit repeatedly has recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework.  *See AFGE*, 929 F.3d at 755 (concluding that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005); *but see Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023). In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide'. . . policy interpreting a statute," its "implementation of such a policy in a particular case," *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67–69), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013); *see generally Grosdidier v. Chairman, Broad. Bd. of Govs.*, 560 F.3d 495, 497 (D.C. Cir. 2009) (holding that federal employees "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions").  As to the D.C. Circuit put it bluntly: "what you get under the CSRA is what you get," even if what you get is nothing at all.  *Fornaro*, 416 F.3d at 67; *Montplaisir*, 875 F.2d at 2–3 (holding under the FLRA, "judicial oversight is 'both prescribed and proscribed' and the district courts are largely omitted from the equation." (internal

citation omitted))

Here, Plaintiffs seek a preliminary injunction that would "enjoin[] Defendants from proceeding with the mass termination announced on March 11, 2025 as to OCR." PI Mot. at 2; *see also* Compl., Prayer for Relief (similar).  It would be odd, though, if a stranger to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise.  In fact, it would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes.  The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions.  *Fausto*, 484 U.S. at 455.  That is, when a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.

For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984), considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else.  *See id.* at 346 (citing 7 U.S.C. § 608c).  When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process."  *Id.* at 347.  Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized."  *Id.*  And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders."  *Id.*  Any other holding would facilitate circumvention of the comprehensive statutory scheme.  *See id.* at 348.  The principles described in *Block* fully apply to the CSRA and other employment statutory schemes. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand juridical review for the type of personnel action

- 11 -

covered by that chapter"). Because Congress intentionally foreclosed judicial review by parties other than those to whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, certainly cannot challenge the Department's employment actions here.

Furthermore, even setting aside Plaintiffs' lack of any role in the federal employment relationship, Plaintiff still cannot bypass Congress's statutory procedures by artfully labeling their claims as a broad challenge to OCR's reduced "capacity." Even where challengers "frame their suit as a systemwide challenge to" agency "policy" rather than individual benefits determinations, the exclusive review procedures for federal employees remain mandatory. *Fornaro*, 416 F.3d at 67–68 (Roberts, J., for the Court); *accord Nyunt*, 589 F.3d at 448–49 (Kavanaugh, J., for the Court) (rule that federal employees may not use APA challenge to "circumvent" CSRA process "applies to a 'systemwide challenge' to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case" (citations omitted)); *see also Lacson v. Dep't of Homeland Sec.*, 726 F.3d 170, 175 (D.C. Cir. 2013) (describing *Elgin* as having "echoed and amplified the approach taken" in D.C. Circuit cases such as *Fornaro* and *Nyunt*). So even if this Court accepts Plaintiffs' characterization of their suit, that would not allow them to "bypass" the FSL-MRS and CSRA. *See Am. Foreign Serv. Ass'n v. Trump*, Civ. A. No. 25-352 (CJN), 2025 WL 573762, at *11 (D.D.C. Feb. 21, 2025) (citation omitted).

Plaintiffs' challenges to the reductions in force also cannot be understood as collateral to the statutory review provisions at issue. "This consideration is related to whether meaningful judicial review is available," and focuses on "whether the plaintiffs aim[] to seek the same relief they could obtain in the agency proceeding." *AFGE*, 929 F.3d at 759–60 (internal quotation marks omitted) (citation omitted). Surely they do—based on the relief the Complaint seeks, Plaintiffs at this point seek to require the Department to vacate its decision to implement the reduction in force. Compl., Prayer for Relief. Proceedings before the administrative agencies could culminate in that relief. *See, e.g.*, *Payne v. Biden*, 62 F.4th 598, 607 (D.C. Cir. 2023) (MSPB can resolve "challenges to adverse employment actions"), *judgment vacated as moot*, 144 S. Ct. 480 (2023).

Ultimately, allowing separate litigation by the instant Plaintiffs would "seriously

undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development . . . of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449. Thus, the Court does not have jurisdiction to review any of Plaintiffs' claims challenging the Department's reductions in force at OCR.

**B.      Plaintiffs Are Unlikely to Succeed on Their APA Claims in Counts I and II.**

Plaintiffs are unlikely to succeed on the merits of their APA claims.

1.      Plaintiffs Do Not Seek Judicial Review of a Discrete Agency Action.

As a threshold matter, Plaintiffs do not identify an agency action that the Department has taken that could specifically be redressed by a federal court. Under the terms of the APA, "[Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted); *Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 21-CV-10083-DJC, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022) ("[A] broad programmatic attack" is not a valid APA claim (citation omitted)). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Cobell*, 455 F.3d at 307.

Plaintiffs' claims and requested injunction present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete

agency action. Rather, they seek wholesale judicial review of the Department's management of OCR. Instead of presenting the court with a "narrow question to resolve," *id.*, the Department's day to day operations regarding OCR staffing levels.

The wholesale nature of the challenge is confirmed by Plaintiffs' pleadings. For example, in their APA count involving claimed statutory violations, Plaintiffs allege that "Defendants' decision to eliminate approximately half of OCR's staff and close half of its regional offices violates the mandates of Title VI and Tile IX to effectuate the provisions of those statutes." Compl. ¶ 87. But these statutes are general statutes that forbid civil rights violations. They do not specifically address OCR. As the Court explained in *SUWA*, the purpose of the APA's discrete agency action requirement is:

> to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 66-67.

Even more practically, a wholesale challenge like Plaintiffs' is impossible to litigate under the mechanics of judicial review that the APA contemplates. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *Patel v. Johnson*, 2 F. Supp. 3d 108, 117 (D. Mass. 2014) (in an APA case, "'the district judge sits as an appellate tribunal,' and '[t]he entire case on review is a question of law.'") (alteration in original) (quoting *Am. Bioscience,* 269 F.3d at 1083). Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials considered "in making the challenged decision." *Cousins v.*

*Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989). Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment. Nor is it possible for the Court to apply the applicable standard of review to the agency action. *See* 5 U.S.C. § 706 (limiting scope of judicial review to "agency action"). Plaintiffs are unlikely to succeed on their APA claims because they are sweeping programmatic challenges unavailable under the APA.

### 2.    Plaintiffs Do Not Identify any Agency Action That is Final.

Even assuming Plaintiffs have identified discrete agency actions, they have not shown that these programmatic actions are final. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs' motion claims "[t]he Secretary's own words thus confirm that the RIF serves a purpose [closing Department offices, including OCR] that was expressly placed off limits by Congress." Pls.' Br. at 15. It is telling that Plaintiffs are unable to identify any concrete, final decision by the Department of Education to shut down OCR. To the contrary, taking Plaintiffs allegations at face value, it retains half of its employes. Compl. ¶ 39 ("The RIF eliminated more than half of OCR's previously 550-person staff"). To the extent that Plaintiffs are relying on any of the individual actions taken with respect to OCR as the final agency action (even if those actions are part of a Department-wide effort), Secretary McMahon in her public statements has indicated

those programmatic decisions mark the initiation, not the consummation, of the agency's decision-making process regarding the reorganization of the Department, including OCR.

The actions taken so far reflect a decision by Department leadership that agency functions need to be streamlined and reorganized. Those decisions are thus "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704. "It may be a step, which if erroneous will mature into a prejudicial result[.]" *Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the individual programmatic actions themselves the "consummation of the administrative process" reevaluating the agency's priorities to reorganize the Department. *Id*. at 113.

> 3. <u>The Department's Enforcement of Civil Rights Violations is Committed to Agency Discretion.</u>

Plaintiffs are likewise unlikely to succeed on the merits of their arbitrary and capricious claim, which, as briefed, involves actions committed to agency discretion by law. Plaintiffs present various arguments for why they believe they are likely to succeed on their APA arbitrary and capricious claims. *See* Pls.' Br. at 14-18. None have merit.

For example, Plaintiffs allege as arbitrary and capricious the reduction in force because it will affect OCR enforcement. Plaintiffs argue that "the RIF would severely undermine OCR's capacity to investigate and resolve its growing backlog of civil rights complaints and deliver on its statutory and regulatory mandates." *Id.* at 16. But "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," *Heckler*, 470 U.S. at 831. Only where the "substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers" would a decision whether and how OCR enforces Civil Rights violations be reviewable. *Id.* at 833. But here, the statute cited by Plaintiffs (42 U.S.C. § 2000d-1) contains no guidelines or standard for how OCR enforces civil rights complaints. This statute merely directs agencies to effectuate the prohibition against exclusion from participation in, denial

of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin. 42 U.S.C. § 2000d-1.

For similar reasons, Plaintiffs' argument that the reduction in force violates OCR's statutory and regulatory mandates is unlikely to succeed. Plaintiffs point to an OCR regulation that investigations into complaints will be completed "promptly." Pls.' Br. at 19. Yet the regulations do not define what "promptly" entails, and investigations have been pending since 2007. U.S. Dep't of Educ., *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools* (last updated Jan. 14, 2025), https://ocrcas.ed.gov/open-investigations. Agency practice shows that investigations can take variable amounts of time, even decades. The Court is left with no standard by which to judge OCR's enforcement actions, much less determine whether, as Plaintiffs assert, that the Department is not following its own regulations. *See* Pls.' Br. at 19.

In Plaintiffs' telling, OCR was already understaffed with "untenable" caseloads before the reductions-in-force. Pls.' Br. at 8 (citation omitted). Yet Plaintiffs do not ask this Court to mandate staffing that would cause all complaints to be "promptly" investigated, but rather to "enjoin[] Defendants from proceeding with the mass termination announced on March 11, 2025 as to OCR." PI Mot. at 2. But Plaintiffs never explain why the previous staffing levels are legally required, and for good reason. Presumably recognizing that there is "no meaningful standard against which [the court could] judge the agency's exercise of discretion" in its enforcement of civil rights laws, *Heckler*, 470 U.S. at 830, Plaintiff's embrace of the prior administration's staffing levels allows them to avoid having to justify the level of staffing that they cannot define but claim is required by law. Only where an agency's policy is "so extreme as to amount to an abdication of its statutory responsibilities" is a decision not to prosecute or enforce conceivably reviewable. *Id.* at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973)). *See also In re Aiken Cnty.*, 725 F.3d 255, 266 (D.C. Cir. 2013) ("[P]rosecutorial discretion encompasses the discretion not to enforce a law against private parties; it does not encompass the discretion not to follow a law imposing a mandate or prohibition on the Executive Branch." (emphasis omitted)). Here, it is undisputed that OCR still has a substantial number of staff.

Separate and apart from the discretion afforded to the Department over OCR's enforcement activities, reductions in force incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a reduction in force; absent a clear abuse of that discretion, a substantial departure from applicable procedures, a misconstruction of governing statutes, or the like, we do not upset a final agency decision." (citation omitted)). Agency action regarding reallocation of resources, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department. As noted, the Secretary has reorganized the Department of Education as part of an effort to right-size and streamline the Department's operations. Plaintiffs may disagree with that decision, but that does not give them the right to substitute their judgment for that of the Secretary's about how best to conduct civil rights enforcement.

Plaintiffs acknowledge as much when they assert that the decision to implement RIFs is "arbitrary and capricious because it relied on a factor Congress did not intend it to consider, the President's goal to facilitate the closure of the Department of Education." Pls.' Br. at 15 (citations omitted). Plaintiffs' assertions, however, reflect a fundamental "lack of understanding" of "the nature" of the Department's actions, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). As a threshold matter, while the Department Executive Order directs the Secretary to "take all necessary steps to facilitate the closure of the Department of Education," she may only do so "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679. And while Plaintiffs assert that the Department failed to "explain how halving the Department's staff and stalling civil rights investigations would lead to 'efficiency' or 'accountability,'" Pls.' Br. at 14, the Department's actions are part of a longer-term plan to streamline its operations to the minimum required by statute. And ultimately,

Courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and enjoin agency leadership from exercising control over their own staffing would be an extraordinary violation of the separation of powers.

4.     <u>There Are Adequate Alternative Remedies Available.</u>

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in a court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies.

5.     <u>Because the Department Executive Order Expressly Directs the<br>Department to Continue All Actions Required by Law, the Executive<br>Order Does Not Infringe on the Department's Statutory Obligations.</u>

Insofar as Plaintiffs are challenging the President's Executive Order, the claim fails because it relies on characterizations of that Order that are inconsistent with its terms. The Department Executive Order does not require the immediate shutdown of the Department. To the contrary, the Department Executive Order requires the Secretary of Education only to discontinue activities "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.

Definitionally, directing the Secretary to end functions unless required by law cannot be interpreted to violate the law. It is plainly lawful for the President to direct the Secretary to act within the agency's discretion to implement the Act and related statutes consistent with the law. Plaintiffs argue that Defendants violate the Department of Education Organization Act by reducing

OCR's staff. Pls.' Br. at 19. But that argument proceeds from a premise that the Department Executive Order expressly rejects. Again, the notion that the agency has eliminated OCR's ability to enforce civil rights violations is inconsistent with Secretary McMahon's statement that the Department "will continue to deliver on all statutory programs that fall under the agency's purview." RIF Press Release.

### C.    Plaintiffs' Are Unlikely to Succeed on Their Ultra Vires Claim in Count III.

Plaintiffs do not make any progress by repackaging their APA claims as ultra vires claims. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949) (footnotes omitted). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no *ultra vires* claim that is distinct from their APA claims. Indeed, Plaintiffs argue that the RIFs are *ultra vires* because they "not the product of 'reasoned decisionmaking' because it was not 'supported by the agency's contemporaneous justification'" and because makes "impossible for OCR to meet its statutory and regulatory mandates." Pls.' Br. at 20 (citation omitted).  For each argument, Plaintiffs merely cite to their APA arguments. *Id.* Thus, Plaintiffs' *ultra vires* claim fails for the same reasons as does their APA statutory requirements claim.

Plaintiffs' ultra vires claim is particularly inapplicable in the context of prosecutorial discretion.  The Supreme Court has long recognized that agencies can permissibly decide what enforcement and supervision actions to take, if any, consistent with the statutory duties imposed on the agency by Congress. *See Heckler*, 470 U.S. at 831 (agency enforcement discretion generally not subject to judicial review). Judicial deference to Defendant's decision-making about the priorities of the Department is especially warranted here, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *Nixon*, 418 U.S. at 693; *see also Heckler*, 470 U.S. at 832 ("[W]e recognize that an agency's refusal to institute proceedings

shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (citation omitted)). As the Court explained in *Heckler*, agencies are "far better equipped" to evaluate "the many variables involved in the proper ordering of its priorities" than are the courts. 470 U.S. at 831-32.

## II.    Plaintiffs Have Not Shown that They Will Face Irreparable Harm Absent a Preliminary Injunction.

Plaintiffs bear the "substantial burden" to show that the "extraordinary equitable remedy" that they seek is warranted. *Boston's Children First v. City of Boston*, 62 F. Supp. 2d 247, 253 (D. Mass. 1999). Claims of irreparable harm must be correct as a matter of theory but also as a matter of fact and reality. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020). Plaintiffs fail in both respects. The vast majority of harms alleged by Plaintiffs are harms brought by the alleged discrimination they face in school. But that harm is only tenuously connected to the relief sought. Assuming, *arguendo*, that OCR could resolve complaints in the same day, each Plaintiff is only harmed to the extent their underlying case would be resolved in their favor. Even if the Court enters a preliminary injunction, it by no means would resolve the harms alleged by the Plaintiffs. And to the extent any harm does flow from Defendants' actions, these harms are not redressable because they flow from agency actions that are entrusted to the Department's discretion and are not required by statute. As set forth in detail in Part I.B.1., *supra*, OCR is invested with prosecutorial discretion.

In any event, consistent with the "characterization of injunctive relief as an extraordinary remedy," *Winter*, 555 U.S. at 22, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018).  Rather, the injury must be "great" in magnitude.  *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); s*ee, e.g., FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980).

If the standards were equated, then every lawsuit against the Government "even [for] as little as $1" would provide a basis for extraordinary injunctive relief.  *See Air Transp. Ass'n of Am. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).[4]

VRLC's declaration is insufficient to show that, while this litigation is pending, it will experience the type of great injury necessary to justify extraordinary relief.  For example, Stacy Malone attests that the RIFs "interfere with [VRLC's] key functions." ECF 20-17, Malone Decl. ¶ 6.  In particular, Malone states that VRLC has to divert resources to perform complex research on alternative relief to OCR (*id.* ¶ 17), create new training material and provide additional training (*id.* ¶ 29), and revise policies and procedures (*id.* ¶ 30).  VRLC fails to provide any evidence placing those diverted resources "in the context of [its] overall finances."  *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-3569, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023).  And in the absence of evidence showing that the "expense is disproportionate" to those finances, more resource-intensive activities would "not justify [an] injunction."  *Petroleum Expl., Inc. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 220-21 (1938).

What is more, the Supreme Court has held that expenses associated with addressing a dispute are precisely the type of costs that do not qualify as irreparable harm.  *See, e.g., Standard Oil*, 449 U.S. at 244 ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury" (citation omitted)); *see also I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 25 (D.C. Cir. 1986) ("Formidable as it is, the cost and delay associated with modern-day litigation simply does not establish irreparable harm.").  And Plaintiffs' characterizations aside, VLRC complains of increased expenses associated with addressing sexual and gender-based violence disputes in education—not meaningfully different from litigation expenses insufficient to show irreparable injury. *See Standard Oil*, 449 U.S. at 244; *see also Petroleum Expl.*, 304 U.S. at 220 (considering "expense in preparing for and carrying out

---

[4] For this reason, *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), cannot be understood to equate the standard for irreparable harm and the standard for organizational standing derived from *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

an investigation").  Indeed, the Malone Declaration concedes that there are alternative state and local avenues for addressing sexual and gender-based violence disputes.  Malone Decl. ¶ 6.  Given those options, it is far from clear that any harms here are truly beyond remediation, let alone great in magnitude.

### III.    The Equities and Public Interest Weigh Against Relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors tilt decisively against granting a preliminary injunction here.  Granting a preliminary injunction would disrupt the Department's efforts to comply with the Department Executive Order's directive to "the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education and return authority over education to the States and local communities while ensuring the effective and uninterrupted delivery of services, programs, and benefits on which Americans rely." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.

The public has an interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Department, including OCR. Entering any sort of preliminary relief would displace and frustrate the President's decision about how to best address those issues. *Heckler*, 470 U.S. at 831–32. As discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief, because Plaintiffs have not shown that their harm could not otherwise be mediated later.

### IV.    Any Preliminary Injunction Should Be Limited.

For the reasons explained above, Plaintiffs are not entitled to a preliminary injunction. But if the Court concludes otherwise, the relief granted "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health*

*Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The expansive relief that Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all.

As such, any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is either broader in substance or scope (i.e., wholesale reinstatement of staffing for programs that Plaintiffs do not even utilize) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). A federal court may entertain a suit only by a plaintiff who has suffered a concrete "injury in fact," and the court may grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury." *Id.* at 66 (citation omitted). Principles of equity reinforce those limitations, and "[u]niversal injunctions have little basis in traditional equitable practice." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring).

## V. Any Preliminary Injunction Should Be Accompanied by a Security and Should Be Stayed.

Any preliminary injunction should also require Plaintiffs to post a security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction. Particularly given that the relief requested by Plaintiffs could hinder Defendants' ability to conduct the reorganization of the Department and, in particular, OCR, in a manner consistent with the President's policies, the Court should consider the implications of any order prohibiting the Department from implementing the President's policy objectives as to OCR.

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized.

*     *     *

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.


DATED: May 16, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General

                                       BRAD P. ROSENBERG
                                       Special Counsel

                                       */s/   Michael Bruns*
                                       Michael Bruns
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, N.W.
                                       Washington, DC 20005
                                       Email: michael.bruns@usdoj.gov
                                       Tel: 202-514-4011

                                       *Counsel for Defendants*