# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF MASSACHUSETTS

VICTIM RIGHTS LAW CENTER; T.R., by and
through his parent, TARA BLUNT; TARA
BLUNT; A.J., by and through his parent, KAREN
JOSEFOSKY; and KAREN JOSEFOSKY,

              *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
EDUCATION; LINDA MCMAHON, in her official
capacity as Secretary of Education; and CRAIG
TRAINOR, in his official capacity as Acting
Assistant Secretary for Civil Rights,

              *Defendants*.

Case No. 1:25-cv-11042-MJJ

**Leave to File Granted
on March 21, 2025**

## REPLY IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ................................................................................................................ 1

I.    The Plaintiffs have standing........................................................................................ 2

A.    T.R. and A.J. have standing. ................................................................................ 2

B.    VRLC has standing. .............................................................................................. 6

II.    Federal labor and employment statutes do not channel or preclude these claims. ............ 8

III.    Plaintiffs' APA claims are likely to succeed. ............................................................ 12

A.    The RIF is a discrete and final agency action. ............................................... 12

B.    The RIF is reviewable, not "committed to agency discretion."...................... 13

IV.    Plaintiff's ultra vires claim is likely to succeed. ........................................................ 18

V.    Plaintiffs have shown irreparable injury. ................................................................. 18

VI.    The balance of equities and public interests favor an injunction................................. 19

VII.    The Court should grant the requested relief.............................................................. 20

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967) ................................................................................... 9

*Adams v. Richardson*,
480 F.2d 1159 (D.C. Cir. 1973).......................................................... 16, 17

*Am. Fed'n of Gov''t Emps., AFL-CIO v. Trump*,
2025 WL 1358477 (N.D. Cal. May 9, 2025)...................................... 9, 10

*Ahmed v. Blinken*,
759 F. Supp. 3d 1 (D.D.C. 2024)............................................................. 5

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003)............................................................. 18

*Am. Ass'n of Univ. Professors v. Rubio*,
2025 WL 1235084 (D. Mass. Apr. 29, 2025)........................................ 6

*Am. Fed'n of Gov''t Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019)............................................................... 11

*Antilles Cement Corp. v. Fortuno*,
670 F.3d 310 (1st Cir. 2012)................................................................... 4

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) ............................................................... 9, 10, 11

*Bennett v. Spear*,
520 U.S. 153 (1997) ............................................................................. 13

*Block v. Community Nutrition Institute*,
467 U.S. 340 (1984) ............................................................................. 11

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................. 20

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ........................................................... 15, 18

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979) ............................................................................. 10

*Caswell v. Califano*,
    583 F.2d 9 (1st Cir. 1978)..................................................................................... 16

*Chamber of Com. v. Lierman*,
    90 F.4th 679, 688 (4th Cir. 2024) ......................................................................... 2

*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*,
    2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) ........................................................ 8

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) .....................................................................................*Passim*

*Dugan v. Ramsey*,
    727 F.2d 192 (1st Cir. 1984).................................................................................. 14

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
    438 U.S. 59 (1978) ................................................................................................. 4

*El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Rev.*,
    959 F.2d 742 (9th Cir. 1982) ................................................................................. 8

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ................................................................................................. 11

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005) ............................................................................................... 2

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ........................................................................................... 3, 8

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) .......................................................................................... 9, 11

*Giacobbi v. Biermann*,
    780 F. Supp. 33 (D.D.C. 1992).............................................................................. 17

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................................ 6, 7, 8

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................................... 14, 15, 16

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016)............................................................................... 19, 20

*Lujan v. Nat'l Wildlife Fed'n*
  497 U.S. 871 (1990). .................................................................................. 13

*Maine v. U.S. Dep't of Agric.*,
  2025 WL 1088946 (D. Me. Apr. 11, 2025) ............................................... 19

*Markland v. OPM*,
  140 F.3d 1031 (Fed. Cir. 1998) ............................................................... 14

*Maryland v. USDA*,
  2025 WL 973159 (D. Md. Apr. 1, 2025) ................................... 9, 10, 11, 12

*Maryland v. USDA,*
  2025 WL 800216 (D. Md. Mar. 13, 2025) ..................................... 9. 10. 20

*Massachusetts v. v. EPA*,
  549 U.S. 497 (2007) ............................................................................... 3, 5

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .......................................................................... 1, 12, 17

*Moghaddam v. Pompeo*,
  424 F. Supp. 3d 104 (D.D.C. 2020) .......................................................... 17

*N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*,
  817 F.2d 149 (1st Cir. 1987) .................................................................... 16

*Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*,
  2023 WL 2043149 (D.D.C. Feb. 16, 2023) ............................................... 20

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
  2025 WL 1188160 (D.N.H. Apr. 24, 2025)  ................................................ 7

*Nat'l Treasury Emps. Union v. Vought,*
  2025 WL 942772 (D.D.C. Mar. 28, 2025) ................................................ 2, 14

*New York v. McMahon*,
  2025 WL 1463009 (D. Mass. May 22, 2025) ..................................... *passim*

*New York v. Trump*,
  133 F.4th 51 (1st Cir. 2025) ................................................................ 12, 13

*Nulankeyutmonen Nkihtaqmikon v. Impson*,
  503 F.3d 18 (1st Cir. 2007) ..................................................................... 5, 6

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No.*,
  551 U.S. 701 (2007) ............................................................................ 2

*Rhode Island v. Trump*,
  2025 WL 1303868 (D.R.I. May 6, 2025) .................................... 9, 10, 20

*Robbins v. Reagan*,
  780 F.2d 37 (D.C. Cir. 1985)............................................................. 18

*Sierra Club v. U. S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) ........................................................... 4

*SurvJustice Inc. v. DeVos*,
  2018 WL 4770741 (N.D. Cal. Oct. 1, 2018) ..................................... 8

*Union of Concerned Scientists v. Wheeler*,
  954 F.3d 11 (1st Cir. 2020).............................................................. 15

*United States v. Fausto*,
  484 U.S. 439 (1988) ........................................................................ 11

*Victim Rights Law Center v. Cardona*,
  552 F. Supp. 3d 104 (D. Mass. 2021)............................................ 6, 7

*Webb v. Injured Workers Pharmacy, LLC*,
  72 F.4th 365 (1st Cir. 2023) ............................................................ 7

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  586 U.S. 9 (2018) ........................................................................... 13

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agriculture*,
  2025 WL 1116157 (D.R.I. Apr. 15, 2025) ........................................ 20

*Young v. Trump*,
  506 F. Supp. 3d 921 (N.D. Cal. 2020) .............................................. 5

**Statutes**

5 U.S.C. § 701 ................................................................... 12, 13, 28

5 U.S.C. § 704 ........................................................................... 12

5 U.S.C. § 7103 ........................................................................... 9

5 U.S.C. § 7118 ........................................................................... 9

5 U.S.C. § 7123 ........................................................................... 9

5 U.S.C. § 7701 ........................................................................................................... 9

5 U.S.C. § 7703 ........................................................................................................... 9

20 U.S.C. § 3413 ................................................................................................. 15, 17

20 U.S.C. § 1682 ....................................................................................................... 16

20 U.S.C. § 3402 ......................................................................................................... 5

20 U.S.C. § 3473 ................................................................................................... 1, 15

42 U.S.C. § 2000d-1 .................................................................................................. 16

**Regulations**

5 C.F.R. § 2423.22 ..................................................................................................... 10

34 C.F.R. § 100.7 ................................................................................................... 5, 16

**Other Authorities**

S. Rep. 96-49 (1979), as reprinted in 1979 U.S.C.C.A.N. 1514 .................................. 15

## INTRODUCTION

On March 11, 2025, the Secretary of Education cut the Department's Office for Civil Rights (OCR) in half, reducing its workforce to the lowest number in the agency's forty-year history, closing half its offices, and leaving thousands of students without recourse for discrimination in school. The government does not contend that this unprecedented action met the normal demands of agency action—that the agency consider the "relevant factors" and "articulate . . . 'a rationale connection between the facts found and the choices made.'" *Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It does not dispute that the Secretary failed to consider how the mass termination would impact OCR's ability to meet its statutory mandates and how it would affect the students who count on OCR. It does not even contest the RIF violated Congress's command that the Secretary may not "consolidate" or "alter" OCR or "reallocate" its functions. 20 U.S.C. § 3473(a)(1). It does not submit any evidence at all.

Instead, the government simply argues that the Secretary's decision is immune from judicial review, no matter how many laws it violated. It says Plaintiffs lack a concrete stake in this dispute, Resp. Br. 2, which it frames as an internal matter "between the federal government and its employees" to which the plaintiffs are "strangers," *id.* at 9. That blinks reality. Congress designed OCR to protect students like plaintiffs T.R. and A.J. They have a concrete stake in this case because they need OCR's help to go back to school free from discrimination, and the mass termination stalls that relief. Victim Rights Law Center (VRLC) has standing because the RIF frustrates its mission. And none of the doctrines the government invokes bar judicial review.

In *New York v. McMahon*, the Court recently found jurisdiction and enjoined the Department-wide RIF for similar reasons. No. 25-10601-MJJ, 2025 WL 1463009, at *1 (D. Mass. May 22, 2025). As in that case, the plaintiffs do not ask this Court to "place . . . OCR operations

into receivership," Resp. Br. 1. They do not ask it to prevent future, lawful terminations. They simply ask the Court to stay the March 11 RIF and allow affected staff to return to work to preserve the status quo. Proposed Order, Doc. No. 21. The Court should grant that straightforward relief.[1]

## I.     The Plaintiffs have standing.

T.R., A.J., and VLRC have standing: They are suffering "concrete, particularized" injuries that are "fairly traceable to the defendant's challenged behavior" and "likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019).

### A.  T.R. and A.J. have standing.

**1.** Defendants do not dispute that the student plaintiffs have concrete, ongoing injuries in fact. T.R. and A.J. experienced consistent harassment based on their race and disability—T.R. faced racial epithets and physical assault, and A.J. faced regular exposure to life-threatening allergens—and they remain unable to attend their local public schools without reentering that hostile environment. Ex. 15, Blunt Decl. ¶¶ 4-8, 10-11, 16 ("[W]ithout OCR's intervention, I will need to keep T.R. in private school next year"); Ex. 16, Josefosky Decl. ¶¶ 6-7, 10, 24 ("We have no reason to believe that the school will take steps to keep A.J. safe in public school without OCR's intervention" and "cannot send A.J. back to public school this coming fall."). The deprivation of equal educational opportunity is itself a concrete injury in fact. *See*, *e.g.*, *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (holding potential lost opportunity to enroll in a school due to discrimination is an injury in fact); Opening Br. 12 & n.6.

---

[1] The order in *New York* does not moot this motion because the government has appealed that order and the plaintiffs here have distinct standing and merits arguments. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 n.7 (2005); *Chamber of Com. v. Lierman*, 90 F.4th 679, 688 (4th Cir. 2024) (holding relief in other court did not moot case because "there was an impending appeal which could . . . vacate the [other] judgment"); *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381, 2025 WL 942772, at *15 n.14 (D.D.C. Mar. 28, 2025) (similar).

Those injuries are "attributable at least in part" to the RIF. *Dep't of Com.*, 588 U.S. at 768; *see also Massachusetts v. v. EPA*, 549 U.S. 497, 523 (2007) (holding state had standing to challenge "EPA's refusal to regulate" pollution that "contribute[d]" to harms caused by unregulated emitters). The unrebutted evidence shows that the RIF has stalled T.R. and AJ.'s OCR investigations and allowed their educational harms to continue. Ex. 16, Josefosky Decl. ¶¶ 17-21; Ex. 15, Blunt Decl. ¶ 12-16. As OCR's own budget requests and staff testimony show, the RIF makes it impossible for OCR to complete investigations within a reasonable time. *See* Opening Br. 8-9. The office handling T.R.'s complaint has been inundated with cases from the closed Dallas office, which has more than doubled its attorneys' caseloads and predictably slowed investigations. Ex. 3, Gonzales Decl. ¶ 19. The office handling A.J.'s complaint closed. Ex. 16, Josefosky Decl. ¶ 15; Ex. 4, Doe 7 Decl. ¶ 12 (Cleveland office closed). T.R. and A.J.'s families have heard nothing from OCR for months. *See* Ex. 16, Josefosky Decl. ¶¶ 18-21; Ex. 15, Blunt Decl. ¶¶ 14–15. The government provides no evidence that OCR will resolve T.R. and A.J.'s complaints before they start school in the fall—or, indeed, that it can resolve their complaints at all. T.R. and A.J.'s schools permitted the harassment to continue before, and they are unlikely to change their ways without OCR's intervention. Ex. 16, Josefosky Decl. ¶¶ 8-10, 23-24; Ex. 15, Blunt Decl. ¶¶ 6, 9, 16. And while OCR fails to act, T.R. and A.J. are unable to return to school without reentering the hostile environment. Ex. 16, Josefosky Decl. ¶¶ 24-25; Ex. 15, Blunt Decl. ¶ 16.

That this chain of causation relies on the RIF's effects on OCR, and the school's predictable inaction without its intervention, does not defeat standing. To show traceability, plaintiff may rely on "a predictable chain of events leading from the government action to the asserted injury," which exists when third parties "'will likely react in predictable ways' that in turn will likely injure the plaintiffs." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383-85 (2024) (listing

"a variety of familiar circumstances where government regulation of a third-party individual or business may be likely to cause injury in fact to an unregulated plaintiff"). Plaintiffs have presented unrebutted evidence that the RIF has stalled OCR investigations and that their schools will not address the hostile environments that exclude them from school without OCR's help. Unlike the cases Defendants cite, the students' "theory of standing thus does not rest on mere speculation about the decisions of third parties"; it relies on the RIF's "predictable effect" on OCR and the schools' "predictable" behavior absent relief. *Dep't of Com.*, 588 U.S. at 768.

An injunction would also redress T.R. and A.J.'s injuries. To satisfy this requirement, they need only show a "substantial likelihood," *Duke Power Co. v. Carolina Env't Study Grp., Inc.,* 438 U.S. 59, 74–75 (1978), that judicial relief will "lessen" their injury; they "need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012). "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Sierra Club v. U. S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018).

T.R. and A.J. have made that showing. When OCR investigates a complaint and identifies a violation or concern, it must negotiate "steps that, when implemented, will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur." Off. for Civ. Rts., U.S. Dep't of Educ., OCR Case Processing Manual 17 (Feb. 19, 2025); *see also* Ex. 12 (OCR 2024 Annual Report) at 23-65 (listing cases in which OCR required schools to take steps to remedy hostile environments). If the Court restores OCR's staff, OCR will be substantially more likely to provide faster relief that allows T.R. to return to public school with a lower risk of harassment.

**2.** T.R. and A.J. also have a procedural injury. When the law creates a process "designed

4

to protect some threatened concrete interest' personal to" the plaintiff, the deprivation of that procedure is itself an "injury in fact." *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007). Congress established OCR to protect the "access to equal educational opportunity" that T.R. and A.J. seek. 20 U.S.C. § 3402. As the government agrees, the applicable regulations guarantee them "'a prompt investigation whenever a . . . complaint . . . indicates' prohibited discrimination." Resp. Br. 2 (quoting 34 C.F.R. § 100.7). And T.R. and A.J. have a concrete interest in the outcome of that process: If OCR finds a violation, it could redress the hostile educational environment that excludes them from public school. But the unrebutted evidence shows that the RIF has stalled that process for both of them, just as it has for students around the country, while they are denied access to educational opportunities. *See* Opening Br. 8-12. That is sufficient to show a procedural injury. *See Nulankeyutmonen Nkihtaqmikon*, 503 F.3d at 27; *Ahmed v. Blinken*, 759 F. Supp. 3d 1, 8-9 (D.D.C. 2024) (holding that "procedural harm from the prolonged delay in processing [plaintiff's] application" established standing when plaintiff suffered ongoing emotional harm in interim); *Young v. Trump*, 506 F. Supp. 3d 921, 936 (N.D. Cal. 2020) (holding that loss of "valuable time" in obtaining relief was injury in fact).

Because T.R. and A.J. have a procedural injury, they need not "meet[] all the normal standards for redressability and immediacy." *Massachusetts*, 549 U.S. at 517-18. They have standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed" them, *id*. at 518, or that it would "reduce[]" their "risk" of more harm "to some extent." *Id.* at 526. Common sense dictates that if the Court restores OCR's capacity, the agency will be able to resolve T.R. and A.J.'s complaints more quickly than it would with half its staff. *See* Ex. 13 at 26 (showing that before the RIF, OCR resolved most cases within 180 days). Even if "Plaintiffs cannot establish with any certainty" that OCR will

provide them relief if the Court restores its capacity and enables it to resume T.R. and A.J.'s investigations, "there is at least a chance" that OCR will provide them with prompt relief. *Nulankeyutmonen Nkihtaqmikon*, 503 F.3d at 28. That is enough to establish standing. *See id.*[2]

### B. VRLC has standing.

An organization has standing when the challenged action "perceptibl[y] impair[s]" its activities and "drain[s]" its "resources," a recognized injury in fact. *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-10685, --- F. Supp. 3d ---, 2025 WL 1235084, at *17 (D. Mass. Apr. 29, 2025) (Young, J.) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). In *Victim Rights Law Center v. Cardona*, for example, the court found that VRLC had standing to challenge a Department regulation that set certain requirements for school Title IX investigations for two reasons: First, the rule chilled students from filing Title IX complaints with their schools, meaning that VRLC received fewer requests to assist students in school investigations. 552 F. Supp. 3d 104, 125 (D. Mass. 2021). Second, because of the rule, VRLC "diverted resources in the form of reassignments, creating new material for clients, and spending more time advising clients." *Id.*

The RIF has similar effects. First, as in *Cardona*, VRLC has shown that the RIF interferes with a core business activity: direct client representation. *See* Opening Br. 22. The unrebutted evidence shows that the RIF effectively ends VRLC's practice representing students in OCR investigations. *See* Ex. 17, Malone Decl. ¶¶ 7-16. Such representation was a "crucial" way that VRLC pursued its "mission . . . to help victims of [sexual] violence get the legal recourse they need to rebuild their lives." *Id.* ¶¶ 3, 9, 11 (noting that "VRLC employs seven attorneys who represent students in OCR investigations" and "represented seven students" in OCR investigations

---

[2] A.J.'s family is currently attempting to negotiate a resolution with his school district on its own. Plaintiffs will update the Court if any final agreement is reached.

last year). But the RIF has made it impossible for OCR to provide VRLC's clients with meaningful relief within a reasonable time. *See* Opening Br. 8-9. As a result, VRLC cannot help victims for whom OCR was the only path to recourse, and it must "turn away" clients for that reason. Ex. 17, Malone Decl. ¶¶ 6, 15. So, as in *Cardona*, "VRLC will be able to help fewer people." *Id.* ¶ 15.

Second, VRLC has diverted "hours of time and resources" to new tasks because of the RIF. Ex. 17 Malone Decl. ¶ 6. It must investigate "alternative administrative remedies" in multiple jurisdictions to respond to inquiries from attorneys and advocates nationwide. *Id.* at ¶¶ 21-26. It must create new training materials to educate advocates about those remedies. *Id.* ¶¶ 28-31. And it must identify new complaint venues and revise policies and procedures for the 150 education institutions it advises as part of the Campus Grant Program. *Id.* ¶¶ 30-31. All of this "takes time and resources away from other critical projects VRLC's staff must perform." *Id.* ¶¶ 6, 23 (providing specific examples); *see also Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 376-77 (1st Cir. 2023) (holding that a "loss of this time" that could "otherwise have been put to profitable use" is a cognizable injury). And because VRLC must turn down clients and "lacks the time, resources, and reach necessary" to develop expertise on the "laws and remedies available in 56 jurisdictions," its "value" and its "reputation as an expert on remedies for student victims of sexual and gender-based violence will suffer." Ex. 17, Malone Decl. ¶ 27.

The government does not dispute these facts. Instead, it suggests VRLC cannot establish standing because it has not had to entirely cease providing direct representation to all clients in all matters. *See* Resp. Br. 7-8. But an organization need not show it is "literally impossible to engage in the organization's core activities" to establish standing; it need only show the challenged action has "perceptibly impaired" those activities. *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 25-CV-091, 2025 WL 1188160, at *9-10 (D.N.H. Apr. 24, 2025) (quoting *Havens*, 455 U.S. at 379). In

*Havens*, for example, the Court held that a non-profit organization had standing to challenge unlawful practices that "perceptibly impaired" its "ability to provide counseling and referral services to for low-and moderate-income homeseekers" and caused it to "devote significant resources to identify and counteract" those practices, even though it did not have to cease any core activity. 455 U.S. at 379; *accord All. for Hippocratic Med.*, 602 U.S. at 395 (explaining that organization has standing when conduct "interfere[s] with [its] core business activities").

So too here: The RIF has impaired VRLC's ability to provide specific services to specific communities and caused it to divert resources to counteract its effects, all to comply with grant conditions VRLC must fulfill to keep funding. *See* Ex. 17 Malone Decl. ¶¶ 5, 8, 18, 30. "Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources," are enough for standing. *Havens*, 455 U.S. at 379.[3]

## II.    Federal labor and employment statutes do not channel or preclude these claims.

Defendants argue (at 8-13) that a pair of federal labor and employment statutes strip this this Court's jurisdiction to hear these claims. They do not. As Defendants acknowledge, those statutes—the Civil Service Reform Act (CSRA) and the Federal Service Labor-Management Relations Statute (FSL-MRS)—create a special process that applies only to "disputes between [federal] employees" and their "unions" and "federal employers." Resp. Br. 8. Although they

---

[3] *See also El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Rev.*, 959 F.2d 742, 748 (9th Cir. 1992) (holding that organizations could challenge policy that frustrated "their efforts to obtain asylum and withholding of deportation in immigration court proceedings" for their refugee clients and diverted their resources); C*mty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-CV-02847-AMO, 2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) (holding plaintiffs had standing to challenge action that "'impaired [their] ability to provide [legal] services' to unaccompanied children" and diverted their resources); *SurvJustice Inc. v. DeVos*, No. 18-CV-00535, 2018 WL 4770741, at *7 (N.D. Cal. Oct. 1, 2018) (finding that legal advocacy organization had standing in part because Department of Education rule "made it more difficult . . . to obtain redress and achieve results for its clients" and diverted its resources).

channel "garden variety labor or employment claims" by "unions or employees" into that process, it is "not exclusive," "much less *preclusive*," as to other claims. *Maryland v. USDA*, No. 25-CV-0748, 2025 WL 973159, at *16 (D. Md. Apr. 1, 2025); *accord New York*, 2025 WL 1463009, *19-20 (holding the CSRA and FSL-MRS did not preclude claims); *Am. Fed'n of Gov't Emps.*, *AFL-CIO v. Trump*, No. 25-CV-03698, 2025 WL 1358477, at *15 (N.D. Cal. May 9, 2025); *Rhode Island v. Trump,* No. 1:25-CV-128, 2025 WL 1303868, at *7 (D.R.I. May 6, 2025).

Even when a statute creates an "exclusive" review scheme, that scheme precludes district court jurisdiction only if the statute "reaches the claim in question" by reflecting an intent to channel the plaintiffs' "particular claims." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). Three factors guide the inquiry: Courts "presume that Congress does not intend to limit jurisdiction" if (1) "a finding of preclusion could foreclose all meaningful judicial review"; (2) the suit is "wholly collateral to a statute's review provisions" and (3) "the claims are 'outside the agency's expertise.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010). These factors need not point in the same direction to indicate that Congress did not intend to preclude jurisdiction. *Axon*, 598 U.S. at 186. But all of them favor the plaintiffs here.

**1.** First, the government's position "could foreclose all meaningful judicial review" of the Plaintiffs' claims. *Axon*, 598 U.S. at 190. Only federal employees, job applicants, and their unions may invoke the CSRA and FSL-MRS's review process; the students and organizations who rely on OCR may not. *See* 5 U.S.C. §§ 7103(a)(1), 7118, 7123, 7701, 7703. So if those statutes preclude this Court's jurisdiction over Plaintiffs' claims, no other tribunal could hear them. "Congress rarely allows claims about agency action to escape effective judicial review." *Axon*, 598 U.S. at 186. And courts will not "restrict access to judicial review" absent "clear and convincing evidence" that Congress intended to do so. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 141 (1967). None exists here:

The CSRA "says nothing at all" about students, "non-profit organizations," or other regulatory beneficiaries and lacks any clear statement that Congress intended to preclude judicial relief when the government guts an agency on which they rely. *Am. Fed'n of Gov't Emps., AFL-CIO*, 2025 WL 1358477, at *15; *see Maryland v. USDA*, 2025 WL 800216, at *14 (D. Md. Mar. 13, 2025).[4]

   **2.** Second, these claims are "wholly collateral" to the claims the MSPB and FLRA "customarily handle[], and can apply distinctive knowledge to," *Axon*, 598 U.S. at 186: "garden-variety labor or employment claims" by employees and unions, *Maryland*, 2025 WL 973159, at *16. Unlike the claims the MSPB and FLRA typically handle, this case does not seek to vindicate the rights of federal employees. Rather it seeks to protect the unique interests of "individual citizens" in the "effective protection against [discriminatory] practices" that underpin the civil rights laws. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979). Plaintiffs argue that Defendants failed to consider OCR's obligations to students, not employees, when they initiated the RIF. *See* Opening Br. 16-17; *see also Maryland*, 2025 WL 800216, at *14 (finding that states' challenge to RIF was "collateral" to the CSRA process because it rested on "unique harms" to the plaintiffs "irrespective of [their] connection to the employer-employee relationship"). Defendants do not point to a single case in which the MSPB or FLRA has addressed such a claim.

   **3.** Third, Plaintiffs' claims "fall outside the competence and expertise of the administrative bodies that handle employee grievance arising under the CSRA." *Rhode Island*, 2025 WL

---

[4] Although a regulation allows certain parties to seek "permission to intervene" in FRLA hearings, 5 C.F.R. § 2423.22 (cited in Resp. Br. 8 n.3), Defendants do not argue that such discretionary intervention in labor hearings provides Plaintiffs a sufficient path to meaningful judicial review. *See Axon*, 598 U.S. at 186 (asking whether preclusion "could" foreclose judicial review). And even if an employee could challenge the RIF based on its third-party effects, "[t]he fact *someone* can seek review of similar claims is [not] enough to disclaim jurisdiction." *Maryland*, at 2025 WL 800216, at *15. Indeed, "[i]t is highly doubtful that solo employees or their unions would or could adequately represent the [plaintiffs'] peculiar interests in an administrative setting." *Id.* In fact, the government points to no MSPB or FLRA complaint raising similar claims.

1303868, at *7. This case involves no "questions unique to the employment context." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012). Plaintiffs' APA and *ultra vires* claims are "standard questions of administrative law" that courts "are at no disadvantage in answering." *Free Enter. Fund*, 561 U.S. at 491. They do not involve "technical considerations" about personnel policy or labor relations as to which the MSPB or FLRA would have special expertise. *Id.* The MSPB and FLRA may know "a good deal about" those matters, *Axon*, 598 U.S. at 194, but they know "nothing special," *id.*, about the APA, the *ulta vires* doctrine, or OCR's mandates under the civil rights statutes and their regulations, on which this case turns, *see* Opening Br. 13-20.

Defendants cannot identify any case finding that the CSRA or FSL-MRS preclude non-employee third parties from pursuing their claims in court. "Each cited case involved a suit brought by employees or unions over employee or union problems." *Maryland*, 2025 WL 973159, at *16; *see*, *e.g.*, *United States v. Fausto*, 484 U.S. 439, 440 (1988) (considering whether, by addressing claims of certain types of employees by "withholding [a] remedy" for those claims, Congress "meant to preclude judicial review *for those employees*" (emphasis added)); *Elgin*, 567 U.S. at 22 (addressing claims brought by government employees); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (holding that statutes channeled *federal employee union's* claims concerning executive orders about collective bargaining).

*Block v. Community Nutrition Institute*, which did not involve the labor and employment statutes, does not help Defendants either. *See* 467 U.S. 340, 347 (1984). *Block* involved a distinct statutory scheme designed to "raise the price" that milk producers charged milk "handlers" to "establish an orderly system for marketing" the product. *Id.* at 346. To accomplish that goal, Congress created a special rulemaking procedure that "limit[ed] the classes entitled to participate" to "handlers" and "producers" and provided handlers with a mechanism to seek judicial review.

*Id.* "The structure of th[e] Act indicate[d] that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* at 347. Here, in contrast, the CSRA provide "no reason to think Congress expected federal employees to police [an agency's] compliance" with its duty to live up to separate statutory obligations to non-employees, *Maryland*, 2025 WL 973159, at *17, like OCR's mandates under the civil rights laws.

Accordingly, the labor and employment statutes do not preclude this Court's jurisdiction.

## III. Plaintiffs' APA claims are likely to succeed.

The government does not contend that the Secretary articulated a reasoned explanation for her decision sufficient to survive review under *State Farm*. Instead, it argues (at 13-16) that the Court cannot review the decision because the RIF is not a discrete and "final" agency action and is "committed to agency discretion by law," 5 U.S.C. §§ 701(a)(2), 704. Neither claim is correct.[5]

### A.  The RIF is a discrete and final agency action.

Contrary to the government's contention, the RIF is a "discrete" agency action. *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025); *accord New York*, 2025 WL 1463009, *23-24. It results from a single decision, made on a single day, to terminate a group of employees. *See* Ex. 6 (Mar. 11 Press Release) at 1 ("[T]he Department today initiated a reduction in force (RIF) impacting nearly 50% of the Department' s workforce."). To fix it, Plaintiffs plainly do not ask the Court to "superintend OCR's civil rights enforcement operation." Resp. Br. 1. Nor do they "seek wholesale judicial review of the Department's management of OCR" or its "day to day operations regarding OCR staffing levels." *Id.* at 14. They simply ask the Court to stay the RIF and reinstate the staff it terminated. *See* Proposed Order, Doc. No. 21. This is nothing like the "broad programmatic attack"

---

[5] Defendants also argue that the CSRA and FSL-MRS provide an "adequate remedy in a court" for the same reasons that it argues they preclude jurisdiction. Resp. Br. 19 (quoting 5 U.S.C. § 704). That argument fails for the reasons described above. *See supra* Part II.

in *Lujan*, which challenged the "'<u>continuing (and thus constantly changing) operations</u> of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required' under federal law." *New York*, 133 F.4th at 67 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990)) (holding that decision to freeze federal funds from various different sources was discrete agency action).

The RIF is also final. It (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) has "legal consequences." *Bennett v. Spear*, 520 U.S. 153, 177-78 (1997). The Secretary's decision to axe half of OCR's workforce in one stroke was neither tentative nor interlocutory: As of June 10, 2025, the employees' employment will terminate. Ex. 10, Hamlin Supp. Decl. at 6. That "plainly marks the end of the agency's decisionmaking with respect to the employee[s] involved," with "self-evident legal consequences." *New York*, 2025 WL 1463009, *24. Tellingly, Defendants do not actually contend that the RIF itself is tentative or interlocutory. Instead, they suggest that the RIF does not "consummat[e]" the Department's "decision-making process" because it does not complete the Secretary's broader "reorganization" of the Department and does not "shut down OCR." Resp. Br. 15-16. But the Secretary's future plans will not stay the June 10, 2025, termination date, and they do not make the RIF decision any less final.

**B. The RIF is reviewable, not "committed to agency discretion."**

Defendants next claim that the Court cannot review the decision to institute a RIF because it is "committed to agency discretion by law." Resp. Br. 18 (quoting 5 U.S.C. § 701(a)(2)). Not so. See *New York*, 2025 WL 1463009, *24-25 (holding the RIF was reviewable).

The APA creates a "strong presumption favoring judicial review" to prevent arbitrary government and protect the rule of law. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22-23 (2018). Against this presumption, the "committed to agency discretion" exception must

be read "narrowly." *Id.* The Supreme Court has (1) "limited" the exception to those few "categories" of decisions that courts have "traditionally" declined to review and (2) further "restricted" it to those "rare" cases in which "the relevant statute" offers "no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. at 772 (2019). The RIF satisfies neither prong.

**1.** A reduction-in-force is not among the few "categories" of decisions that Congress and the courts have traditionally left to agencies' unchecked discretion. *Dep't of Com.*, 588 U.S. at 772. Courts routinely review agency personnel actions, including RIFs. *See*, *e.g.*, *Dugan v. Ramsey*, 727 F.2d 192, 195 (1st Cir. 1984) (holding that agency decision to reject applicant for employment that violated regulation was reviewable); *Vought*, 2025 WL 942772, *41 (reviewing RIF that prevented agency from performing its statutory functions). Indeed, in *Markland v. OPM*, which Defendants cite, the court reviewed the RIF to ensure that it complied with applicable regulations. *See Markland v. OPM*, 140 F.3d 1031, 1033-36 (Fed. Cir. 1998). If RIFs were unreviewable, the Executive Branch would have unchecked power to incapacitate federal agencies and nullify their statutory mandates without congressional consent. That has never been the law.

Nor is the RIF a presumptively unreviewable decision "not to take enforcement action" against particular violations, akin to the "decision of a prosecutor . . . not to indict." *Heckler v. Chaney*, 470 U.S. 821, 832 (1985), cited in Resp. Br. 16. Such decisions are unreviewable because they require case-specific judgments about "whether a violation occurred, [] whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts," and "whether the particular enforcement action requested best fits the agency's overall policies," matters that courts are less equipped to review. *Heckler*, 470 U.S. at 831-32. But the Secretary—who instituted the RIF—lacks the authority to exercise such enforcement discretion to

begin with. *See* 20 U.S.C. § 3413(a); S. Rep. 96-49, at 36 (1979), *as reprinted in* 1979 U.S.C.C.A.N. 1514, 1550 (explaining that statute requires Secretary to delegate enforcement authority to head of OCR). In any event, unlike the decision in *Heckler*, the RIF bears no resemblance to an exercise of "prosecutorial discretion." *Heckler*, 470 U.S. at 834. Indeed, it violates the APA in part because Secretary ignored its effects on enforcement altogether. *See* Opening Br. 16. And even if the Secretary had discretion to decline to investigate certain OCR complaints, that would not authorize her to remove OCR's ability to promptly investigate complaints altogether. *See Heckler*, 470 U.S. at 833 n.4 (noting that enforcement discretion does not authorize agency action that "amount[s] to an abdication of [] statutory responsibilities").

**2.** Regardless, the RIF is reviewable because the relevant statutes and regulations provide "meaningful standard[s]" against which to test the decision. *Dep't of Com.*, 588 U.S. at 772. As the government acknowledges (at 16), a court may review even an agency's enforcement decisions when a "substantive statute has provided guidelines for the agency to follow." *Heckler*, 470 U.S. at 833. That is because an agency is never "free . . . to disregard legislative direction in the statutory scheme that the agency administers." *Id.* Nor may the agency disregard its own regulations. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97-98 (1st Cir. 2025) (holding that "applicable regulations" supplied a "meaningful standard" for review). Several statutes and regulations, along with OCR's overall purpose, provide meaningful guideposts for reviewing the RIF.

**a.** First, the DEOA provides that the Secretary may not "consolidate, alter, or discontinue" OCR. 20 U.S.C. § 3473(a)(1). Congress passed that provision precisely to limit the Secretary's authority over OCR. S. Rep. 96-49, at 83. Its assessment that "some fetters were needed" to limit the Secretary's interference with OCR shows that Congress did not intend to foreclose judicial review. *Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 (1st Cir. 2020) (reasoning that

statute restricting internal agency committee appointment decisions indicated that Congress did not intend to remove them from judicial review). Defendants' reviewability argument does not even address this provision, much less explain why the Court cannot determine whether the RIF violates its plain terms. *See* Resp. Br. 16-18. It undisputedly does. *See* Opening Br. 19-20.

**b.** The civil rights statutes and regulations, which require OCR to enforce their nondiscrimination mandates and investigate potential violations, also provide meaningful standards. In *Heckler*, the Court made clear that when a statute required the agency to investigate complaints and initiate enforcement action upon a finding of probable cause, courts could review the agency's decision not to do so. 470 U.S. at 832-34. Even when a statute provides "insufficient standards for review of particular decisions," the Court may review actions that "amount to an abdication of [the agency's] statutory responsibilities." *N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 159 (1st Cir. 1987) (quoting *Heckler*, 470 U.S. at 833 n.4). Thus, when a civil rights statute directed an agency to act "affirmatively to further" its policies, the court could review the agency's systemic failure to enforce the statute against violators. *Id.* at 158-59.

Title VI and Title IX's mandate to "effectuate" their nondiscrimination requirements are no less meaningful. 42 U.S.C. § 2000d-1; 20 U.S.C. § 1682. The D.C. Circuit has already held that mandate supplies a "clear statement of an affirmative enforcement duty [that] should not be discounted" and enables courts to review whether a systemic failure to enforce Title VI within a "reasonable time" violated the statute. *Adams v. Richardson*, 480 F.2d 1159, 1162-63 (D.C. Cir. 1973). OCR's regulations are even more specific: They require "'a prompt investigation whenever a . . . complaint … indicates' prohibited discrimination." Resp. Br. 2 (quoting 34 C.F.R. § 100.7). Courts regularly review whether an agency has acted within a "reasonable time." *See Caswell v. Califano*, 583 F.2d 9, 15 (1st Cir. 1978); *Adams*, 480 F.2d at 1163 (holding court could review

whether OCR acted within a "reasonable time"); *Giacobbi v. Biermann*, 780 F. Supp. 33, 38 (D.D.C. 1992) (holding statute that "require[d] that an investigation be undertaken promptly" provided meaningful standard). "[A] reasonable time for agency action is typically counted in weeks or months, not years." *Moghaddam v. Pompeo*, 424 F. Supp. 3d 104, 116 (D.D.C. 2020). And here, OCR's own longstanding standard—to resolve 80% of cases within 180 days—provides a context-specific benchmark to anchor the analysis. *See* Opening Br. 4. The Court can review whether the RIF has caused OCR to lag so far behind that benchmark as to violate its mandates.

**c.** But regardless of whether the Department has violated Title VI and Title IX's mandates, they reflect a "relevant factor" the Secretary should have considered. *State Farm*, 463 U.S. at 42-43. Agencies must ensure their decisions do not undermine their ability to achieve such mandates. For example, the Supreme Court recently held that courts could review an agency's decision to add a new question to the census because the Census Act "mandat[ed] a population count that will be used to apportion representatives." *Dep't of Com.*, 588 U.S. at 772-73. In doing so, the statute identified a relevant factor to consider: whether the decision would advance or undermine the agency's "duty" to conduct an "accurate" census that "fairly accounts for the crucial representational rights that depend on the census." *Id.* Likewise, by making a "clear statement of an affirmative enforcement duty," *Adams*, 480 F.2d at 1162, Title VI and Title IX identify a factor plainly relevant to the decision to terminate half of OCR's staff: whether the cuts would undermine OCR's capacity to comply with that statutory duty. As the D.C. Circuit has held, such a command "should not be discounted." *Id.* Indeed, the DOEA contemplates that OCR will "employ such officers and employees, including staff attorneys, as may be necessary to carry out [its] functions." 20 U.S.C. § 3413(c)(2). The Court may review the Secretary's decision, at minimum, to ensure she considered whether the terminated staff were necessary to perform those functions.

**d.** Finally, Defendants admit that the RIF seeks to "facilitate the closure of the Department of Education." Resp. 23 (quoting Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679, and arguing that staying the RIF would "disrupt" the effort to comply with that executive order). That goal is inconsistent with the goal implicit in Congress's decision to create OCR and give it a job to do. *See* Opening Br. 15. The Court can review and vacate the RIF for that reason alone. When a court can "discern from the statutory scheme a Congressional intention to pursue a general goal," and "the agency action is found not to be reasonably consistent with this goal, then the courts must invalidate" the agency action. *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985); *see California*, 132 F.4th at 98 (holding the court could review agency's grant termination decision to determine whether the agency's reasons conflicted with the grant statute's goals).

## IV.    Plaintiff's ultra vires claim is likely to succeed.

The government argues that Plaintiffs' ultra vires claim "fails for the same reasons as does their APA statutory requirements claim"—that is, because the RIF is unreviewable under APA §§ 701(a)(1) and 704. Resp. Br. 20-21. But ultra vires review, designed to ensure that agencies do not exceed their lawful authority or violate clear statutory mandates, is available "even when APA review is unavailable." Opening Br. 20; *see, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172-73 (D.C. Cir. 2003) (explaining that "even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception" when the agency has acted "ultra vires" by "acting outside the scope of its statutory authority"). In any event, the government's APA arguments lack merit for the reasons already explained. *See supra* Part III. Accordingly, Plaintiffs' ultra vires claim is also likely to succeed on the merits.

## V.    Plaintiffs have shown irreparable injury.

In arguing (at 21) that T.R. and A.J. have not shown irreparable harm, the government

rehashes its standing arguments, which fail for the reasons already explained, *see supra* Part I. It also argues that VRLC's diversion of resources is insufficient to show irreparable harm based on cases holding that "economic loss" does not show irreparable harm unless the loss "would significantly damage [a] business above and beyond a simple diminution in profits." *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-CV-3569, 2023 WL 2043149, at *3, 6-7 (D.D.C. Feb. 16, 2023). But VRLC alleges more than "litigation expenses" and other economic harm. Resp. Br. 22. It has presented unrebutted evidence that, due to the RIF, it must turn down clients, divert attorneys' time (not just money) from critical tasks, and will suffer damage to its reputation, all of which show irreparable harm. *See* Opening Br. 22-25 (collecting cases); *see also*, *e.g.*, *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (holding organizations had standing, no matter the size of "expenditures," because the challenged action "ma[de] it more difficult . . . to accomplish their primary mission of registering voters").

**VI.    The balance of equities and public interests favor an injunction.**

Finally, the balance of equities and public interest favor an injunction. In arguing otherwise, the government does not argue that the financial costs of paying employees or facilitating their return to work weigh against an injunction. Nor could it, since OCR requested and Congress appropriated funds for OCR to pay staff, and reinstated employees would perform necessary work if allowed to do so. *See* Opening Br. 25; Ex. 13 (FY 2025 Budget Request) at 10; *Maine v. U.S. Dep't of Agric.*, No. 1:25-CV-00131, 2025 WL 1088946, at *29 (D. Me. Apr. 11, 2025) (finding no irreparable harm where injunction would merely require government "to disburse funds that Congress has appropriated"). Instead, Defendants' only counter is that the injunction "would disrupt the Department's efforts to comply with" the President's orders and policy priorities. Resp. Br. 23. But, of course, an agency may not pursue the Executive's policy

priorities by violating the law. *See Rhode Island*, 2025 WL 1303868, at *17 (rejecting argument that injunction was unwarranted because it would "disable several federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities"). There is "generally no public interest in the perpetuation of unlawful agency action"; and "[i]n fact, the 'substantial' public interest lies 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *League of Women Voters*, 838 F.3d at 12). Accordingly, the balance of interests strongly favors an injunction.

## VII.    The Court should grant the requested relief.

The Court should grant the relief requested: it should stay the RIF and facilitate the affected staff's return to duty. The "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And the normal remedy for a successful APA challenge is vacatur of the unlawful decision. *See Woonasquatucket River Watershed Council v. U.S. Dep't of Agriculture*, No. 25-cv-00097, 2025 WL 1116157, at *25 (D.R.I. Apr. 15, 2025) (collecting cases). Thus, for example, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Courts have applied these principles to hold that the "ordinary remedy" under the APA for an unlawful RIF is also "vacatur" and have stayed the RIF and ordered reinstatement pending a final decision. *Maryland*, 2025 WL 800216, at *25.

## CONCLUSION

Here, restoring the affected employees to their job duties is necessary to restore the "status quo" and to provide OCR the staff and flexibility to perform its statutory mandates. *Maryland*, 2025 WL 800216, at *22. The court should grant the motion without bond. *See* Opening Br. 25.

*/s/ Sean Ouellette*
Sean Ouellette
Patrick Archer**
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
Phone: (202) 797-8600
souellette@publicjustice.net

Leila Nasrolahi*
PUBLIC JUSTICE
475 14th Street, Unit 610
Oakland, CA 94612
Phone: (510) 622-8250
lnasrolahi@publicjustice.net

L. Reid Skibell*
Jonathan H. Friedman*
GLENN AGRE BERGMAN & FUENTES LLP
1185 Avenue of the Americas
New York, New York 10036
Tel: (212) 970-1600
rskibell@glennagre.com
jfriedman@glennagre.com

*Counsel for Plaintiffs*

*\* Admitted pro hac vice*

*\*\* Motion for admission pro hac vice pending*

21

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified in the Notice of Electronic Filing.

*/s/ Sean Ouellette*
Sean Ouellette