## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| VICTIM RIGHTS LAW CENTER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 25-11042-MJJ |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| EDUCATION, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

June 18, 2025

JOUN, D.J.

The Department of Education's Office of Civil Rights ("OCR"), a statutorily created office, is tasked by Congress to enforce federal civil rights laws that ban discrimination based on race, sex, and disability in the public education system. For over forty years, students facing discrimination and/or harassment have relied on OCR to investigate their claims and to provide an alternative route to relief from costly litigation. Schools, as well as non-profit organizations representing students and parents, have relied on OCR's expertise and guidance to ensure compliance with federal civil rights laws.

This case arises from the impacts of the far-reaching March 11, 2025 reduction in force ("RIF"), which severely impacted OCR, resulting in the shutdown of seven of OCR's twelve offices and dismissal of half its employees. Plaintiffs—two students and their parents who have pending investigations with the OCR, and a non-profit organization dedicated to serving the legal

needs of victims of sexual and gender-based violence—filed suit alleging that they are likely to suffer irreparable harm because the RIF has made it impossible for OCR to meet its statutory duties. More specifically, student Plaintiffs A.J. and T.R., who have experienced severe race-based and disability-based harassment in school, have seen their OCR investigations stall due to the RIF, and allege, alongside their parents, that the RIF will make it impossible for OCR to timely resolve their complaints and for them to return to school. Plaintiff Victim Rights Law Center ("VRLC"), who relies on OCR's processes, alleges that the RIF has made it more difficult for VRLC to accomplish its primary mission: providing legal recourse for victims of sexual and gender-based violence.

I first note that Plaintiffs' suit is related to an action brought by 20 states and the District of Columbia, school districts, education non-profits, and labor unions challenging the RIF as it applied to the Department of Education's (the "Department") functions in their entirety, *see New York v. McMahon*, No. 25-cv-10601-MJJ (the "Lead Case"). On May 22, 2025, I granted a preliminary injunction in the Lead Case, enjoining the RIF and ordering that the Department be returned to the pre-RIF status quo. *See New York v. McMahon*, No. 25-cv-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025). I found that Consolidated Plaintiffs were likely to succeed in their claims that the mass terminations hamstring the Department's ability to meet its statutory functions and that the RIF effectively eliminates the Department without Congressional approval, in violation of the APA and the Constitution.

Like the Lead Case, Plaintiffs here move for a preliminary injunction, seek enjoinment of the RIF, and request a return to the status quo. Although the cases are related, I find that Plaintiffs' case warrants a separate decision to address the unique harms they are suffering. As further elucidated below, Plaintiffs have demonstrated a likelihood of success on the merits of

their APA and *ultra vires* claims, as well as a likelihood that they will suffer irreparable harm in the absence of an injunction. Thus, Plaintiffs' Motion for Preliminary Injunction, [Doc. No. 18], is <u>GRANTED</u>.

## I.    BACKGROUND

### A.  <u>Legal Background</u>

#### 1.  <u>Creation And Functions Of The OCR</u>

In 1979, Congress established the United States Department of Education—along with many of its offices, including the Office of Civil Rights—by statute through the Department of Education Organization Act ("DEOA"). [Doc. No. 1 at ¶ 15 (citing 20 U.S.C. §§ 3401–510)]. In part, Congress established the Department to satisfy the "continuing need to ensure equal access for all Americans to educational opportunities of a high quality" and to ensure that "such educational opportunities should not be denied because of race, creed, color, national origin, or sex." [*Id.* (quoting 20 U.S.C. § 3401)].

In pursuit of these goals, Congress created the Department's Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights. [*Id.* at ¶ 16 (citing S. Rep. No. 96-49, at 35 (Mar. 27, 1979); 20 U.S.C. § 3413(a)]. OCR is tasked with the responsibility to enforce the nation's civil rights statutes that prohibit race, sex, and disability-based discrimination under education programs and activities that receive financial assistance from the federal government. [*Id.* at 17]. Namely, the statutes administered by OCR include:

a.   *Title VI of the Civil Rights Act of 1964*: Title VI obligates the Department to enforce the prohibition of discrimination based on race, color, or national origin in programs or activities that receive federal funds. [*See id.* at ¶ 17–18 (quoting 42 U.S.C. §§ 2000d *et seq*.) ("Each Federal department and agency which is empowered to extend Federal financial assistance to

any program or activity by way of grant, loan, or contract . . . is . . . directed to effectuate the

provisions of [Title VI] with respect to such program or activity")].

b. *Title IX of the Education Amendments of 1972*: Title IX obligates the Department to enforce

the prohibition of sex-based discrimination, including sexual harassment. [*See id.* (quoting 20

U.S.C. §§ 1681 *et seq*.) ("Each Federal department and agency which is empowered to

extend Federal financial assistance to any program or activity by way of grant, loan, or

contract . . . is . . . directed to effectuate the provisions of [Title IX] with respect to such

program or activity.")].

c. *Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities

Act*: These statutes obligate the Department to enforce the prohibition of disability

discrimination. [*See id*. (first citing 29 U.S.C. § 794 ("No otherwise qualified individual with

a disability . . . shall . . . be subjected to discrimination under any program or activity

receiving Federal financial assistance or under any program or activity conducted by any

Executive agency . . . The head of such agency shall promulgate such regulations as may be

necessary to carry out the amendments to this section . . . ."); and then citing 42 U.S.C. §§

12132 ("[N]o qualified individual with a disability shall . . . be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."))].

To facilitate the implementation of the aforementioned statutes, federal regulations

explicitly require the OCR to promptly investigate and resolve complaints that indicate "possible

failure[s] to comply" with Title VI, Section 504, Title IX, and Title II. [*Id.* at ¶ 19 (citing C.F.R.

Parts 100, 104, & 106; 28 C.F.R. Part 35)]. For example, "[t]he responsible Department official

or his designee" is required to "make a prompt investigation whenever a compliance review,

report, complaint, or any other information indicates a possible failure to comply" with the regulations implementing Title VI. [*Id.* (citing 34 C.F.R. § 100.7(c))]. In addition to mandating retroactive investigations, "the regulations require OCR to initiate 'periodic compliance reviews' to assess the practices of recipients [of federal funding] to determine whether they comply with the Title VI regulations." [*Id.* (quoting Off. For Civ. Rts., U.S. Dep't of Educ., OCR Case Processing Manual (hereinafter "Case Processing Manual"), at 21 (Feb. 19, 2025), https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/ocrcpm.pdf; 34 C.F.R. § 100.7(a))]. Similarly, the regulations implementing Title II require OCR to investigate Title II complaints for which it is responsible. [*Id.* (citing 28 C.F.R. § 35.171; Case Processing Manual, at 7 n.3)].

To guide the enforcement of these regulations, OCR's Case Processing Manual provides procedures that OCR must follow "to promptly and effectively investigate and resolve complaints, compliance reviews and directed investigations." [*Id.* at ¶ 20 (citing Case Processing Manual, at 2)]. Specifically, it requires OCR to ensure that "the actions it[] takes in investigations are legally sufficient, supported by evidence, and dispositive of the allegations." [*Id.* (quoting Case Processing Manual, at 15)]. Once OCR concludes its investigation, it must issue a letter of findings regarding whether the evidence obtained during the investigation is sufficient to establish that a violation indeed occurred. [*Id.* at ¶ 22].

When OCR finds a violation, it must attempt to negotiate a resolution agreement, which "must include actions [or] steps that . . . will remedy both the individual discrimination at issue and any similar instances where future violative conduct may recur." [*Id.* (quoting Case Processing Manual, at 17)]. If OCR is able to resolve a case through such a voluntary resolution agreement, it must also ensure: (1) the agreement is tied to both the allegations and the evidence obtained during the investigation; and (2) the resolution comports with applicable regulations.

[*Id.* at ¶ 21]. Upon entering the resolution agreement, OCR must continue to monitor the recipient of federal funding to ensure it complies with the agreement. [*Id.* (citing Case Processing Manual, at 22)].

However, if OCR discovers a violation but is unable to negotiate a resolution agreement within the specified timeframe, OCR must initiate enforcement action. [*Id.* at ¶ 23]. OCR must either: (1) initiate administrative proceedings to deter financial assistance that the recipient typically receives from the Department; or (2) refer the case to the Department of Justice for judicial proceedings. [*Id.* (citing Case Processing Manual, at 23)].

In addition to investigations and enforcement actions, federal regulations require OCR to "provide assistance and guidance to recipients to help them comply voluntarily" with civil rights laws in order to prevent such violations from even occurring in the first place. [*Id.* at ¶ 24 (citing 34 C.F.R. §§ 100.6(a), 100.12(b)) (requiring OCR to "issue and promptly make available to interested persons forms and detailed instructions and procedures for effectuating this part")]. For instance, OCR provides guidance documents, FAQs, pre-recorded webinars and webcasts, and many other similar resources for facilitating compliance with civil rights statutes.[1] For further support pertaining to compliance—e.g., for interpretative guidance regarding the application of civil rights laws to certain situations—students, families, schools, and advocates like VRLC could contact OCR's attorneys. [*Id.*]. These resources empowered students to advocate for themselves, helped VRLC advocate for its clients, and enabled schools to achieve compliance without the need for formal legal action. [*Id.*].

---

[1] Off. For Civ. Rts., U.S. Dep't of Educ. Civil Rights Tutorials and Technical Assistance, https://www.ed.gov/about/ed-offices/ocr/civil-rights-tutorials-and-technical-assistance (last visited June 9, 2025).

### 2. <u>OCR's Role In Enforcing Civil Rights Laws In Schools</u>

OCR is an essential bulwark against unlawful discrimination in the American education system, as it carries out relevant landmark legislation delegated to it by Congress. [*Id.* ¶ 25]. In particular, a functional OCR is crucial because, although students are permitted to file lawsuits against educational institutions that violate their rights under Title VI and Title IX, a lawsuit is not always a viable option for many students who face discrimination. [*Id.* at ¶ 26].

First, finding an attorney who can navigate the complex demands of litigation is too financially and logistically burdensome for most students, as compared to the OCR process. [*Id.* at ¶ 27]. Even for those who can afford an attorney, it is sometimes impossible for them to find an attorney who is willing to litigate their case on a contingency basis, especially in light of a 2022 Supreme Court decision holding that claimants can no longer obtain damages for emotional distress under Title VI, Title IX, or Section 504. [*Id.*]. Even when students can find an attorney willing to take their case, litigation is still very costly: Typically, at the end of the case, students must pay one-third of any money recovered in attorneys' fees, in addition to the expenses of litigation—which can amount to tens or even hundreds of thousands of dollars. [*Id.*]. In contrast, the OCR process is designed for students to file complaints and obtain relief without the financial and logistical burdens of an attorney, since OCR itself conducts investigations and negotiates resolutions with schools without the need for students to conduct discovery, brief motions, or handle a trial. [*Id.*]. Further, OCR's two mediation options—in which the parties may voluntarily agree to have a trained OCR staff member help them to try to reach a mutually acceptable resolution to the complaint—are more affordable for students, since OCR provides mediation without cost to the complainant. [*Id.* at ¶ 33 (citing Case Processing Manual at 13–14)].

Second, the bar to succeed in a private lawsuit is much higher than the bar to succeed in an OCR investigation. For instance, private lawsuits require a showing of intentional discrimination, but administrative enforcement by OCR does not. [*Id.* at ¶ 28]. Accordingly, a claim of disparate impact under Title V—i.e., a claim based on a school policy that has a disparate impact based on race—would allow OCR to investigate the potential violation, but students may not assert such claims in a private lawsuit, which requires a showing of intentional discrimination. [*Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 285 (2001))]. Similarly, a student can file a lawsuit based on race-based harassment under Title VI only if: (1) the harassment was both "severe" *and* "pervasive"; (2) a school official with authority to take corrective action had "actual" knowledge of the harassment; and (3) the school showed "deliberate indifference" to it. [*Id.* at ¶ 29 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 643, 650 (1999))]. Even when all the necessary elements are present, the burden of acquiring a sufficient amount of that evidence through discovery to prove these elements is often insurmountable. [*Id.*]. Alternatively, OCR may determine that a school has violated Title VI if: (1) a student experienced "severe, pervasive *or* persistent" race-based harassment; (2) a school employee had "constructive" notice—i.e., *should* have known—of the harassment; and (3) the school failed to take "reasonable steps to eliminate" the hostile environment. [*Id.* (quoting Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance, 59 Fed. Reg. 11448, 11449-50 (Mar. 10, 1994))].

Likewise, for Section 504 and Title II harassment lawsuits, a student alleging disability-based harassment must meet an adaptation of the *Davis* standard, showing that: (1) they faced severe and pervasive harassment based on their disability; and (2) the school showed "deliberate indifference" to it. [*Id.* at ¶ 30 (quoting *Thomas v. Springfield Sch. Comm.*, 59 F. Supp. 3d 294,

305 (D. Mass. 2014))]. However, OCR can much more easily identify the occurrence of a disability-based harassment violation under Section 504 and Title II when: "(1) a student is bullied based on a disability; (2) the bullying is sufficiently serious to create a hostile environment; (3) school officials know or should know about the bullying; and (4) the school" failed to "take prompt and effective steps reasonably calculated to end the bullying, eliminate the hostile environment, prevent it from recurring, and, as appropriate, remedy its effects." [*Id*. (quoting Off. Of Civ. Rts., U.S. Dep't of Educ., *Dear Colleague Letter: Responding to Bullying of Students with Disabilities* 4 (Oct. 21, 2014) (emphasis added))].

Finally, while the Department's Title IX regulations require more for sexual harassment complaints than for disability-based ones, these standards are still much less stringent and less burdensome than those for private litigants under *Davis*. [*Id*. at ¶ 31]. Namely, OCR may find that a school had "actual" notice of sexual harassment if "any employee"—even those who did not have "authority to redress the harassment"—knew about it. [*Id*. (citing Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30038–30039 (May 19, 2020))]. Additionally, single instances of "sexual assault, dating violence, domestic violence, and stalking" all meet the definition of "sexual harassment" for OCR's purposes even when they do not fully "meet the Davis elements of severity, pervasiveness, and objective offensiveness." [*Id*. (citing Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026, 30036 (May 19, 2020))].

Overall, OCR has often obtained systemic relief—e.g., changes to school policies, procedures, and practices—that benefit not only individual complainants but also other current and future students at the school. [*Id*. at ¶ 32]. In addition, when OCR reaches a resolution

agreement, it monitors compliance with that agreement on its own, as opposed to individual students who often lack the power, time, or resources to do so. [*Id*.]. Accordingly, these foundational remedies help to prevent future violations, whereas private lawsuits can often only provide individualized relief for individual plaintiffs. [*Id*.].

Given the crucial services that OCR provides, many students who face discrimination or harassment at school, because their local school systems have either engaged in discrimination or allowed it to continue, have looked to OCR to protect their civil rights because they have nowhere else to turn. [*Id*. at ¶ 3].

### B. Factual Background

#### 1. The RIF's Impact On The OCR

The RIF eliminated more than half of the agency's previous 550-person staff. [*Id*. at ¶ 39]. On the same day as the RIF, the Department terminated all employees and completely shuttered seven of OCR's twelve regional offices in Boston, Chicago, Cleveland, Dallas, New York, Philadelphia, and San Francisco. [*Id*. at ¶ 40]. These OCR employees were notified of their termination less than two hours after they received notice of the RIF, and the notice did not comply with standard protocols for RIFs. [*Id*. at ¶ 43].

Even months prior to the RIF, Defendants had frozen nearly all investigations except for a select few high-profile investigations regarding diversity, equity and inclusion programs that Defendants allege discriminate against white and Asian students. [*Id*. at ¶ 5]. Since January 2025, the Department has ignored thousands of pending complaints pertaining to other types of discrimination, which cannot be resolved in a prompt and equitable manner due to the RIF and office closures. [*Id*. at ¶ 53]. Specifically, OCR has not announced any investigations or resolutions of complaints based on: (1) disability discrimination; (2) sex discrimination, besides

those based on policies or practices that permit transgender students to access school facilities and activities; or (3) race discrimination against Black, Latino or Indigenous students. [*Id.*]. Beyond freezing all investigations of complaints filed by members of the public, OCR also instructed staff to not communicate with students, families, and schools involved in their cases and to cancel scheduled meetings and mediations. [*Id.* at ¶ 36]. Additionally, OCR instructed its staff that they could not request documents, conduct interviews, participate in meetings or mediations, negotiate resolution agreements, issue letters of finding, or take other steps to investigate or resolve complaints. [*Id.*]. On February 20, 2025, Acting Assistant Secretary for Civil Rights Craig Trainor lifted the pause exclusive to complaints that solely alleged disability-based discrimination, while the freeze remained in effect for complaints containing claims of race or sex discrimination. [*Id.*]. On March 8, 2025, the Department removed OCR's ability to promptly or equitably investigate most complaints of discrimination. [*Id.* at ¶ 38].

Overall, the RIF leaves OCR with the capacity to address only a small fraction of the complaints that it receives, making it impossible for OCR to comply with its statutory and regulatory obligations. [*Id.* at ¶¶ 4–5, 42, 47]. Namely, the shuttered offices had an aggregate of 208 investigators and part-time investigators—comprising approximately 55% of OCR's total number of investigators—and handled most of OCR's open investigations, leaving doubled caseloads for the remaining investigators. [*Id.* at ¶ 48]. The closings have made it costly and often infeasible for investigators to visit schools in-person to gather critical facts, making it impossible for OCR to complete investigations and cases promptly and fairly. [*Id.* at ¶ 49]. Additionally, OCR will lose the regional expertise and community relationships that those now-closed offices had built and used to resolve cases. [*Id.*]. While the Department has recently fast-tracked certain high-profile investigations by collaborating with the Department of Justice, it

does not address the fact that OCR is currently incapable of addressing the vast majority of OCR complaints, especially since the Department of Justice's Civil Rights Division is undergoing its own downsizing. [*Id.* at ¶ 50].

As of January 2025, OCR had 12,000 or more active investigations, including nearly 6,000 complaints of disability discrimination; 3,200 complaints of race discrimination; and 1,000 complaints of sexual harassment, including sexual violence. [*Id.* at ¶ 54]. However, most of the students behind those complaints will never receive meaningful relief due to OCR's lack of intervention to secure needed learning accommodations or to allow them to return to school safely. [*Id.*]. Many OCR cases are time-sensitive and involve the ongoing educational needs of children, often affecting their access to education altogether. [*Id.* at ¶ 55]. As an example, prior to the RIF, a school had refused to allow a kindergarten student to bring a wheelchair on campus until an Individualized Education Program meeting could be held—blocking the student from accessing school altogether. [*Id.* at ¶ 56]. Due to OCR's greater capacity at the time, OCR's rapid resolution procedure allowed the situation to be resolved such that the student was able to start school on time. [*Id.*]. Thus, without such intervention, the student could have been forced to miss the entire school year and be irreparably harmed. [*Id.*]. Similarly, Craig Haller, a special education advocate, filed an OCR complaint in January 2025 against Brookline, Massachusetts Public Schools alleging systemic discrimination against students with disabilities. [*Id.* at ¶ 57]. Prior to the RIF, Mr. Haller's complaint would have been handled by OCR's Boston office. [*Id.* at ¶ 58]. Now, it is unclear which office, if any, is addressing the complaint, as Mr. Haller has received no updates on the matter since it was filed. [*Id.*]. As a result, special education services continue to be disrupted in the Brookline school district. [*Id.*].

## 2. Plaintiff T.R.

Plaintiff T.R. is a twelve-year-old Black child who attended a public elementary school in Falls City, Nebraska from 2022 to 2023. [*Id.* at ¶ 10]. Plaintiff Tara Blunt is T.R.'s mother. [*Id.*]. During this period, T.R. experienced persistent harassment from other students based on his race. [*Id.*]. Specifically, a group of students pushed and hit him at recess and regularly referred to him with racial epithets. [*Id.* at ¶ 59]. In October 2022, one of the students pushed T.R. to the ground and stomped on his head, and teachers found T.R. crying in the fetal position. [*Id.*]. In response, T.R. and Ms. Blunt reported the racial harassment to teachers and administrators, but school officials failed to take meaningful action to end the harassment. [*Id.*]. The school district also did not provide any plan to protect T.R. from the ongoing harassment. [*Id.*]. As a result, with T.R. afraid to return to his public school, Ms. Blunt saw no viable choice but to withdraw him from the school district. [*Id.*].

In June 2023, Ms. Blunt filed an OCR complaint under Title VI of the Civil Rights Act of 1964. [*Id.* at ¶ 60]. In August 2023, she amended the complaint through counsel. [*Id.*]. Relying on OCR's longstanding guidance regarding Title VI racial harassment complaints, Ms. Blunt alleges that: (1) T.R. experienced "severe, pervasive or persistent" race-based harassment; (2) the school district had at least "constructive" notice of the harassment; and (3) it failed to take "reasonable" steps to eliminate the hostile environment. [*Id.*]. Although OCR opened an investigation on December 7, 2023, regarding the school's response to the harassment and the alleged retaliation, T.R.'s complaint is likely to remain uninvestigated and unresolved due to the RIF. [*Id.* at ¶ 61, 63]. The Kansas City office, to which T.R.'s complaint was assigned, has absorbed all of the cases previously assigned to OCR's much larger Dallas office, which had approximately 2,000 pending complaints. [*Id.* at ¶ 63]. Consequently, according to the Dallas

office's Chief Attorney, "[i]t is not possible for the Kansas enforcement office to absorb this work" while still processing its "own caseload." [*Id.*].

### 3. **Plaintiff A.J.**

Plaintiff A.J. is a ten-year-old child with life-threatening allergies, including an allergy to dairy, that constitute a legal disability under Section 504. [*Id.* at ¶¶ 11, 64]. Plaintiff Karen Josefosky is A.J.'s mother. [*Id.* at ¶ 11]. From 2023 through 2024, A.J. attended third grade at a public school in Birmingham, Michigan. [*Id.*]. During this period, he was repeatedly and severely harassed for his allergies throughout the school year, while his school failed to address the discrimination. [*Id.* at ¶ 65]. Classmates called A.J. names, pulled his glasses off his face, shoved him, punched him, waved food with his allergens, taunted him to touch or eat the food, and rubbed cheese on his desk. [*Id.*]. Two students poured milk on A.J.'s lunch and coat on separate occasions, saying "[a]llergies are dumb" while other students laughed. [*Id.*]. Following a particularly traumatic event in which other students surrounded A.J. with allergens, taunted him, and pushed him to the ground, A.J. no longer felt safe returning to school, and Ms. Josefosky was forced to withdraw A.J. from the public school. [*Id.* at ¶¶ 65, 67]. The school did not respond to this recurring harassment effectively, if at all, as the deputy superintendent even admitted at one point that the school had no plan in place to protect A.J. from further harassment. [*Id.* at ¶ 66]. Nevertheless, the district denied the family's request to transfer A.J. to a different public school. [*Id.*].

On September 2, 2024, Ms. Josefosky filed a complaint with OCR regarding the school's failure to address A.J.'s disability-based harassment and failure to implement A.J.'s Section 504 plan. [*Id.* at ¶¶ 11, 68]. On October 1, 2024, OCR opened an investigation into "whether a student was subjected to harassing conduct on the basis of disability . . . and, if so, whether the District failed to investigate promptly and to respond appropriately," and "whether the District

failed to provide a qualified student with a disability with a free appropriate public education."
[*Id.* at ¶ 69]. Shortly after OCR opened the investigation, OCR recommended a mediation, and
the parties began to discuss potential dates. [*Id.* at ¶ 70]. On February 5, 2025, however, OCR
informed Ms. Josefosky that the investigation had been paused. [*Id.*]. Since then, OCR has
neither contacted Ms. Josefosky to reschedule the mediation nor indicated that any progress has
been made on the case. [*Id.*]. Upon information and belief, OCR has stopped investigating Ms.
Josefosky's complaint, and the RIF has made it impossible for OCR to fulfill its responsibility to
promptly resolve the investigation and address the discrimination. [*Id.* at ¶ 11]. Due to the RIF
and office closures, A.J.'s complaint is unlikely to be resolved, while the harassment at his public
school remains, effectively barring A.J. from attending school there. [*Id.* at ¶ 72].

### 4. **Plaintiff VRLC**

Plaintiff Victim Rights Law Center is a nonprofit organization that is dedicated to serving
the legal needs of victims of sex-based harassment. [*Id*. at ¶ 9]. In pursuit of this goal, one of
VRLC's core activities includes representing students in OCR investigations. [*Id.* at ¶ 73].
Notably, because VRLC does not have the capacity to take most cases to litigation, the OCR
process provides the only viable way to obtain relief for many of its clients. [*Id*. at ¶ 75].
However, Defendants have upended this activity by precluding OCR's ability to promptly and
equitably investigate most discrimination complaints, which has forced VRLC to divert its
limited resources to exploring alternative remedies for its clients and for attorneys nationwide
who seek VRLC's advice. [*Id*.]. Many of the complainants that VRLC represents had OCR
investigations that were previously pending in OCR's now-closed Boston office. [*Id.* at ¶ 76].
Due to the RIF, the OCR investigators and points of contact for those cases were terminated.
[*Id.*]. Since then, VRLC has attempted to contact OCR to ascertain the status of its pending
cases, but it has not received any response. [*Id.*]. As such, OCR is now unlikely to provide

VRLC's clients with timely or meaningful relief, leading VRLC to spend time and resources to investigate other avenues to relief for its clients and advise them accordingly. [*Id.*].

In addition to directly representing its own clients in OCR investigations, VRLC also provides advice to advocates, attorneys, and education professionals across the country to work with victims of gender-based violence in education settings. [*Id.* at ¶ 77]. To do so, VRLC employs three full-time staff attorneys responsible for reviewing such education-related requests, conducting research necessary to address them, and counseling the person seeking advice. [*Id.*]. It also employs three other staff attorneys who provide advice on education-related matters, in addition to other subjects. [*Id.*]. In the last twelve months, VRLC provided ninety consultations on education-related matters. [*Id.*]. However, the RIF and office closures have led to a flood of requests for advice regarding other avenues to relief from attorneys and advocates across the country, including those who had pending complaints in offices closed during the RIF. [*Id.* at ¶ 78]. These requests required VRLC attorneys to conduct additional research that would not have been necessary when OCR was a viable path to relief, as they must now conduct hours of jurisdiction-specific research to determine the alternative options available to victims in particular states and territories, if any. [*Id.*].

## II.    STANDING[2]

Plaintiffs have shown concrete, imminent injury, traceable to Defendants that is sufficient to establish standing. Below, I list just a few examples of Plaintiffs' harms due to the RIF. *See infra* Section IV.B (providing comprehensive summary of irreparable harms to Plaintiffs as a result of the RIF).

---

[2] For an overview of the legal standards courts must follow when analyzing standing, *see New York*, 2025 WL 1463009, at *17.

A.  **Students**

A.J. and T.R. and their parents (the "Students") have seen their OCR investigations stall because of the RIF. [Doc. No. 20-16 at ¶¶ 17, 20–21 (Although A.J.'s parent spoke with an OCR mediator on January 15, 2025, and had discussed imminent mediation dates, since the RIF, "OCR has not contacted [A.J.'s] family to schedule the mediation" and has not "indicated that any progress has been made on [his] case."); Doc. No. 20-15 at ¶¶ 13–15 (OCR opened T.R.'s investigation on December 7, 2023; however, on March 12, 2025, his OCR investigator noted the Department's announcement of the RIF. T.R.'s parent has "not heard anything from OCR since then.")]. Without ongoing OCR investigations, the Students are unable to attend school for fear of reentering a hostile environment, demonstrating concrete injury in fact. [Doc. No. 20-16 at ¶¶ 4–9; Doc. No. 20-15 at ¶¶ 4–11]; *see Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121–22 (1st Cir. 2003) (cleaned up) (finding irreparable harm where "developmentally delayed and hearing-impaired teenager" experienced gap in interpreter services because even "a few months can make a world of difference in harm to a child's development"); *see also Plyler v. Doe,* 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation on the life of the child," that "education has a fundamental role in maintaining the fabric of our society," and "the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.").

The Students have also shown procedural injury to demonstrate standing. *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007) (citing *Lujan,* 504 U.S. at 572 n.7) ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). "With immediacy concerns relaxed, to establish an injury in fact, Plaintiffs need

only show that [OCR was] 'designed to protect some threatened concrete interest' personal to Plaintiffs." *Id.* (citing *Lujan*, 504 U.S. at 572–73 nn. 7–8). Here, the applicable law and regulations guarantee A.J. and T.R. "'a prompt investigation whenever a . . . complaint . . . indicates' prohibited discrimination" to fulfill OCR's purpose of protecting "access to equal educational opportunity." 20 U.S.C. § 3402; [Doc. No. 25 at 11 (citing 34 C.F.R. § 100.7)]. As already established, the Students have seen their investigations stall due to the RIF. Therefore, the Students have alleged a sufficient injury in fact traceable to Defendants. *See Ahmed v. Blinken*, 759 F. Supp. 3d 1, 9 (D.D.C. 2024) (finding concrete harms where plaintiff "alleges . . . both the procedural harm from the prolonged delay in the processing of her application and the emotional harm from being unable to visit her family in the United States.").

Defendants argue that Plaintiffs rely on a highly attenuated chain of possibilities that foreclose standing. Specifically, Defendants argue that Plaintiffs only point to the fact that half of OCR's staff was reduced and that seven of the twelve regional offices are closed to show that complaints will not be investigated, and that relief would be granted but for the delay in investigations. Defendants' argument is unavailing. Defendants ignore that the Students' investigations were actually stalled *after the RIF announcement*. Where there was previous communication between the parents and investigators about A.J. and T.R.'s cases, there is now radio silence. [Doc. No. 20-16 at ¶¶ 17, 20–21; Doc. No. 20-15 at ¶¶ 13–15]. Defendants also ignore that the OCR offices handling the Students' complaints are either closed or inundated with cases from nearby closed offices *due to the RIF*. [Doc. No. 20-16 at ¶ 15 ("A.J.'s case was assigned to the Cleveland OCR office."); Doc. No. 20-4 at ¶¶ 12, 15 (identifying the Cleveland office as closed); Doc. No. 20-15 at ¶ 13 (T.R.'s complaint was assigned to OCR's Kansas City office.); Doc. No. 20-3 at ¶ 19 (Dallas office's estimated 2,000 cases will be transferred to

Kansas, which is "much smaller than the Dallas enforcement office, and already struggling with its own case load.")]. Finally, Defendants ignore that former staff within OCR have explicitly stated that OCR will no longer be able to complete investigations within a reasonable time *due to the RIF*. [Doc. No. 20-3 at ¶¶ 2, 18 ("Given my experience [as Chief Attorney at OCR's Dallas office], I do not think that the Department can meet its obligations to address complaints, complete investigations, and ultimately enforce civil rights laws."); Doc. No. 20-4 at ¶ 16 ("[I]t is impossible for the remaining investigative staff to absorb the additional cases in a way that will continue to meaningfully enforce civil rights laws in the education systems of this country.").

Taken together, far from a highly attenuated chain of possibilities that foreclose standing, Plaintiffs "show a predictable chain of events leading from the government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the [P]laintiff[s]." *Food & Drug Admin. v. All. for Hippocratic Med*., 602 U.S. 367, 385 (2024). Furthermore, Plaintiffs have shown there is a "substantial likelihood," *Duke Power Co. v. Carolina Env't Study Grp., Inc.,* 438 U.S. 59, 74–75 (1978), that judicial relief will "lessen" their injury, for standing purposes. *Antilles Cement Corp. v. Foruno*, 670 F.3d 310, 318 (1st Cir. 2012). With a return to the status quo, OCR will be substantially more likely to resolve complaints like T.R. and A.J's in a timely and efficient manner. Thus, the Students have demonstrated standing.

### B.  VRLC

VRLC has shown that the RIF interferes with a core business activity—direct client representation—demonstrating concrete injury in fact. "VRLC attorneys frequently represent students in OCR investigations. [VRLC's] attorneys advise students about the OCR process,

prepare and file OCR complaints on students' behalf, collect facts and conduct legal research into potential claims, and assist students during the investigation." [Doc. No. 20-17 at ¶ 9]. "Since March 11, 2025, when the Boston office closed, VRLC has attempted several times to contact OCR to ascertain the status of its pending cases, but it has not received any response" and "[a]s a result, VRLC can no longer advise students to pursue relief through the OCR process." [*Id.* at ¶¶ 12, 14]. Such representation was a "crucial" way that VRLC pursued its "mission . . . to help victims of [sexual] violence get the legal recourse they need to rebuild their lives." [*Id.* at ¶¶ 3, 9, 11] (noting that "VRLC employs seven attorneys who represent students in OCR investigations" and "represented seven students" in OCR investigations in 2024)]. Due to the RIF, "VRLC has no way to seek recourse for many victims whose schools violate their rights under Title IX or Section 504. As a result, VRLC has had to turn down multiple representations and expects to have to turn down more for the same reason." [*Id.* at ¶ 15]. These undisputed facts show that the RIF interfered with VRLC's core business activity, demonstrating concrete injury in fact. *Alliance*, 602 U.S. at 395 (Standing found where a defendant's actions "directly affected and interfered with [plaintiff's] core business activities.").[3]

Furthermore, because of the RIF, VRLC "must divert hours of time and resources to investigating and advising attorneys, advocates, and other stakeholders nationwide about alternative state and local remedies and to revising training materials, policies, and procedures, which takes time and resources away from other critical projects VRLC's staff must perform." [Doc. No. 20-17 at ¶ 6]. VRLC has sufficiently alleged that this diversion of resources, along

---

[3] I am unconvinced by Defendants' argument that VRLC cannot establish standing because it has not had to entirely cease providing direct representation to all clients in all matters. Where the RIF has "perceptibly impaired" VRLC's ability to provide direct client representation, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

with "[t]he need to turn away so many students who seek VRLC's help," will harm VRLC's reputation in the community, demonstrating concrete harm. [*Id*. at ¶ 16 ("Most clients learn about VRLC from community and campus-based advocates who have come to trust VRLC's attorneys. Advocates often reach out before referring potential clients to share case details. At that point, VRLC assesses capacity and confirms that it is an appropriate referral. If VRLC attorneys repeatedly turn clients away because there is no meaningful relief we can offer those clients without OCR, we will lose that trust and advocates will make fewer referrals to VRLC.")]; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (identifying "goodwill and reputation" as injuries that "are not easily quantifiable."). These injuries to VRLC would not have occurred in the absence of the RIF that they challenge. *Compare Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 45 n. 25 (1976) (fairly traceable element of standing not met where "respondents' injuries might have occurred even in the absence of the IRS Ruling that they challenge"). Thus, like the Students, VRLC has demonstrated standing.

## III.    JURISDICTION

The Civil Service Reform Act ("CSRA") does not divest this court of jurisdiction.[4] Defendants' primary concerns here are that "stranger[s] to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise." [Doc. No. 25 at 20]. Defendants also fear that challengers can frame their case as a challenge to agency "policy" rather than "individual benefits determinations." [*Id.* at 21]. Recently, the First Circuit denied Defendants' Motion to Stay

---

[4] Defendants advance largely the same arguments for why the CSRA precludes Plaintiffs' claims here, as they did in the Lead Case. For a detailed explanation of my reasoning as to why the CSRA does not apply to preclude claims brought by plaintiffs who are neither federal employees nor labor unions representing those employees, bringing the types of challenges that Plaintiffs bring here, *see New York*, 2025 WL 1463009, at *19-20.

Pending Appeal of the Lead Case. There, the First Circuit addressed, and squarely dismissed,

Defendants' concerns:

> We do appreciate the appellants' concern that the CSRA may not be bypassed by
> the mere recharacterization of a challenge to a termination of employment. Still, we
> are loath at this juncture of the proceedings to attribute to Congress the intention in
> enacting the CSRA that the appellants appear to attribute to it. The appellants appear
> to be of the view that Congress intended to bar every challenge to an unlawful effort
> by the Executive to shut down a statutorily created agency by summarily firing its
> employees en masse -- including, on the appellants' seeming view, even by
> terminating the employment of every single one of the agency's employees -- except
> for those specific challenges that the terminated employees themselves may choose
> to bring. *Cf. Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023) (noting that it would
> be "surprising" if claims raising questions about an agency's "structure or very
> existence" could not be heard in district court).

*Somerville Pub. Sch. v. McMahon*, No. 25-1495, 2025 WL 1576570, at *4 (1st Cir. June 4, 2025).

As the First Circuit held, I find that Congress did not intend to foreclose the availability of

judicial review of mass terminations that effectively incapacitate a statutorily created office.

*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984), is distinguishable. In *Block*, a statute

permitting dairy handlers to obtain review of milk market orders reflected Congress's intent to

foreclose judicial review of milk market orders to consumers. *Id.* at 346. Defendants argue that

*Block* was concerned that consumers and handlers might "collude" in some way to bring suit,

which they allege is what Plaintiffs are doing here. [Mot. H'rg Draft Tr. 06/05/2025 at 26].

Defendants point to the declarations to show that there are "employees who are working with the

plaintiff organizations to effectively bring what are employment claims thus bypassing the

statutory scheme that has been set up by those employees to bring those very claims." [*Id.*]. But

Plaintiffs do not challenge "employment actions," and it would strain credulity to conclude that a

decision reviewing an act regulating milk market orders applies to preclude claims challenging

the effects of a wide-reaching RIF that incapacitates a federal agency from meeting its statutory

duties. *Block's* reasoning cannot be stretched to find that "a comprehensive statutory scheme

authorizing review of an agency action by one category of plaintiffs always forecloses claims by

other plaintiffs regardless of the nature of those claims." *Somerville*, 2025 WL 1576570, at *4.

## IV.    PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat.*

*Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs "must establish that [they are] likely to

succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the

public interest." *Id.* at 20. Among these four factors, the likelihood of success is the "main

bearing wall" of the analysis. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)

(cleaned up). This Court accepts as true "all of the well-pleaded allegations of [Plaintiffs']

complaint and uncontroverted affidavits filed in support of the motion for a preliminary

injunction." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

### A.    <u>Likelihood Of Success On The Merits</u>[5]

---

[5] Defendants alerted me to a recent opinion in the District Court for the District of Columbia, *Carter v. United States Dep't of Educ.*, No. 25-cv-0744, 2025 WL 1453562 (D.D.C. May 21, 2025); [Doc. No. 36]. There, a group of parents, students, and a non-profit organization with pending complaints before OCR filed suit alleging that the RIF significantly reduced OCR's ability to investigate civil rights complaints, if not "functionally preventing it from doing so." *Carter*, 2025 WL 1453562, at *1. Plaintiffs sought an injunction compelling Defendants to restore the investigation and processing capacity of OCR, process OCR complaints promptly, order any additional remedies necessary to ensure Defendants' future compliance with their obligations, such as periodic reporting to the court, and retaining the court's jurisdiction to oversee compliance. *Id.* at *4. The court denied plaintiffs' motion, finding they were unlikely to succeed on the merits of their APA and *ultra vires* claims. *Carter* is distinguishable from Plaintiffs' claims here. There, plaintiffs' APA claims failed because the court found that "OCR is in fact investigating civil rights complaints . . . albeit now likely at a much slower pace" and that "plaintiffs have not been injured by the Department's actions themselves." *Id.* at *7-8. That is not the case here. Plaintiffs have provided a record which demonstrates that OCR is not investigating most complaints and have clearly demonstrated irreparable harm with respect to at least two students who are unable to return to public school because their complaints have been forestalled by the OCR. Plaintiffs have not merely "predict[ed]" that "OCR's reduced investigatory capacity will mean that OCR is unable to satisfy its statutory and regulatory duties," they have shown that OCR is currently unable to do so. *Id.* at *8. More

1.  **APA Claims**

    a.  **Discrete And Final Agency Action**

Plaintiffs have established that there is a discrete and final agency action subject to judicial review under the APA. Defendants argue that this Court does not have the authority to review Plaintiffs' claims because it is essentially a "wholesale challenge" to the "Department's management of OCR" and the "day to day operations regarding OCR staffing levels." [Doc. No. 25 at 22-23]. The requirement under the APA that a Plaintiff must challenge a "discrete" agency action means that the Plaintiff "must direct its attack against some particular 'agency action' that causes it harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). "The limitation to discrete agency action precludes the kind of broad programmatic attack [the Court] rejected in [*Lujan*]." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). As I held in the Lead Case, Plaintiffs' challenge here is not the type of broad, programmatic attack in *Lujan*. *See New York*, 2025 WL 1463009, at *24. Rather, Plaintiffs challenge a discrete decision by Defendants to terminate half of OCR's staff, as part of the RIF, and shut down seven out of twelve of its offices. As part of this challenge, Plaintiffs ask that this Court restore the OCR to its pre-RIF conditions, such that it can carry out its statutory functions. Plaintiffs do not ask that the Court manage the day-to-day operations or otherwise dictate *how* OCR should accomplish its mandated obligations, so long as it has the *capacity* to do so. *Somerville Pub. Sch.*, 2025 WL 1576570, at *6 (Defendants "fail to explain why a reduction in force that effects mass terminations and is

---

importantly, the relief plaintiffs sought in *Carter* was sweeping, asking the court to constantly monitor Defendants' compliance and implement "a restoration plan that would enable OCR to process complaints promptly and equitably." *Id.* at *10. The *Carter* plaintiffs challenged a "host of related factors which have prevented OCR from carrying out its statutory responsibilities" such as "operational decisions" regarding "policies related to document preservation, the cutting off of all travel funding, and inadequate IT support." *Id.* (cleaned up). Plaintiffs here do not seek such broad, programmatic relief; they simply ask that OCR be returned to the status quo. As such, *Carter* is inapposite.

implemented to effectively shut down a cabinet department fails to constitute a 'discrete' agency action under the cases that they cite."). Defendants' contentions that their actions are not final just because Plaintiffs "are unable to identify any concrete, final decision by the Department of Education to shut down OCR" is unconvincing for the same reasons I held in the Lead Case. [Doc. No. 25 at 24]; *New York*, 2025 WL 1463009, at *23-24. As such, I find that Defendants' actions are discrete and final.

### b. Agency Action Committed To Discretion By Law

Defendants argue that the implementation of the RIF against the OCR should be considered "enforcement actions" committed to agency discretion. There are several reasons why I am unpersuaded by this argument.[6]

First, the actions that Plaintiffs challenge—a widespread and debilitating RIF with impact to OCR—is not a challenge to any particular enforcement action that was taken by the OCR, such as a decision to pursue or not pursue an OCR complaint. In this regard, *Heckler v. Chaney*, 470 U.S. 821 (1985) is plainly distinct. In *Heckler*, respondents were prison inmates sentenced to death by lethal injection of drugs, who alleged that the use of these drugs violated the FDCA and requested that the FDA take enforcement actions to prevent these violations, but the FDA refused. *Id.* at 823. The Court of Appeals for the District of Columbia Circuit held that FDA's refusal to take enforcement actions was reviewable. The Supreme Court reversed, holding that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. The Court stated that there are multiple reasons for why such decisions are afforded discretion, including that "an

---

[6] In the Lead Case, I addressed and dismissed Defendants' arguments that RIFs are generally subject to agency discretion, specifically because large-scale RIFs to dismantle a statutorily created agency do not fall within the narrow exception to presumptive judicial review under the APA. *See New York*, 2025 WL 1463009, at *24-25.

agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise" which the "agency is far better equipped than the courts to deal with." *Id.* at 831-832. Plaintiffs' challenge here does not require this Court to conduct the type of "complicated balancing" that would be better suited to be done by the agency if, for instance, Plaintiffs had challenged any particular enforcement decision actually made by Defendants. This is especially true where Plaintiffs allege that virtually no enforcement decisions are being made *at all*.[7]

Indeed, *Heckler* holds that when an agency's policy is "so extreme as to amount to an abdication of its statutory responsibilities" such decisions may not be afforded discretion. *Id.* at 833, n. 4. Defendants argue that there is no abdication here, because OCR still retains half of its staff, and the Secretary has testified that the OCR will continue to perform work. [Mot. H'rg Draft Tr. 06/05/2025 at 16]. But these facts are not supported by any evidence to show that OCR is in fact able to comply with its statutory obligations. While "OCR has opened a few self-directed investigations into discrete forms of purported discrimination, like diversity programs alleged to discriminate against white students, OCR has not announced a single new investigation or resolution of a complaint of race discrimination against a student of color, sexual harassment, or disability discrimination made by a member of the public since President Trump was inaugurated." [Doc. No. 19 at 25].

*N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149 (1st Cir. 1987) is instructive. There, the NAACP sued the Secretary of Housing and Urban Development ("HUD") and other

---

[7] Defendants' discretion-based arguments are further undermined by the fact that the Secretary does *not* have discretion to make enforcement decisions in the OCR. *See* 20 U.S.C.A. § 3413(a) ("There shall be in the Department an Office for Civil Rights, to be administered by the Assistant Secretary for Civil Rights appointed under section 3412(b) of this title. Notwithstanding the provisions of section 3472 of this title, the Secretary shall delegate to the Assistant Secretary for Civil Rights all functions, other than administrative and support functions, transferred to the Secretary under section 3441(a)(3) of this title").

officials for failing to enforce constitutional and statutory prohibitions against discrimination in federally assisted programs. *Id.* at 151. There, plaintiffs pointed to the Fair Housing Act's policy that there must be "fair housing throughout the United States," and the Act's provisions instructing the Secretary of HUD to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of" the Act. *Id.* (citing 42 U.S.C. §§ 3601–3608). The First Circuit found that there were "adequate standards" against which to judge HUD's conduct. *Id.* at 158. The court held that it must review "whether, over time, HUD's pattern of activity reveals a failure to live up to its obligation," a standard which could be "drawn directly from the statutory instruction to 'administer' its programs 'in a manner affirmatively to further the policies' of 'fair housing.'" *Id.* (citing 42 U.S.C. §§ 3608(e)(5), 3601). The court held that this assessment "need not involve the court in superintending economic and managerial decisions." *Id.* (citation omitted). The court noted that such an analysis of whether an agency has abdicated its statutory responsibilities was possible, "'even though there were insufficient standards for review of particular decisions.'" *Id.* at 159 (citing *Heckler*, 470 U.S. at 833 n.4).

Here, as in *NAACP*, OCR is under an explicit mandate to enforce federal civil rights laws by reviewing complaints and making prompt investigations. The statute does not give the Secretary or even the Assistant Secretary to selectively enforce complaints that come into the OCR that it prefers; the statute requires that the OCR investigate *all* complaints alleging violations of federal civil rights laws prohibiting race, sex, and disability-based discrimination. In *Adams v. Richardson*, for example, the District Court for the District of Columbia affirmed injunctive relief against the Secretary of Health, Education, and Welfare, the predecessor to OCR, finding that agency's failure to comply with their duty to enforce Title VI or take

"appropriate action to end segregation" was reviewable because the suit was "not brought to challenge HEW's decisions with regard to a few school districts in the course of a generally effective enforcement program. To the contrary, appellants allege that HEW has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty." 480 F.2d 1159, 1161-1162 (D.C. Cir. 1973). Plaintiffs have put forth evidence that no new investigations have opened since President Trump's inauguration and that existing complaints have been paused almost entirely. [*See* Doc. No. 19 at 25]. This is enough to indicate that due to the RIF's mass terminations and closure of multiple OCR's offices, that OCR has abdicated its enforcement duties.

Defendants characterize Plaintiffs' Complaint as a challenge to staffing decisions and argue that "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. Defendants contend that because Plaintiffs do not define what it means to "promptly" review investigations according to OCR guidelines or explain what level of staffing is necessary for the office to fulfill its obligations, that there are no meaningful standards against which I can assess whether the agency exercised appropriate discretion. [Doc. No. 25 at 26]. I disagree.

OCR's regulations provide that "[t]he responsible Department official or his designee will make a prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part." 34 C.F.R. § 100.7(c). OCR itself has defined that a "timely" resolution of a complaint means resolution within 180 days, with a target of resolving at least 80% of its cases within that timeframe. [*See* Doc. No. 20-13 at 28; *see also* Doc. No. 19 at 10]. Additionally, the DEOA provides that the Assistant Secretary for

Civil Rights must "employ such officers and employees, including staff attorneys, as may be necessary to carry out the functions of such Office." 20 U.S.C.A. § 3413(c)(2). According to excerpts of the Department's OCR annual budget requests for fiscal years 2010-2025, "[f]or the past fifteen years, the Department has requested funds for between 500 and 800 full time equivalent staff at OCR, stating that such staffing was 'necessary,' essential, or required 'for OCR to deliver on its statutory and regulatory mandates.'" [Doc. No. 19 at 14-15 (citing Doc. No. 20-13)]. These are meaningful standards against which I can assess whether OCR is able to meet its statutory duties.

For instance, "[t]he RIF eliminated more than half of OCR's previously 550-person staff." [Doc. No. 1 at ¶ 39]. Given that OCR's own data shows that at least 500 staff are necessary to deliver on the OCR's statutory mandates, and that the OCR was already struggling to resolve complaints in a timely manner, it is only logical to conclude that cutting half of the staff at the OCR would make it even more difficult, if not impossible, to resolve claims "promptly." Further, the relevant statute provides that "[t]here shall be in the Department an Office for Civil Rights" that the Secretary may not "consolidate, alter, or discontinue." 20 U.S.C. § 3413(a); 20 U.S.C. § 3473(a) ("[T]he authority of the Secretary under this subsection does not extend to . . . any function vested by statute in such an entity or officer of such an entity"). The Assistant Secretary for Civil Rights must "carry[] out the nation's civil rights laws in education." S. Rep. No. 96-49, at 35 (Mar. 27, 1979). Title VI and Title IX also expressly direct the Department to enforce their anti-discrimination mandates. *See* 42 U.S.C.A. § 2000d-1; 20 U.S.C.A. § 1682. These statutes and the regulations, combined with OCR's own data, provide meaningful guidelines that I can follow in reviewing Defendants' actions under the APA.

### i. **Arbitrary And Capricious**

Plaintiffs have shown a likelihood of success on the merits of their claim that the RIF is arbitrary & capricious under the APA.[8] Here, I look to the Secretary's June 3, 2025 Statement to the U.S. Senate's Committee on Appropriations ("June 3rd Statement") for the agency's explanation of the RIF as it pertains to the OCR.[9] Specifically:

> Past administrations have muddled the enforcement of laws designed to protect students, creating administrative confusion and hostile environments. Massive backlogs of legitimate civil rights complaints languished in OCR, while legal staff were directed to focus on cases based on transgender ideology and other progressive causes.
>
> The Trump Administration is taking decisive action to provide clarity on the widespread problem of illegal discrimination in our education system. We are strengthening oversight to ensure that both K-12 and higher education institutions adhere to civil rights laws, especially those addressing discrimination. To receive Federal funding, these institutions must comply with Federal law. Every student deserves an education free from bias, unfair treatment, or ideological agendas that undermine equal opportunity.
>
> To this end, we have revised OCR's case processing manual to ensure the timely evaluation of civil rights complaints. We have also reorganized personnel by specialized topics, not regions, a more focused approach that aligns well with the urgent yet legally diverse priorities being addressed.
>
> The success of the dedicated task force for Title IX investigations is an example of how specialization creates greater efficiency. These reforms have enabled us to stay on pace with past administrations in our processing of civil rights complaints, including disability complaints, with a leaner OCR staff. As long as Congress charges the Department with overseeing civil rights enforcement, we will never advocate for budget reductions that would debilitate this all-important duty.

---

[8] For an overview of the legal standards courts must follow when assessing whether an agency decision is arbitrary and capricious, *see New York*, 2025 WL 1463009, at *26-28.

[9] At the hearing held June 5, 2025, Defendants introduced the Secretary's recent statement to the Committee on Appropriations of the U.S. Senate. *See* Statement by Linda McMahon, Secretary, U.S. Department of Education on The President's Fiscal Year 2026 Budget before Committee on Appropriations, Subcommittee on Labor, Health and Human Services, Education, and Related Agencies, U.S. Senate, June 3, 2025, https://www.appropriations.senate.gov/imo/media/doc/secretary_linda_mcmahon_testimony_6325.pdf. Additionally, I have already addressed why the March 11 Directive announcing the RIF was arbitrary and capricious in the Lead Case. *New York*, 2025 WL 1463009, at *27.

[June 3rd Statement, at 4]. The June 3rd Statement does not provide a *reasoned* explanation under the APA. For instance, the June 3rd Statement does not set forth the Department's reasoning as to why or how the mass terminations "strengthen[] oversight" of civil rights laws, and Defendants have not submitted any evidence as to how "reorganize[ing] personnel by specialized topics," as well as a "dedicated task force for Title IX investigations" is permitting the OCR to actually fulfill its statutory obligations, as opposed to merely "stay[ing] on pace with past administrations in our processing of civil rights complaints." [*Id.*]; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made") (citation omitted).

Further, to the extent that the agency believes OCR will meet its statutory functions by simply reducing its caseload by only addressing cases that align with the new administration's policies, that is arbitrary and capricious. To be clear, the new administration has some leeway regarding how it decides to *prioritize* certain OCR complaints, but it cannot pick and choose which complaints it will investigate, and which complaints it will not investigate at all. It is not entirely clear what the June 3rd Statement means when it explains that the administration is revising the Case Processing Manual entirely to ensure the "timely evaluation of civil rights complaints," and to take "a more focused approach that aligns well with the urgent yet legally diverse priorities being addressed." [June 3 Statement, at 4]. However, given the Secretary's other statements regarding the previous administration's alleged focus on "transgender ideology and other progressive causes," I can only read this statement to conclude that the way the new administration is increasing "efficiency" is by investigating certain categories of complaints that it deems "legitimate," and foregoing others. [*Id.*]. But this goes squarely against what Congress

mandated. In other words, even if the agency decides to reprioritize claims, the overall number of

complaints remain the same, but the OCR's capacity to handle those claims is significantly worse

than it was prior to the RIF because seven out of twelve offices have been closed entirely, half of

OCR's employees have been terminated, and smaller OCR regional offices have taken on double

the case load to account for the closed offices. Clearly, Defendants "relied on factors which

Congress has not intended it to consider." *State Farm*, 463 U.S. at 43; 20 U.S.C. § 3413(a)

(mandating that OCR is responsible for enforcing all federal civil rights laws banning race, sex,

and disability-based discrimination in the public education system); 20 U.S.C. § 3473(a)

(prohibiting the Secretary from closing OCR).

Finally, there is no indication on the record that Defendants considered the "important

aspect of the problem." *State Farm*, 463 U.S. at 43. There is no record evidence in the form of

data, research, or even meeting minutes that may indicate that Defendants discussed or

considered "the likelihood that the RIF would severely undermine OCR's capacity to investigate

and resolve its growing backlog of civil rights complaints and deliver on its statutory and

regulatory mandates." [Doc. No. 19 at 22]. Defendants have not meaningfully responded to the

"chorus of current and former OCR employees—including the former Assistant Secretary for

Civil Rights and the Chief Attorney of the Dallas OCR Office" who have attested that "it will be

impossible for OCR to fulfill those legal obligations with only half its staff." [*Id.*].

For these reasons, I find that Plaintiffs are likely to succeed on their merits of their claim

that the RIF, and its effects on the OCR, was arbitrary and capricious.

## ii. <u>Contrary To Law</u>

Plaintiffs are likely to succeed on the merits of their claim that Defendants' actions are

contrary to law under the APA. Contrary to law "means, of course, any law, and not merely those

laws that the agency itself is charged with administering." *F.C.C. v. NextWave Pers. Commc'ns*

*Inc.*, 537 U.S. 293, 300 (2003). This includes an agency's own regulations. *Town of Weymouth v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 47 (1st Cir.), *amended on reh'g*, 973 F.3d 143 (1st Cir. 2020). Defendants' actions in incapacitating the OCR violates numerous laws and regulations that lay the foundation of the OCR's purpose. First, by reducing the staff necessary to fulfill OCR's obligations, Defendants have acted contrary to Title VI and Title IX's mandates requiring the OCR to enforce antidiscrimination provisions. *See* 42 U.S.C.A. § 2000d-1; 20 U.S.C.A. § 1682; *Adams*, 480 F.2d at 1161-1162 (finding that officers of the predecessor to OCR violated Title VI, rejecting their argument that the "means of enforcement is a matter of absolute agency discretion"). Second, OCR's own regulations require it to "prompt[ly]" investigate complaints of alleged violations of those statutes, or of Section 504 or Title II. *See* 34 C.F.R. § 100.7(c); 34 C.F.R. § 106.81; 34 C.F.R. § 104.61; 28 C.F.R. § 35.171(a)(3). Plaintiffs have demonstrated that OCR's significantly reduced-staff is unable to promptly investigate complaints given that many offices have had to absorb caseloads of other closed-offices. Finally, the RIF exceeds the Secretary's authority by effectively "alter[ing], or discontinue[ing]" a "function vested by statute." 20 U.S.C. § 3473(a)(1).

## 2. <u>Ultra Vires</u>[10]

Plaintiffs are likely to succeed on their *ultra vires* claims. Plaintiffs argue that the RIF exceeds Defendants' lawful authority because it is not a product of reasoned decision-making, and it makes it impossible for OCR to meet its statutory and regulatory mandates. [*See* Doc. No. 19 at 26]. Defendants argue that Plaintiffs' *ultra vires* claims are duplicative of their APA claims, and thus fail for the same reasons as Plaintiffs' APA claims. [Doc. No. 25 at 29]. I have already found that Plaintiffs are likely to succeed on their APA claims. Additionally, "judicial review is

---

[10] For a background of *ultra vires* claims, *see New York*, 2025 WL 1463009, at *23.

available when an agency acts *ultra vires*," even when review is unavailable. *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003). In other words, *ultra vires* relief is designed to permit courts to "reestablish the limits" on executive authority when it acts "beyond its authority." *Id* .at 1172-1173. That is precisely what Plaintiffs have alleged here. The RIF effectively prevents OCR from meeting its statutory obligations, such that Defendants have exceeded any authority it has under the DEOA. Defendants' actions in effectively preventing the OCR from complying with other federal civil rights laws that mandate the OCR to enforce those statutes also demonstrates that Defendants have acted beyond their statutory duties.

### B.  Irreparable Harm[11]

Plaintiffs A.J, T.R., and VRLC have met their burden of showing that they are likely to suffer irreparable harm. Defendants do not dispute the veracity of Plaintiffs' declarations.

### 1.  RIF's Impact To OCR

In the Lead Case, I discussed the lay of the land within OCR after the RIF. *See New York*, 2025 WL 1463009, at *36 (outlining how OCR staff has been cut in half and that seven of the twelve regional offices have been shut down). Plaintiffs' declarations further affirm how the RIF has hobbled OCR's abilities to carry out its essential functions. [Doc. No. 20-1 at ¶ 23; Doc. No. 20-1 at ¶ 26 ("[T]he average caseload is now as high as 80 cases per investigator. With the closure of more than half of the regional offices, [] that average [is expected] to dramatically increase to as high as 120 cases per investigator.").

Many students facing discrimination turn to OCR because they endure hostile environments, cannot access key services, miss out on classes or activities, or avoid school altogether. [Doc No. 20-3 at ¶ 32 ("In my time at OCR, I have worked on a case where an

---

[11] For an overview of the legal standards courts must follow when analyzing irreparable harm, *see New York*, 2025 WL 1463009, at *29.

elementary school student was raped on the bus while another student video-taped it, a case where a high school student was raped in a school stairwell, a compliance review wherein children with disabilities were being restrained to the point of physical injury, and cases wherein students were being severely harassed due to their race, including being subjected to racial slurs. I have seen some cases where the harassment became so bad that the students attempted suicide."); Doc. No. 20-17 at ¶ 10 ("Clients who rely on OCR often need time-sensitive relief." OCR mediated a timely resolution for a student who sought services from VRLC after a school employee distributed a sexually explicit image of her and the school failed to respond.)].

It is abundantly clear that because of the RIF, OCR will likely be unable to resolve student discrimination complaints in a timely and meaningful fashion, absent an injunction. [*See* Doc. No 20-2 at ¶¶ 17–19 (former investigator outlines how several of his cases reached "critical stages" on March 11, 2025, including a deadline to sign a resolution agreement where a student with a disability was "not receiving required services and accommodations in his classroom, which impacted his education." Without the San Francisco office, "the execution of the agreement is in jeopardy and the child will likely not receive the benefits and remedies included in the agreement."); Doc. No. 20-9 at ¶¶ 20–23 (The New York office was working on a complaint involving a student with a disability who was not being provided with an aide by their school, but due to the RIF, "[the New York] office was not able to ensure that the school provides the student with the required accommodation."); Doc. No. 20-14 at ¶¶ 8–12 (Contrary to prior practices, OCR has not provided an update in three months after a resident filed a complaint against Brookline, Massachusetts Public Schools, where families reported the district had improperly redirected federal funds for special educations services. No one at OCR answered his phone calls. As a result of the RIF, "disruptions to special education services continue unabated

in the Brookline school district" and "disabled and special education students are not receiving services or compensatory services they need and to which they are entitled.")].

### 2.  <u>Harm To Students</u>

Plaintiffs, T.R. and A.J. and their parents, similarly rely on OCR's investigation and resolution processes, without which they will be irreparably harmed. As discussed *supra* II.A, the Students have already seen their investigations stall; they no longer have access to OCR's support through investigations, enforcement actions, technical assistance and free mediation options. [Doc. No. 20-16 at ¶¶ 17, 20–21; Doc. No. 20-15 at ¶¶ 13–15]. In the absence of those resources, the Students' access to education has been significantly impeded. Both Students faced severe harassment and are currently unable to return to public school while their OCR investigations remain pending. [Doc. No. 20-16 at ¶¶ 4–9 ("The school did not respond to [the] recurring harassment effectively, if at all and did not enforce the Section 504 plan"); Doc. No. 20-15 at ¶¶ 4–15 ("[T]he school did not treat the abuse as racial harassment or try to teach the students about the race-based nature of their words and actions.")]. Thus, where the Students have seen their investigations stall due to the RIF, they face irreparable harm. *See supra* II.A (citing *Nieves-Marquez*, 353 F.3d at 121–22 (cleaned up) and *Plyler,* 457 U.S. at 221).

Defendants argue that the harms alleged by the Plaintiffs are harms only tenuously connected to the relief sought. They argue that "[e]ven if the Court enters a preliminary injunction, it by no means would resolve the harms alleged by the Plaintiffs." [Doc. No. 25 at 30]. As described *supra* II.B, the Students have shown there is a "substantial likelihood," *Duke Power Co.*, 438 U.S. at 74–75, that judicial relief will "lessen" their injury. *Foruno*, 670 F.3d at 318. With a return to the status quo, OCR will be substantially more likely to resolve discrimination complaints like T.R. and A.J.'s in a timely and efficient manner. "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to

show redressability." *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018).[12]

### 3.  **Harm To VRLC**

VRLC has shown that the RIF interferes with VRLC's ability to provide direct legal services to victims of sexual and gender-based violence, and that absent an injunction, VRLC will suffer irreparable harm. [Doc. No. 20-17 at ¶¶ 3, 13, 15–16]. "VRLC . . . provides direct legal services to victims of rape, sexual assault, dating violence, and stalking, including in investigations by the Department of Education's Office for Civil Rights ("OCR") . . ." [*Id.* at ¶ 4]. Because of the RIF, the Boston office, where VRLC had pending cases, is now closed and "VRLC has attempted several times to contact OCR to ascertain the status of its pending cases, but it has not received any response." [*Id*. at ¶ 11–12]. Thus, "[d]ue to the RIF and the closure of OCR's Boston office, OCR is now unlikely to provide VRLC's clients with timely or meaningful relief," interfering with its mission of providing direct representation to victims of sexual and gender-based violence. [*Id*. at ¶¶ 3, 13].

VRLC also "counsels and trains attorneys, advocates, and school administrators nationwide about the legal rights of victims of sexual and gender-based violence and the remedies available to them when they face sexual harassment or abuse; and . . . reviews and provides advice on school policies and procedures to ensure they accurately describe the legal rights and remedies available to such victims." [*Id*. at ¶ 4]. The RIF is forcing VRLC to sink hours of attorney time into investigating alternative avenues of relief for victims nationwide, revising training materials, and revising policies and procedures. [*Id*. at ¶ 21 ("Because of the

---

[12] I am also unconvinced by Defendants' argument that the RIF has increased OCR's efficiency. Defendants provide no evidence, statistical or otherwise, to support their argument, which runs contrary to the numerous declarations outlining the RIF's harms.

RIF, VRLC's attorneys have had to field more requests for advice than they did before. Attorneys and advocates from multiple jurisdictions have reached out to VRLC for advice about alternative administrative remedies available now that OCR is unable to provide prompt or effective relief. These requests have required VRLC attorneys to conduct hours of research that they did not have to conduct when OCR was a viable path to relief.")]. As established *supra* IV.B.1, the RIF has significantly reduced OCR's ability to resolve student discrimination complaints. VRLC is struggling with the obstacle of a nonfunctioning OCR, where it was previously able to rely on and provide expertise towards OCR processes, in furtherance of its mandate of providing legal recourse to victims of sexual and gender-based violence. The burden of "conduct[ing] hours of jurisdiction-specific research to determine the alternative options available to victims in particular states and territories," [*Id*. at ¶ 22], where VRLC attorneys are experts on the OCR process which applies nationwide, is "an onerous one, requiring diversion of resources away from the [VRLC's] core mission[]." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021).

As here, "[a]ctions by a defendant that 'make it more difficult for' an organization 'to accomplish [its] primary mission . . . provide injury for purposes [] of . . . irreparable harm.'" *Nat'l Treasury Emps. Union v. Vought*, No. 25-cv-0381, 2025 WL 942772, at *15 (D.D.C. Mar. 28, 2025) (citing *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs*., 408 F. Supp. 3d 1057, 1125-1126 (N.D. Cal. 2019), aff'd sub nom. *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs*., 981 F.3d 742 (9th Cir. 2020) (finding irreparable injury where the goals of providing healthcare and legal services were frustrated and that plaintiffs' changes to their programs and other diversions of resources constituted irreparable harm.).

Finally, absent an injunction, VRLC faces irreparable reputation harm. *Ross-Simons,* 217 F.3d 8 at 13 (identifying "goodwill and reputation" as injuries that "are not easily quantifiable."). It is clear that, "[m]ost clients learn about VRLC from community and campus-based advocates who have come to trust VRLC's attorneys. Advocates often reach out before referring potential clients to share case details. At that point, VRLC assesses capacity and confirms that it is an appropriate referral. If VRLC attorneys repeatedly turn clients away because there is no meaningful relief [VRLC] can offer those clients without OCR, [VRLC] will lose that trust and advocates will make fewer referrals to VRLC." [Doc. No. 20-17 at ¶ 16]. Where it can no longer provide direct representation, has already turned away clients, and is expected to turn away more, VRLC has shown that it will suffer irreparable harm absent an injunction. [*Id*. at ¶ 15 ("VRLC has had to turn down multiple representations and expects to have to turn down more for the same reason.")].

Defendants argue that VRLC fails to show that it will experience the type of great injury necessary to justify extraordinary relief. Specifically, Defendants argue that VRLC has not provided any evidence placing their diverted resources "in the context of [its] overall finances." [Doc. No. 25 at 31 (citing *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-3569, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023))]. Defendants also argue that VRLC's increased expenses associated with addressing sexual and gender-based violence disputes in education are not meaningfully different from litigation expenses, insufficient to show irreparable injury. I disagree and find that Defendants' characterization of VRLC's harm is too simplistic. VRLC is *not* alleging mere monetary loss that threatens its business, like in *Nat'l Council of Agric. Emps*., 2023 WL 2043149, at *6–7. Rather, VRLC has shown that due to the RIF, it has had to turn down clients because it can no longer provide direct representation, divert VRLC's attorney

expenses *and* time from critical tasks that is core to its mission, and will suffer damage to its reputation, all of which show irreparable harm.

Finally, Defendants argue that VRLC concedes in its cited declaration, [Doc. No. 20-17 at ¶ 6], that there are alternative state and local avenues for addressing sexual and gender-based violence disputes. As discussed above, VRLC faces irreparable harm because the RIF has hindered VRLC's core mission. VRLC can no longer rely on a previously essential resource, OCR, for its mission of providing legal recourse to victims of sexual and gender-based violence. That there are alternative state and local avenues for addressing its core mission does not change that VRLC can no longer provide direct representation, has had to divert significant time and resources because of the RIF, and faces reputational harm. And even if I were to take Defendants' assumption as true, which I do not, I am unconvinced that the existence of state and local avenues for addressing sexual and gender-based violence disputes are sufficient to show that Plaintiffs will not be irreparably harmed. *See New York*, 2025 WL 1463009, at *36 (cleaned up) (discussing how States and local education agencies are overburdened and struggling to fill gaps left by the RIF and that "[t]his is not a situation where state and local educational agencies are merely being delegated tasks previously handled by the OCR. Rather, this is a case where the Department can no longer effectuate vital statutory functions specifically tasked to it, and which States are scrambling to fill.").

Thus, taken together, VRLC has shown that cuts to the OCR will likely irreparably harm them, absent an injunction. Through supporting declarations, VRLC has shown that their ability to fulfill their core mission has been impeded and that they are likely to suffer irreparable reputational harm, absent an injunction.

### 4. **Irreparable Harm Summary**

Here, even though "the likelihood of success on the merits is great, which would allow a movant to show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief, the allowance is unnecessary." *Massachusetts v. Nat'l Institutes of Health*, No. 25-CV-10338, 2025 WL 702163, at *31 (D. Mass. Mar. 5, 2025), *judgment entered,* No. 1:25-CV-10338, 2025 WL 1063760 (D. Mass. Apr. 4, 2025) (citation omitted). Through supporting declarations of parents, former OCR employees, VRLC, and more, Plaintiffs have shown that they are likely to suffer irreparable harm.

More specifically, A.J. and T.R. are seeing their investigations stall because of the RIF, impacting their right to receive quality education. These stalled investigations raise immediate predicaments about whether the Students will be able to return to their public schools for the 2025-2026 year; they risk further gaps in their education. Furthermore, absent an injunction, the RIF has and will continue make it more difficult for VRLC to accomplish its primary mission of providing legal recourse for victims of sexual and gender-based violence, which will irreparably harm its reputation. Taken together, the detriment Plaintiffs face cannot be remedied through retroactive relief or money damages. Thus, I am convinced that, absent an injunction, the risk of harm to Plaintiffs is immediate and irreparable.

### C. **Balance Of The Equities And The Public Interest**[13]

Defendants argue that the equities tilt in their favor because granting the injunction would "disrupt the Department's efforts to comply" with the Executive Order directing closure of the Department, *see* Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679 and "[t]he public has an

---

[13] For a detailed analysis of the balance of the equities and the public interest factors, *see New York*, 2025 WL 1463009, at *38. I further decline to impose bond for the same reasons explained in the Lead Case. *Id.* at *39.

interest in permitting the President to take decisive action when it comes to setting his policy priorities for the Department, including OCR." [Doc. No. 25 at 32]. I disagree. "There is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. Further, "there is a continuing need to ensure equal access for all Americans to educational opportunities of a high quality, and such educational opportunities should not be denied because of race, creed, color, national origin, or sex." 20 U.S.C. § 3401(2). In recent years, more than 20,000 Americans relied on the OCR to invoke the equal access and protections provided by federal civil rights laws, and "students across the country [] look to OCR to obtain relief." [Doc. No. 19 at 14, 30]. In contrast, Defendant has "[not] shown that the public's interest lies in permitting a major federal department to be unlawfully disabled from performing its statutorily assigned functions." *Somerville*, 2025 WL 1576570, at *8.

## V.    CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Preliminary Injunction, [Doc. No. 18], is <u>GRANTED</u>. OCR must be able to carry out its functions and its obligations under the DEOA and other relevant statutes as mandated by Congress.

It is therefore ORDERED, until further order of this Court, that:

1. The Defendants are enjoined from carrying out the reduction-in-force announced on March 11, 2025 as to the employees of the Department of Education's Office for Civil Rights ("OCR");

2. The Defendants are enjoined from implementing, giving effect to, or reinstating the March 11, 2025 Directive under a different name;

3. The Defendants shall stay the termination or elimination, and take all steps necessary to facilitate the return to duty, of all OCR employees whose employment was set to be terminated or otherwise eliminated as part of the reduction-in-force announced on March 11, 2025 to restore the OCR to the status quo such that it is able to carry out its statutory functions;

4. OCR must continue to investigate all complaints alleging violations of federal civil rights

laws prohibiting race, sex, and disability-based discrimination under education programs and activities that received federal financial assistance, as mandated by the DEOA, including enforcement of Title VI, Title IX, Section 504 of the Rehabilitation Act of 1973, and Title II.

5. The Defendants shall provide notice of this Order of Preliminary Injunction within 24 hours of entry to all their officers, agents, servants, employees, attorneys, and anyone acting in concert with them;

6. The Defendants shall file a status report with this Court within 72 hours of the entry of this Order, describing all steps Defendants have taken to comply with this Order, and every week thereafter until the Department is restored to the status quo prior to January 20, 2025; and

7. This Preliminary Injunction shall become effective immediately upon entry by this Court. The Preliminary Injunction Order shall remain in effect for the duration of this litigation and until a merits decision has been issued.

SO ORDERED, this 18th day of June 2025 at 6:00 P.M.

/s/ Myong J. Joun
United States District Judge