**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| STATE OF NEW YORK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 25-10601-MJJ |
| LINDA MCMAHON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

|  |  |  |
|---|---|---|
| SOMERVILLE PUBLIC SCHOOLS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-10677-MJJ |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF RACHEL OGLESBY**

1. My name is Rachel Oglesby. I make this Declaration based on my own personal knowledge, on information contained in the records of the Department of Education, or on information provided to me by Department of Education employees.

2. I am currently employed as Chief of Staff for the U.S. Department of Education, headquartered in Washington, D.C. I began my service at the Department on January 20, 2025.

3.  Before joining the Department, I worked at America First Policy Institute as the Chief State Action Officer and Director of the Center for the American Worker.

4.  In my role at the Department, I have the following responsibilities:

    a.  I assist the Secretary of Education with all her responsibilities running the Department.
    b.  I advise the Secretary on significant matters within and affecting the Department.

5.  I submitted declarations in this matter on June 3, 2025, June 10, 2025, June 17, 2025, and June 26, 2025, describing the Department's compliance activities with regard to the preliminary injunction issued by this Court on May 22, 2025 (the "Preliminary Injunction"), and I incorporate herein by reference the statements made in my previous declarations. I am also aware of the preliminary injunction issued by this Court on June 18, 2025 in *Victim's Rights Law Center v. U.S. Department of Education*, Case No. 25-11042-MJJ specific to the Department's Office for Civil Rights (the "OCR Order"). This declaration specifies Department compliance actions with respect to the Preliminary Injunction and the OCR Order.

6.  The ad hoc committee described in my earlier declarations met again on June 26, 2025, to further coordinate reintegration activities. By June 30, 2025, the Department had:

    - Received additional responses to the Department's "Outside Employment Survey" from employees who had received RIF notices on March 11, 2025, bringing that total to 657.
        - For those employees who responded to the survey and indicated that they have obtained outside employment since receiving notification of the RIF, and that they plan to remain in their new position following reintegration, the Department continues to review those responses to ensure compliance with applicable ethics rules.
    - Received additional responses to the Department's "Employee Reintegration and Space Planning Survey" from employees who had received RIF notices on March 11, 2025, bringing that total to 1,183.
        - Issued formal communication (by email to personal email addresses for employees who do not have access yet to their government furnished equipment (GFE)) on June 27, 2025, to the employees who had received RIF notices on March 11, 2025, requesting that those who had not yet submitted their reintegration survey responses do so by June 30, 2025. A true and correct copy of that communication is attached hereto as Exhibit A.
    - Identified the process and locations at which personal identity verification (PIV) cards that were returned by employees who had received RIF notices on March 11, 2025, can be reprinted.
    - Continued to build-out the Department's reintegration plan to ensure all dependencies and supporting actions are identified, including reconciling employee

2

responses (and non-responses) to the two surveys and integrating into the reintegration plan the data provided in those responses, as well as incorporating input from the Department's June 24, 2025, meeting with DNI regarding operational security.

- o Began to implement IT restoration as to government furnished equipment (GFE) previously returned by employees that must be reimaged and updated to Windows 11, in preparation for reissuing GFE to employees.
- o Continued planning for physical space and remote (telework) arrangements in light of the information being received in employee responses to the reintegration survey, including communications with General Services Administration and reviewing actions for collective bargaining agreement compliance.
- o Formulated systematic approaches to incorporate program office senior management's input into reintegration strategies.

- Ensured that OCR continues to process, investigate, and resolve complaints:
  - o From March 11 to June 27, 2025, OCR received 4,833 complaints; opened 309 for investigation; opened 26 directed investigations; dismissed 3,424 complaints consistent with OCR's Case Processing Manual; resolved 96 complaints after investigation concluded insufficient evidence for findings; and resolved 290 complaints with voluntary agreements, OCR-mediated settlements, or technical assistance from OCR to ensure a recipient's digital resources are accessible to students with disabilities.
    - For historical context, there was a net increase in OCR's caseload of approximately 1,100 cases in 2nd quarter 2025; a net decrease in OCR's caseload of approximately 590 cases in 2nd quarter 2024; and a net increase in OCR's caseload of approximately 3,569 cases in 2nd quarter 2023.
  - o True and correct copies (redacted to protect personally identifying information) of four OCR cases closed with resolution agreements with school districts in West Virginia, California, New Jersey, and Colorado in late May and June 2025, are attached hereto as Exhibit B, illustrating OCR's continued resolution of civil rights complaints.
- The Department continued to pause to pause implementing significant interagency agreements and memoranda of understanding with agencies such as the Department of Labor and Treasury Department as referenced in my June 10, 2025 declaration, preventing the Department (and other agencies) from pursuing operational efficiencies and cost-savings.

\*\*\*

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington, DC this 1st day of July.

Rachel Oglesby

_____

Rachel Oglesby

# EXHIBIT A

| | |
|---|---|
| **From:** | CHCO-Info |
| **To:** | "rif@listserv.ed.gov" |
| **Subject:** | Please Complete Surveys no later than Monday June 30th |
| **Date:** | Friday, June 27, 2025 12:04:00 PM |

Good Afternoon,

If you have not done so already, please complete the following surveys **by Monday June 30, 2025**. This information will assist us in understanding reentry timelines and identifying any accommodations that may be needed. There is no need to resubmit the surveys if you have already completed them.

1. Reintegration & Space Planning Survey
2. Outside Employment Disclosure

Thank you,

Jacqueline Clay
Chief Human Capital Officer

# EXHIBIT B



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

June 5, 2025

**VIA EMAIL ONLY: XXXXXX**

Superintendent XXXXXX
[School District in West Virginia]
XXXXXX.
XXXXXX

**Re: XXXXXX - OCR Complaint Number XX-XX-XXXX**

Dear Superintendent XXXXXX:

This letter is to advise you of the outcome of the U.S. Department of Education, Office for Civil Rights' (OCR) investigation of the complaint filed against XXXXXX (District) on XXXXXX, alleging discrimination on the basis of disability. The Complainant alleged that the District discriminated against her child (the Student) on the basis of disability by: (1) refusing to allow the Student to attend school from XXXXXX, through XXXXXX, due to inadequate training of nursing staff to manage the Student's insulin pump for his diabetes; and (2) refusing to allow the Student to attend school, even after XXXXXX, if the Student's blood sugar levels are out of range.

OCR enforces Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. Section 794, and its implementing regulation, 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability and retaliation by recipients of federal financial assistance; and Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. Sections 12131 *et seq.*, and its implementing regulation, 28 C.F.R. Part 35, which prohibit discrimination on the basis of disability by public entities. As a recipient of federal financial assistance from the Department of Education and as a public entity, the District must comply with Section 504, Title II and their implementing regulations.

During the investigation, OCR reviewed documentation provided by the Complainant and the District, including the Student's Section 504 Plan and Diabetes Medical Management Plan, District/School Board Policies, text messages, email communications, the Student's diabetes monitoring logs, and training sign-in sheets. Based upon OCR's review of the documentation, OCR identified a concern in that the Student missed approximately one month of school and was asked to not attend school when his blood sugars were out of range, potentially resulting in a denial of a free, appropriate public education (FAPE).

Page 2 - Complaint Number XX-XX-XXXX

Prior to OCR completing its investigation, the District expressed an interest in resolving the complaint pursuant to Section 302 of OCR's Case Processing Manual (CPM). Section 302 states that allegations under investigation may be resolved at any time when, prior to the point when the OCR issues a final determination, the recipient expresses an interest in resolving the allegations and OCR determines that it is appropriate to resolve them because OCR's investigation has identified issues that can be addressed through a resolution agreement.

The relevant legal standards and a summary of the evidence obtained during OCR's investigation are below.

**LEGAL STANDARDS**

The Section 504 regulation, at 34 C.F.R. § 104.4, and the Title II regulation, at 28 C.F.R. § 35.130(a), provide that no qualified individual with a disability shall be excluded from participation in, denied the benefits of, or otherwise subjected to discrimination under a recipient's programs or activities on the basis of disability. An individual with a disability under Section 504 is any person who has a physical or mental impairment which substantially limits one or more major life activities.  With regard to public elementary and secondary educational services, such an individual is deemed "qualified" when he or she is of an age during which it is mandatory under state law to provide such services, or of an age during which it is mandatory under state law to provide such services to persons with disabilities.

The Section 504 regulation, at 34 C.F.R. § 104.33, also requires recipients to provide a FAPE to each qualified student with a disability in its jurisdiction. An appropriate education is regular or special education and related aids and services that are designed to meet the individual educational needs of students with disabilities as adequately as the needs of students without disabilities are met and that are developed in compliance with Section 504's procedural requirements. OCR interprets the Title II regulation, at 28 C.F.R. §§ 35.103(a) and 35.130(b)(1)(ii) and (iii), to require recipients to provide a FAPE to the same extent required under the Section 504 regulation.

In investigating a denial of a FAPE under Section 504, OCR first looks at the services to be provided as written in a student's plan or as otherwise agreed to by the student's team. If OCR finds that a recipient has not implemented a student's plan in whole or in part, it will examine the extent and nature of the missed services, the reason for the missed services, and any efforts by the recipient to compensate for the missed services in order to determine whether this failure resulted in a denial of a FAPE.

**FACTS**

The Student enrolled in XXXXXX in the District at the start of the 2023-2024 school year. Upon enrollment, the Complainant informed the District that the Student has diabetes, and as a result, the District developed and implemented a Section 504 Plan for the Student that included a Diabetes Medial Management Plan (DMMP), dated XXXXXX. The Section 504 Plan and DMMP call for glucose monitoring, carbohydrate monitoring, and insulin administration. The Student attended the XXXXXX for the 2024-2025 school year at XXXXXX (School).

Page 3 - Complaint Number XX-XX-XXXX

The Complainant asserts that on XXXXXX, the School Nurse informed her that the Student could not be at School with the insulin pump that was prescribed by his doctor. The Complainant asserts that the pump was noted on the Student's medical orders and communicated to the School at the beginning of the school year. According to the Complainant, the School Nurse told the Complainant that she had to involve the County Head Nurse and the State Head Nurse to coordinate the proper policy and training for the pump, and until that could be arranged, the Student would not be permitted at School. The Complainant told OCR that, while the Student was not permitted to return to School, the School did not provide any instruction until two weeks later, when the Complainant inquired about the Student falling behind. The Complainant told OCR that the School then provided a handwriting, math and reading book with worksheets, and a school tablet which he could use for math and reading. The Complainant maintains that the School provided no communications unless she reached out.

The District told OCR that a DMMP was in place for the Student to start the 2024-2025 school year, and on XXXXXX, the Student's 504 team met to develop the Student's 504 Plan and review the DMMP for the upcoming school year. On XXXXXX, the School Nurse met with the Complainant to review and revise the DMMP. According to the District, at that time, the Student's monitoring device for his glucose levels was the XXXXXX, and the School Nurse was required to determine the appropriate insulin dosage to administer to the Student. The next day, however (XXXXXX), the Student returned to school fitted with a new glucose monitoring device – the XXXXXX Pump (the Pump). Unlike the XXXXXX, the Pump automatically determines and administers the appropriate insulin dosage, rather than the School Nurse. The District told OCR that the Student was XXXXXX.

On that same day – XXXXXX – the School Nurse contacted the Nursing Service Coordinator (the Coordinator) regarding the Student's new insulin pump, as the School Nurse had not been provided with updated insulin orders, pursuant to District policy. The School Nurse also emailed the Diabetes Nurse Educator for the Student to ask about the Pump orders for the Student, and the School Nurse explained that she was unable to set the appropriate amounts of insulin without the orders. The Diabetes Nurse Educator emailed the School Nurse that the Complainant should have shared the information with the School Nurse, to which the School Nurse explained that the information was never provided. In her email to the Nursing Service Coordinator, the School Nurse explained that the Student's doctor's office had not provided clear information or orders, so she had no idea what to chart or how much insulin the Student was receiving.

After the School Nurse communicated the issues with the Student's Pump to the Coordinator, the Coordinator contacted the Coordinator at the West Virginia Department of Education Office of Federal Programs, Division of Student Support and Well-being (West Virginia Coordinator), who determined that a procedure for school nurses to follow for the Pump, pursuant to State Policy 2422.7 (Basic and Specialized Health Care Procedure Manual), did not exist due to the novelty of the Pump. The West Virginia Coordinator advised the Nursing Service Coordinator that the Student could not return to School until the updated insulin orders were received, and a procedure for the Pump for the School Nurse was developed and approved by the West Virginia Department of Education and the West Virginia Department of Health.

On that same date – XXXXXX – the Nursing Service Coordinator contacted the Complainant to

Page 4 - Complaint Number XX-XX-XXXX

explain the situation and arrange for the Student to receive his school assignments in the interim. The District told OCR that the School also made sure that the Student brought his school iPad home for use, as well as hard copies of assignments to be completed and returned.

The next day, the Nursing Service Coordinator started coordinating training for the School Nurse on the Pump; the training was held on XXXXXX. On XXXXXX, the procedure for the Pump was approved by the West Virginia State Health Officer, which included approval for the procedure, the monitoring log and the skills performance checklist, which was shared with the School Nurse. The information was also shared with all school nurses in West Virginia. On XXXXXX, the School Nurse informed the Complainant, via text, that the policy was approved and asked the Complainant to bring the Student to school the next day – XXXXXX. The School Nurse also asked that the Complainant to provide a demonstration of the Pump at that time. The Complainant replied to the text that she might have to wait until XXXXXX to return the Student to School so that she could find a time to meet with the School Nurse to provide a demonstration regarding the Pump. Email documentation also shows several exchanges between the School Nurse and the Nursing Service Coordinator regarding whose responsibility it was to become familiar with insulin pumps such as the Student's. Specifically, the email documentation shows that the School Nurse repeatedly requested training for the Student's Pump, while the Nursing Service Coordinator repeatedly relayed that it was the responsibility of the School Nurse to educate herself.

The Student returned to School on XXXXXX. The diabetes monitoring log shows that on XXXXXX, the Students' blood sugar reading was low while he was at home, and the School Nurse advised the Complainant to keep the Student home until he received a normal reading. Internal emails show that on XXXXXX, the School Nurse emailed various District and School staff to express concern that since the Student had his new Pump installed on XXXXXX, his sugars had been unstable. In many instances, the School Nurse provided screenshots of the Student's low glucose readings from the Pump. She also expressed frustration that when she would call the on-call doctor or diabetic nurse, she was given conflicting information on how to handle the repeated lows. The email exchanges from XXXXXX also show that the School Nurse stated that one of the teachers discussed the need for an Individualized Education Program (IEP) for the Student instead of a 504 Plan "due to the level the student is at currently." The Principal replied that the Student "would have to show lack of progress on the academic side," and would have to go through the Student Assistance Team and show "little to no progress after being in Tiered support for weeks," to qualify for an IEP. The text communications also show that on XXXXXXX, the School Nurse advised the Complainant that the Student's blood sugar had dropped that morning. The Complainant responded that the Student was with the sitter and getting treated, to which the School Nurse responded, "Just make sure they know if he stays low like that to keep him home until it is normal before dropping off at school."

The email documentation also shows that on XXXXXX, the Complainant had an exchange with the School Nurse, in which the Complainant questioned why the School Nurse was reaching out to the Student's doctors directly, without communicating with the Complainant first. The School Nurse replied that the Student's glucose levels had been unstable, and she had receive conflicting information from the Student's doctors, and that staff were concerned about maintaining the Student's glucose levels. The School Nurse explained that she does have to communicate the

repeated drops to the doctor, per her job description. The Complainant replied that the Student's doctors asked that all communication come from the Complainant. She also stated that the Student's 504 Plan and DMMP were not being followed. In a follow-up email, the Complainant expressed frustration that the Student had only been at School for 3.5 days and there should not have been as many issues or changes, nor had the Student run low consistently for each day. The Complainant asked that the School Nurse communicate with the Complainant, who would communicate with the doctors directly. Last, the Complainant objected to the School Nurse's suggestion that every low glucose reading be reported to the doctor or necessitate keeping the Student home, as it would not be reasonable to report or keep the Student home every single time he ran low or high.

A Section 504 meeting was scheduled for XXXXXX, to address the concerns raised by the School Nurse. At that time, the team reviewed the Plan and determined that the Plan and the DMMP were still appropriate for the Student, but new doctor's orders were requested.

The District maintains that during the Student's absences, the Complainant communicated with the teacher and the Student was provided lessons through an electronic pathway as well as written work. The District also asserts that the Student was also included in all co-curricular activities such as school pictures, field trips, and visits to the classroom from the fire department.

**ANALYSIS**

Based on the evidence gathered to date in OCR's investigation, OCR is concerned that the Student missed approximately one month of school while the District worked to obtain new insulin orders and developed new procedures for the Student's Pump. While this was happening, the Complainant was asked to keep the Student home when his glucose levels were out of range, thereby, resulting in a potential denial of FAPE.

Before OCR completed its investigation of this complaint, pursuant to Section 302 of OCR's CPM, the District requested to resolve the case through a voluntary resolution agreement (Agreement), and OCR determined such a resolution was appropriate. The District signed the enclosed Agreement, which when fully implemented, will address the evidence obtained and all of the allegations investigated in this complaint. OCR will monitor the implementation of the agreement until the District has fulfilled the terms of the Agreement.

**CONCLUSION**

This concludes OCR's investigation of the complaint. This letter should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The Complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise

Page 6 - Complaint Number XX-XX-XXXX

retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, or participates in an OCR proceeding. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act (FOIA), it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released.

If you have any questions, please contact me at wendy.gatlin@ed.gov.

Sincerely,

/s/

Wendy Gatlin
Compliance Team Leader

Enclosure

**Voluntary Resolution Agreement**
**[School District in West Virginia]**
**OCR Complaint Number XXXXXX**

XXXXXX (the District) agrees to resolve the above-referenced complaint by voluntarily entering into this Resolution Agreement (Agreement) with the U.S. Department of Education's Office for Civil Rights (OCR). This Agreement does not constitute an admission of liability, non-compliance, or wrongdoing by the District. The District assures OCR that it will take the following actions to ensure compliance with the requirements of Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, and its implementing regulation, 34 C.F.R. Part 104, and Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. § 12131, and its implementing regulation, 28 C.F.R. Part 35 which prohibit discrimination on the basis of disability by recipients of federal financial assistance and public entities, respectively.

Prior to the completion of OCR's investigation, the District agreed to resolve the issues raised in this complaint pursuant to Section 302 of OCR's Case Processing Manual. Accordingly, to resolve the issues under investigation, the District agrees to take the actions outlined below.

## ACTION ITEM 1

Within forty-five (45) days of this Agreement, the District will convene a Section 504 team meeting to include a group of persons knowledgeable about the Student, to determine whether the Student suffered any educational loss as a result of the Student's absences from school during the 2024-2025 school year. At the meeting, the District will also develop a written plan, or incorporate into the Student's Section 504 Plan, the plan for addressing the Student's attendance at school when his glucose levels are not within range. The District will invite the Student's parents to attend the meeting at least 15 calendar days in advance of the meeting and will allow them seven (7) calendar days from the date of receipt of the letter to submit a written response to the invitation.

If the Team determines that the Student suffered an educational loss, it will then determine whether the loss entitles the Student to compensatory education services. In making this determination, the Team will adhere to the requirements of 34 C.F.R. § 104.35 (evaluation and placement) and § 104.36 (procedural safeguards). The District will provide the Student's parents with a meaningful opportunity to provide input into the Team's determination.

If the Team determines that the Student is entitled to compensatory education or services, the Team will develop a plan for providing the required education or services, and the District will provide such education or services in addition to any other service to which the Student is entitled.

**REPORTING REQUIREMENT:**

1. Within sixty-five (65) days of signing this Agreement, the District will submit to OCR documentation showing that the meeting described in Action Item 1 took place and reflecting the Team's decision, including:

      a.  a copy of the invitation to the Student's parents;

      a.  a list of attendees by name and title;

      b.  the information considered by the Team;

      c.  an explanation for all decisions made, including the Team's decision as to whether the Student suffered an educational loss;

      d.  a description of the types of compensatory education or other remedial service options discussed, if applicable;

      e.  a description of and schedule for providing compensatory and/or remedial services to the Student for educational loss (if any);

      f.  confirmation that the procedural safeguards were provided to the Student's parents;

      g.  a copy of any meeting minutes or notes;

      h.  the plan developed by the Team to address the Student's attendance at school when his glucose levels are not within range; and

      i.  documentation that any compensatory and/or remedial services that the Team determined were appropriate were actually provided;

2. If the Team decides during the meeting described in Action Item 1 that the Student is entitled to compensatory and/or remedial services, the District will provide documentation to OCR with fifteen (15) days of the completion of the compensatory and/or remedial services, confirming that the Student received said compensatory and/or remedial services.

By signing this Agreement, the District agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. Further, the District understands that during the monitoring of the Agreement, if necessary, OCR may visit the District, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms of the Agreement and is in compliance with Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, and its implementing regulation, 34 C.F.R. Part 104, and Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. § 12131, and its implementing regulation, 28 C.F.R. Part 35, that were at issue in this case.

Upon the District's satisfaction of the terms and obligations of the resolution agreement and compliance with Section 504 and its implementing regulation, 34 C.F.R. Part 104, and Title II and its implementing regulation, 28 C.F.R. Part 35 that were at issue in this case, OCR will close the case.

The District understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of the resolution agreement and/or the applicable statutes and regulations. Before initiating such proceedings, OCR will give the District written notice of the alleged breach and 60 calendar days to cure the alleged breach.

Page 3 –OCR Case Number XXXXXX, XXXXXX

This Agreement will become effective immediately upon the signature of the District's representative below.


_/s/_____          5/30/2025
_____          _____
Superintendent or Designee                      Date



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

May 30, 2025

Via e-mail only to: XXXXXX

XXXXXX
Interim Superintendent
[School District in California]
XXXXXX
XXXXXX

Re:    XXXXXX, OCR Case Number XXXXXX

Dear Superintendent XXXXXX:

This letter is to notify you of the disposition of the above-referenced complaint filed against XXXXXX with the U.S. Department of Education, Office for Civil Rights (OCR). OCR investigated whether the District discriminated against a student (Student A) on the basis of disability by denying him the ability to participate fully in the hybrid model program at the XXXXXX.

OCR investigated this case under the authority of Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, and its implementing regulation, at 34 C.F.R. Part 104, which prohibit retaliation and discrimination on the basis of disability in programs and activities receiving federal financial assistance. OCR is also responsible for enforcing Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. § 12131 et seq., and its implementing regulation, at 28 C.F.R. Part 35, which prohibit retaliation and disability discrimination by public entities. As the District receives federal financial assistance from this Department and is a public entity it is subject to these laws.

As explained below, prior to completion of OCR's investigation, the District expressed an interest in voluntarily resolving the allegation and signed the enclosed voluntary Resolution Agreement (agreement) to address the identified issues.

Legal Standards

The regulation implementing Section 504, at 34 C.F.R. § 104.33, requires a recipient that operates a public elementary or secondary education program or activity to provide a free appropriate public education (FAPE) to each qualified disabled person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's disability. An appropriate education is regular or special education and related aids and services that are designed to meet the individual educational needs of disabled persons as adequately as the needs of nondisabled persons are met and that are based upon adherence to Section 504's procedural requirements. Implementation of an Individualized Education Program (IEP) developed in accordance with the Individuals with Disabilities Education Act (IDEA) is one way to provide a FAPE.

Page 2

The regulation implementing Section 504, at 34 C.F.R. § 104.35(a), requires a recipient that operates a public elementary or secondary education program or activity to conduct an evaluation of any person who, because of disability, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement.

Under 34 C.F.R. § 104.34(a), a student with a disability must be educated with students without disabilities to the maximum extent appropriate to the needs of the student with a disability. School districts must place students with disabilities in the regular educational environment unless it can be demonstrated that education in the regular setting with the use of supplementary aids and services cannot be achieved satisfactorily. If a school district places a student in a setting other than the regular education program, it must consider the proximity of the alternate setting to the student's home.

OCR interprets the Title II regulations consistent with the requirements of Section 504.

### Investigation To Date

Based on the investigation to date, OCR has a concern that the District may not have met its Section 504 procedural obligations with respect to the identification, evaluation, and placement of Student A and that this may have had the effect of limiting Student A in his ability to receive a FAPE and access the hybrid XXXXX program to the maximum extent appropriate to his needs.

Specifically, OCR is concerned that the District may have made decisions regarding Student A's related aids and services, such as social emotional learning and occupational therapy, based on the availability of the services and not on Student A's individual needs. OCR also is concerned that the District's earlier practice of prohibiting Student A's aide from communicating with Student A's Parent and the District's failure to consistently document information regarding Student A's behavior in the educational setting may have made it difficult for Student A's Parent and the IEP team to have timely and critical information that would allow for meaningful participation in meetings where Student A's individualized education program (IEP) was discussed.

Further, OCR is concerned that the XXXXXX Director's presence at and comments during IEP meetings may have had a negative impact on the ability of the IEP team to fully consider Student A's individual needs. In addition, OCR has a concern that Student A's aide may not have been fully trained in the unique disability-related behavior needs of Student A with respect to behavior management.

### Resolution

In accordance with Section 302 of the OCR Case Processing Manual (February 19, 2025) (CPM), allegations under investigation may be resolved at any time when, prior to the point when the Regional Office issues a final determination under CPM Section 303, the recipient expresses an interest in resolving the allegations and OCR determines that it is appropriate to resolve them because OCR's investigation has identified issues that can be addressed through a resolution agreement. In this case, the District requested to resolve the complaint prior to the conclusion of OCR issuing a final determination. In light of the District's willingness to address

Page 3

the concerns identified by OCR comprehensively without further investigation, OCR determined that entering into a voluntary Resolution Agreement was appropriate. Subsequent discussions with the District resulted in the District signing the enclosed agreement.

The actions the District will take under the agreement include: ensuring that Student A's behavior incidents are documented; training Student A's aide on Student A's specific disability-related behaviors and in the implementation of Student A's behavior intervention plan; ensuring that Student A's aide is either included as a member of Student A's IEP team or that the IEP team solicits, prior to each of Student A's IEP team meetings, the aide's input for review; ensuring that Student A is educated with students without disabilities to the maximum extent appropriate to the needs of Student A; and, ensuring that an individual from the county office of education attends Student A's IEP meetings.

This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

This concludes OCR's investigation of the complaint. The complainant may have the right to file a private suit in court regardless of OCR's determination.

Please be advised that the District may not harass, coerce, intimidate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process. If this happens, the individual may file another complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. In the event that OCR receives such a request, we will seek to protect, to the extent provided by law, personally identifiable information, which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

OCR will monitor the implementation of the agreement and will close the complaint when OCR determines that the terms of the agreement have been satisfied. The first report under the agreement is due by June 26, 2025.

If you have any questions regarding this letter, please feel free to contact me at (206) 607-1607 or mark.farr@ed.gov.

Sincerely,

/s/

Mark A. Farr
Senior Equal Opportunity Specialist

Enclosure: Resolution Agreement

[School District in California]
Resolution Agreement
OCR # XX-XX-XXXX

The XXXXXX (the District) agrees to implement this Resolution Agreement (Agreement) to resolve the issues investigated by the U.S. Department of Education, Office for Civil Rights (OCR), under Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Act Amendments Act of 2008 (Title II or ADA), and their implementing regulations, in the above-referenced OCR case number.

## I.    INDIVIDUAL STUDENT REMEDIES

A.  Beginning with the date that this Agreement is executed by the District and as long as the Student attends XXXXXX, the District will ensure that an individualized education program (IEP) team meeting facilitator from the XXXXXX is present for any IEP team meeting convened regarding Student, including any IEP team meeting convened pursuant to this Agreement.

B.  Beginning with the date that this Agreement is executed by the District, the District will ensure that it is preparing incident reports for the Student's behavioral issues, when warranted.

C.  Within 15 school days of the date that this Agreement is executed by the District, the District will provide training to any special circumstances instructional assistant or other 1 to 1 aide (aide) who is providing services to the Student. The training will be specifically tailored to address the Student's specific disability-related behaviors and in the implementation of Student's behavior intervention plan and will be delivered by a qualified professional of the District's choice who possesses sufficient knowledge, education, or training in the area of behavior intervention and is qualified to train others about it.

D.  In the event that there is a change in the aide who provides services to the Student, the District will also train the new aide in the same manner stated in the previous paragraph within 5 school days of the date the new aide begins to provide services to the Student.

E.  Beginning with the date that this Agreement is executed by the District, the District will ensure that the Student's current aide is either included as a member of the Student's IEP team or that the IEP team solicits, prior to each of the Student's IEP team meetings, the aide's input for review and consideration as part of each IEP team meeting for the Student.

Additionally, the District will not discourage communication between the complainant and any aide who is providing services to the Student.

F.   The District will ensure that it is educating the Student in the least restrictive environment, which may consist of increasing his in-person attendance. The District will also ensure that the Student has an equal opportunity to participate in all school activities, curricular and extracurricular.

G.   With its execution of this Agreement, the District acknowledges that its obligation to provide a free appropriate public education to the Student is not limited or restricted by the Student's attendance at the XXXXXX and that it is obligated to implement the Student's IEP, including related aids and services such as occupational therapy, while he attends the XXXXXX.

**Reporting Requirements**

H.   By January 1, 2026, the District will provide OCR with a report demonstrating that it has taken the actions required by paragraph I(A) and I(B), I(D), I(E), and I(F) above. The report should include, at a minimum, copies of all of the Student's educational records created between the execution of this Agreement and the date of the report, including but not limited to documents related to special education, discipline, attendance, and general education, and including any e-mails, notes, database entries, memoranda, letters, telephone messages, and other records, whether generated or received by the District and/or XXXXXX, and whether in paper or electronic format.

I.   Within two weeks of completing the training required by paragraph I(C) of this Agreement, the District will verify to OCR that the training occurred, including the name and qualifications of the individual who provided the training, to whom the training was provided, the date(s) that the training was provided, a description of the training that was provided, and a copy of any documents that were used for the training. By January 1, 2026, in the event that there were changes to the Student's SCIA or 1 to 1 aide, the District will provide the same information for any new SCIA or 1 to 1 aide who is tasked with providing services to the Student.

II.   **COMPENSATORY EDUCATION/SERVICES**

A.   By no later than August 29, 2025, after providing proper written notice to the complainant, a group of knowledgeable persons, including the complainant, will determine whether the Student needs compensatory and/or remedial education or services taking into account the concerns identified by OCR in its resolution letter. If so, within one week of its determination, the group will develop a plan for providing timely compensatory and/or remedial education or services with a completion date not to extend beyond December 15, 2025. The District will provide the complainant with notice of procedural safeguards including the right to challenge the group's determination through an impartial due process hearing.

**Reporting Requirements**

B. Within two weeks of making the decision about whether compensatory and/or remedial education or services are needed as required by the above paragraph, the District will submit to OCR a report documenting the group's decision. The report submitted shall include documentation showing the participants in the meeting, the information considered, an explanation for decisions made, and a description of and schedule for providing any compensatory and/or remedial education or services (if any) to the Student. OCR will, prior to approving the District's decision and plan for providing the proposed services, review the documentation to ensure that the District met the requirements of the regulation implementing Section 504, at 34 C.F.R. §§ 104.34, 104.35 and 104.36, and, as applicable, Title II, at 28 C.F.R. § 35.160, in making these determinations.

C. By January 1, 2026, the District will provide documentation to OCR of the dates, times, and locations that compensatory and/or remedial education or services were provided, a description of what was provided, and the name(s) of the service provider(s).

## III.    Monitoring

The District understands that by signing this Agreement, it agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. Further, the District understands that during the monitoring of the Agreement, if necessary, OCR may visit the District, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms and obligations of the Agreement. Upon the District's satisfaction of the commitments made under the Agreement, OCR will close the case.

The District understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of the Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the District written notice of the alleged breach and sixty (60) calendar days to cure the alleged breach.

/s/                                                                5/28/2025
_____      _____
XXXXXX                                                    Date
Interim Superintendent
XXXXXX



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

May 27, 2025

<u>By email only</u> to XXXXXX

XXXXXX
Superintendent of Schools
[School District in New Jersey]
XXXXXX
XXXXXX

Re:     Case Number XX-XX-XXXX
        <u>XXXXXX</u>

Dear XXXXXX:

On XXXXXX, the U.S. Department of Education, Office for Civil Rights (OCR) notified you that we received a complaint filed against XXXXXX. The complaint alleged that the District discriminates on the basis of disability by failing to provide accessible parking spaces for the District's football field.

OCR enforces Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, and its implementing regulation at 34 C.F.R. Part 104, which prohibit discrimination on the basis of disability in programs and activities that receive federal financial assistance.  OCR also enforces Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulation at 28 C.F.R. Part 35, which prohibit discrimination against qualified individuals with disabilities by public entities, including public education systems and institutions, regardless of whether they receive federal financial assistance. As a recipient of federal financial assistance from the Department of Education and as a public entity, the District must comply with these laws.

OCR processes complaints in accordance with its Case Processing Manual (CPM) (February 19, 2025).  OCR determined that this case was appropriate for the Rapid Resolution Process, as outlined in Section 110 of the CPM. Accordingly, OCR reached out to the District about promptly resolving this complaint. During this process, OCR reviewed information from the Complainant and the District, including photographs of the parking lots at the football field, and interviewed District staff. The District expressed interest in resolving the allegation pursuant to Section 302 of OCR's *Case Processing Manual*, which states that allegations may be resolved prior to OCR making a determination if the school expresses an interest in resolving the allegations and OCR determines that it is appropriate to resolve them because OCR has identified issues that can be addressed through a resolution agreement.  The following is a summary of the evidence obtained by OCR to date.

**<u>Summary of the Evidence Obtained to Date</u>**

The Complainant alleged that the District discriminates on the basis of disability by failing to provide accessible parking spaces at the District's football field. Specifically, the Complainant asserted that

Page 2

on September 14, 2024, she visited the District to attend a football game and found that "the parking lot" lacked accessible parking.

The District football field is located at its high school (the School). The District uses two School parking lots for the football field: the Upper Lot and the Lower Lot, the latter of which is adjacent to the football field. The District stated that the Upper Lot has 68 parking spaces, with 3 designated as accessible, and that the Lower Lot has 92 parking spaces, with 2 designated as accessible. The District provided photographs of both lots. The Upper Lot photographs show that all three of its accessible spaces are marked with an accessibility symbol, but the markings appear to be faded. The Lower Lot photographs show that each of the two accessible parking spaces have an accessibility symbol on the pavement of the space, but neither space has accessibility signage.

## Legal Standards

The Section 504 regulation, at 34 C.F.R. § 104.21, and the Title II regulation, at 28 C.F.R. § 35.149, provide that no qualified individual with a disability shall be excluded from participation in, denied the benefits of, or otherwise subjected to discrimination in a school district's programs or activities because the school district's facilities are inaccessible to or unusable by individuals with disabilities.

The regulations implementing Section 504 and Title II each contain two standards for determining whether a school district's programs, activities, and services are accessible to individuals with disabilities. One standard applies to facilities existing at the time of the publication of the regulations and the other standard applies to facilities constructed or altered after the publication dates. The applicable standard depends on the date of construction and/or alteration of the facility. Under the Section 504 regulation, existing facilities are those for which construction began prior to June 4, 1977; under the Title II regulation, existing facilities are those for which construction began prior to January 27, 1992. Facilities constructed or altered on or after these dates are considered newly constructed or altered facilities under Section 504 and Title II standards.

For existing facilities, the Section 504 regulation, at 34 C.F.R. § 104.22, and the Title II regulation, at 28 C.F.R. § 35.150, require a school district to operate each service, program, or activity so that, when viewed in its entirety, it is readily accessible to and usable by individuals with disabilities. The school district may comply with this requirement through the reassignment of programs, activities, and services to accessible buildings, alteration of existing facilities, or any other methods that result in making each of its programs, activities and services accessible to persons with disabilities. In choosing among available methods of meeting the requirements, a school district must give priority to methods that offer programs, activities and services to persons with disabilities in the most integrated setting appropriate.

With respect to newly constructed facilities, the Section 504 regulation, at 34 C.F.R. § 104.23(a), and the Title II regulation, at 28 C.F.R. § 35.151(a), require that the school district design and construct the facility, or part of the facility, in such a manner that it is readily accessible to and usable by individuals with disabilities. In addition, for new alterations that affect or could affect facility usability, the Section 504 regulation, at 34 C.F.R. § 104.23(b), and the Title II regulation, at 28 C.F.R. § 35.151(b), require that, to the maximum extent feasible, the school district alter the facility in such a manner that each altered portion is readily accessible to and usable by individuals with disabilities.

Page 3

The new construction provisions of the Section 504 and Title II regulations also set forth specific architectural accessibility standards for facilities constructed or altered after particular dates. With respect to Section 504 requirements, facilities constructed or altered after June 3, 1977, but prior to January 18, 1991, must comply with the American National Standards Institute (ANSI) Standards (A117.1-1961, re-issued 1971). Facilities constructed or altered after January 17, 1991, must meet the requirements of the Uniform Federal Accessibility Standards (UFAS). Under the Title II regulation, school districts had a choice of adopting either UFAS or the 1991 Americans with Disabilities Act Accessibility Guidelines (ADAAG) for facilities constructed or altered after January 26, 1992 and prior to September 15, 2010. For facilities where construction or alterations commenced on or after September 15, 2010, and before March 15, 2012, the Title II regulation provides that school districts had a choice of complying with either UFAS, ADAAG, or the 2010 ADA Standards for Accessible Design (2010 Standards). The Title II regulation provides that school districts are required to comply with the 2010 Standards for construction or alterations commencing on or after March 15, 2012. While the Section 504 regulations have not been amended to formally adopt the 2010 Standards, a school district may use the 2010 Standards as an alternative accessibility standard for new construction and alterations pursuant to Section 504. The 2010 Standards consist of 28 C.F.R. § 35.151 and the 2004 ADAAG, at 36 C.F.R. Part 1191, appendices B and D.

With respect to parking, the 2010 ADA Standards require that a parking facility have a certain number of designated accessible parking spaces based on the facility's total number of parking spaces. 2010 ADA Standards 208.2. Specifically, a parking facility must have three accessible spaces if it has between 51 and 75 total spaces and four accessible spaces if it has between 76 and 100 total parking spaces. In addition, a parking lot must have a certain number of "van accessible' spaces, specifically one in every six accessible spaces under 2010 ADA 208.2.

The 2010 ADA Standards 208.2 requires that when more than one parking facility is provided on a site, the number of accessible spaces provided shall be calculated according to the number of spaces required for each parking facility. Therefore, each parking lot is considered separately to determine if it meets the 2010 ADA Standards.

Additionally, the 2010 ADA Standards 216.5 states that parking spaces must be identified by signs that include the International Symbol of Accessibility, and that signs identifying van parking must contain the designation "van accessible." The signs also must be a minimum of 60 inches above the finish floor or ground surface.

## **Analysis**

OCR found evidence that the District provides some accessible parking spaces for the football field in both the Upper Lot and Lower Lot. However, OCR identified concerns that in the Lower Lot, the District has not designated the number of accessible spaces required. Additionally, OCR has concerns that in the Upper Lot, the District has not designated a van accessible space. Moreover, OCR has concerns that the District does not have the required signage for accessible spaces in either lot. Specifically, the Lower Lot appears to have two accessible spaces, but requires four given its size, and has pavement markings for the spaces that are not sufficient signage; the Upper Lot has the required number of accessible spaces but does not appear to have a clearly designated van accessible space, and the accessibility markings for all three spaces are faded.

Page 4

On May 27, 2025, the District agreed to implement the enclosed Resolution Agreement, which, when fully implemented, will address the allegation at issue. OCR will monitor the District's implementation of the agreement until the District is in compliance with the terms of the agreement.

## **Conclusion**

This concludes OCR's use of the Rapid Resolution Process to resolve the complaint. This letter should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. Individuals who file complaints with OCR may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, it will seek to protect, to the extent provided by law, personally identifiable information that, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

We appreciate the District's cooperation in the resolution of this complaint. If you have any questions, please contact the OCR attorneys assigned to this complaint: Sara Clash-Drexler at 202-453-5906 or Sara.Clash-Drexler@ed.gov or James Gallagher at 202-987-1533 or James.Gallagher@ed.gov.

Sincerely,

/s/

Dan Greenspahn
Team Leader

Enclosure

<u>**RESOLUTION AGREEMENT**</u>
**[School District in New Jersey]**
**OCR Case Number XX-XX-XXXX**

XXXXXX (the District) agrees to fully implement this Resolution Agreement to resolve the allegation investigated in Office for Civil Rights (OCR) Case Number XX-XX-XXXX. This Agreement does not constitute an admission by the District of a violation of Section 504 of the Rehabilitation Act of 1973 (Section 504), Title II of the Americans with Disabilities Act of 1990 (Title II), or any other law enforced by OCR.

<u>**Action Item 1: Accessible Parking and Signage**</u>

By September 15, 2025, the District will make alterations to the School's Lower Parking Lot and Upper Parking Lot to ensure that designated accessible parking and signage is provided in compliance with the requirements of the 2010 ADA Standards for Accessible Design. This will include, but is not limited to, ensuring that the School's Lower Parking Lot has the requisite number of designated accessible parking spaces and appropriate signage; and the School's Upper Parking Lot has a parking space designated as van accessible, appropriate signage, and accessible spaces that are appropriately marked with the International Symbol of Accessibility.

> **Reporting Requirement:** By September 30, 2025, the District will provide documentation to OCR (e.g., copies of paid invoices, photographs, etc.) for OCR's review and approval confirming completion of the changes to the Lower and Upper Parking Lots required by Action Item 1. OCR reserves the right to go onsite to review the District's alterations.

By signing this Agreement, the District agrees to provide data and other information in a timely manner in accordance with the reporting requirements of the Agreement. During the monitoring of this Agreement, if necessary, OCR may visit the District, interview staff and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms and obligations of this Agreement.

Upon the District's satisfaction of the commitments made under this Agreement, OCR will close the case.

The District understands and acknowledges that OCR may initiate proceedings to enforce the specific terms and obligations of this Agreement and/or the applicable statute(s) and regulation(s). Before initiating such proceedings, OCR will give the District written notice of the alleged breach and 60 calendar days to cure the alleged breach.

By: _____/s/_____     Date: _____May 27, 2025_____
XXXXXX, Superintendent
XXXXXX



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS**

June 17, 2025

By email only to XXXXXX

XXXXXX, Superintendent
[School District in Colorado]
XXXXXX
XXXXXX, CO XXXXXX

Re: XXXXXX (CO), OCR Case Number XX-XX-XXXX

Dear Superintendent XXXXXX:

This letter is to notify you of the disposition of the above-referenced case stemming from a complaint filed with U.S. Department of Education, Office for Civil Rights (OCR) on XXXXX. On May 6, 2025, OCR opened an investigation into whether XXXXXX (District) discriminated based on disability. The Complainant alleged that the District failed to: (a) reevaluate her son (Student) (i.e., conduct a manifestation determination) before subjecting him to significant changes in placement in the context of discipline; and (b) reevaluate the Student and/or adjust his services and supports, despite being aware that his needs were not being met.

OCR conducted this investigation under Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 United States Code (U.S.C.) § 794, and its implementing regulations at 34 Code of Federal Regulations (C.F.R.) Part 104, which prohibit discrimination on the basis of disability by recipients of federal financial assistance; and Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulations at 28 C.F.R. Part 35, which prohibit discrimination on the basis of disability by public entities. As a recipient of federal financial assistance from the Department and a public entity, the District must comply with these laws and regulations.

OCR requested and reviewed a variety of records and information from the Complainant and the District. Prior to the completion of OCR's investigation, the District expressed an interest in taking voluntary action to resolve the complaint pursuant to Section 302 of OCR's [Case Processing Manual (CPM) (February 19, 2025)](). The District voluntarily entered into the attached resolution agreement (the Agreement) to resolve the allegations under Section 302 of OCR's CPM.

## I.    Legal Standards

The Section 504 regulations require recipients to provide a free appropriate public education (FAPE) to all students with disabilities in their jurisdictions. An appropriate education is defined as regular or special education and related aids and services that are designed to meet the individual needs of students with disabilities as adequately as the needs of students without

Page 2

disabilities are met, and that are developed in accordance with Section 504's procedural requirements pertaining to educational setting, evaluation and placement, and due process protections. OCR interprets the Title II regulations to require public elementary and secondary schools to provide a FAPE at least to the same extent required under the Section 504 regulations.

The Section 504 regulations require school districts to evaluate any student who, because of disability, needs or is believed to need special education or related aids and services before initially placing the student and before any subsequent significant change in placement. Placement decisions must be made by a group of persons knowledgeable about the student, the evaluation data, and the placement options. Placement decisions must be based on information from a variety of sources that is carefully considered and documented. School districts must provide procedural safeguards for parents and guardians of students with disabilities with respect to any action regarding the identification, evaluation, or placement of the student.

Following a student's initial evaluation and identification as a student with a disability, Section 504 requires reevaluations on a periodic basis. Also, because a recipient's Section 504 FAPE obligation is ongoing, a recipient may need to reconvene a student's Section 504 team or individualized education program (IEP) team to reevaluate the student if the recipient has reason to believe that the student's needs are no longer being met within their current placement. For example, if a student continues to have disability-based behavioral challenges that impede learning or if a student develops new or more significant behaviors that impede learning, a recipient may need to reconvene the Section 504 or IEP team to conduct a reevaluation, determine if additional or different services or other supports are necessary, or change the student's placement. Recipients must ensure that any needed changes are made promptly to ensure the continued provision of FAPE and that the changes are reflected in the student's Section 504 plan or IEP. An additional evaluation would also be necessary if the school has reason to believe the student may have an additional disability affecting their behavior.

Additionally, Section 504 and Title II require public elementary and secondary recipients to evaluate a student with a disability prior to any significant change in the student's placement. A significant change in placement, in the context of disciplinary removal, occurs when a student with a disability is: (a) removed from class or school for more than 10 consecutive school days; or (b) subject to a series of removals from class or school that together total more than 10 school days in a school year and constitute a pattern of removal. The purpose of the evaluation (called a "manifestation determination") is to decide whether the behavior for which discipline is proposed is based on the student's disability, and, if so, whether changes in the student's placement are required to ensure the student receives a FAPE. OCR determines whether a series of removals creates a pattern of removal on a case-by-case basis, considering evidence related to, among other factors, the length of each removal, the proximity of the removals to each other, the total amount of time the student is removed from school, and the nature of the behavior underlying each incident and giving rise to the series of removals. Schools must ensure that they do not violate the rights of a student with a disability by creating a pattern of removals that constitutes a significant change in placement absent a manifestation determination.

Page 3

## II.    Findings of Fact

The Student has been diagnosed with attention-deficit/hyperactivity disorder (ADHD) and depression. During school year (SY) 2023-24, he was in XXXXXX grade at the School.

On XXXXXX, a team revised the Student's Section 504 plan. The revised plan included the following behavior-related accommodations: (a) "Allow [the Student] to use a 'Pressure Pass' to access a quieter, smaller space to take a break and de-escalate as needed;" (b) "Provide supervision during lunch/recess time;" (c) "Encourage [the Student] to tell an adult any time a conflict begins to occur;" (d) "If adults know that [the Student] is beginning to be upset, they can stay nearby, encourage him to take a break, and/or tell him to do a different activity;" and (e) "Removal of certain recess activities if conflict occurs (for example, losing the ability to play competitive sports at recess for a week)."

On XXXXXX, SY 2024-25 began. The Student was in seventh grade at the School.

On XXXXXX, the School's counselor/the Student's case manager (Counselor) emailed the Student's Section 504 plan to his teachers.

On XXXXXX, the Student got into a fight during physical education (PE) class. The Complainant's and the Student's advocate (Advocate) alleged that the School sent the Student home early on XXXXXX. According to attendance records, the Student had an unexcused absence during eighth period on XXXXXX. From XXXXXX to XXXXXX, the Student served an out-of-school suspension (OSS) for the fight.

On XXXXXX, the District's Director of XXXXXX (Director) wrote in an email to School staff, "You will need to set up a 504 review. According to [the Complainant][,] [the Student] is now on antidepressant medication to reduce suicidal ideations."

On XXXXXX, the School's Section 504 Coordinator/Assistant Principal (Assistant Principal) sent an email to the Student's teachers asking them to provide responses to the following questions: "How is [the Student] doing in your class;" "What accommodations are you currently using with [the Student]? Are they working;" and "Do you feel he needs any additional accommodations?" Teacher 1 replied, "[The Student] has a great attitude in class and is a hard worker. He is respectful and participates in class discussion. … I have not seen him dysregulated in class. I have really enjoyed having him in class this school year." Teacher 2 replied, "[The Student] has been doing great in my class and has not needed any accommodations. He has had issues with the subs who I had recently, clicking a pen repeatedly during silent time. When one pen was taken away he would get another one out and do the same thing." Teacher 3 replied, "[The Student] is doing well in class. He is a little behind in XXXXXX." Teacher 4 replied, "I have no concerns about [the Student] whatsoever. In my class, he is great and one of my highest scorers on pretty much every assignment." Teacher 5 replied, "[The Student] in PE does what he needs to and doesn't need any special accommodations. He has gotten better at understanding that losing happens in different games but I have seen him get as upset as he would last year so far this year. He does what [sic] is asked to do but just like any XXXXXX grader he needs a little reminder to stay on task."

Page 4

On XXXXXX, the Student refused to relinquish his cell phone to School staff. The Advocate told OCR that the Student was sent home early from school that day and served an OSS on XXXXXX. Attendance records for the Student specify "UPC" for XXXXXX and an unexcused absence for XXXXXX. Attendance records indicate that "UPC" stands for "Unexpgo." Discipline records indicate that the Student was given a one-day OSS.

On XXXXXX, the Student was referred for a minor conflict with a peer. On XXXXXX, the Student was referred for refusing to complete classwork.

On XXXXXX, a revised Section 504 plan was finalized by the Student's team. The revised plan included the following behavior-related accommodations: (a) "If [the Student] becomes unregulated, allow [the Student] a 5-10 minute break outside of the classroom;" (b) "Use of a non-distracting fidget during class times;" (c) "When [the Student] becomes physically agitated, an adult will redirect using the phrase, '[The Student], do you need a break;'" and (d) "During independent times, [the Student] is able to work use a [C]hromebook to listen to music with corded headphones." The Counselor emailed the Student's revised Section 504 plan to his teachers.

On XXXXXX, the Student was referred for non-compliance with a staff directive. The next day, the Student was referred for physical aggression.

On XXXXXX, the Student refused to relinquish his cell phone to School staff. The School gave the Student an OSS for the last three periods of the school day and from XXXXXX to XXXXXX.

On XXXXXX, the Complainant wrote in an email to the District's Section 504 Coordinator, "Just wanted to follow up with our conversation this morning about [the Student] being suspended for more than 10 days and the manifestation determination review."

On XXXXXX, the District held a manifestation determination for the Student. Records from the meeting specify that: (a) the incident occurred on XXXXXX; (b) the Student had 10 days of OSS to date in SY 2024-25, and the School was considering another four days of OSS for the Student; (c) the team determined that the Student's misconduct was not a manifestation of his disability or a manifestation of a failure to implement his Section 504 plan; and (d) the team determined that another team meeting was needed but that a functional behavioral assessment (FBA), reevaluation, and behavioral intervention plan (BIP) were not needed. The Advocate told OCR that the Complainant requested an FBA and BIP during a team meeting in XXXXXX.

On XXXXXX, a revised Section 504 plan was finalized by the Student's team. The revised plan included the following behavior-related accommodations: (a) "If [the Student] becomes unregulated, allow [the Student] a 5-10 minute break outside of the classroom;" (b) "Use of a non-distracting fidget during class times;" (c) "During independent times, [the Student] is able to work use a [C]hromebook to listen to music with corded headphones;" and (d) "Provide coaching when noticeably stressed in a neutral tone, especially in a disciplinary situation, and provide processing time after providing a request."

Page 5

On XXXXXX, the Student was referred for rough play/physical contact. Also, the Counselor emailed the Student's revised Section 504 plan to his teachers.

On XXXXXX, the Student got into a fight with a student while returning from recess. The School gave the Student an OSS for the last two periods of the school day, from XXXXXX to XXXXXX, and from XXXXXX and XXXXXX.

On XXXXXX, the Complainant wrote in an email to the School's principal (Principal), "Just wanted to follow up from our conversation this afternoon with [the Assistant Principal]. After having a mutual agreement that the MDR should have been done before disciplinary actions and you mentioned reaching out to the district's attorney. I would appreciate to be kept in the loop on what is going on." The Principal replied to the Complainant, "Yes, I will let you know. I am not sure or not whether it should have been, but I can see how you could read it that way. I will let you know what they say."

On XXXXXX, the District held a manifestation determination for the Student. Records from the meeting specify that: (a) the incident occurred on XXXXXX; (b) the Student had 15 days of OSS to date in SY 2024-25, and the School was considering another five days of OSS for the Student; (c) the team (except the Complainant, who disagreed) determined that the Student's misconduct was not a manifestation of the Student's disability or a manifestation of the School's failure to implement his Section 504 plan; and (d) the team determined that another team meeting was needed but that an FBA and a reevaluation were not needed.

On XXXXXX, the Complainant asked the Student's teachers, via email, if the Student had ever cursed at them. Teacher 1 replied, "I have never heard him talk with inappropriate language toward me or others …. My experience with [the Student] has all been positive. He is a pleasure to have in class." Teacher 2 replied, "[The Student] has always been quite respectful in science class." Teacher 3 replied, "[The Student] has never cursed at me. He gets along with almost everyone in band class that he is around." Teacher 6 replied, "[The Student] has not ever cussed at me. He has always been polite."

The District provided to OCR a letter – dated XXXXXX and written by an outside medical provider – that read:

> [The Student] has ADHD [and] depression …. He is showing signs of worsening depression and med adjustments are ongoing. He is also having med dose adjustments for his ADHD. [The Student] is manifesting his depression with less emotional flexibility along with irritability, anger and sleep problems. His ADHD is manifesting as more impulsive behavior ….
>
> Please take the above into consideration during his manifestation hearing, as well as any times when suspension is being considered. [The Student] is continuing in mental health counseling weekly due to all of his diagnoses and the increased stress with school and suspensions.

Page 6

On XXXXXX, the Complainant filed a state complaint with the Colorado Department of Education alleging that the "District did not identify and evaluate Student from XXXXXX to present, when it was on notice that Student may have a disability and need special education and related services, as required by [the IDEA regulations] and [Colorado's Exceptional Children's Educational Act]." On XXXXXX, the Complainant and the District signed a state complaint resolution agreement. The District agreed to evaluate whether the Student has a serious emotional disability or other health impairment under the IDEA by XXXXXX. That same day, the Complainant provided the District with consent for an evaluation of the Student to determine his eligibility under the IDEA. In XXXXXX, information was solicited from the Student's teachers for the reevaluation.

On XXXXXX the Student was referred for refusing to do classwork. On XXXXXX, the Student was referred for a minor conflict with a peer.

On XXXXXX, a school psychologist observed the Student in class for the reevaluation. On XXXXXX, a team met and determined that the Student was ineligible under the IDEA.

## III.    Compliance Concerns

### A.    Manifestation Determinations

According to District records, during the first semester of SY 2024-25, the Student was out-of-school suspended for approximately nine-and-a-half days: XXXXXX. If the records are completely accurate, the District would not have been required to conduct a manifestation determination. Nevertheless, the District held a manifestation determination on XXXXXX. The Advocate alleged that the Student was also suspended for a portion of the school day on XXXXXX and for the whole school day on XXXXXX. If the Advocate's allegation is true, and the OSSs constituted a pattern of removal, the District would have been required to conduct a manifestation determination by XXXXXX.

During the second semester of SY 2024-25, the Student was out-of-school suspended for two periods on XXXXXX, and all school day on XXXXXX – bringing his total days of OSS during SY 2024-25 to at least 15. The District did not conduct a manifestation determination until XXXXXX. If the OSSs constituted a pattern of removal, the manifestation determination would have been untimely.

Before OCR further investigated whether the Student was out-of-school suspended on XXXXXX and XXXXXX, as alleged by the Advocate, and whether the OSSs constituted patterns of removal, the District entered into the Agreement.

### B.    Reevaluation/Adjustment of Services and Supports

The Student had ongoing behavior issues during SY 2024-25. He had documented referrals on XXXXXX. The Student's conduct signaled that the District should reconvene his Section 504 team to conduct a reevaluation, determine if additional or different services or other supports were necessary, and/or change the Student's placement. The District did not conduct an FBA of

the Student or create a BIP for him. However, the District did convene his Section 504 team and revised his plan in XXXXXX. Additionally, the District evaluated the Student under the IDEA in XXXXXX, albeit after the Complainant filed a state complaint. Notably, according to records, when asked for information about the Student in XXXXXX, the Student's teachers provided positive feedback and did not raise any significant concerns.

Before OCR further investigated whether the District adequately responded to the Student's ongoing behavior issues under Section 504, the District entered into the Agreement.

## IV.    Conclusion

Upon being advised of the compliance concerns OCR identified under Section 504 and Title II, the District entered into the Agreement to resolve the concern. A signed copy of the Agreement is attached with this letter. When the Agreement is fully implemented, the issues will be resolved consistent with the requirements of Section 504, Title II, and their implementing regulations. OCR will monitor implementation of this Agreement through periodic reports from the District about the status of the Agreement terms and until the District is in compliance with its terms and the statutory and regulatory obligations under Section 504 and Title II that were at issue in the case.

This case is now in the monitoring phase. The monitoring of this case will be completed when OCR determines that the District has fulfilled all terms of the Agreement. When the monitoring phase of this case is complete, OCR will close this case and send a letter to the District stating that this case is closed.

This concludes OCR's investigation in this case and should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter. This letter sets forth OCR's determinations in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.

The Complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR. If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request. If OCR receives such a request, OCR will seek to protect, to the extent provided by law, personal information, which, if released, could constitute an unwarranted invasion of privacy.

Page 8


Thank you for the courtesy and cooperation extended to OCR during the investigation and resolution of this case. If you have any questions, please contact me, the attorney assigned to this case, at 303-844-6299 or Jason.Langberg@ed.gov.

                              Sincerely,

                              /s/

                              Jason Langberg
                              Designated Team Leader


Attached:     Resolution Agreement (signed)

cc:           XXXXXX
              XXXXXX

**RESOLUTION AGREEMENT**
**[School District in Colorado]**
**OCR Case XX-XX-XXXX**

XXXXXX (the District) enters into this Resolution Agreement (the Agreement) to resolve the compliance concerns that the U.S. Department of Education, Office for Civil Rights (OCR) identified in OCR Case XX-XX-XXXX. This case involved the District's compliance with Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 794, and its implementing regulations at 34 C.F.R. Part 104; and Title II of the Americans with Disabilities Act of 1990 (Title II), 42 U.S.C. §§ 12131 *et seq.*, and its implementing regulations at 28 C.F.R. Part 35. The District assures OCR that it will take the following actions to resolve OCR's compliance concerns identified in this case and to comply with the requirements of Section 504, Title II, and their regulations.

**Term I: Remedial Measures for the Student**

A. Within the first six weeks of school year (SY) 2025-26 (i.e., by September 17, 2025), the District will conduct a functional behavioral assessment (FBA)[1] of the Student and, if necessary, as determined by the Student's Section 504 team, create a behavioral intervention plan (BIP)[2] for the Student. If the District is unable to complete an FBA due to the Student's availability/attendance, the District will notify OCR and provide documentation of its efforts to secure the Student's availability/attendance.

B. The FBA and BIP will meet the procedural requirements of the Section 504 regulations, at 34 C.F.R. §§ 104.35(b)-(c), 104.36. If the Student's Section 504 team determines that a BIP is necessary, the team, including the Complainant, will create the BIP at a properly convened Section 504 team meeting. The District will provide a copy of the procedural safeguards to the Complainant at the meeting and a finalized BIP to the Complainant, either at the meeting or through email by September 30, 2025.

C. If a BIP is created, the District will implement it with fidelity.

D. **Reporting:**

   1. By September 30, 2025, the District will:

      a. email a copy of the BIP and the District's procedural safeguards to the Complainant and copy OCR on the email; and

---

[1] An FBA is assessment used to understand the function and purpose of a child's specific, interfering behavior and factors that contribute to the behavior's occurrence and non-occurrence for the purpose of developing effective positive behavioral interventions, supports, and other strategies to mitigate or eliminate the interfering behavior.

[2] A BIP is an individualized plan, based on information provided through an FBA, that identifies behavioral supports individually tailored to a student's needs to ensure a free appropriate public education. A BIP generally describes the behavior that inhibits the student from accessing learning and the positive behavioral interventions and other strategies that are to be implemented to reinforce positive behaviors and prevent behavior that interferes with the student's learning and that of others.

    b.  submit to OCR a copy of the FBA report and a copy of the minutes or notes from the team meeting at which the BIP was created.

## Term II: Employee Training

A. The District will train all relevant employees in Central Office and at XXXXXX (the School) about, at a minimum:

    1.  free appropriate public education (FAPE) for students with behavioral needs, including reevaluations and individualized behavioral interventions and supports; and

    2.  manifestation determinations, to include record-keeping related to disciplinary removals, counting partial school day removals, and the timing of manifestation determination meetings.[3]

B. Relevant employees will include, at a minimum:

    1.  the District's Section 504 Coordinator;
    2.  the District's Special Education Coordinator for the School;
    3.  the District's Behavior Support Coordinator;
    4.  all administrators at the School;
    5.  the School's Section 504 Coordinator;
    6.  all the School's school psychologist(s); and
    7.  all the School's counselor(s).

C. **Reporting:**

    1.  Within 30 days of this Agreement being signed, the District will submit to OCR for review and approval:

        a.  draft training materials;
        b.  the name(s), title(s)/position(s), and qualifications of one or more qualified individuals to provide the training; and
        c.  the names and titles/positions of proposed individuals to be trained.

    2.  By August 8, 2025, the District will ensure that the approved trainer(s) conduct the training, using the approved materials, for all individuals on the approved list of trainees.

    3.  Within 10 days of the training taking place, the District will submit to OCR:

        a.  confirmation that the approved trainer(s) delivered the training;
        b.  confirmation that the approved materials were used for the training;
        c.  the names and titles/positions of all staff who attended the training; and

---

[3] *See* U.S. Dept. of Educ., Office for Civ. Rights, "Supporting Students with Disabilities and Avoiding the Discriminatory Use of Student Discipline under Section 504 of the Rehabilitation Act of 1973" (July 2022), *available at* https://www.ed.gov/sites/ed/files/about/offices/list/ocr/docs/504-discipline-guidance.pdf.

    d.   if applicable, the name(s) and title(s)/position(s) of all individuals who did not attend the training, an explanation for each person's absence, and a plan to train each person.

**Understandings and Acknowledgments**

By signing this Agreement, the District agrees to provide the foregoing information in a timely manner in accordance with the reporting requirements of this Agreement. Further, the District understands that during the monitoring of this Agreement, OCR may visit the District, interview employees and students, and request such additional reports or data as are necessary for OCR to determine whether the District has fulfilled the terms of this Agreement. The District understands that OCR will not close the monitoring of the Agreement until such time as OCR determines that the District is in compliance with the terms of this Agreement and the Section 504 and Title II statutory and regulatory obligations at issue in this case.

The District understands and acknowledges that OCR may initiate administrative enforcement or proceedings or refer this case to the U.S. Department of Justice for judicial proceedings in the event of breach to enforce the specific terms and obligations of this Agreement and/or the underlying Section 504 and Title II statutory and regulatory obligations. Before initiating administrative enforcement (34 C.F.R. §§ 100.9, 100.10), or judicial proceedings to enforce this Agreement, OCR will give the District written notice of the alleged breach and 60 calendar days to cure the alleged breach.

This Agreement will become effective immediately upon the signature of the District's representative below:

**For the District:**

/s/                                                                 6/17/2025
_____        _____
XXXXXX                                                          Date