UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUTTES

| | |
|---|---|
| VICTIM RIGHTS LAW CENTER, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>U.S. DEPARTMENT OF EDUCATION, et al.,<br><br>       Defendants. | Civil Action No. 25-11042-MJJ |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................1

I.      Statutory Background ...............................................................................................1

II.     Executive Orders Regarding the Department ...........................................................2

III.    Procedural Background .............................................................................................4

LEGAL STANDARDS ........................................................................................................4

ARGUMENT ........................................................................................................................5

I.      The Court Lacks Jurisdiction Over Plaintiffs' Claims. ............................................6

        A.      Plaintiffs Lack Standing. ..............................................................................6

        B.      Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising
                from Federal Employment into a Distinct System, Not Review in This Court in the
                First Instance. ................................................................................................8

        C.      Plaintiffs' APA Claims Should be Dismissed Because They Do Not Seek Judicial
                Review of a Discrete Agency Action. ..........................................................13

II.     This Court Should Dismiss for Failure to State a Claim. ........................................16

        A.      Plaintiffs' APA Claims Should be Dismissed Because There Are Adequate
                Alternative Remedies Available. ..................................................................16

        B.      Plaintiffs' APA Claims Should Be Dismissed Because OCR's Functions Are
                Committed to Agency Discretion. ................................................................17

        C.      Because the Department Executive Order Expressly Directs the Department to
                Continue All Actions Required by Law, the Executive Order Does Not Infringe on
                the Department's Statutory Obligations. ......................................................18

        D.      Plaintiffs Fail to State an Ultra Vires Claim. ...............................................19

CONCLUSION ...................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adams v. Richardson,*
    480 F.2d 1159 (D.C. Cir. 1973) ................................................................... 17, 19

*Am. Bioscience, Inc. v. Thompson,*
    269 F.3d 1077 (D.C. Cir. 2001) ........................................................................ 15

*Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell,*
    No. CV 25-10276-GAO, 2025 WL 470459 (D. Mass. Feb. 12, 2025) ......................... 9, 10

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
    929 F.3d 748 (D.C. Cir. 2019) ................................................................. 9, 10, 13

*Am. Foreign Serv. Ass'n v. Trump,*
    768 F. Supp. 3d 6 (D.D.C. 2025) ..................................................................... 13

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................... 5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................... 5

*Bennett v. Spear,*
    520 U.S. 154 (1997) .................................................................................... 16

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) .................................................................................... 12

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .................................................................................... 16

*Carter v. U.S. Dep't of Educ.,*
    No. 25-744 (PLF), 2025 WL 1453562 (D.D.C. May 21, 2025) .............................. 15

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...................................................................................... 7

*Cobell v. Kempthorne,*
    455 F.3d 301 (D.C. Cir. 2006) .................................................................. 13, 14

*Cortés-Ramos v. Martin-Morales,*
    956 F.3d 36 (1st Cir. 2020) ............................................................................. 5

*Cousins v. Sec'y of U.S. Dep't of Transp.,*
    880 F.2d 603 (1st Cir. 1989) ............................................................................... 15

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ............................................................................... 9, 10, 13

*Equal Means Equal v. Ferriero,*
    478 F. Supp. 3d 105 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021) ................................. 8

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ............................................................................... 6, 8

*FDIC v. Meyer,*
    510 U.S. 471 (1994) ............................................................................... 5

*Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.,*
    423 U.S. 326 (1976) ............................................................................... 18

*Fornaro v. James,*
    416 F.3d 63 (D.C. Cir. 2005) ............................................................................... 11, 12

*Gagliardi v. Sullivan,*
    513 F.3d 301 (1st Cir. 2008) ............................................................................... 5

*Gateway City Church v. Gavin Newsom, Governor of California,*
    141 S. Ct. 1460 (2021) ............................................................................... 6

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ............................................................................... 9

*Greater Bos. Legal Servs. v. U.S. Dep't of Homeland Sec.,*
    No. 21-CV-10083-DJC, 2022 WL 138629 (D. Mass. Jan. 14, 2022) ................................. 13

*Grosdidier v. Chairman, Broad. Bd. of Governors,*
    560 F.3d 495 (D.C. Cir. 2009) ............................................................................... 11

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................................... 7, 17, 19, 20

*In re Aiken Cnty.,*
    725 F.3d 255 (D.C. Cir. 2013) ............................................................................... 17

*Lacson v. U.S. Dep't of Homeland Sec.,*
    726 F.3d 170 (D.C. Cir. 2013) ............................................................................... 12

*Larson v. Domestic & Foreign Com. Corp.,*
    337 U.S. 682 (1949) ............................................................................... 19

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................................................................17

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................................7

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ................................................................................................13

*Mahoney v. Donovan,*
    721 F.3d 633 (D.C. Cir. 2013) ...............................................................................11

*Markland v. OPM,*
    140 F.3d 1031 (Fed. Cir. 1998) ..............................................................................17

*McMahon v. New York,*
    606 U.S. ----, 2025 WL 1922626 (July 14, 2025) .............................................. 4, 6

*Merlonghi v. United States,*
    620 F.3d 50 (1st Cir. 2010) ......................................................................................5

*Montplaisir v. Leighton,*
    875 F.2d 1 (1st Cir. 1989) ................................................................................ 10, 11

*Murphy v. United States,*
    45 F.3d 520 (1st Cir. 1995) ......................................................................................5

*New York v. McMahon,*
    No. 25-cv-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025) ......................4

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ............................................................................................ 13, 15

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) .......................................................................... 11, 12

*Patel v. Johnson,*
    2 F. Supp. 3d 108 (D. Mass. 2014) .........................................................................15

*Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs,*
    87 F.3d 1242 (11th Cir. 1996) .................................................................................15

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ..................................................................................................7

*Taber Partners, I v. Merit Builders, Inc.,*
    987 F.2d 57 (1st Cir. 1993) ......................................................................................5

*Thunder Basin Coal Co. v. Reich*,
 510 U.S. 200 (1994) ............................................................................................9

*Trump v. Boyle*,
 606 U.S. ----, 2025 WL 2056889 (July 23, 2025) ............................................6

*United States v. Fausto*,
 484 U.S. 439 (1988) ......................................................................................*passim*

*United States v. Nixon*,
 418 U.S. 683 (1974) .....................................................................................7, 20

*United States v. Texas*,
 599 U.S. 670 (2023) .......................................................................................6, 7

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
 435 U.S. 519 (1978) ..........................................................................................18

*Whitmore v. Arkansas*,
 495 U.S. 149 (1990) ............................................................................................7

**Statutes**

5 U.S.C. § 701 ......................................................................................................17

5 U.S.C. § 704 ......................................................................................................16

5 U.S.C. § 706 ......................................................................................................16

5 U.S.C. § 1204 ......................................................................................................9

5 U.S.C. § 7105 ......................................................................................................9

5 U.S.C. § 7123 ......................................................................................................9

5 U.S.C. § 7512 ......................................................................................................9

5 U.S.C. § 7701 ......................................................................................................9

5 U.S.C. § 7703 ......................................................................................................9

7 U.S.C. § 608c ....................................................................................................12

20 U.S.C. § 3402 ....................................................................................................2

20 U.S.C. § 3413 ....................................................................................................2

28 U.S.C. § 1295 ......................................................................................................................9

28 U.S.C. § 1331 ......................................................................................................................9

42 U.S.C. § 2000d-1 ..............................................................................................................17

Department of Education Organization Act,
　Pub. L. No. 96-88, 93 Stat. 668 (1979) ...........................................................................1

**Regulations**

5 C.F.R. § 2423.22 ...................................................................................................................9

34 C.F.R. § 100.1 .....................................................................................................................2

34 C.F.R. § 100.7 .....................................................................................................................2

34 C.F.R. § 106.1 .....................................................................................................................2

**Other Authorities**

Andrew Ba Tran et al., *How Education Department layoffs hit student*
　*loans, testing, civil rights,* The Washington Post (Mar. 13, 2025),
　https://www.washingtonpost.com/education/2025/03/13/
　education-department-layoffs-student-loans-fafsa-impacts/ .................................................4

Filip Timotija, *Education secretary: Mass layoffs first*
　*step toward total shutdown,* The Hill (Mar. 12, 2025),
　https://thehill.com/homenews/education/5190161-
　linda-mcmahon-education-department-mass-layoffs/ ..........................................................3

Improving Education Outcomes by Empowering Parents,
　States, and Communities Executive Order,
　Exec. Order No. 14,242, 90 Fed. Reg. 13679 (Mar. 20, 2025) ...................................3, 18, 19

Implementing the President's 'Department of Government Efficiency'
　Workforce Optimization Initiative Executive Order,
　Exec. Order No. 14,210 ........................................................................................................3

Press Release, U.S. Dep't of Educ., *U.S. Department of*
　*Education Initiates Reduction in Force* (Mar. 11, 2025),
　https://www.ed.gov/about/news/press-release/us-
　department-of-education-initiates-reduction-force ..............................................................3

## INTRODUCTION

This lawsuit is one of three challenges before this Court to this Administration's efforts to reduce waste and improve efficiencies at the Department of Education. In *New York v. McMahon* and *Somerville Public Schools v. Trump*, this Court entered a preliminary injunction precluding a reduction in force across the entire Department, including in its Office for Civil Rights ("OCR"). This lawsuit is somewhat narrower in its focus on RIFs only at OCR, but the legal theories underpinning Plaintiffs' claims here are identical to those presented in *New York* and *Somerville Public Schools*. That matters: On July 14, the Supreme Court stayed the preliminary injunction this Court entered in *New York* and *Somerville Public Schools*, thus rejecting this Court's analysis in granting preliminary relief. Defendants have recently moved to vacate the preliminary injunction issued in this case. The Supreme Court's stay, and the analysis presented by the Government to the Supreme Court in obtaining that stay, also justifies dismissal of this lawsuit.

At the threshold, this Court lacks jurisdiction over Plaintiffs' claims. Plaintiffs lack standing because their injuries are speculative, because their claims—which at bottom are employment claims—are precluded by the channeling provisions of the Civil Service Reform Act ("CSRA"), and because they do not seek review of a discrete agency action. Moreover, Plaintiffs fail to state an APA claim because there are adequate alternative remedies (under the CSRA) and OCR's enforcement of civil rights is subject to agency discretion. Nor do Plaintiffs state a viable *ultra vires* claim. This lawsuit should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

### I. Statutory Background

The Department of Education was established as part of the Department of Education Organization Act. Pub. L. No. 96-88, 93 Stat. 668 (1979). The purpose of the Department is principally

> (1) to strengthen the Federal commitment to ensuring access to equal educational opportunity for every individual; (2) to supplement and complement the efforts of States, the local school systems and other instrumentalities of the States, the private sector, public and private educational institutions, public and private nonprofit educational research institutions, community-based organizations, parents, and

students to improve the quality of education; (3) to encourage the increased involvement of the public, parents, and students in Federal education programs; (4) to promote improvements in the quality and usefulness of education through federally supported research, evaluation, and sharing of information; (5) to improve the coordination of Federal education programs; (6) to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds; and (7) to increase the accountability of Federal education programs to the President, the Congress, and the public.

20 U.S.C. § 3402.

Congress established OCR in the Department of Education. 20 U.S.C. § 3413. Among other things, OCR regulations state that "no person in the United States shall; on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from the Department of Education." 34 C.F.R. § 100.1. Similarly, OCR regulations are meant to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. 34 C.F.R. § 106.1.

Department regulations allow for the submission of complaints by or on behalf of individuals who may have suffered prohibited discrimination. 34 C.F.R. § 100.7. OCR regulations state there will be "a prompt investigation whenever a . . . complaint . . . indicates" prohibited discrimination. *Id.* § 100.7(c).

## II.    Executive Orders Regarding the Department

On February 11, 2025, President Trump signed the "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative" Executive Order, Exec. Order No. 14,210. Section 3(c) of that Executive Order directed that agencies

shall promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs. All offices that perform functions not mandated by statute or other law shall be prioritized in the RIFS, including all agency diversity, equity, and inclusion initiatives; all agency initiatives, components, or operations that my Administration suspends or closes; and all components and employees performing functions not mandated by

statute or other law who are not typically designated as essential during a lapse in appropriations . . . .

The Department then began implementing a RIF, which impacts "[a]ll divisions within the Department," with some divisions requiring a "significant reorganization to better serve students, parents, educators, and taxpayers." Press Release, U.S. Dep't of Educ., *U.S. Department of Education Initiates Reduction in Force* (Mar. 11, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-initiates-reduction-force ("RIF Press Release"). The purpose of the RIF is "efficiency, accountability, and ensuring that resources are directed where they matter most: to students, parents, and teachers." *Id.* It is "the first step of eliminating . . . bureaucratic bloat," Filip Timotija, *Education secretary: Mass layoffs first step toward total shutdown*, The Hill (Mar. 12, 2025), https://thehill.com/homenews/education/5190161-linda-mcmahon-education-department-mass-layoffs/ ("Hill Article"). The Department intends to "ke[ep] all of the right people and the good people to make sure that the outward-facing programs . . . the grants, the appropriations that come from Congress, all of that are being met, and none of that's going to fall through the cracks." *Id.* (omission in original). As part of the RIF, any staff that may be separated will first be put on administrative leave. RIF Press Release.

After the March 11 RIF was announced, President Trump signed on March 20 the "Improving Education Outcomes by Empowering Parents, States, and Communities" Executive Order. Exec. Order No. 14,242, 90 Fed. Reg. 13679 (Mar. 20, 2025) (the "Department Executive Order"). The Department Executive Order found that, for instance, "American reading and math scores are near historical lows" and the "Department of Education has entrenched the education bureaucracy" that "is not working." *Id.* § 1. Ultimately, the Order contemplates that the "[c]losure of the Department of Education would drastically improve program implementation in higher education" and "would provide children and their families the opportunity to escape a system that is failing them." *Id.* Under the Department Executive Order, the Secretary of Education was ordered "to the maximum extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the Department of Education." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13679. The "Secretary of Education

shall ensure that the allocation of any Federal Department of Education funds is subject to rigorous compliance with Federal law." *Id.* § 2(b). And the Department Executive Order states that it should "be implemented consistent with applicable law and subject to the availability of appropriations." *Id.* § 3(b).

Throughout the overhaul, the Department has stated that it "will continue to deliver on all statutory programs that fall under the agency's purview." RIF Press Release. Pursuant to the RIF, headcount at OCR was to have been cut by 51%. Andrew Ba Tran et al., *How Education Department layoffs hit student loans, testing, civil rights,* The Washington Post (Mar. 13, 2025), https://www.washingtonpost.com/education/2025/03/13/education-department-layoffs-student-loans-fafsa-impacts/. And longer term, Secretary McMahon recognizes that shutting down the Department will require "work with Congress." Hill Article. However, these reorganizations were halted by this Court's preliminary injunction in *New York v. McMahon*, No. 25-cv-10601-MJJ, 2025 WL 1463009 (D. Mass. May 22, 2025), and specifically within OCR, also by the duplicative preliminary injunction in this action. ECF 40. Pursuant to a stay issued by the Supreme Court in *McMahon v. New York*, 606 U.S. ----, 2025 WL 1922626 (July 14, 2025), RIFs have now resumed at the Department, though they remain enjoined as to OCR by the preliminary injunction issued in this case.

## III.    Procedural Background

Plaintiffs filed a Complaint on April 21, 2025 seeking broad declaratory relief, namely, that RIF at OCR is unlawful. Compl. at 31, Prayer for Relief, ECF No. 1. The Complaint includes three counts. Counts I and II allege violations of the APA, stating that the RIF at OCR was arbitrary and capricious (Count I) and unlawful (Count II). *Id.* ¶¶ 79-89. Count III seeks *ultra vires* review of the RIF. *Id.* ¶¶ 90-95. As noted above, this Court issued a preliminary injunction, *see* Memo. & Order on Pls.' Mot. for Prelim. Inj., ECF No. 40, which Defendants have moved to vacate in light of the Supreme Court's stay in *New York*, *see* Defs.' Mot. to Vacate Prelim. Inj., ECF No. 48.

## LEGAL STANDARDS

A district court should dismiss claims under Rule 12(b)(1) when it lacks subject-matter

jurisdiction to decide them. That includes where, as here, the federal government has not waived its sovereign immunity for the types of claims at issue. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010). "A plaintiff, however, may not rest merely on unsupported conclusions or interpretations of law." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (citation omitted). Moreover, "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993).

In evaluating a Rule 12(b)(6) motion to dismiss, the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[ ], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. Dismissal is appropriate if the claim fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)

## ARGUMENT

The Court does not have jurisdiction over Plaintiffs' claims because Plaintiffs lack Article III standing, their claims are channeled by the CSRA, and they do not seek judicial review of a discrete agency action for purposes of the APA. The Court should also dismiss Plaintiffs' claims because there are adequate alternative remedies that preclude Plaintiffs' APA claims, OCR enforcement priorities are entirely within the discretion of the Executive, and the Executive Order directs the Secretary to

proceed in accordance with the law. Plaintiffs also fail to state an *ultra vires* claim, which is duplicative of their APA claims.

As noted above, the Supreme Court recently stayed a preliminary injunction enjoining the RIF across the Department. *See McMahon v. New York*, 606 U.S. ----, 2025 WL 1922626, at *1 (July 14, 2025). In seeking a stay from that Court, the Government argued that the preliminary injunction enjoining RIFs across the Department should be stayed because the plaintiffs in that case lacked Article III standing, the CSRA channeled personnel actions, and the district court lacked jurisdiction to superintend the management of the Department. Stay Application at 14, *McMahon v. New York*, 606 U.S. ---- (U.S. filed June 6, 2025) (No. 24A1203). The Supreme Court, in granting the stay, necessarily determined that the Government was likely to succeed regarding those arguments. Given that the parties' arguments in *New York* are identical to the arguments in this case and the Supreme Court sided with the Government, this Court should dismiss Plaintiffs' claims here. *See Trump v. Boyle*, 606 U.S. ----, 2025 WL 2056889 (July 23, 2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases"); *Gateway City Church v. Gavin Newsom, Governor of California*, 141 S. Ct. 1460 (2021) (finding error where lower court failed to grant relief in light of Supreme Court relief provided in similar case).

## I.    The Court Lacks Jurisdiction Over Plaintiffs' Claims.

### A.    Plaintiffs Lack Standing.

Plaintiffs lack Article III standing. Standing is a "bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). It requires that a plaintiff "possess a personal stake" in the outcome, which "helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Standing doctrine thus "serves to protect the 'autonomy' of those who are most directly affected so that they can decide whether and how to challenge the defendant's action." *Id.* at 379–80 (citation omitted).

Under any theory of standing, "the irreducible constitutional minimum" requires that, (1) the plaintiff have suffered an "injury in fact" that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical"; (2) there must exist "a causal connection between the injury and the conduct complained of"; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).

Plaintiffs rely on a highly attenuated chain of possibilities that forecloses standing. Plaintiffs allege 1) that the staff at OCR has been reduced by roughly half, and seven of the twelve regional offices are closed, 2) that, notwithstanding OCR still having staff, their complaints will not be investigated, and 3) but for the delay in investigation, they will receive meaningful relief. Compl. ¶¶ 9-11. This is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); s*ee also Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (same); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same).

Even if Plaintiffs could show an imminent, actual harm to a particular Plaintiff—only one part of the chain they must show for standing—they cannot connect it to a statutory violation rather than a proper exercise of discretion. "[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974). Here, the individual Plaintiffs have already submitted complaints for investigation on their claims. Compl. ¶¶ 9-11. Although Plaintiffs allege that these investigations are proceeding too slowly, *see, e.g.,* Compl. ¶¶ 62-63, they fail to specify how fast would be fast enough to pass legal muster, or what staffing levels are required to meet specific timeliness objectives. Nor could they: there is "no meaningful standard against which [the court could] judge the agency's exercise of discretion" in the law enforcement context. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see also United States v. Texas*, 599 U.S. 670 (2023).

Victims Rights Law Center (VRLC) appears to assert organizational standing,[1] but its

---

[1] VRLC cannot show associational standing. To show associational standing, an organization "must demonstrate that (1) its members have an injury that would make out a justiciable case had the members themselves brought suit . . . (2) the interests served by the suit are pertinent to the mission of the organization . . . [and (3) the nature of the claim and of the relief sought [does not] require[]

arguments there fare no better. To establish organizational standing, a plaintiff must "have an injury distinct from an interest in the problem." *Equal Means Equal v. Ferriero*, 478 F. Supp. 3d 105, 122 (D. Mass. 2020), *aff'd*, 3 F.4th 24 (1st Cir. 2021). "Courts, therefore, do not find standing when the organizational goal is one in the same with the injury because those organizations have only a 'mere interest' in a problem." *Id.* A plaintiff-organization does not have standing just because it "diverts its resources in response to a defendant's actions." *All. for Hippocratic Med.*, 602 U.S. at 395. Rather, a plaintiff-organization must show that the defendant's "actions directly affected and interfered with [plaintiff's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

VRLC's core activities are not harmed by Defendants' actions. "VRLC's mission is to help survivors of sexual violence rebuild their lives." Compl. ¶ 74. VRLC alleges that as a condition of its funding, "VRLC must dedicate eighty percent of representation activities to sexual assault victims." *Id.* First, even if access to OCR was completely revoked, VRLC could engage in representation activities in state and federal courts, in arbitration, and in school and institution-level proceedings. Second, and as VRLC alleges in its Complaint, OCR retains about half of its employees, Compl. ¶ 39, and is pursuing investigations. Compl. ¶ 52. Based on its own allegations, VRLC can continue its core activity of providing direct legal services and VRLC fails to aver what staffing levels, in conjunction with OCR's prosecutorial discretion, would even allegedly be required to somehow ensure that VRLC's provision of legal services continues at the rate VRLC believes it should. Without its core activities being harmed, VLRC does not have organizational standing.

**B.**  **Congress Has Channeled Subject-Matter Jurisdiction Over Plaintiffs' Claims Arising from Federal Employment into a Distinct System, Not Review in This Court in the First Instance.**

Even if Plaintiffs have Article III standing, this Court lacks jurisdiction to adjudicate Plaintiffs' challenges to the employment decisions of federal agencies. Although district courts have jurisdiction

---

the participation of individual members." *Equal Means Equal*, 478 F. Supp. 3d at 119. VRLC has not identified its members or their harms.

over civil actions arising under federal law, *see* 28 U.S.C. § 1331, "Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 754 (D.C. Cir. 2019); *see generally Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). As detailed below, Congress has precluded jurisdiction for the claims brought by Plaintiffs challenging the Department's RIF.

The CSRA and the Federal Service Labor-Management Relations Statute ("FSL-MRS"), which is set forth in the CSRA, together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *AFGE*, 929 F.3d at 752 (regarding FSL-MRS); *see Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (regarding CSRA more broadly). In passing the CSRA, Congress made the Merit Systems Protection Board[2] and Federal Labor Relations Authority ("FLRA")[3] the exclusive means for federal employees, labor unions, and other interested parties to raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is required even when such disputes involve constitutional claims. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 10–15 (2012); *see also AFGE*, 929 F.3d at 752; *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, No. CV 25-10276-GAO, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (finding "the decision in [AFGE] . . . instructive" and dissolving the temporary restraining order and denying the preliminary injunction).

The First Circuit has recognized that under the FLRA, "judicial oversight is 'both prescribed

---

[2] Congress established the MSPB to, among other things, hear employee appeals of final adverse actions as set out in 5 U.S.C. § 7512. *See* 5 U.S.C. § 1204(a)(1). The MSPB may order relief to prevailing employees, including reinstatement, backpay, and attorney's fees. *Id.* §§ 1204(a)(2), 7701(g). Employees may appeal adverse MSPB decisions to the Federal Circuit. *See id.* § 7703(b)(1)(A); *see also* 28 U.S.C. § 1295(a)(9).

[3] The FLRA was established by Congress as part of the FSM-LRS to conduct hearings and resolve complaints of unfair labor practices, *see* 5 U.S.C. § 7105(a)(2)(G). Direct review of the FLRA's decisions on unfair labor practice and negotiability issues is available in the courts of appeals. *See id.* § 7123(a). FLRA regulations are set out at 5 C.F.R. pt. 2420. Among other things, the regulations allow persons or organizations who show that the outcome of the proceeding is likely to directly affect their rights or duties to intervene. *See* 5 C.F.R. § 2423.22.

and proscribed' and the district courts are largely omitted from the equation." *Montplaisir v. Leighton*, 875 F.2d 1, 2–3 (1st Cir. 1989) (internal citation omitted). The fact that Plaintiffs "chose not to couch their complaint as an unfair labor practice cuts no mustard." *Id.* at 4. "Where labor-law preemption is an issue, creative labelling cannot carry the day." *Id.* "Rather, the needed reconnaissance focuses upon 'the conduct being regulated, not the formal description of governing legal standards . . . .'" *Id.* (citation omitted).

CSRA's channeling provisions preclude this Court's review of Plaintiffs' RIF claims. Everything about those claims, and the remedies Plaintiffs seek, derives from the relationship between the federal government and its employees, to which Plaintiffs are strangers. Plaintiffs cannot step into the shoes of those employees and assert claims against the Department that the employees cannot themselves assert in federal district court but instead must pursue before the FLRA or the MSPB. Nor can Plaintiffs purport to raise their own claims without essentially attempting to step into the shoes of the Department's employees.

In *AFGE*, the D.C. Circuit applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to conclude that the union plaintiffs in that case could not challenge in district court three executive orders related to federal employment. *AFGE*, 929 F.3d at 754; *Am. Fed'n of Gov't Emps., AFL-CIO*, 2025 WL 470459, at *2 (finding "the decision in *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ('AFGE') . . . instructive" and dissolving the temporary restraining order and denying the preliminary injunction). Under that framework, district courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of appeals is "(i) . . . 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *See AFGE*, 929 F.3d at 754-55 (alteration in original) (citation omitted).

The Supreme Court repeatedly has held that the CSRA provides the exclusive means of redressing employment disputes involving federal employees. *See Elgin*, 567 U.S. at 10–15; *Fausto*, 484 U.S. at 455. Likewise, the D.C. Circuit repeatedly has recognized that the FSL-MRS and the CSRA readily satisfy the first prong of the *Thunder Basin* framework. *See AFGE*, 929 F.3d at 755 (concluding

that union plaintiffs could not challenge in district court three executive orders related to federal employment); *Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005). In other words, Congress intended to make the FSL-MRS and CSRA the exclusive scheme, and they satisfy the first step of the two-step *Thunder Basin* framework.

As to covered actions, beyond restricting judicial review of covered constitutional claims, the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's "'systemwide'. . . policy interpreting a statute," its "implementation of such a policy in a particular case[,]" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quoting *Fornaro*, 416 F.3d at 67–69), or its decision to engage in "'a *type* of personnel action' the [CSRA] does not cover," *Mahoney v. Donovan*, 721 F.3d 633, 635–36 (D.C. Cir. 2013); *see generally Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (holding that federal employees "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions"). As the D.C. Circuit put it bluntly: "what you get under the CSRA is what you ge[t]," even if what you get is nothing at all. *Fornaro*, 416 F.3d at 67; *Montplaisir*, 875 F.2d at 2–3 (holding under the FLRA, "judicial oversight is 'both prescribed and proscribed' and the district courts are largely omitted from the equation." (internal citation omitted))

Here, Plaintiffs ask the Court to "vacate Defendants' decision to implement the RIF and the decision to close half of OCR's regional offices." Compl. at 31, Prayer for Relief. It would be odd, though, if a stranger to the federal-employment relationship—such as Plaintiffs here—could raise claims in this Court that the affected federal employees cannot themselves raise. In fact, it would upend the entire reticulated process Congress set out in the exclusive statutory schemes of the CSRA and other employment statutes. The "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under other provisions. *Fausto*, 484 U.S. at 455. That is, when a comprehensive scheme of the sort at issue here permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review by plaintiffs who are not authorized to bring claims.

For example, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347 (1984), considered a statute that permitted dairy handlers to obtain review of certain "market orders" after exhausting administrative remedies, but did not authorize review by anyone else. *See id.* at 346 (citing 7 U.S.C. § 608c). When a group of dairy consumers sought review of a marketing order, the Supreme Court explained that the statute omits a "provision for participation by consumers in any proceeding," and that "[i]n a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process." *Id.* at 347. Hence, the "structure of this Act indicates that Congress intended only producers and handlers, and not consumers, to ensure that the statutory objectives would be realized." *Id.* And the "restriction of the administrative remedy to handlers strongly suggests that Congress intended a similar restriction of judicial review of market orders." *Id.* Any other holding would facilitate circumvention of the comprehensive statutory scheme. *See id.* at 348. The principles described in *Block* apply to the CSRA and other employment statutory schemes. *See Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees who lack CSRA appeal rights "should not be able to demand judicial review for the type of personnel action covered by that chapter"). Because Congress foreclosed judicial review by parties other than those to whom it specifically authorized to seek relief, Plaintiffs, who are not employees of the Department, cannot challenge the Department's employment actions here.

Furthermore, even setting aside Plaintiffs' lack of any role in the federal employment relationship, Plaintiffs still cannot bypass Congress's statutory procedures by artfully labeling their claims as a broad challenge to OCR's reduced "capacity." Even where challengers "frame their suit as a systemwide challenge to" agency "policy" rather than individual benefits determinations, the exclusive review procedures for federal employees remain mandatory. *Fornaro*, 416 F.3d at 68 (Roberts, J., for the Court); *accord Nyunt*, 589 F.3d at 448–49 (Kavanaugh, J., for the Court) (rule that federal employees may not use APA challenge to "circumvent" CSRA process "applies to a 'systemwide challenge' to an agency policy interpreting a statute just as it does to the implementation of such a policy in a particular case" (citations omitted)); *see also Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 175 (D.C. Cir. 2013). So even if this Court accepts Plaintiffs' characterization of their suit, that

would not allow them to "bypass" the FSL-MRS and CSRA. *See Am. Foreign Serv. Ass'n v. Trump*, 768 F. Supp. 3d 6, 24 (D.D.C. 2025) (citation omitted).

Plaintiffs' challenges to the RIF also cannot be understood as collateral to the statutory review provisions at issue. "This consideration is related to whether meaningful judicial review is available," and focuses on "whether the plaintiffs aim[] to obtain the same relief they could seek in the agency proceeding." *AFGE*, 929 F.3d at 759–60 (internal quotation marks omitted) (citation omitted). Surely they do—based on the relief the Complaint seeks (and the relief this Court provided via a preliminary injunction), Plaintiffs seek to require the Department to vacate its decision to implement the RIF as to OCR. Compl. at 31, Prayer for Relief. Proceedings before the administrative agencies could culminate in that relief.

Ultimately, allowing separate litigation by the instant Plaintiffs would "seriously undermine[]" "[t]he CSRA's objective of creating an integrated scheme of review," *Elgin*, 567 U.S. at 14, and harm "the development . . . of a unitary and consistent Executive Branch position on matters involving personnel action," *Fausto*, 484 U.S. at 449. Thus, the Court does not have jurisdiction to review any of Plaintiffs' claims challenging the Department's RIF at OCR.

### C. Plaintiffs' APA Claims Should be Dismissed Because They Do Not Seek Judicial Review of a Discrete Agency Action.

Plaintiffs do not identify in their Complaint an agency action that the Department has taken that could specifically be redressed by a federal court. Under the terms of the APA, "[Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And that agency action must be "circumscribed" and "discrete[.]" *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 62 (2004). Consistent with these principles, the APA does not permit Plaintiffs to "seek *wholesale* improvement" of agency management "by court decree"—even in the face of allegations of "rampant" violations of law. *Lujan*, 497 U.S. at 891. "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted); *Greater Bos. Legal Servs. v. U.S.*

*Dep't of Homeland Sec.*, No. 21-CV-10083-DJC, 2022 WL 138629, at *7 (D. Mass. Jan. 14, 2022) ("[A] broad programmatic attack" is not a valid APA claim (citation omitted)). "Consequently, as each case only presents the court with a narrow question to resolve, [the court] can have no occasion to order wholesale reform of an agency program." *Cobell*, 455 F.3d at 307.

Plaintiffs' claims present exactly the type of wholesale challenge that the APA forbids. Plaintiffs' allegations reveal that they do not seek judicial review of a discrete agency action. Rather, they seek wholesale judicial review of the Department's management of OCR. Instead of presenting the court with a "narrow question to resolve," *id.*, the Department's day to day operations regarding OCR staffing levels are being challenged here. To illustrate, imagine that Plaintiffs had brought suit prior to the Department's March 11, 2025 RIF and had challenged the Department's "action" to *not hire*, say, twice as many OCR employees and to *not open* double the number of regional offices. After all, if 550 OCR employees are helpful, 1,100 employees may be more so; if 12 regional offices are efficient, perhaps 24 would be more so. Clearly, such claims would represent an attempt to have the judiciary micromanage wholesale reform of OCR per the wishes of third parties such as the Plaintiffs. But Plaintiffs' present claims are no different, amounting to an argument that the Department's operational, managerial, discretionary decisions and plans with regard to OCR can and should be subjected to judicial oversight. Such arguments are precluded by *Lujan* and its progeny.

The wholesale nature of the challenge here is confirmed by Plaintiffs' pleadings. For example, in their APA count involving claimed statutory violations, Plaintiffs allege that "Defendants' decision to eliminate approximately half of OCR's staff and close half of its regional offices violates the mandates of Title VI and Tile IX to effectuate the provisions of those statutes." Compl. ¶ 87. But these statutes are general statutes that forbid civil rights violations. They do not address OCR staffing levels or the number or location of regional offices. They do not state or presume there is some ideal or even aspirational personnel level under which OCR is incapable of enforcement activities pursuant to Title VI and Title IX. As the Court explained in *SUWA*, the purpose of the APA's discrete agency action requirement is:

> [T]o protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management. . . . The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA.

542 U.S. at 66-67. Plaintiffs do not, for instance, contend that OCR staffing levels have been fixed over time; to the contrary, OCR staffing levels have fluctuated over the decades and under a variety of presidential administrations. It is Plaintiffs' claims, not the Department's operational decisions, that amount to arbitrary, broad demands about how OCR should be managed. It is little wonder that when presented with a virtually identical set of claims regarding OCR, the United States District Court for the District of Columbia denied a motion for a preliminary injunction on the basis that plaintiffs' challenge was a "'broad programmatic attack' on the agencies operations that is not cognizable under the APA." *Carter v. U.S. Dep't of Educ.*, No. 25-744 (PLF), 2025 WL 1453562, at *6 (D.D.C. May 21, 2025). Plaintiffs here present a similar "programmatic attack," which is not redressable under the APA.

Even more practically, a wholesale challenge like Plaintiffs' is impossible to litigate under the mechanics of judicial review that the APA contemplates. "[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *Patel v. Johnson*, 2 F. Supp. 3d 108, 117 (D. Mass. 2014). Accordingly, "APA review typically takes place on the basis of a record compiled by the agency" consisting of the materials considered "in making the challenged decision." *Cousins v. Sec'y of U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989). Wholesale challenges to programmatic decision-making make it impossible for the agency to "compil[e] and organiz[e] the complete administrative record" for the agency action, *see Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 n.2 (11th Cir. 1996), because there is no discrete agency action, as necessary for the parties to proceed to summary judgment. Nor is it possible for the Court to apply the applicable standard of

review to the agency action. *See* 5 U.S.C. § 706 (limiting scope of judicial review to "agency action").

Plaintiffs' failure to identify a discrete agency action also means that they have failed to identify a final agency action for review. "Final agency action" has two components. First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704. Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett*, 520 U.S. at 178 (citation omitted).

Plaintiffs' Complaint alleges that the agency acted with the "stated goal of shutting down the DOE" and that the "RIF created widespread chaos and made it impossible for OCR to fulfill its statutory and regulatory obligations." Compl. ¶ 42. Yet taking Plaintiffs' allegations at face value, OCR retains approximately half of its employees. Compl. ¶ 39 ("The RIF eliminated more than half of OCR's previously 550-person staff"). To the extent that Plaintiffs are relying on any of the individual actions taken with respect to OCR as the final agency action (even if those actions are part of a Department-wide effort), Secretary McMahon in her public statements has indicated those programmatic decisions mark the initiation, not the consummation, of the agency's decision-making process regarding the reorganization of the Department, including OCR.

## II.    This Court Should Dismiss for Failure to State a Claim.

Even if this Court finds that it has jurisdiction, it should nonetheless dismiss this lawsuit for failure to state a claim.

### A.  Plaintiffs' APA Claims Should be Dismissed Because There Are Adequate Alternative Remedies Available.

Review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. The requirement that a plaintiff have "no other adequate remedy in a court," *id.*, reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action," *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). As already described above, this is, in essence, an employment action, and there are CSRA and FSL-MRS remedies available.

**B.      Plaintiffs' APA Claims Should Be Dismissed Because OCR's Functions Are Committed to Agency Discretion.**

Plaintiffs' APA claims also fail because OCR's actions are committed to agency discretion by law. Plaintiffs allege the RIF is arbitrary and capricious because it will affect "OCR's ability to promptly and equitably investigate complaints of unlawful discrimination and perform its other functions." Compl ¶ 81. But "an agency's decision not to prosecute or enforce . . . is a decision generally committed to an agency's absolute discretion," *Heckler*, 470 U.S. at 831. Only where the "substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers" would a decision about whether and how OCR enforces civil rights violations be reviewable. *Id.* at 833. But here, the statute cited by Plaintiffs (42 U.S.C. § 2000d-1) contains no guidelines or standards for how OCR enforces civil rights complaints. Compl. ¶ 18. This statute merely directs agencies to effectuate the prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin. 42 U.S.C. § 2000d-1. Moreover, Plaintiffs allege that about half of OCR's staff will remain post-RIF. *See* Compl. ¶ 4. But only where an agency's policy is "so extreme as to amount to an abdication of its statutory responsibilities" is a decision not to prosecute or enforce conceivably reviewable. *Heckler*, 470 U.S. at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973)); *see also In re Aiken Cnty.*, 725 F.3d 255, 266 (D.C. Cir. 2013).

Separate and apart from the discretion afforded to the Department over OCR's enforcement activities, RIFs incorporate the type of actions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) ("We accord an agency wide discretion in conducting a [RIF.]"). Agency action regarding reallocation of resources, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."). As described above, President Trump and Secretary McMahon have repeatedly articulated the presence of inefficiency and waste at the Department. As noted, the

Secretary has reorganized the Department as part of an effort to streamline the Department's operations. Plaintiffs may disagree with that decision, but that does not give them the right to substitute their judgment for that of the Secretary about how best to conduct civil rights enforcement.

Plaintiffs acknowledge as much when they allege that the decision to implement RIFs is arbitrary and capricious because it "relied on an impermissible consideration—their goal to close the Department." Compl. ¶ 81. Plaintiffs' allegations, however, reflect a fundamental "lack of understanding" of "the nature" of the Department's actions, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978). As a threshold matter, while the Department Executive Order directs the Secretary to "take all necessary steps to facilitate the closure of the Department of Education," she may only do so "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13679. Moreover, the Department undertook its RIF consistent with a presidential Executive Order (No. 14,210) directing all agencies to plan significant reductions in force, prior to the Department Executive Order's issuance on March 20, 2025. And while Plaintiffs assert that the Department failed to "consider the consequences of their actions, including for OCR's ability to promptly and equitably investigate complaints," Compl. ¶ 81, the Department's actions are part of a longer-term plan to streamline its operations to the minimum required by statute while ensuring that services to students and families remain undisrupted. Ultimately, courts lack the power to "dictat[e] to the agency the methods[] [and] procedures" it uses to complete its statutory obligations. *See Vt. Yankee*, 435 U.S. at 545 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). To override these principles and prevent agency leadership from exercising control over their own staffing would be an extraordinary violation of the separation of powers.

**C.    Because the Department Executive Order Expressly Directs the Department to Continue All Actions Required by Law, the Executive Order Does Not Infringe on the Department's Statutory Obligations.**

Insofar as Plaintiffs are challenging the President's Executive Order, the claim fails because it relies on characterizations of that Order that are inconsistent with its terms. The Department Executive Order does not require the immediate shutdown of the Department. To the contrary, the

Department Executive Order requires the Secretary of Education only to discontinue activities "to the maximum extent appropriate and permitted by law." Exec. Order No. 14,242 § 2(a), 90 Fed. Reg. at 13,679.

Definitionally, directing the Secretary to end functions unless required by law cannot be interpreted to violate the law. Again, the notion that the agency has eliminated OCR's ability to enforce civil rights violations is inconsistent with Plaintiffs' own allegations that OCR will retain approximately half of its staff. *See* Compl. ¶ 4. Their allegations therefore do not meet the standard of an operational decision "so extreme as to amount to an abdication of [an agency's] statutory responsibilities." *Heckler*, 470 U.S. at 833 n.4 (citing *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973)).

### D.    Plaintiffs Fail to State an Ultra Vires Claim.

Plaintiffs do not make any progress by repackaging their APA claims as *ultra vires* claims. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949) (footnotes omitted). The exception to sovereign immunity is based on the principle that such *ultra vires* action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no *ultra vires* claim that is distinct from their APA claims. Indeed, Plaintiffs argue that the RIFs are *ultra vires* because they were not "supported . . . with a contemporaneous, reasoned justification" and asks for relief "to ensure that OCR is able to fulfill its statutory and regulatory mandates." Compl. ¶¶ 93, 95. For each allegation, Plaintiffs fail to identify what statutory authority Defendants exceed and appear to rely on the same allegations as their APA claims. *Id.* Thus, Plaintiffs' *ultra vires* claim fails for the same reasons as do their APA statutory requirements claim.

Plaintiffs' *ultra vires* claim is particularly inapplicable in the context of prosecutorial discretion. The Supreme Court has long recognized that agencies can permissibly decide what enforcement and supervision actions to take, if any, consistent with the statutory duties imposed on the agency by Congress. *See Heckler*, 470 U.S. at 831 (agency enforcement discretion generally not subject to judicial

review). Judicial deference to Defendant's decision-making about the priorities of the Department is especially warranted here, as "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *Nixon*, 418 U.S. at 693; *see also Heckler*, 470 U.S. at 832 ("[W]e recognize that an agency's refusal to institute proceedings shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" (citation omitted)). As the Court explained in *Heckler*, agencies are "far better equipped" to evaluate "the many variables involved in the proper ordering of its priorities" than are the courts. 470 U.S. at 831-32.

## CONCLUSION

Plaintiffs' Complaint should be dismissed for lack of jurisdiction or failure to state a claim.


DATED: July 28, 2025                    Respectfully submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General

                                        ERIC J. HAMILTON
                                        Deputy Assistant Attorney General

                                        */s/   Brad P. Rosenberg*
                                        BRAD P. ROSENBERG
                                        (D.C. Bar No. 467513)
                                        Special Counsel
                                        MICHAEL BRUNS
                                        Trial Attorney
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street, N.W.
                                        Washington, DC 20005
                                        Phone: 202-514-3374
                                        Email: brad.rosenberg@usdoj.gov

                                        *Attorneys for Defendants*