**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

STATE OF NEW YORK; COMMONWEALTH OF
MASSACHUSETTS; STATE OF HAWAI'I; STATE OF
CALIFORNIA; STATE OF ARIZONA; STATE OF
COLORADO; STATE OF CONNECTICUT; STATE OF
DELAWARE; THE DISTRICT OF COLUMBIA; STATE
OF ILLINOIS; STATE OF MAINE; STATE OF
MARYLAND; ATTORNEY GENERAL DANA NESSEL
FOR THE PEOPLE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA; STATE OF NEW
JERSEY; STATE OF NEW MEXICO; STATE OF
OREGON; STATE OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WASHINGTON; and STATE OF
WISCONSIN;

     Plaintiffs,

        v.

LINDA MCMAHON, in her official capacity as U.S.
Secretary of Education; U.S. DEPARTMENT OF
EDUCATION; and DONALD J. TRUMP, in his official
capacity as President of the United States;

     Defendants.

C.A. No. 1:25-cv-10601-MJJ

SOMERVILLE PUBLIC SCHOOLS, *et al.*,

     Plaintiffs,

        v.

DONALD J. TRUMP, *et al.*,

     Defendants.

C.A. No. 1:25-cv-10677-MJJ

**PLAINTIFF STATES' AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      The Department of Education is essential. Plaintiff States rely on the Department for an extraordinary array of programs. The Department provides funds for low-income children and students with disabilities. It enforces the laws that prohibit discrimination in education. It administers federal student aid programs. In each of these programs, and others, congressional acts governing the existence and responsibilities of the Department are deeply intertwined with the education systems in Plaintiff States.

2.      Nevertheless, the Defendants publicly oppose the very existence of the Department of Education and have taken multiple steps, including multiple widespread Reductions in Force ("RIFs") and the execution of agreements designed to strip the Department of all functions and funds, to eliminate the Department.  These actions are not supported by any actual reasoning or specific determinations about how to eliminate purported waste in the Department—rather, these efforts are part and parcel of President Trump's and Secretary McMahon's opposition to the Department of Education's entire existence.

3.      President Trump called the Department "a big con job" and declared that he would "like to close it immediately." Michael C. Bender, *Trump Is Said to Be Preparing Order That Aims to Eliminate Education Dept.*, The New York Times (Mar. 6, 2025),  https://perma.cc/EJE5-D6VR. He also stated that he would like Secretary McMahon to put herself "out of a job." Zachary B. Wolf, *Trump and Musk are moving to smother these three pieces of the government*, CNN (Feb. 5, 2025), https://perma.cc/YP4Q-6VAK. Secretary McMahon has affirmed that "President Trump believes that the bureaucracy in Washington should be abolished so that we can return education to the states, where it belongs," and that she "wholeheartedly support[s] and agree[s] with this mission." Lexi Lonas Cochran, *McMahon says she 'wholeheartedly' agrees with Trump plan to*

*abolish Education Department*, The Hill (Feb. 25, 2025), https://perma.cc/AJ6H-2B9L. On March 3, 2025, Secretary McMahon asked employees to join her in "perform[ing] one final, unforgettable public service to future generations of students" by dismantling the Department of Education. *Secretary McMahon: Our Department's Final Mission*, U.S. Dep't of Educ. (Mar. 3, 2025), https://perma.cc/F7BT-MQ3D.

4.      But the Trump Administration cannot dismantle the Department of Education. It cannot override—whether through large-scale RIFs or otherwise—the statutory framework prescribing the Department's responsibilities. As the Supreme Court put it nearly a century ago, "[t]o Congress under its legislative power is given the establishment of offices [and] the determination of their functions and jurisdiction." *Myers v. United States*, 272 U.S. 52, 129 (1926). And, thus, administrative agencies "are creatures of statute." *Nat'l Fed. of Indep. Bus. v. Dep't of Labor*, 595 U.S. 109, 117 (2022).

5.      Past attempts to eliminate the Department of Education have reflected these limitations on executive power. President Reagan sought legislation to dismantle the Department of Education, which Congress did not pass. *See* Ronald Reagan, U.S. President, State of the Union (Jan. 26, 1982), available at https://perma.cc/Z93E-NRN5. Since then, numerous bills have been introduced to shutter the Department of Education. *See* Mona Vakilifathi, *Why Trump is Trying to Reduce the Status of the Department of Education*, Brookings Inst. (July 16, 2018), https://perma.cc/2DSB-GAUL. Each of these efforts reflects the uncontroversial understanding that only Congress may abolish an agency it created.

6.      And while Congress has granted the Secretary of Education—though not the President—the authority to modestly restructure the Department of Education, the Secretary is expressly limited to "allocat[ing] or reallocat[ing] functions among the officers of the Department"

or modifying "organizational entities within the Department as may be necessary or appropriate." 20 U.S.C. § 3473(a). She is not permitted to eliminate or disrupt functions required by statute, nor can she transfer the Department's responsibilities to another agency outside of its statutory authorization. *Id.*

7.      Neither the President nor his agencies can undo the many acts of Congress that authorize the Department, dictate its responsibilities, and appropriate funds for it to administer. Therefore, the President's directive to eliminate the Department of Education ("Directive")— including through the repeated decimation of the Department's workforce, the unauthorized transfer of function and funds outside the Department, and any other agency implementation—is an unlawful violation of the separation of powers, and the Executive's obligation to take care that the law be faithfully executed.

8.      The Department's implementation of the Directive is also separately unlawful because it violates the Administrative Procedure Act (APA). It is arbitrary and capricious, and contrary to law.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States). Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705, 706.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events or omissions giving rise to the claims asserted herein

occurred in this district, and Defendants are United States agencies or officers acting in their official capacities.

## PARTIES

### I.    Plaintiffs

11.    Plaintiff State of New York is a sovereign state of the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York.

12.    Plaintiff Commonwealth of Massachusetts is a sovereign commonwealth in the United States of America. Massachusetts is represented by Attorney General Andrea Campbell, who is the chief law enforcement officer of Massachusetts.

13.    Plaintiff State of Hawai'i, represented by and through Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Haw. Rev. Stat. § 28-1 to pursue this action.

14.    Plaintiff State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

15.    Plaintiff State of Arizona, represented by and through its Attorney General, is a sovereign state of the United States of America. Arizona is represented by and through its chief legal officer, Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

16.     Plaintiff State of Colorado is a sovereign state in the United States of America. Colorado is represented by and through its Attorney General Phil Weiser. The Attorney General acts as the chief legal representative of the state and is authorized by Colo. Rev. Stat § 24-31-101 to pursue this action.

17.     Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Conn. Gen. Stat. § 3-125 to pursue this action on behalf of the State of Connecticut.

18.     Plaintiff State of Delaware, represented by and through its Attorney General, Kathleen Jennings, is a sovereign state of the United States of America. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

19.     Plaintiff District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

20.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief law enforcement officer of Illinois.

21.     Plaintiff State of Maine is a sovereign state of the United States of America. Maine is represented by its Attorney General, who is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

22.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

23.     Plaintiff the People of the State of Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the People of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

24.     Plaintiff State of Minnesota is a sovereign state of the United States of America. Minnesota is represented by Attorney General Keith Ellison, who is the chief law enforcement officer of Minnesota.

25.     Plaintiff State of Nevada is a sovereign state of the United States of America. Nevada is represented by and through its chief legal officer, Attorney General Aaron D. Ford. The Attorney General has the authority to file this suit to protect and secure the interests of the State. NRS 228.170.

26.     Plaintiff State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

27.     Plaintiff the State of New Mexico, represented by and through its Attorney General Raúl Torrez, is a sovereign state of the United States of America. As the State's chief law

enforcement officer, the Attorney General is authorized to act on behalf of the State of New Mexico in this matter.

28.    Plaintiff State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield, who is the chief law enforcement officer of Oregon.

29.    Plaintiff State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

30.    Plaintiff State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, who is the State's chief legal officer and authorized to pursue this action on behalf of the State. 3 Vt. Stat. Ann. § 159.

31.    Plaintiff State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

32.    Plaintiff State of Wisconsin is a sovereign state of the United States of America. Wisconsin is represented by Attorney General Josh Kaul, who is the chief law enforcement officer of Wisconsin.

## II.    Defendants

33.    Defendant Linda McMahon is the Secretary of the United States Department of Education and that agency's highest ranking official. 20 U.S.C. § 3412. She is charged with the supervision and management of all decisions and actions of the agency. She is sued in her official capacity.

34.    Defendant the United States Department of Education is a cabinet agency within the executive branch of the United States government that has been created by Congress. 20 U.S.C. § 3411. The United States Department of Education and Linda McMahon are jointly referred to as "Agency Defendants."

35.    Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

## LEGAL BACKGROUND

### I.    The Executive Has No Authority to Incapacitate a Congressionally Created Agency

36.    It is a bedrock constitutional principle that the President and his agencies cannot make law. Rather, they can only—and indeed, they must—implement the laws enacted by Congress, including those statutes that create federal agencies and dictate their duties. The Executive thus can neither outright abolish an agency nor incapacitate it by cutting away the personnel required to implement the agency's statutorily-mandated duties.

37.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1.

38.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350).

39.     "As Chief Justice Marshall put it, this means that 'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 23 U.S. 1, 42-43 (1825)).

40.     Congress has exclusive authority to abolish executive agencies, and either redistribute their functions to existing or newly created agencies, or to discontinue their functions. *See, e.g.*, Homeland Security Act of 2002, Pub. L. 107–296, §§ 471, 441, and 451(b), 116 Stat. 2135 (abolishing Immigration and Naturalization Service and transferring its functions to the newly-created Department of Homeland Security); Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, Division G, 112 Stat. 2681 (abolishing several agencies and consolidating their functions within the Department of State, and creating USAID as an independent executive agency).

41.     The Constitution vests executive power in the President. U.S. Const., art. II, § 1. The primary function of the President is understood to be delineated in the "Take Care" clause, which requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. Nothing in Article II authorizes the Executive to dismantle a statutorily created agency directly or indirectly.

42.     The Executive has no authority to enact, amend, or repeal statutes. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). The Executive does not have, under the Constitution or otherwise, an undefined "inherent" power, even in "emergency" circumstances, to unilaterally decide to ignore statutes. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 649-651(1952) (Jackson, J., concurring).

43.    Indeed, the Executive acts at the "lowest ebb" of his constitutional authority and power when he acts contrary to "the expressed or implied will of Congress." *Id.* at 637 (Jackson, J., concurring).

## II.    The Statutory Framework Authorizing the Department of Education

44.    In 1979, pursuant to its constitutional authority, Congress established the Department of Education, and many of its offices, by statute, with the enactment of the Department of Education Organization Act. Pub. L. 96–88, § 201–220, 93 Stat. 669 (1979) (codified as amended at 20 U.S.C. §§ 3411–3427). That Act made express findings about the importance of the Department's mission. 20 U.S.C. §§ 3401–3402. And through its enabling legislation, Congress made clear that Congress—and only Congress—could effect major re-organizations of the Department.

45.    Chief among Congress's findings prior to the creation of the Department—and an important consideration animating the Department of Education Organization Act—was the need for one, centralized federal resource to speak with a single voice on federal education policy.  In its Congressional Findings related to the promulgation of the Department of Education Organization Act, Congress acknowledged "a need for improvement in the management and coordination of Federal education programs to support more effectively State, local, and private institutions, students, and parents in carrying out their educational responsibilities," among other things.  20 U.S.C. § 3401(7)–(10).  These considerations mandated a central, unitary education function, residing in a Department of Education.  *Id.*

46.    In clarifying its purpose in promulgating the Department of Education Organization Act, Congress wrote that "the establishment of a Department of Education is in the public interest, will promote the general welfare of the United States, will help ensure that education issues receive

proper treatment at the Federal level, and will enable the Federal Government to coordinate its education activities more effectively." 20 U.S.C. § 3402. Among the specific purposes of the Department were "to improve coordination of Federal education programs;" *id.* § 3402(5), "to improve the management and efficiency of Federal education activities, especially with respect to the process, procedures, and administrative structures for the dispersal of Federal funds, as well as the reduction of unnecessary and duplicative burdens and constraints, including unnecessary paperwork, on the recipients of Federal funds;" *id.* § 3402(6), and "to increase the accountability of federal education programs to the President, the Congress, and the public," *id.* § 3402(7).

47.    "[P]rimary responsibility for establishing policy and providing funding for elementary and secondary education rests with the states and instrumentalities therein," but the Department of Education "has primary responsibility for administering federal elementary, secondary, and postsecondary education programs." *See* Rebecca R. Skinner et al., *A Summary of Federal Education Laws Administered by the U.S. Department of Education*, Cong. Rsch. Serv. (Dec. 12, 2024) (hereinafter, "the Skinner Report").

48.    Over time, Congress has enacted more statutes authorizing additional functions for the Department of Education and appropriating additional funds for it to administer. The major statutes administered by the Department (as detailed in the Skinner Report) include:

a.    The Elementary and Secondary Education Act (ESEA). The ESEA (Pub. L. 89–10) was enacted in 1965 and was last reauthorized in 2015 by the Every Student Succeeds Act (ESSA) (Pub. L. 114–95). Title I-A, the largest ESEA program, provides compensatory grants to local educational agencies (LEAs). Congress appropriates funds for ESEA on an annual basis.

b.      <u>The Individuals with Disabilities Education Act (IDEA)</u>. In 1975, Congress enacted Pub. L. 94–142 (now known as the IDEA), which authorizes grant programs that support legally-mandated early intervention and special education services for children with disabilities, from birth to age 21. The IDEA was last reauthorized in 2004 (Pub. L. 108–446). Over 90% of IDEA funds are appropriated for Part B (Section 611), which provides funding for special education services for school-aged children. The authorization of appropriations for Part B is permanent. Funds for Part C—which authorizes state grants for infants and toddlers with disabilities—and Part D—which authorizes national activities—have been appropriated on an annual basis.

c.      <u>Higher Education Act of 1965 (HEA)</u>. The HEA (Pub. L. 89–329, as amended) was enacted in 1965. It was last comprehensively reauthorized by the Higher Education Opportunity Act of 2008 (HEOA) (Pub. L. 110-315), and has since been amended multiple times. Title IV of the HEA authorizes a number of student aid programs that assist students with postsecondary education expenses. These include the Federal Pell Grant program, the William D. Ford Federal Direct Loan program, and the Federal Work-Study program. The HEA also authorizes programs providing federal support directly to institutions of higher education through Title III and Title V. Title II includes programs focused on recruiting, training, and developing teachers, and Title VII includes Graduate and Post-Secondary Improvement programs. HEA programs are funded through a combination of discretionary and mandatory appropriations. Mandatory funding for the Direct Loan program is permanently authorized, and mandatory funding for the

13

Federal Pell Grant program is permanently appropriated. Funding continues to be appropriated for other HEA programs annually.

        d.    <u>Rehabilitation Act of 1973</u>. Under the Rehabilitation Act of 1973 (Pub. L. 93–112, as amended), the Department provides funds to support vocational rehabilitation services primarily through the State Vocational Rehabilitation Services Program, which supports services to help individuals with disabilities. Congress continues to appropriate funding for the program annually.

        e.    <u>Civil Rights Laws</u>. The Department is also charged with enforcing various civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance. These include Title VI of the Civil Rights Act of 1964 (Pub. L. 88–352); Title IX of the Education Amendments of 1972 (Pub. L. 92–318); Section 504 of the Rehabilitation Act of 1973 (Pub. L. 93–112); the Age Discrimination Act of 1975 (Pub. L. 94–135); and Title II of the Americans with Disabilities Act of 1990 (Pub. L. 101–336).

        f.    <u>Privacy Rights Laws</u>. The Department also enforces laws that protect student privacy rights: (1) the Family Educational Rights and Privacy Act and (2) the Protection of Pupil Rights Amendment.

49.    Congress has granted the Secretary of Education limited discretion to reallocate functions within the Department, but that authority is modest, and does not include the power to eliminate statutorily-created functions. The Secretary is authorized to "allocate or reallocate functions among the officers of the Department, and to establish, consolidate, alter, or discontinue such organizational entities within the Department as may be necessary or appropriate." 20 U.S.C. § 3473(a). "[B]ut the authority of the Secretary" under these provisions "does not extend to: (1) any

office, bureau, unit, or other entity transferred to the Department and established by statute or any function vested by statute in such an entity or officer of such an entity, except as provided in subsection (b); (2) the abolition of organizational entities established by this chapter; or (3) the alteration of the delegation of functions to any specific organizational entity required by this chapter." *Id.* By statute, there are fourteen offices and programs that may be "consolidate[d], alter[ed], or discontinue[d]," or have their "functions" "reallocate[d]" by the Secretary. *Id.* § 3473(b)(1). Even then, however, the Secretary must give the congressional committees of jurisdiction "a full and complete statement of the action proposed to be taken pursuant to this subsection and the facts and circumstances relied upon in support of such proposed action," and then wait ninety days before acting. *Id.* § 3473(b)(2). To date, on information and belief, despite eliminating some of the offices identified in Section 3473(b), the Secretary has not given Congress notice of her reorganization plans.

50.    The Secretary is permitted by law to delegate functions Congress has assigned to the Department, but only to Department employees: pursuant to 20 U.S.C. § 3472, "[e]xcept as otherwise provided in this chapter, the Secretary may delegate any function to such officers and employees of the Department as the Secretary may designate, and may authorize the successive redelegation of such functions within the Department as may be necessary or appropriate." However, importantly, "[n]o delegation of functions by the Secretary under this section or under any other provision of this chapter shall relieve the Secretary of responsibility for the administration of such functions." *Id.*

51.    Thousands of employees have administered the many programs the Department is mandated to operate. Nothing in the numerous statutes creating the Department and describing its

mandated functions authorizes the Executive to gut an agency such that it can no longer meet its statutory obligations.

52.    While the Secretary has limited statutory authority to transfer appropriations from Congress between Departmental programs, *see* 20 U.S.C. § 3484, the Secretary has no legal authority to transfer a large portion of the funds appropriated by Congress to the Department to other federal agencies.

53.    The Department may engage in limited restructuring and downsizing of its workforce through a RIF, "an administrative procedure by which agencies eliminate jobs and reassign or separate employees who occupied the abolished positions." *James v. Von Zemenszky*, 284 F.3d 1310, 1314 (Fed. Cir. 2002). But the Department's authority to administer RIFs does not override Congress's exclusive authority to abolish executive agencies or to discontinue their functions. And an agency cannot use a RIF to unilaterally cease implementing the agency's statutorily-mandated duties.

## FACTUAL ALLEGATIONS

54.    The Department of Education operates programs that touch on nearly every aspect and level of education. The Department's elementary and secondary programs annually serve nearly 18,200 school districts and over 50 million students attending roughly 98,000 public schools and 32,000 private schools, while the Department's higher education programs provide services and support to more than 12 million postsecondary students.

**I.    The Department of Education's Support Across All Spectrums of Education**

55.    The Department of Education is among the smallest federal agencies, yet it is charged with performing an immense breadth of work.

16

A.  <u>The Department's Support for Birth-to-Grade-12 Educational Programs</u>

56.    In federal fiscal year 2024, the Department directed 25.4% of its total spending to states and local governments. The federal government provides 13.6% of the funding for public K–12 education.

57.    The two largest sources of federal funding for schools are Title I funding and IDEA funding. The Department of Education distributes over $18 billion under the Title I program to help support schools with high-poverty populations, providing benefits like extra staff to supplement reading instruction. The Department disburses over $15 billion in IDEA funding, which helps cover the costs of special education.

58.    Public education funding varies significantly across states. K–12 schools in Alaska receive the most federal funding per pupil, followed by North Dakota. Utah and Kansas receive the least federal funding per pupil. New York and Massachusetts are among those that receive the least federal funding per pupil. Nevertheless, every state receives considerable federal funding and services from the Department.

59.    The K–12 funding provided by the Department supports a wide variety of educational programs and needs: special education, including paying for assistive technology for students with disabilities; teacher salaries and benefits; school counselors and homeless liaisons; professional development and salaries for special education teachers, paraprofessionals, and reading specialists; transportation to help children receive the services and programming they need; and physical therapy, speech therapy, and social workers.

60.    Department of Education funding supports education of students with disabilities, both in public and private schools. Funding through IDEA, 20 U.S.C. §§ 1400–09, pays for a broad range of special education services required by individualized education programs (IEPs) for students with disabilities attending public schools. IDEA funding also helps school districts pay

for the costs of placing students with disabilities who need out-of-district placements in special education schools and programs that can meet their needs. *E.g.*, 34 C.F.R. §§ 300.145–300.146. IDEA also provides funding for equitable services for students with disabilities attending regular private schools. 34 C.F.R. §§ 300.130–300.138. IDEA funding helps support the cost of salaries of special education teachers and other service providers who provide direct instruction and services to students with disabilities, such as speech-language pathologists, reading specialists, physical and occupational therapists, audiologists, psychologists, behavioral therapists, deaf and hard of hearing instructors, and other service providers. IDEA funding also supports the cost of augmentative communication equipment and devices for students with speech, language or communication impairments. IDEA also funds the costs of providing Extended School Year programs for students with disabilities who need continuous support outside of the academic year to maintain their academic, social, behavioral, and communication skills. IDEA funding also supports professional development activities for special education teachers and other service providers who work with students with disabilities, to better meet the students' needs. IDEA funding supports special education instruction and services to students with disabilities who are in institutional settings.

61.     The Department of Education also administers grants for various disaster and emergency-related relief and preparations, through the Office of Elementary and Secondary Education and the Department's Disaster Recovery Unit.

62.     Department of Education funding also supports early childhood education for children from birth through kindergarten. For instance, the Preschool Development Grant Birth through Five program is a $250 million competitive federal grant designed to improve states' early

childhood systems by building upon existing federal, state, and local early care and learning investments.

B. <u>The Department's Role in Providing Administrative and Substantive Services for Birth-to-Grade-12 Education</u>

63.    The Department of Education's statutory mission includes promoting "improvements in the quality and usefulness of education through federally supported research, evaluation and sharing of information." 20 U.S.C. § 3402(4).

64.    To that end, the Department of Education gathers data, identifies best practices in pedagogy, and disseminates that research to educators and others. The Department also operates several National Centers housed within the Institute of Education Sciences, all of which conduct research, collect and analyze data, and provide technical assistance to educators, parents, students, policymakers, and the general public on a range of topics aimed at improving academic achievement for all children and ensuring the effectiveness of educational programs. *See* 20 U.S.C. §§ 3419, 9511(a) (establishing the Institute of Education Sciences); 20 U.S.C. § 9531(a) (establishing a National Center for Education Research); 20 U.S.C. § 9541(a) (establishing the National Center for Education Statistics); 20 U.S.C. § 9561(a) (establishing the National Center for Education Evaluation and Regional Assistance); 20 U.S.C. § 9567(a) (establishing the National Center for Special Education Research). The Department, for example, creates resources to support educators and school districts in meeting academic standards, providing education to children who are English language learners, addressing school safety, bullying, and chronic absenteeism, supporting children with significant behavioral issues, and other important topics.

65.    The Department's Office of English Language Acquisition, Language Enhancement and Academic Achievement for Limited English Proficient Students oversees policy for the education needs of linguistically and culturally diverse students. 20 U.S.C. § 3420.

66.    The Student Privacy Policy Office implements the Family Educational Rights and Privacy Act and the Protection of Pupil Rights Amendment, both of which specifically mandate the creation of an office and review board to investigate, process, review, and adjudicate violations of the student privacy laws. 20 U.S.C. §§ 1232g(g), 1232h(f).

67.    The Department's Office of Special Education and Rehabilitative Services (OSERS) provides guidance, technical assistance, and oversight of special education requirements under the IDEA. 20 U.S.C § 3417. The Office of Special Education Programs, established within OSERS, administers programs concerning education of children with disabilities. 20 U.S.C. § 1402(a).

68.    Under the McKinney-Vento Homeless Assistance Act, 42 U.S.C. §§ 11301–11489, the Department provides guidance relating to the educational rights of students who are homeless. Similarly, the Department provides guidance regarding protections for students in foster care under the ESSA.

69.    The Department collects and publishes data relating to education services across the country. For example, it conducts the Civil Rights Data Collection, through which it compiles and publishes data on a broad range of civil rights related topics that serve as a valuable resource to state education agencies.

C.    The Department's Role in Safeguarding Equal Access to Public Education

70.    The Department of Education plays a critical role in safeguarding equal access to public education through transparency and accountability. The Department's Office for Civil Rights (OCR) was created by Congress and has historically focused on ensuring that schools provide equal access to education across diverse student bodies. 20 U.S.C. § 3413.

71.    OCR directs, coordinates, and recommends policy for activities that are designed to, among other things, comply with legislative and regulatory civil rights requirements. For

example, in May 2022, OCR announced proposed amendments to the Department of Education's regulations implementing Section 504 of the Rehabilitation Act of 1973. *U.S. Department of Education Announces Intent to Strengthen and Protect Rights for Students with Disabilities by Amending Regulations Implementing Section 504* (May 2022), available at https://perma.cc/3KZM-BGUA. As part of that process, OCR sought and considered written suggestions from the public about how best to improve the current regulations. *Id.* In 2024, OCR also promulgated regulations implementing Title IX of the Education Amendments of 1972, restoring strong protections against sexual harassment and assault and reinforcing critical protections for LGBTQ+ students. *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024).

72.     OCR is charged with enforcing and investigating alleged violations of various federal civil rights laws that protect students against discrimination, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. OCR has a responsibility to act in a reasonably prompt manner in response to alleged violations of these laws.

73.     In FY 2024, OCR reviewed the highest volume of complaints ever, totaling 22,687 complaints. U.S. Department of Education Office for Civil Rights, *2024 Fiscal Year Annual Report* (2024), available at https://perma.cc/2S45-D74Z. That number represented an 18% increase over a previous record high in FY 2023 of 19,201 complaints. *Id.*

74.     In addition to their enforcement and investigative work, OCR has provided trainings and technical assistance to state education agencies and local educational agencies on civil rights laws. For example, OCR provided training to state and local educational agencies

regarding digital accessibility of websites and other electronic documents for individuals who have disabilities, including blindness.

      D.   <u>The Department's Administration of Higher Education Programs and the Federal Student Financial Aid.</u>

75.    The federal student loan programs administered under Title IV of the Higher Education Act of 1965, as amended, are central components of the financial aid provided to students in Plaintiff States. These programs are designed to provide critical assistance to prospective students and expand access to higher education to students who could not otherwise afford to pursue a degree or certificate.

76.    The Department manages the federal student loan system through its Office of Federal Student Aid (FSA), which handles loan disbursement, servicing and borrower assistance. 20 U.S.C. § 1018.

77.    Included in this system is the administration of Pell Grants, work-study programs and subsidized loans. The Department awards more than $120 billion a year in grants, work-study funds, and low-interest loans to approximately 13 million students. Much of this funding is sent directly to colleges and universities, including public colleges and universities in the Plaintiff States. Already, Plaintiff States' universities have experienced difficulties with respect to student financial aid. In some instances, students and their families have experienced delays when appealing loan credit decisions through the Department.  Such delays create enrollment risk for universities, as the delays can cause substantial funding gaps that create a risk of students having to withdraw from their studies.

78.    The Office of Federal Student Aid develops the *Free Application for Federal Student Aid* (FAFSA) form and processes, with vendors, more than 17.6 million FAFSA forms each year. The deadline for applicants to submit their FAFSA forms is June 30, 2026, although

many students submit their FAFSA forms earlier, as their decision about whether they can afford to attend college and, if so, which college, is necessarily dependent on learning what financial aid they qualify for. If FAFSA forms are not processed on time, this will mean that many students may seek to delay their decisions about *which* college to attend, and many students will decide to *postpone* attending college, for a year or indefinitely.

79.    While the Department distributes this funding to institutions of higher education, it also ensures that the institutions receiving Title IV funding are financially responsible. The Secretary of Education determines the standard of financial responsibility and enforces it as required under the HEA. When something happens that could affect an institution's financial responsibility, the institution is required to notify the Department within 21 days. If such notifications are no longer monitored by the Department, institutions that continue to receive Title IV funding could engage in wasteful or unnecessary spending without repercussions.

80.    Under the HEA, the Department enforces the requirement that institutions of higher education provide counseling to new students as well as graduating students, with information about debt management and repayment. If the Department ceased enforcement of these programs, it would become substantially more difficult to ensure that institutions provide this counseling. Accordingly, students could lose the opportunity to make informed decisions about their student loan debt, or could even become unwitting victims of predatory lending.

81.    The Department's responsibilities are not just financial. The Department manages large-scale data collection and enforcement, which would not be possible on a state-by-state basis. Such data are described in various Congressional Acts and often implicate campus safety. Collecting this vital data across states, and therefore monitoring nationwide trends, would be infeasible for individual states.

82.     For instance, the Jeanne Clery Campus Safety Act ("Clery Act") also requires colleges and universities to disclose certain crimes that occur on campus, via an annual report. *See* 20 U.S.C. § 1092; 34 C.F.R. § 668.46. If the Department no longer processed the notice and reports made under this and other statutes, campus safety would suffer.

83.     Similarly, the Department enforces reporting and compliance of campus safety with regard to drug and alcohol use under the Drug Free Schools and Communities Act and the HEA. These statutes require institutions of higher education to maintain policies surrounding illegal drug and alcohol use, and to determine the number of drug- and alcohol-related violations and fatalities associated with the institution. The Department collects this information from institutions and ensures compliance. Were the Department to cease enforcement of these Acts, institutions would no longer need to monitor and report this data, impacting campus safety.

84.     The Violence Against Women Act requires the Secretary of Education to nationally survey reports of sexual and domestic violence or harassment across institutes of higher education. The Secretary of Education is required to report the data biennially, and institutions receiving federal funding must in turn publish it (at a campus level) on their websites. This allows current or prospective students to make informed decisions regarding their place of education. Were the Department to cease collection of this information, not only would campus safety be affected by the lack of enforcement, but the Secretary of Education would be in violation of the Violence Against Women Act.

85.     The Department also enforces the Family Educational Rights and Privacy Act. It requires that institutions of higher education allow students to inspect their records, and that institutions obtain written consent before sharing such records with external personnel. Lack of enforcement places students' data security and private records at risk.

86.     The Department's Office of Postsecondary Education is a fundamental component of the Department required by statute and is responsible for formulating federal postsecondary education policy and administering programs to support increased access to quality postsecondary education. 20 U.S.C. § 3415. Through the Office of Postsecondary Education, the Department carries out many of its required functions under the Higher Education Act of 1965, as amended. *See* 20 U.S.C. §§ 1001–1161aa-1.

87.     The Department is also responsible for vital aspects of higher education accreditation. The accreditation of institutions of higher education is a joint process between the educational institutions, states, the Department, and third-party accreditation authorities. Accreditation ensures that educational institutions meet certain standards for quality and assures students that a degree from that institution has and will continue to have value in the workplace. The Department is responsible for reviewing the accreditation standards of agencies that review programs and institutions of higher education. While some accrediting agencies work without Department of Education recognition, these agencies need not conform to any standards of quality or integrity. Without Department-recognized accreditation, institutions of higher education may engage in profit-seeking behaviors that provide no educational benefits to students. Many unaccredited institutions are profit-hungry "diploma mills" that lack external quality control or educational standards, and whose diplomas are therefore meaningless to the job market and worthless to graduates.

E.   The Department's Programs Supporting Vocational Education and Rehabilitation.

88.     The Department of Education provides both vocational education and vocational rehabilitation services to help individuals gain skills for employment and support those with disabilities in finding and maintaining jobs.

89.     The Department's Office of Career, Technical, and Adult Education (OCTAE) is a fundamental component of the Department required by statute that administers and coordinates functions related to career, technical, and adult education. 20 U.S.C. § 3416. OCTAE also administers programs related to adult education and literacy and community colleges for advancing workforce development.

90.     OCTAE's Division of Academic and Technical Education is responsible for helping adult students acquire academic and technical skills to be prepared for high-skill, high-wage, or high-demand occupations.

91.     OCTAE's Division of Academic and Technical Education administers formula and discretionary grant programs under the Carl D. Perkins Career and Technical Education Act, 20 U.S.C. §§ 2301–2414, which is the primary source of federal funding for career and technical education. The Division also provides assistance to states to improve program quality, implementation, and accountability, and establishes national initiatives that help states implement rigorous career and vocational education programs.

92.     The Division of Academic and Technical Education also administers the Perkins Collaborative Resource Network, which provides resources and tools for state directors and state staff who administer career and technical education programs.

93.     OCTAE's Division of Adult Education and Literacy administers programs that help adults acquire basic skills including reading, writing, math, English language proficiency, and problem-solving. The Office of Correctional Education, which coordinates efforts to support educational opportunities in correctional settings, is also located in the Division of Adult Education and Literacy.

94.    The Division of Adult Education and Literacy administers formula grant programs to states under the Adult Education and Family Literacy Act, Title II of the Workforce Innovation and Opportunity Act. 29 U.S.C. §§ 3271–3333. The Division provides assistance to states to improve program quality, accountability, and capacity, and establish national leadership activities to enhance the quality of adult education.

95.    OCTAE provides national leadership to strengthen the role of community colleges in expanding access to postsecondary education for youth and adults and advancing workforce development.

96.    OCTAE's community college initiatives are designed to build public support for community colleges as centers of innovation and providers of excellent education and training that are affordable and accessible to all Americans; facilitate the dissemination of timely and actionable guidance on community college educations for teachers, administrators, students, parents, and employers; and promote the development of strategies that support students in the completion of their postsecondary certification and degree programs.

97.    The Department of Education also provides critical vocational rehabilitation services and funding for individuals with disabilities through its Rehabilitation Services Administration, a component of the Department's Office of Special Education and Rehabilitative Services (OSERS). 29 U.S.C. § 702; Department of Education Organization Act, Pub. L. No. 96–88, 93 Stat. 669 (1979) (codified as amended at 20 U.S.C. §§ 3401–3510). The Rehabilitation Services Administration provides leadership and resources to assist state and local education agencies in providing vocational rehabilitation and other services to individuals with disabilities, to maximize their employment, independence, and integration into the community and the competitive labor market.

98.     The Rehabilitation Services Administration funds and administers many programs, including disability employment programs, an independent living program, technical assistance centers, training programs, and disability innovation fund programs.

99.     Two disability employment programs—the State Vocational Rehabilitation Services Program and the State Supported Employment Services Program—provide formula grants to states to provide employment services for individuals with disabilities.

100.    The State Vocational Rehabilitation Services Program is authorized by the Rehabilitation Act of 1973, as amended. This program provides grants to assist states in operating statewide vocational rehabilitation programs, each of which is an integral part of a statewide workforce development system.

101.    The State Supported Employment Services Program is authorized by Title VI of the Rehabilitation Act of 1973, as amended. This program provides grants to assist states in developing and implementing collaborative programs with appropriate entities to provide supported employment services for individuals with significant disabilities, including youth, who require supported employment services following the achievement of a supported employment outcome.

102.    State supported employment grant funds are used to supplement funds provided under the State Vocational Rehabilitation Services Program. Program funds may be used to provide supported employment services once an individual has been placed in supported employment, for up to 24 months, and to supplement other vocational rehabilitation services necessary to help individuals with the most significant disabilities find work in the labor market.

103.    The Rehabilitation Services Administration also provides Independent Living Services for Older Individuals Who Are Blind formula grants to states under Title VII, Chapter II of the Rehabilitation Act of 1973, as amended, to support services for individuals age 55 or older

whose severe visual impairment makes competitive employment difficult to obtain but for whom independent living goals are feasible.

104.    The Rehabilitation Services Administration also provides critical technical assistance, training programs, and disability innovation fund programs to states.

105.    Technical assistance centers provide training and technical assistance to states education agencies and other state entities. These centers help state entities ensure that transition-age youth with disabilities receive high-quality education services; provide adequate vocational rehabilitation services to individuals who are blind; and work to increase the number and quality of employment outcomes for individuals with disabilities.

106.    The Rehabilitation Services Administration also administers training programs to help fund undergraduate and graduate programs in the field of rehabilitation, and for the use of braille for personnel providing vocational rehabilitation services or education services to youth and adults who are blind.

107.    The Rehabilitation Services Administration also provides funds through Disability Innovation Fund Programs to state agencies to conduct innovative activities aimed at improving outcomes for individuals with disabilities.

F.    The Department's Administration of Impact Aid.

108.    Because school districts rely heavily on local property taxes for funding, property tax exemptions on federal land create funding shortages for neighboring school districts. The Impact Aid program, signed into law by President Harry Truman in 1950 (School Facilities Construction Act, Pub. L. No. 81–815, 64 Stat. 967; Educational Agencies Financial Aid Act, Pub. L. No. 81–874, 64 Stat. 1100), is a critical method of ensuring the financial survival of local school districts whose revenue is decreased due to the presence of non-taxable federal land. School districts that are near, or serve students from, military bases, federal lands, federal low-rent housing

facilities, and tribal communities lose local revenue because of the presence of these nontaxable federal activities. While these school districts typically continue to receive funding from their states, Impact Aid funding partially reimburses school districts for this loss of locally-derived revenue.

109.    The Department is the primary agency responsible for administering Impact Aid payments to local school districts. *See* ESEA, Title VII, 20 U.S.C. §§ 7701–14; 34 C.F.R. part 222. Every year, each school district seeking Impact Aid must submit an application to the Department. Typically, this occurs on January 31, though late application deadlines can extend to April 1 with payment of a penalty. The Department reviews the applications and processes payments based on congressional appropriations each fiscal year and allocates funding in multiple installments until all available funds are distributed.

110.    Many school districts within the Plaintiff States are heavily dependent on the Department's effective funding distribution and administration of Impact Aid due to the large amount of nontaxable federal property within their boundaries, as the amount of Impact Aid received by each school district is based on the number of affected students who live on federal property or whose parents work in federal facilities. School districts within Plaintiff States receive hundreds of millions of dollars annually in Impact Aid funding for construction, special education, maintenance, and operations.

111.    The Impact Aid Program is the only K–12 Federal education program that is not forward funded. Any delay in either appropriations or administration has an immediate impact on Impact Aid-recipient school districts' ability to fund day-to-day operations, instructional expenditures, utility payments and payroll.

## II.    Funding the Department of Education

### A.  Federal Funding Legal System

112.    The Constitution gives the "power of the purse" to Congress. Specifically, the Constitution grants to Congress the authority to levy taxes, to finance government operations through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."); U.S. Const. art. I, § 8, cl. 1 (Congress has authority "[t]o lay and collect Taxes, Duties, Imposts and Excises; to pay the Debts and provide for the common Defence and general Welfare of the United States[.]").

113.    The Constitution also vests in Congress all legislative powers and prescribes a specific procedure by which laws may be enacted, which includes the requirements of bicameralism and presentment. U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."); U.S. Const. art. I, § 7, cls. 2, 3.

114.    The President may recommend laws for Congress's consideration, including those related to spending. U.S. Const. art. II, § 3. Upon presentment with a bill, the President may sign it into law, veto it, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. Once a spending law is enacted, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

115.    To finance federal programs and activities, Congress empowers an agency to incur financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i).

116.    One such authorization is an appropriation, which creates the legal authority to "make funds available for obligation" and to make "expenditure[s]" for the purposes, during the

time periods, and in the amounts specified in the law authorizing the appropriations. *See* 2 U.S.C. § 622(2)(A)(i).

117.    Where Congress does not adopt an appropriations act by the beginning of its fiscal year, it can instead adopt a continuing resolution to avert a funding gap. Continuing resolutions generally continue the levels of funding from the prior year's appropriations (or the prior continuing resolution) for a set period. *See* Congressional Research Services, *Continuing Resolutions: Overview of Components and Practices* (2026), 1-4, https://www.congress.gov/crs-product/R46595.

118.    Through appropriations acts, Congress prescribes how appropriated funds may be used in three primary ways. First, Congress describes how appropriations should be applied, stating that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—that is, funds can only be used for the purposes that Congress has designated.

119.    Second, Congress prescribes how long an appropriation is available to an executive agency, i.e., the "period of availability" within which an agency may obligate or actually expend an appropriation. Government Accountability Office, *Principles of Federal Appropriations Law*, Vol. I, Ch. 5 at 5-3–5-4 (3d ed. 2004).

120.    Third, Congress prescribes the amount of the appropriation. In other words, Congress prescribes how much an executive agency can spend for the purposes and time periods Congress defines. *Id*. Vol. II, Ch. 6 at 6-4.

B.  General Structure of Education Programs

*i.  General Education Provisions Act*

121.    Congress has imposed a number of funding-related legal mandates on the Department, both through the General Education Provisions Act (GEPA), 20 U.S.C. §§ 1221–34i, and the program-specific statutes at issue here.

122.    Pursuant to GEPA, Congress recognized the need to give education officers "adequate notice" of the funds available "for carrying out ongoing education activities and projects." 20 U.S.C. § 1223(a). To that end, GEPA broadly authorizes Congress to provide "advance appropriations" for education programs—that is, to appropriate funds for a given year in the previous year's budget. *Id*. This forward funding gives schools enough notice to begin to hire personnel, purchase curriculum and equipment, and so on, in the summer before the school year during which the federal programs will be administered.

123.    GEPA authorizes the Department of Education to make funds "available for obligation by the recipient" on the basis of the recipient's academic year. 20 U.S.C. § 1225(a). The Department has exercised this Congressionally authorized discretion by tying the availability of funds for the States to when the funds become available to the Department itself. For States with approved plans, the funds for certain formula grant programs are available to the States when they become available to Department of Education for obligation. *See* 34 C.F.R. § 76.703(d).

124.    GEPA also created a framework to allow continuous participation in federal programs from year to year. The statute authorizes the Department to use single applications to govern "more than one fiscal year." 20 U.S.C. § 1231g(a). States that receive funds therefore need not refresh their applications for each program for each year. *See id.*; *id.* § 1232(c); 34 C.F.R. § 76.103.

*ii.   Formula Grant Funding: State Plans*

125.    For formula grants (as opposed to competitive grants), States typically submit a "plan" rather than an "application." *See* 34 C.F.R. § 76.101. By way of example, States submit plans under the Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. No. 89–10, 79 Stat. 27 (1965), as most recently reauthorized by the Every Student Succeeds Act (ESSA), Pub. L. No. 114–95, 129 Stat. 1802 (2015); and plans under Title II of WIOA, Pub. L. No. 113–128, tit. II, 128 Stat. 1425, 1608–24 (2014), known as the Adult Education and Family Literacy Act.

126.    ESEA requires States that seek federal ESSA grants to adopt plans to help improve outcomes for all students receiving elementary and secondary education. Among these obligations, States must establish high academic content standards, and schools must teach all students those standards to help prepare them for college and careers. States and districts must also establish systems of accountability and support for schools. *See* 20 U.S.C. §§ 6311–12. ESSA creates several discrete grant programs, and it allows States to submit a single "consolidated" plan covering most of those programs. 20 U.S.C. §§ 7842, 7801(11).

127.    Similarly, the Adult Education and Family Literacy Act (WIOA Title II) requires States to adopt adult education and civics literacy plans as part of their "unified State plans" or their "combined State plan" under WIOA. See 29 U.S.C. § 3304. Such plans must detail how the State intends to carry out the requirements of the grant program. 29 U.S.C. §§ 3112(b)(2)(D)(ii), 3113(b)(1). Such plans are generally valid for four years. 29 U.S.C. §§ 3112(a), 3112(c)(1)(B). Because the Adult Education and Family Literacy Act grants are administered by the Department, the program is subject to GEPA and its implementing regulations. *See* 20 U.S.C. § 1221(b)(1), (c)(1).

C.  Congressional Appropriations for the Impacted Programs

128.    In federal fiscal year ("FFY") 2024, Congress appropriated over $43 billion for Department operations. *See* Further Consolidated Appropriations Act, Pub. L. No. 118–47, div. D, 138 Stat. 460, 681–93 (2024). Importantly, the Department's appropriations, which were passed by Congress as part of the Labor, Health, and Human Services Appropriations Act of 2024, contain the following requirement:

> None of the funds made available in this Act may be transferred to any department, agency, or instrumentality of the United States Government, except pursuant to a transfer made by, or transfer authority provided in, this Act or any other appropriation Act.

Section 512 of the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024.

129.    A narrow carve-out exists from the provisions of Section 512; pursuant to Section 302 of the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, the Department may transfer a small sum (not to exceed one percent of discretionary funds) under limited circumstances.

130.    In FFY 2025, Congress appropriated funds for the Department operations through three continuing resolutions. First, Congress passed a continuing resolution that extended the same appropriation levels from fiscal year 2024 through December 20, 2024. Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118–83, 138 Stat. 1524, 1524–26 (2025). Second, Congress passed another continuing resolution that extended those same appropriation levels through March 14, 2025. American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722, 1723 (2025). Third, on March 15, 2025, Congress extended those same appropriation levels through the end of fiscal year 2025, through September 30, 2025, at the same level with minor exceptions. Full-Year Continuing Appropriations and Extensions Act, Pub. L. No. 119–4, 139 Stat. 31–33 (2025).

131.    In FFY 2026, Congress has to date appropriated funds for Department operations through the Continuing Appropriations and Extension Act, 2026, which was signed into law by the President on November 12, 2025.  This continuing resolution provides for funding for the Department through January 30, 2026.

132.    Both the FFY 2025 and 2026 appropriations resolutions incorporated the prohibition, codified at Section 512 of the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2024, on transferring of funds to other departments.  *See also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119–4, § 1105, 139 Stat. 12; Continuing Appropriations and Extension Act, 2026, Pub. L. No. 119–37, §§ 103 and 108, 139 Stat. 497.

## III.    The Dismantling of the Department of Education.

### A.    Pre-March 11, 2025 Statements Regarding Future of the Department

133.    As the Defendants emphasized to this Court, "President Trump ran on the promise to close the Department of Education . . . ." Doc. No. 95 at 1.

134.    The President has not been shy regarding his ultimate intentions for the Department. He has called the Department "a big con job" and declared in February 2025 that he would "like to close it immediately." *See, e.g.*, Michael C. Bender, *Trump Is Said to Be Preparing Order That Aims to Eliminate Education Dept.*, The New York Times (Mar. 6, 2025), https://perma.cc/EJE5-D6VR. He also stated that he would like Secretary McMahon to put herself "out of a job." Zachary B. Wolf, *Trump and Musk Are Moving to Smother These Three Pieces of the Government*, CNN (Feb. 5, 2025), https://perma.cc/YP4Q-6VAK ("I told Linda, 'Linda, I hope you do a great job in putting yourself out of a job.' I want her to put herself out of a job – Education Department.").

135.    In a post-election interview in 2024, the President expressed his view that "you can do a lot of things without Congress" to cut the size of the federal government.  Time Staff, *Full*

*Transcript of Donald Trump's 2024 Person of the Year Interview with Time*, Time (Dec. 12, 2024),
https://time.com/7201565/person-of-the-year-2024-donald-trump-transcript/ (last visited Dec. 2,
2025). The President further explained that he intended "[a] virtual closure of the Department of
Education in Washington." *Id.*

136.    The President's selection to lead the Department has been equally transparent about
her long-term goals for the Department. On March 3, 2025, shortly after being sworn in as the
Secretary of the Department, Secretary McMahon asked employees to join her in "perform[ing]
one final, unforgettable public service to future generations of students" by dismantling the
Department of Education. *Secretary McMahon: Our Department's Final Mission*, U.S. Dep't of
Educ. (Mar. 3, 2025), https://perma.cc/F7BT-MQ3D.

137.    Later that week, the Secretary confirmed that the President's and her goal was to
abolish the Department, noting in an interview:

| Ainsley Earhardt: | Do you know for sure he's [President Trump] definitely going to abolish the Department of Education? |
| McMahon: | He's been very clear about that. I mean he couldn't be any more clear when he said he wanted me to put myself out of a job…. |

*Secretary McMahon details Trump's push for school choice as he prepares to abolish Education
Department*, Fox News Channel, (Mar. 7, 2025),
https://www.foxnews.com/video/6369719995112 (last visited Jan. 9, 2026).

B.    The March 11, 2025 RIF Guts the Department

138.    On March 11, 2025, the Defendants' efforts to abolish the Department began in
earnest, with the announcement that the Department had taken steps to cut its workforce virtually
in half. *U.S. Department of Education Initiates Reduction in Force*, U.S. Dep't of Educ. (Mar. 11,
2025), https://perma.cc/DAS7-286X. The key element of the Department's widespread workforce

reduction was a massive RIF, which the Department described as a central component of its "final mission" impacting "[a]ll divisions within the Department."

       i.   *Arbitrary and Capricious Process of Identifying Personnel Impacted by the March Reduction in Force and Resulting Scope and Scale of the Reduction in Force and Accompanying Headcount Reductions.*

139.    Department officials began working to effectuate a large-scale RIF within weeks of President Trump's January 2025 inauguration.  On information and belief, the RIF was organized and designed by a small team of officials and proceeded without material input from the vast majority of senior career officials within the Department.

140.    In February 2025, the Department began an effort to identify statutory functions of Department employees.  On information and belief, the Department ultimately opted to terminate a large number of individuals, including those that performed statutorily mandated functions.

141.    By February 28, 2025, the Department had generated a list of individuals it anticipated terminating as part of its planned reduction in force.  The Department initially anticipated terminating 2,289 of the 4,133 individuals then employed by the Department.  On information and belief, these figures were in addition to—rather than including—individuals who would depart from the Department as a result of voluntary resignation programs offered by the Department.

142.    On March 11, 2025, the Department announced that, as a result of voluntary and involuntary departures, the Department's workforce would total "roughly" 2,183 workers—an implied headcount reduction of approximately 47%.  This total included 572 employees— approximately 14% of the Department—who had voluntarily resigned or retired from the Department at that time.  On information and belief, the Department has never compiled a "retention register" of individuals impacted by the March RIF.

143.    The March RIF devastated important segments of the Department of Education, rendering the agency unable to perform its core functions.

144.    Almost the entire staff of the Institute of Education Sciences was eliminated.

145.    All contracts for the Regional Educational Laboratories Program, a program required under the Education Sciences Reform Act and housed in the National Center for Education Evaluation, were cancelled in February, and all staff working on the program were subject to the March RIF.

146.    Similarly, the entire staff of the Management and Planning Division, responsible for statutorily required workforce planning and training within the Office of Postsecondary Education, was subject to the RIF. On information and belief, the work of this division is not being performed.

147.    The majority of staff in the OCR were eliminated or otherwise removed by the March RIF. Regional offices of the OCR in Boston, San Francisco, Cleveland, New York, Chicago, Dallas, and Philadelphia have been eliminated and closed, with employees terminated in each of those offices. Given that the RIF heavily impacted investigative staff, the cuts have already severely limited meaningful investigation of discrimination in schools.

148.    The Office of General Counsel was also gutted, with many divisions eliminated and approximately three-quarters of the Office of General Counsel's staff terminated. One such eliminated division, the Ethics Division, is responsible for counseling current and past Department employees on ethics matters. The Office of General Counsel advised offices and units across the Department and its effective gutting will negatively impact the Department's ability to perform statutory functions. All Office of General Counsel attorneys specializing in K–12 grants, IDEA

grants, and equity grants were terminated. The March RIF has also resulted in the termination of most Office of General Counsel attorneys focused on privacy issues.

149.    The March RIF had a material impact on the Office of Special Education and Rehabilitative Services, which serves as the principal adviser to the Secretary on Departmental matters related to special education and rehabilitative services. *See* 20 U.S.C. § 3417. In particular, the March RIF may hamstring OSERS' activities related to policy, program and strategic planning, regulations, evaluation, and grant activities.

150.    The RIF also effectively eliminated the Office of Elementary and Secondary Education's State and Grantee Relations Team, which partners with stakeholders and connects them to the resources and relationships they need to support and educate students nationally.

151.    The March RIF also seriously impacted FSA, which directs, coordinates, and recommends policies for programs that are designed to provide financial assistance to eligible students enrolled in postsecondary educational institutions. This assistance includes grants, loans, and work-study assistance to nearly 12.9 million students through approximately 6,100 postsecondary institutions.

152.    Given the impending challenges of students facing renewed payments following the pandemic, the Department employed contractors to help borrowers weather the resumed payments. Even prior to the RIF, it was reported on March 7 that "the agency hasn't been able to provide any communication to schools, servicers, or borrowers about how to navigate the changes that are coming." Kayla Tausche, *Dismantling of Education Department puts future of trillions of dollars in student loans in question*, CNN (Mar. 7, 2025), https://perma.cc/Y5DF-L2H9. "And many staffers with institutionalized knowledge about the aid programs have been fired or left." *Id.*

153.    In a public LinkedIn post, the Executive Director of the newly formed Office of

Loan Portfolio Management at FSA wrote:

> When I accepted the position two months ago, I dove in, putting together a strategy for tackling the challenges that I knew would come with managing a group of 200 dedicated public servants and shepherding 43M borrowers back into our complex repayment environment after a long payment pause and on-ramp. But now, I have lost many of those 200 staff, with more to come. I spend my days justifying our existence, our dignity, and our mission. I try to keep the work going in spite of the impossible environment we find ourselves in. I'm afraid of what the coming days, weeks, months, years will bring not just for me and the Department, but for the borrowers we serve. I've dedicated my career to the work of supporting college affordability and a student aid system that supports our most vulnerable, and it is heartbreaking to see that dissolving before my eyes. I'm not sure what the future will bring, but as always, I'm here to fight, to work for the mission, to do the right thing.

Colleen Campbell, LinkedIn, https://perma.cc/2W7Q-XEF5.

154.    Within FSA, the March RIF resulted in the termination of many of the Department's

employees in the School Eligibility and Oversight Services Group, which is responsible for

administering a program of eligibility, certification, financial analysis, and oversight of schools

participating in Federal Student Aid programs. In order to receive FSA funds, schools must remain

compliant with Title IV requirements and submit to audits which confirm compliance. Department

employees responsible for Title IV oversight ensure compliance, process auditing results, and

release Title IV funding timely.  On information and belief, as a result of the severe cuts to FSA

staff, the Title IV certification and recertification process has been severely delayed, impacting

colleges' and universities' ability to budget and expand and threatening their financial viability.

155.    The RIF effectively eliminated FSA's Vendor Oversight Division, which oversees

and assists federal student loan servicers. The Vendor Oversight Division is responsible for

ensuring that loan servicers fulfill their contracts while meeting Department requirements. When

such requirements are not met, it is responsible for enforcing corrective action. For example, when

the Higher Education Loan Authority of the State of Missouri (MOHELA) failed to comply with

its contractual requirements after the return to repayment in August 2023, including mismanaging borrower accounts, the Department imposed a corrective action plan on MOHELA, which the Vendor Oversight Division is responsible for overseeing and defending. The Vendor Oversight Division also plays a key role in verifying compliance with the requirements of the Public Service Loan Forgiveness (PSLF) program and the Income-Based Repayment plan, before instructing federal loan servicers to discharge a student's debt under these programs.

156.    On information and belief, the March RIF eliminated key staff members in FSA's Product Management Group, including those responsible for the online income-driven repayment application, Direct Loan Consolidation application, and PSLF Help Tool, which enables borrowers to certify their qualifying employment for the PSLF Program.

157.    In sum, on information and belief, the March RIF so severely impaired the Department of Education that it could no longer properly function, and could not fully comply with its statutory requirements.

*ii.    Contemporaneous Statements of Department and Administration Officials*

158.    Departmental and Administration officials were clear that the March RIF represented the first concrete step towards abolishing the Department.  On March 11, 2025, for instance, Secretary McMahon stated, during an interview with Laura Ingraham of Fox News, that the workforce reductions were the first steps in dismantling the Department of Education:

Ingraham:    Now, is this the first step on the road to a total shutdown?

McMahon:    Yes, actually it is, because that was the President's mandate. His directive to me, clearly, is to shut down the Department of Education, which we know we'll have to work with Congress, you know, to get that accomplished. But what we did today was to take the first step of eliminating what I think is bureaucratic bloat.

*See Education secretary says department took first steps to eliminate 'bureaucratic bloat,'* Fox News Channel, (Mar. 11, 2025), https://perma.cc/R9D7-YMR8.

159.    Several days after the March RIF was announced, on March 20, 2025, Elon Musk, then the head of DOGE and a high-ranking advisor to the President, posted an image of President Trump gloating over a new grave for the "Departmen [*sic*] of Education" on the platform "X":



C.  March 20, 2025 Executive Order 14242 and Initial Transfer of Functions
Announcements

160.    Approximately a week after the March RIF, the President formalized his intent to

shutter the Department:  on March 20, 2025, the President signed Executive Order 14242, entitled

"Improving Education Outcomes by Empowering Parents, States, and Communities."  90 Fed.

Reg. 13679. The Executive Order states that "[t]he Secretary of Education shall, to the maximum

extent appropriate and permitted by law, take all necessary steps to facilitate the closure of the

Department of Education and return authority over education to the States and local communities

while ensuring the effective and uninterrupted delivery of services, programs, and benefits on

which Americans rely."  *Id.*

161.    The President then announced, on March 21, 2025, that he planned to transfer core

functions out of the Department and to other federal agencies.  As part of his announcement, the

President claimed that the U.S. Small Business Administration would "handle all of the

[Department's] student loan portfolio," which would be "coming out of the Department of

Education immediately."  Lexi Lonas Cochran, *Trump Says Student Loans Moving to SBA,

'Special Needs' to HHS*, The Hill (Mar. 21, 2025), https://perma.cc/SL3G-T5SZ.  The President

also announced that "special needs" and "nutrition programs" would be transferred to the U.S.

Department of Health and Human Services ("HHS").  *Id.*

D.  Chaos Ensues and the Department is Forced to Rescind Reductions in Force or
Re-Hire Hundreds of Impacted Employees

162.    The effects of the March RIF, the Executive Order, and the announced imminent

transfer of statutory functions were immediate and widespread.  Personnel impacted by the March

RIF—who were immediately blocked from external communications and who rapidly lost access

to Department files—went dark, leaving end users in the Plaintiff States and throughout the

44

country in disarray.  OCR investigations paused midstream, without any warning or notification to impacted parties.

163.    On March 12, 2025, the day after the RIF was announced, the Department's website for administering the distribution of federal funds (referred to as the "G6" system) became unavailable. G6 was the Department system used for managing federal funds, and allowed schools to request payments, adjust drawdowns, and return cash to the Department for many Title IV programs. On March 12, the website for the G6 system stated: "G6.ed.gov will no longer exist, G5.gov will be the correct URL. To access G5, external users should enter their G5 email ID and their G5 email password."

164.    When certain users then attempted to access the G5.gov system for the distribution of federal funds, the G5 website announced:

> ALERT: Due to severe staffing restraints, you can expect delays in connecting to a live help desk agent for assistance with G5. We recommend sending an email to obssed@servicenowservices.com with a summary of your issue or question. The next available agent during normal business hours will respond to your email in the order it was received.

165.    On March 12, 2025, a user of the G5 system from the Massachusetts Department of Elementary and Secondary Education attempted to access the G5 system in order to process a request for anticipated disbursements of federal funds.  The user was unable to access the G5 system for hours.

166.    Since the March RIF, the Department has repeatedly re-assigned remaining Department employees to positions for which they have limited or no prior experience.

167.    As it has become increasingly clear that the initial scale of the March RIF was untenable, the Department has been attempting to re-hire employees that it initially sought to terminate, effectively conceding that the RIF was arbitrary and capricious.

168.    Beginning in the late summer and early Fall of 2025, the Department began to post job listings for positions that had been eliminated by the March RIF.  In early September 2025, for instance, the Department posted openings for positions within the Institute of Education Sciences, which had been effectively eliminated by the March RIF.  Over the last few months, the Department has begun to hire more than 100 new employees and contractors to roles within FSA impacted by the March RIF.

169.    In late December 2025, the Department was again forced to admit that it had cut too deeply with its March RIF, asking hundreds of OCR employees—who had been on administrative leave since March 2025—to return to work amidst a rapidly ballooning backlog of OCR complaints, which had grown by approximately 5,000 in just the months following the March RIF.  *See* Zachary Schermele, *Education Dept. asks hundreds of fired employees to temporarily return*, USA Today (Dec. 6, 2025), https://perma.cc/G8WM-4H7V.

170.    On or around August 1, 2025, the Department terminated approximately 1,000 employees who had previously received RIF notices from the Department in connection with the March RIF.

171.    As of September 28, 2025, the Department employed approximately 2,447 employees.  *See* Linda McMahon, *U.S. Department of Education Contingency Plan for Lapse in Fiscal Year (FY) 2026 Appropriations*, U.S. Dep't of Educ. (Sept. 28, 2025), https://perma.cc/8UYC-DSUX.

   E.    The Government Shutdown, Ensuing RIFs, and 2025 Education Week Public Remarks

172.    On September 30, 2025, federal appropriations for FFY 2026 lapsed.  Ten days into the federal shutdown, on October 10, 2025, the Department announced another wide-ranging RIF (the "October RIF").

173.    The October RIF impacted 465 employees, including 137 OCR employees, 121 OSERS employees, 64 OPE employees, and 132 Office of Elementary and Secondary Education (OESE) employees.  *See* Decl. of J. Clay ¶ 8, *Am. Fed. Of Gov't Empl., et al. v. OMB et al.*, No. 3:25-cv-08302-SI (N.D. Cal. Oct. 17, 2025), ECF No. 62-6.  On information and belief, the proposed cuts to OSERS and OESE would have resulted in the elimination of more than half of the remaining employees in each office.

174.    Following the government shut down, Secretary McMahon and the Department continued to publicly announce their intentions regarding the Department.  In a November 13, 2025 post on X, for example, the official account of the Department wrote:  "Government shutdown is over, and we're baaackkkkk!  But let's be honest:  did you really miss us at all?"  U.S. Department of Education (@usedgov), X.com (Nov. 13, 2025, 8:00 AM), https://perma.cc/DQS3-JMPD.  The post was accompanied by a video montage of various members of the Kardashian family dancing.  *Id.*

175.    Four days later, Secretary McMahon posted on X, noting that she had furloughed 90% of the Department's staff during the federal shutdown and that "if 90% of an agency supposedly governing education can disappear for weeks without disrupting education . . . do we really need it at all?"  Linda McMahon (@EDSecMcMahon) X.com (Nov. 17, 2025, 5:53 PM), https://perma.cc/39Q8-UNDV.

176.    The same day, the President issued his Presidential Message on American Education Week, writing that "[b]y dismantling the Department of Education, my Administration has returned control of education to where it belongs—the States, local communities, and parents who are best equipped to meet the needs of their students."  White House, *Presidential Message on American Education Week* (Nov. 17, 2025), https://perma.cc/6GCK-LVCE.

F.   The Department Discloses "Partnerships" Aimed at Transferring Statutorily-
Mandated Functions Out of Department

177.   Consistent with the President's March 2025 comments suggesting that the
Department anticipated transferring functions out of the Department, the Department disclosed in
the summer of 2025—in response to Orders from this Court—that it had begun to initiate such
transfers.

178.   These partnerships, memorialized in Inter-Agency Agreements ("IAAs") and
Memoranda of Understanding ("MOUs"), effectively transfer funds and functions from the
Department to other agencies within the federal government. On information and belief, these
partnerships transfer these functions with no consideration for whether the agencies to whom these
functions are delegated have the capacity or historical knowledge to perform these tasks.  On
information and belief, the Defendants did not consider how inefficiencies resulting from these
partnerships would impact Plaintiff States, schools, and municipalities who continue to reply upon
the Department for essential funding and guidance.

179.   On November 18, 2025, the Department announced a significant expansion of its
efforts to formally transfer statutory Department functions to other federal agencies, announcing
the creation of six additional "partnerships" between the Department, the Department of Labor,
the Department of the Interior, the Department of Health and Human Services, and the State
Department.  *See* Press Release, U.S. Dep't of Education, U.S. Department of Education
Announces Six New Agency Partnerships to Break Up Federal Bureaucracy (Nov. 18, 2025),
https://perma.cc/YWB3-96QU.

180.   While the partnerships were announced by the Department on November 18, 2025,
the corresponding IAAs were executed nearly a month and a half earlier, on September 30, 2025,
the day before the government shutdown began.

181.    Secretary McMahon described the partnerships as "bold action" and part of the Department's "final mission" to "break up the federal education bureaucracy and return education to the states." Meckler, Laura and Douglas-Gabriel, Danielle, *Trump administration announces dismantling of parts of Education Dept.*, Wash. Post (Nov. 18, 2025), https://perma.cc/CLH2-AS6N.

182.    In aggregate, the impact of these IAAs is staggering.  In FFY 2024, the Department made approximately $92.3 billion in awards.[1]  Of that amount, approximately $70.1 billion— 76%—was awarded by one of four Department offices: OPE, OESE, OCTAE, and OELA.  *Id.* The figures for FFY 2025 are almost identical—those four offices accounted for approximately 77% of total awards by the Department. *Id.*  Similarly, of the roughly $54.3 billion in total grants awarded in FFY 2024, these four offices were responsible for about $34.8 billion, or roughly 64.2% of funding.  *Id.*  For FFY 2025, these four offices accounted for about $31.9 billion of the total $51.4 billion in grant funding for the department—roughly 62% of the total.  *Id.*  Under the terms of the IAAs, most of the grant-making functionality of each of these offices has now been moved to a different agency, with the vast majority of functionality and grant programming going to the Department of Labor.

183.    As a result, after the IAAs are fully implemented, the Department of Labor will manage and distribute substantially more total dollars of award and grant money for Congressionally-mandated Department of Education programs than the Department of Education itself.

---

[1] *See USAspending.gov*, Department of Education (ED), https://perma.cc/57SP-MYJG (last visited Dec. 4, 2025).

184.    Moreover, the funding being transferred to the Department of Labor via the IAAs dwarfs the total awards and grants that the Department of Labor has traditionally distributed.  For FFY 25, the Department of Labor made approximately $11.5 billion in awards and about $9.8 billion in grants.[2]  In FFY 2024, the Department of Labor made approximately $10.6 billion in awards and about $8.4 billion in grants.  *Id.*  The IAAs will thus result in the Department of Labor distributing substantially more grants and awards for education programming than grants and awards for labor programming.

185.    Secretary McMahon continues to reiterate her intent to close the Department by entering into these IAAs.  In a recent interview on Fox News, Secretary McMahon explained:

KUDLOW:    Is the goal still to eliminate the Department of Education?

MCMAHON: . . . The goal with the President is to get rid of the bureaucracy in Education and we clearly want to take programs that are now part of the Department of Education and put them, I think, into other agencies where they, they will flourish, and where it makes sense to put them.  The inter-agency agreement that we signed with the Labor Department is, uh, is one example. . . . You do the inter-agency agreement.  We detail people from the Department of Education, so we have about 12 that are over there now, with a manager from the Department of Education.  It comes out of the Department of Education's budget, we manage it, we oversee the people who are there, then we integrate with the people at the Labor Department, and they are learning as well, so it--it operates a bit like a merger. . . ."

\*       \*       \*

KUDLOW:    Is it conceivable that you will be able to transfer enough of these grants to other agencies that we can close down the Department of Education for good?

MCMAHON: To close down this building and the Department of Education—yes, that, that is the goal.  But we're—we are returning education to the states.  Now the funding will still—Title I funding will still flow—IDEA funding will still flow.  It'll just flow through a different agency—like it did before there was a Department of Education.  Both of those programs were in effect before there was a Department of Education.

---

[2] *USAspending.gov*, Department of Labor (DOL), https://perma.cc/5K6L-V5YJ.

Larry Kudlow, *The goal is to eliminate 'bureaucracy in education,' says Linda McMahon*, Fox News (Dec. 2, 2025), https://perma.cc/6Z6F-UM4T.

186.    To date, 8 IAAs and MOUs have been memorialized.  On information and belief, the Department continues to prepare and consider other IAAs and MOUs to transfer Department functions that have yet to be formalized.

187.    The goal of these partnerships is to effectuate President Trump's and Secretary McMahon's intent of shuttering the Department by vacating the Department of staff, functions, and funds.

188.    Examples of these IAAs include the following:

*i. OCTAE "Partnership" with the Department of Labor*

189.    In late May 2025, the Department entered into an IAA with the Department of Labor, to transfer core functions out of OCTAE into the Department of Labor.  Doc. No. 147-1 at 8, 15.  Under the terms of the OCTAE-DOL IAA, the Department of Labor agreed to administer state formula grants and discretionary programs authorized through the Perkins Act, and discretionary grants, cooperative agreements, and contracts for national activities funded through the Perkins Act and WIOA Title II programs, among other things. The Department of Labor also agreed to implement programs and other initiatives that have historically resided with the Department and which have been directly assigned to the Department by Congress.

190.    Under the terms of the IAA, the Department retains unspecified "management and leadership" obligations over programs formerly managed by OCTAE. On information and belief, the majority of OCTAE employees have been detailed to the Department of Labor for the foreseeable future.  As a result of the OCTAE-DOL IAA, the majority of OCTAE's functional statutory obligations will now be performed by the Department of Labor.

191.    The IAA directly conflicts with Congress's mandate—expressed in the Perkins Act and other legislation—that the Department (and not the Department of Labor) manage the day-to-day operation of these vital funding programs.  *See*, *e.g.*, 20 U.S.C. §§ 2321, 2324, 2342.

192.    The transfer of functionality from the Department to the Department of Labor has been plagued by technical problems, communications lapses, and bureaucratic hurdles, resulting in serious delays of funding preventing States from accessing funds.  *See, e.g.,* Juan Perez, Jr., *The Education Department gave another agency power to distribute its money.  It hasn't gone well*, Politico (Nov. 24, 2025),  https://www.politico.com/news/2025/11/24/the-education-department-gave-another-agency-power-to-distribute-money-it-hasnt-gone-smoothly-00663976  (last visited Jan. 9, 2026).

193.    According to public reporting, the Department conducted an internal after-action report associated with the transfer of OCTAE functions to the Department of Labor, which highlighted the significant difficulty the Department had experienced in transferring that functionality.  *See* Eric Katz, *Trump admin acknowledges difficulties in transferring Education programs to other agencies, internal documents show*, Gov't Executive (Nov. 20, 2025), https://perma.cc/RN5L-WLAT. This after-action report noted that "[t]he size and scope of OCTAE's programs are miniscule . . . compared to other [Education Principal Operating Components] and programs," and "[l]arger formula grants and competitive grants are going to be much more difficult to migrate." *Id.*

### ii.   MOU with the Department of the Treasury

194.    In early April 2025, the Department detailed nearly a dozen senior employees within FSA (including FSA's Deputy Chief Operating Officer) to the Treasury Department via an MOU. Doc. No. 147-1 at 16-21. On information and belief, the MOU was executed as part of the

Department's efforts to move FSA's student loan portfolio—valued at approximately $1.6 trillion—to the Treasury Department.

iii.   *Elementary and Secondary Education Partnership*

195.    In November 2025, the Department announced that it would move the Office of Elementary and Secondary Education—a core component of the Department of Education whose function pre-dates the creation of the Department and originated in the Elementary and Secondary Education Act of 1965—to the Department of Labor.

196.    According to a "Fact Sheet" accompanying this IAA, "this partnership is consistent with Executive Order No. 14242," the Executive Order wherein President Trump announced his intent to close the Department. *Fact Sheet: Department of Education (ED) and Department of Labor (DOL) Elementary and Secondary Education Partnership*, U.S. Dep't of Educ. (Nov. 18, 2025), https://perma.cc/26LC-QL7S.

197.    The IAA effectively transfers day-to-day operation of OESE functions to the Department of Labor, including administration of crucial formula grant programs on which the Plaintiff States rely for a significant portion of their state education budgets.

198.    Under the terms of the IAA, the Department of Labor or agrees to take on no less than 42 tasks, most of which have historically been managed by OESE or other Departmental offices.  These include providing services—including technical assistance to the Plaintiff States—for formula grant programs which in aggregate represent tens of billions of dollars in aid to the Plaintiff States.

199.    The IAA also shifts the day-to-day operations—including administration, grant selection, and other functions—of numerous competitive grant programs to the Department of Labor.  Per the IAA, for instance, the Department will shift a significant amount of its Congressionally-appropriated funding to the Department of Labor, which will be responsible for

administering the formula grant programs described above, and the Department of Labor—not the Department of Education—will "make new awards and administer such grants" as identified in the IAA for the duration of the IAA.

200.    The IAA directly conflicts with Congress's mandate—expressed in the Department of Education Organization Act and elsewhere—that these crucial functions be performed by the Department, not by the Department of Labor. *See e.g.*, 20 U.S.C. §§ 3414, 6301 *et seq.*, 7871; *see also* Tit. 42, Ch. 119, Subchapter VI, Part B ("Education for Homeless Children & Youths"); 34 C.F.R. Subtitle B, Ch. II ("Office of Elementary and Secondary Education, Department of Education").

#### iv.  Postsecondary Education Partnership

201.    Pursuant to another IAA, announced in November 2025,  the Department of Labor will assume most of the functions of the Office of Postsecondary Education to the Employment and Training Administration within the Department of Labor.

202.    Per a "Fact Sheet" accompanying this IAA, the partnership is "in accordance with Executive Order No. 14242"—again, the very Executive Order in which President Trump announced his intent to close the Department. *Fact Sheet: Department of Education (ED) and Department of Labor (DOL) Postsecondary Education Partnership*, U.S. Dep't of Education (Nov. 18,  2025),  fact-sheet-department-of-education-ed-and-department-of-labor-dol-postsecondary-education-partnership-112464.pdf (last visited Jan. 9, 2026). As a result of the IAA, core functions of the Department—which Congress has mandated be performed by the Department and for which Congress has appropriated funding to the Department—will be performed by the Department of Labor.  The Department of Labor will take over the day-to-day operations of programs authorized under the Higher Education Act that in aggregate represent billions of dollars in aid. Among many others,  these  programs  include  the  Federal  TRIO  programs  (including  the  Upward  Bound

programs, the Talent Search program, the Ronald E. McNair Postbaccalaureate Achievement Program, the Student Support Services program, and the Education Opportunities Centers program), Gaining Early Awareness and Readiness for Undergraduate Programs (GEAR UP), and Graduate Assistance in Areas of National Need.

203.    The Department of Labor has agreed to take over management and monitoring of these grant programs, including conducting compliance monitoring visits and monitoring grantee drawdowns of funds, and will be responsible for making and administering new grants and providing technical assistance.

204.    The IAA directly conflicts with Congress's mandate—expressed in the Department of Education Organization Act and elsewhere—that these crucial functions be performed by the Department, not by the Department of Labor.  *See e.g.*, 20 U.S.C. §§ 1070(b), 3415.

*v.  Indian Education Partnership*

205.    Similarly, the Department and the Department of the Interior have entered into an IAA to transfer core Departmental educational programs supporting Native American, Alaska Native, and Native Hawaiian students and communities to the Department of the Interior.  This IAA was also justified by Executive Order 14242.

206.    Many of the programs implicated by this IAA were administered by the Department's Office of Indian Education (OIE), which is statutorily required to be housed within OESE. 20 U.S.C. §3423c. The OIE administers the Indian Education Program of ESEA, as amended by ESSA (Title VI, Part A), which establishes policies and provides financial and technical assistance for supporting local and state education agencies, American Indian Tribes and organizations, post-secondary institutions and other entities in meeting the educational and

academic needs of American Indians and Alaska Natives. 20 U.S.C. §§ 3423c; 7401 *et seq.*[3] The IAA thus violates Congress's mandate that these programs reside in the Department.

207.    Much of OIE's responsibilities must, by statute, be fulfilled by the Department. For example, the ESEA and ESSA gave the Secretary of Education authority to administer Indian Education Formula Grants,[4] which have been administered by the OIE and are provided to local educational agencies, schools, and tribes, *see* 20 U.S.C. § 7422, with review by state education agencies, *see id.* § 7429.

208.    The day-to-day operations and management of the impacted programs will move to an agency with limited or no experience managing grant programs of the type being transferred.

### vi.    *International Education and Foreign Language Studies Partnership*

209.    The Department has also moved crucial support for foreign language education in higher education to the Department of State.  This IAA will improperly move day-to-day operations of dozens of programs governed by the Higher Education Act of 1965 and the Mutual Educational and Cultural Exchange Act out of the Department.

### vii.    *Child Care Access Means Parents in School Partnership*

210.    The Department and HHS have entered into an IAA that will result in the movement of the Child Care Access Means Parents in School (CCAMPIS) program from the Department to the Department of Health and Human Services.  That program, previously managed by OPE, supports grants to colleges and universities for parents funded under Section 419N of the Higher Education Act.

---

[3] "Office of Indian Education," U.S. Dep't of Educ., https://perma.cc/SM5B-YUUK.
[4] *Id.*

*viii.   Foreign Medical Accreditation Partnership*

211.    The Department of Health and Human Services and the Department have also entered into an IAA relating to foreign medical school accreditation.  Federal law established an advisory panel of medical experts to assist in the analysis of foreign medical schools, the National Committee on Foreign Medical Education and Accreditation (NCFMEA).  While public details about this IAA are somewhat limited, the IAA appears to call for closer coordination between the Department and HHS on the operations of the NCFMEA.

## IV.    The Department's Unlawful Dismantling Efforts Have Caused Widespread Harm to the Plaintiff States

212.    Plaintiff States's state education agencies (SEAs) and institutes of higher education have experienced significant delays in receiving information, guidance, and technical assistance from the Department.

213.    For example, staff at state universities can no longer speak with someone at the Department when they encounter technical difficulties, and are now directed to the Department's email ticketing system. Routine inquiries that used to be resolved quickly can now take over a month to be resolved, and require additional follow-up by university staff.

214.    Many of the Department's replies indicate that they now lack knowledge about how their systems and processes operate. These delays and additional required follow-up divert university staff away from other services and hinder their ability to promptly respond to student inquiries and other issues.

215.    Not only are Plaintiff States experiencing delays in receiving information and technical assistance, but they are also receiving incorrect information. Plaintiff state universities' report that the FAFSA call center has been giving out incorrect information to students and families. One state student assistance agency noticed that, in some cases, there was a discrepancy

between the FAFSA submission date provided to students and the submission date provided to the agency, which led to difficulties processing FAFSA submissions. The Department has also posted inaccurate data on the National Student Loan Data Systems website.

216.    Personnel cuts to FSA have also impacted the Department's certification and re-certification process for Title IV funding.  As a result of personnel cuts, state universities' certification and recertification processes have been significantly delayed, resulting in, among other things, cancellation of planned programming.

217.    SEAs have been unable to access Department resources that they previously relied on. For example, the Department took down the website "results.ed.gov," which contained a repository of trainings, guidance, sample forms, applicable legislation, regulation, and other pertinent resources. While the Department claims that the materials have been transferred to the main Department website, SEAs have been unable to locate all of them.  More generally, SEAs have seen widespread diminution in Department technical assistance, impacting a wide range of state functions.  Communications with Department officials, which previously served as a vital source of information to SEAs and state education stakeholders, have been reduced dramatically.

218.    The Department also removed resources related to LGBTQ+ students' rights and anti-harassment policies, which SEAs relied on to effectively respond to inquiries from parents, students, and districts.

219.    SEAs have also experienced increased demands on their services because of the diminished capacity of OCR. Since OCR stopped investigating complaints about the administration of plans developed under Section 504 of the Rehabilitation Act, Illinois' SEA's Special Education Division has fielded an estimated 15% more calls with questions about where to file these types of complaints.  Illinois' experience has been widespread across the country, with

many state civil rights institutions experiencing significantly increased demand following the OCR regional office closures in March 2025.

220.    Finally, the Department's various dismantling efforts have caused significant delays and disruptions to federal funding for state entities.  Transition of Perkins Act funding to the Department of Labor, for instance, has created significant challenges to SEAs, and disrupting access to that funding.

**CAUSES OF ACTION**

**COUNT I**
**Violation of the Administrative Procedure Act – Contrary to Law**
**(Against Agency Defendants)**

221.    The Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

222.    The Agency Defendants are "agenc[ies]" within the meaning of the Administrative Procedures Act ("APA").  *See* 5 U.S.C. § 551(1).

223.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(B)–(C).

224.    Congress enacted the APA "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *U.S. v. Morton Salt*, 338 U.S. 632, 644 (1950)). In *Loper Bright*, the Supreme Court clarified that historical principles of "respect" did not equate to deference, and that "Section 706 makes clear that agency interpretations of statutes—like agency interpretations of the Constitution—are *not* entitled to deference." *Id.* at

392 (emphasis in original). Rather, it "remains the responsibility of the court to decide whether the law means what the agency says." *Id.* (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 109 (2015) (Scalia, J., concurring in judgment)).

225.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority.

226.    No constitutional or statutory authority authorizes the Department of Education to refrain from fulfilling its statutory duties, or to violate federal law.

227.    An agency likewise may not violate its own regulations. When a federal agency promulgates "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). "It is an abecedarian principle of administrative law that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015) (citation omitted). An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures, particularly if that error prejudices the interest of a person before the agency. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545–46 (6th Cir. 2004).

228.    The Agency Defendants lack authority to dismantle the Department as such action is not authorized by statute, and is in direct contravention of statutory authority governing the creation and operation of the Department of Education. The Agency Defendants also lack authority to override the limitations on their own power to dismantle statutorily-mandated agency functions. These agency actions are unauthorized, unprecedented, and not entitled to deference by this Court.

229.    In taking actions to dismantle the Department (for example, through widespread RIFs), the Agency Defendants have acted contrary to the applicable regulations governing the administration of Department functions.

230.    The RIFs, the IAAs, the MOU, and other actions taken by the Department in furtherance of Executive Order 14242 are each final agency actions.  First, the Department implemented a large-scale reduction in force, resulting in the termination or forced departure of approximately half of the Department's workforce.  Second, the Department entered into agreements with other agencies to transfer core functions that Congress has expressly assigned to the Department to other federal agencies.  These actions injure Plaintiffs, because (among other things), they will deny Plaintiffs access to statutorily required resources and services, interfere with and delay the Plaintiffs' access to vital streams of federal funding, force the Plaintiffs to shoulder an increased load in enforcement of civil rights laws in educational settings, and prevent Plaintiffs from expanding and strengthening the offerings of state institutes of higher education.

231.    Because these actions are outside of the Department's authority under the Department of Education Organization Act and other acts of Congress, and are thus contrary to the Department's statutory obligations, they violate the APA.

232.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Defendants lack legal authority to dismantle the Department, contrary to congressional directive and intent, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

233.    Plaintiff States are also entitled to vacatur of the Department of Education's dismantling, and a permanent injunction preventing the Agency Defendants from dismantling of the Department, including through further RIFs and through further execution of IAAs and MOUs transferring statutorily-mandated functions and funds delegated to the Department to other parts of the federal government.

## COUNT II
### Violation of the Administrative Procedure Act –
### Arbitrary & Capricious and an Abuse of Discretion
### (Against Agency Defendants)

234.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

235.    Defendants include "agenc[ies]" under the APA, 5 U.S.C. § 551(1).

236.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

237.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

238.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

239.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspect[s] of the problem" before it. *DHS v. Regents of the Univ. of Calif.*, 591 U.S. 1, 25 (2020) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

240.    The dismantling of the Department is arbitrary and capricious because the Department provided no reasoned basis or explanation for its actions.  For example, on information

and belief, the Agency Defendants disregarded internal analysis indicating that the March RIF would result in the termination of employees necessary for the performance of the Department's functions.

241.     The dismantling of the Department is arbitrary and capricious because the Agency Defendants failed to consider the consequences of their actions.

242.     The Department's RIFs and execution of IAAs and MOUs are arbitrary and capricious because the Agency Defendants' actions impede their ability to perform the Department's functions, both those that are required by statute and those that are not.

243.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that Agency Defendants' actions dismantling the Department, including by implementing RIFs and transferring statutorily-mandated functions and funds delegated to the Department to other agencies of the United States, violate the APA because they are arbitrary and capricious.

244.     Plaintiff States are also entitled to vacatur of the Defendants' actions dismantling the Department pursuant to 5 U.S.C. § 706, and a permanent injunction preventing the Defendants from preventing the Defendants from further dismantling the Department through implementation of RIFs or execution of further MOUs or IAAs transferring statutorily-mandated functions and funds delegated to the Department to other agencies of the United States.

245.     Plaintiff States are further entitled to a permanent injunction requiring the Defendants to maintain sufficient personnel to fulfill all of the Department's Congressionally-mandated functions, as well as other key functions previously undertaken by the Department.

## COUNT III
### Violation of the Separation of Powers Doctrine – Usurping Legislative Authority
### (Against All Defendants)

246. The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

247. Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const., Art. I, Sec. 1.

248. "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC*, 591 U.S. at 223 (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350).

249. Thus, "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) (quoting *Wayman*, 23 U.S. at 42-43).

250. The separation of powers doctrine thus represents a central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637–38 (2024); *Seila Law LLC*, 591 U.S. at 227.

251. Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

252. Any instance where the President, by Executive Order or otherwise, directs an agency to take an action that runs afoul of a statute or the legislative intent of Congress, violates the Separation of Powers doctrine.

253.    Any instance where the President, by Executive Order or otherwise, directs that an agency authorized by Congress to perform statutory duties cease operations, effectively repeals the statutes that authorize that agency and thus violates the Separation of Powers doctrine.

254.    Here, where Congress has created the Department of Education, the Executive and his agencies cannot incapacitate it, absent Congressional action that directs them to do so. The actions challenged herein thus violate Constitutional and statutory mandates, contravene Congressional intent, and are unlawful.

255.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579.

256.    Pursuant to 28 U.S.C. § 2201, the States are also entitled to a declaration that the RIFs violate the constitutional separation of powers doctrine, and impermissibly arrogate to the executive power that is reserved to Congress.

257.    Plaintiff States are further entitled to a permanent injunction requiring the Defendants to maintain sufficient personnel to fulfill all of the Department's Congressionally-mandated functions, as well as other key functions previously undertaken by the Department.

### COUNT IV
### Violation of the Separation of Powers Doctrine – Take Care Clause
### (Against All Defendants)

258.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

259.    The Take Care Clause provides that the executive must "take Care that the Laws be faithfully executed . . . ." U.S. Const. Art. II, Sec. 3; *UARG v. EPA*, 573 U.S. 302, 327 (2014)

("Under our system of government, Congress makes the laws and the President . . . faithfully executes them." (quotation and citation omitted)).

260.    The Executive violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set aside congressional legislation by executive order . . . ."); *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838) (rejecting argument that by charging the President with faithful execution of the laws, the Take Care clause "implies a power to forbid their execution").

261.    By seeking to dismantle an agency authorized by Congress, the President has failed to faithfully execute the laws enacted by Congress in violation of the Take Care Clause.

262.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co.*, 103 F. Supp. at 576, *aff'd*, 343 U.S. 579.

263.    Pursuant to 28 U.S.C. § 2201, the Plaintiff States are also entitled to a declaration that the RIFs and transfers of statutorily-mandated functions and funds delegated to the Department to other cabinets of the United States violate the constitutional separation of powers doctrine, and impermissibly arrogate to the executive power that is reserved to Congress.

264.    Plaintiff States are further entitled to a permanent injunction requiring the Defendants to maintain sufficient personnel to fulfill all of the Department's Congressionally-mandated functions, as well as other key functions previously undertaken by the Department.

## COUNT V
### *Ultra Vires* – Conduct Outside the Scope of
### Statutory Authority Conferred on the Executive
### (Against All Defendants)

265.    The States reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

266.    Neither the President nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

267.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

268.    Defendants' conduct in implementing the RIFs and transferring statutorily-mandated functions and funds delegated to the Department to other cabinets of the United States is contrary to law and outside of Defendants' authority.

269.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the RIFs and transfer of statutorily-mandated functions and funds delegated to the Department to other cabinets of the United States are contrary to law and outside of Defendants' authority.

270.    Plaintiff States are further entitled to a permanent injunction preventing the Agency Defendants from further dismantling of the Department through implementation of RIFs or execution of further MOUs or IAAs transferring statutorily-mandated functions and funds delegated to the Department to other cabinets of the United States.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court will grant the following relief:

a.   Issue a declaratory judgment that Executive Order 14242 directing the dismantling of the Department of Education is unlawful because it violates the U.S. Constitution;

b.   Issue a declaratory judgment that the RIFs, IAAs, MOUs, and other actions implementing Executive Order 14242 are unlawful because they violate the Constitution and the Administrative Procedure Act;

c.   Declare unlawful and set aside the RIFs, IAAs, and MOU as contrary to the U.S. Constitution under 5 U.S.C. § 706(2)(B), not in accordance with law under 5 U.S.C. § 706(2)(B), not in accordance with law under 5 U.S.C. § 706(2)(A), in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C), and arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A);

d.   Issue permanent relief against the Agency Defendants, barring Agency Defendants, their officers, employees, and agents from further implementing Executive Order 14242's directive to dismantle the Department;

e.   Order Agency Defendants to take actions sufficient to carry out all functions of the Department that have not been terminated or removed from the Department by Congress, including restoring sufficient staffing to carry out those functions and returning Department functions that have been transferred to other agencies;

f.   Award the Plaintiffs reasonable attorney's fees and costs; and

g.   Any other further relief that the Court deems fit and proper.

Dated: January 9, 2026                    Respectfully submitted,

                                          *Counsel for the States*


[Signature Blocks to Follow on Subsequent Pages]

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth
of Massachusetts

By: */s/ Michelle Pascucci*
Katherine Dirks (BBO No. 673674)
Chief State Trial Counsel
Michelle Pascucci (BBO No. 690899)
State Trial Counsel
Yael Shavit (BBO No. 695333)
Chief, Consumer Protection Division
Anna Lumelsky (BBO No. 677708)
Deputy State Solicitor
Elizabeth Carnes Flynn (BBO No. 687708)
Nathaniel Hyman (BBO No. 698506)
Arjun Jaikumar (BBO No. 691311)
Assistant Attorneys General
1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov
michelle.pascucci@mass.gov
yael.shavit@mass.gov
anna.lumelsky@mass.gov
elizabeth.carnes-flynn@mass.gov
nathaniel.j.hyman@mass.gov
arjun.k.jaikumar@mass.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
Solicitor General
Ewan C. Rayner*
Caitlyn B. Carpenter*
Deputy Solicitors General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov
ewan.rayner@hawaii.gov
caitlyn.b.carpenter@hawaii.gov

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Molly Thomas-Jensen*
Special Counsel
Gina Bull*
Assistant Attorney General
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
molly.thomas-jensen@ag.ny.gov
gina.bull@ag.ny.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Lucia Choi*
Lucia J. Choi*
Deputy Attorney General
Michael L. Newman*
Senior Assistant Attorney General
Srividya Panchalam*
James E. Stanley*
Supervising Deputy Attorneys General
Natasha A. Reyes*
Francisco V. Balderrama*
Deputy Attorneys General
California Attorney General's Office
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6364
Lucia.Choi@doj.ca.gov
Michael.Newman@doj.ca.gov
Srividya.Panchalam@doj.ca.gov
James.Stanley@doj.ca.gov
Natasha.Reyes@doj.ca.gov
Francisco.Balderrama@doj.ca.gov

**PHIL WEISER**
Attorney General for the State of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
Deputy Solicitor General
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov

**KATHLEEN JENNINGS**
Attorney General for the State of Delaware

By: /s/ *Ian R. Liston*
Ian R. Liston**
Director of Impact Litigation
Vanessa L. Kassab**
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
ian.liston@delaware.gov

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Clinten N. Garrett*
Clinten N. Garrett*
Senior Appellate Counsel
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Clinten.Garrett@azag.gov

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

By: */s/ Andrew Mendrala*
Andrew Mendrala*
Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 724-9726
Andrew.Mendrala@dc.gov


**AARON M. FREY**
Attorney General for the State of
Maine

By: */s/ Paul E. Suitter*
Paul E. Suitter
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
(207) 626-8800
paul.suitter@maine.gov


**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson**
Keith M. Jamieson*
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
(410) 576-6960
kjamieson@oag.maryland.gov


**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Patrick Ring*
Patrick Ring*
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808 5020
Patrick.ring@ct.gov


**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Karyn L. Bass Ehler*
Karyn L. Bass Ehler*
Assistant Chief Deputy Attorney General
Katharine P. Roberts*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(312) 814-4985
karyn.bassehler@ilag.gov
katharine.roberts@ilag.gov


**DANA NESSEL**
Attorney General for the People of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti*
Kathleen Halloran*
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
HalloranK1@michigan.gov

**KEITH ELLISON**
Attorney General for the State of
Minnesota

By: */s/ Liz Kramer*
Liz Kramer*
Solicitor General
445 Minnesota Street, Suite 1400
St. Paul, MN, 55101
(651) 757-1010
Liz.Kramer@ag.state.mn.us


**AARON D. FORD**
Attorney General for the State of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney
General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov


**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Elleanor H. Chin*
Elleanor H. Chin*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
elleanor.chin@doj.oregon.gov


**RAÚL TORREZ**
Attorney General of the State of New
Mexico

By: */s/ Olivia den Dulk*
Olivia den Dulk**
Assistant Attorney General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 270-4332
odendulk@nmdoj.gov


**MATTHEW J. PLATKIN**
Attorney General for the State of New Jersey

By: */s/ Jessica L. Palmer*
Jessica L. Palmer*
Amanda Morejon
*Deputy Attorney General*
25 Market Street
Trenton, NJ 08625-0093
(609) 696-4607
Jessica.Palmer@law.njoag.gov


**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: */s/ Kathryn T. Gradowski*
Kathryn T. Gradowski*
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2810
kgradowski@riag.ri.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jonathan T. Rose*
Jonathan T. Rose*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 793-1646
Jonathan.rose@vermont.gov


**JOSHUA L. KAUL**
Attorney General for the State of
Wisconsin

By: */s/ Charlotte Gibson*
Charlotte Gibson**
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 957-5218
gibsoncj@doj.state.wi.us


*Admitted *Pro Hac Vice*
** Motion for *Pro Hac Vice* pending or
forthcoming

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s/ Spencer W. Coates*
Spencer W. Coates*
Assistant Attorney General
Cristina Sepe*
Deputy Solicitor General
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
spencer.coates@atg.wa.gov
cristina.sepe@atg.wa.gov

## **CERTIFICATE OF SERVICE**

I certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing (NEF).

*/s/ Nathaniel Hyman*
Nathaniel Hyman